otherwise, or in consequence of foreclosures, attachments, levies or executions (other than by Lessor and those claiming from, through or under Lessor) is assumed by Lessee and, in the absence of the negligence, willful misconduct or default in the performance of its obligations pursuant to Section 16, Lessor shall in no event be answerable or accountable therefor nor shall any of the events mentioned in this Section entitle Lessee to any abatement of Rent except as specifically provided in this Lease.

## ARTICLE 21

### INDEMNIFICATION

21.1  Notwithstanding the existence of any insurance provided for in Article 13, and without regard to the policy limits of any such insurance, Lessee will protect, indemnify, save harmless and defend Lessor from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses), to the extent permitted by law, imposed upon or incurred by or asserted against Lessor by reason of: (a) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Leased Property or adjoining sidewalks, including without limitation any claims of malpractice, (b) any use, misuse, non-use, condition, maintenance or repair by Lessee of the Leased Property, (c) any Impositions (which are the obligations of Lessee to pay pursuant to the applicable provisions of this Lease), (d) any failure on the part of Lessee to perform or comply with any of the terms of this Lease, (e) the nonperformance of any of the terms and provisions of any and all existing and future subleases of the Leased Property to be performed by the landlord (Lessee) thereunder and (f) any presence, storage, release or removal of Hazardous Substances from or on the Leased Property related to activities on the Leased Property which is in violation of any law, ordinance, regulation, rule or order of local, state or federal authorities. Any amounts which become payable by Lessee under this Section shall be paid within ten (10) days after liability therefor on the part of Lessor is determined by litigation or otherwise, and if not timely paid, shall bear a late charge (to the extent permitted by law) at the Overdue Rate from the date of such determination to the date of Payment. Lessee, at its expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against Lessor or may compromise or otherwise dispose of the same as Lessee sees fit. Nothing herein shall be construed as indemnifying Lessor against its own gross negligence or willful misconduct or a default of Lessor in its performance of its obligations hereunder.

Lessor shall indemnify, save harmless and defend Lessee from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including attorneys' fees and expenses) imposed upon or incurred by or asserted against Lessee as a result of the gross negligence or willful misconduct of Lessor.

Lessee's or Lessor's liability for a breach of the provisions of this Article arising during the Term hereof shall survive any termination of this Lease.

## ARTICLE 22

## SUBLETTING AND ASSIGNMENT

22.1   **Subletting and Assignment.**  Lessee may not, without the prior written consent of Lessor, which consent shall be at Lessor's sole discretion, assign this Lease or sublet all or any part of the Leased Property. For purposes of this Section 22.1, the term "assign" shall be deemed to include any one or more sales, pledges or other transfers hereafter of an aggregate of twenty-five percent (25%) or more of the capital stock of any class of Lessee or of Guarantor, or of any such sales, pledges or other transfers of the capital, assets or income interest in Lessee or Guarantor, and such sale, pledge, or other transfer results in a change in the day-to-day management and administration of the Facility. The term "assign" shall not be deemed to include any public offering of Guarantor's stock.

22.2   **Attornment.**  Lessee shall insert in each sublease permitted under Section 22.1, provisions to the effect that (a) such sublease is subject and subordinate to all of the terms and provisions of this Lease and to the rights of Lessor hereunder, (b) in the event this Lease shall terminate before the expiration of such sublease, the sublessee thereunder will, at Lessor's option, attorn to Lessor and waive any right the sublessee may have to terminate the sublease or to surrender possession thereunder, as a result of the termination of this Lease and (c) in the event the sublessee receives a written notice from Lessor or Lessor's assignees, if any, stating that Lessee is in default under this Lease, the sublessee shall thereafter be obligated to pay all rentals accruing under said sublease directly to the party giving such notice or as such party may direct. All rentals received from the sublessee by Lessor or Lessor's assignees, if any, as the case may be, shall be credited against the amounts owing by Lessee under this Lease.

-47-

## ARTICLE 23

### OFFICER'S CERTIFICATES; FINANCIAL STATEMENTS AND ANNUAL BUDGETS.

23.1  Officer's Certificates.

At any time and from time to time upon Lessee's receipt of not less than twenty (20) days' prior written request by Lessor, Lessee will furnish to Lessor an Officer's Certificate certifying that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect as modified and setting forth the modifications) and the dates to which the Rent has been paid. Any such Officer's Certificate furnished pursuant to this Section shall be addressed to such prospective purchaser or mortgagee of the Leased Property as Lessor may request and may be relied upon by Lessor and any such prospective purchaser or mortgagee of the Leased Property.

23.2  Financial Statements.

Lessee will furnish and cause Guarantor to furnish the following statements to Lessor:

(i) within ninety (90) days after the end of each of Lessee's fiscal years, a copy of the Consolidated Financials for the preceding fiscal year certified by an independent certified public accountant and an Officer's Certificate stating that to the best of the signer's knowledge and belief after making due inquiry, Lessee is not in default in the performance or observance of any of the terms of this Lease or, if Lessee shall be in default to its knowledge, specifying all such defaults, the nature thereof and the steps being taken to remedy the same;

(ii) witin twenty (20) days after the end of each calendar month during the Term, Lessee shall deliver to Lessor a statement certified as correct by Lessee's chief financial officer, which statement shall set forth Gross Revenues of the Facility for the immediately preceding month, the Additional Rent calculation for each month, and an income and expense report for the Facility which shall include operating statements and occupancy statistics;

(iii) within twenty (20) days after the end of each of Lessee's fiscal quarters, Lessee shall provide Lessor with Consolidated Financial Statements for Lessee certified as correct by Lessee's chief financial officer;

-48-

  (iv) with reasonable promptness, such other information respecting the financial condition and affairs of Lessee as Lessor may reasonably request from time to time; and

  (v) Consolidated Financial Statements of Guarantor certified by the chief financial officer of Guarantor within forty-five (45) days after each Fiscal Quarter (and within ninety (90) days after a final quarter in any Fiscal Year).

23.3 <u>Licensing Information</u>. Lessee shall promptly furnish to Lessor complete copies of all surveys, examinations, inspections, compliance certificates and other similar reports of any kind issued to Lessee by any governmental agencies or authority having jurisdiction over the licensing of the operation of the Facility.

23.4 <u>Annual Budgets</u>. Lessor, in its sole discretion, shall from time to time have the right to review Lessee's proposed annual budgets with respect to the Facility. Lessor shall have the right to reasonably object to any line items in such budget and in such case Lessee shall resolve Lessor's objection within sixty (60) days after notice of such objection or Lessee shall be deemed in default under this Lease.

### ARTICLE 24

### INSPECTION

24.1 Lessee shall permit Lessor and its authorized representatives to inspect the Leased Property and to make any on-site surveys including soil testing, structural testing, etc. during usual business hours subject to any security, health, safety or confidentiality requirements of Lessee, any governmental agency, any Insurance Requirements relating to the Leased Property, or imposed by law or applicable regulations.

### ARTICLE 25

### NO WAIVER

25.1 No failure by Lessor or Lessee to insist upon the strict performance of any term hereof or to exercise any right, power or remedy consequent upon a breach thereof, and no acceptance of full or partial payment of Rent during the continuance of any such breach, shall constitute a waiver of any such breach or any such term. To the extent permitted by law, no waiver of any breach shall affect or alter this Lease, which shall continue in full force and effect with respect to any other then existing or subsequent breach.

ARTICLE 26

REMEDIES CUMULATIVE

26.1  To the extent permitted by law, each legal, equitable or contractual right, power and remedy of Lessor or Lessee now or hereafter provided either in this Lease or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power and remedy and the exercise or beginning of the exercise by Lessor or Lessee of any one or more of such rights, powers and remedies shall not preclude the simultaneous or subsequent exercise by Lessor or Lessee of any or all of such other rights, powers and remedies.

ARTICLE 27

SURRENDER OF LEASED PROPERTY: OF LEASE

27.1  (i) Unless Lessor shall convey any of the Leased Property to Lessee, Lessee will, upon the expiration or prior termination of the Term, vacate and surrender the Leased Property to Lessor in the condition in which the Leased Property was originally received from Lessor, except as repaired, rebuilt, restored, altered or added to as permitted or required by the provisions of this Lease and/except for ordinary wear and tear (subject to the obligation of Lessee to maintain the Leased Property in good order and repair during the entire Term of the Lease), damage caused by the gross negligence or willful acts of Lessor and damage or destruction described in Article 14 or resulting from a Taking described in Article 15 which Lessee is not required by the terms of this Lease to repair or restore, and Lessee shall use its best efforts to transfer and assign to Lessor or its designee, or assist Lessor or its designee in obtaining, any contracts, licenses, and certificates required for the then operation of the Facility.

(ii) Except at the termination of the Term in the ordinary course, no surrender to Lessor of this Lease or of the Leased Property or any part of any thereof, or of any interest therein, shall be valid or effective unless agreed to and accepted in writing by Lessor and no act by Lessor or any representative or agent of Lessor, other than such a written acceptance by Lessor, shall constitute an acceptance of any such surrender.

ARTICLE 28

NO MERGER OF TITLE

28.1  There shall be no merger of this Lease or of the leasehold estate created hereby by reason of the fact that the

same person, firm, corporation or other entity may acquire, own or hold, directly or indirectly, (a) this Lease or the leasehold estate created hereby or any interest in this Lease or such leasehold estate and (b) the fee estate in the Leased Property.

## ARTICLE 29

### TRANSFERS BY LESSOR

29.1  If Lessor or any successor owner of the Leased Property shall convey the Leased Property in accordance with the terms hereof, other than as security for a debt, and the grantee or transferee of the Leased Property shall expressly assume all obligations of Lessor hereunder arising or accruing from and after the date of such conveyance or transfer, and shall be reasonably capable of performing the obligations of Lessor hereunder, Lessor or such successor owner, as the case may be, shall thereupon be released from all future liabilities and obligations of the Lessor under this Lease arising or accruing from and after the date of such conveyance or other transfer as to the Leased Property and all such future liabilities and obligations shall thereupon be binding upon the new owner.

## ARTICLE 30

### QUIET ENJOYMENT

30.1  So long as Lessee shall pay all Rent as the same becomes due and shall fully comply with all of the terms of this Lease and fully perform its obligations hereunder, Lessee shall peaceably and quietly have, hold and enjoy the Leased Property for the Term hereof, free of any claim or other action by Lessor or anyone claiming by, through or under Lessor, but subject to all liens and encumbrances of record as of the date hereof or hereafter consented to by Lessee. No failure by Lessor to comply with the foregoing covenant shall give Lessee any right to cancel or terminate this Lease, or to fail to perform any other sum payable under this Lease, or to fail to perform any other obligation of Lessee hereunder. Notwithstanding the foregoing, Lessee shall have the right by separate and independent action to pursue any claim it may have against Lessor as a result of a breach by Lessor of the covenant of quiet enjoyment contained in this Article.

## ARTICLE 31

### NOTICES

31.1  All notices, demands, requests, consents, approvals and other communications hereunder shall be in writing and

delivered or mailed (by registered or certified mail, return receipt requested and postage prepaid), or delivered by reputable overnight delivery service, addressed to the respective parties, as follows:

(a) if to Lessee:

Integrated Health Services of Cliff Manor, Inc.
11019 McCormick Road, Suite 400
Hunt Valley, MD 21031
Attn: William Krystopowicz

with a copy to:

Duane, Morris & Heckscher
One Franklin Place, Suite 1500
Philadelphia, PA 19102
Attn: Brian Siegel, Esquire

(b) if to Lessor:

Meditrust of Missouri, Inc.
15-A Walnut Street
Wellesley, MA 02181
Attn: Jonathan S. Sherwin

with a copy to:

Nutter, McClennen & Fish
One International Place
Boston, MA 02110-2699
Attn: Michael J. Bohnen, Esquire

if to Fidelity Bank, National Association (pursuant to Sections 16.1 and 16.2):

Broad and Walnut Streets
Philadelphia, PA 19109
Attn: Douglas D. Dimmig, Vice President

with a copy to:

Charles C. Freyer, Esq.
Saul Ewing Remick & Saul
3800 Centre Square West
1500 Market Street
Philadelphia, PA 19102

or to such other address as either party may hereafter designate, and shall be effective upon receipt.

-52-

## ARTICLE 32

### PURCHASE RIGHTS

32.1  **Lessee's Option to Purchase the Leased Property.**  If this Lease is in full force and effect and there exists no Event of Default which has not been cured within any applicable grace period, then Lessee shall have the option exercisable on not less than six (6) months' nor more than twenty-four (24) months' notice to purchase the Leased Property on the Purchase Option Date at the greater of the Fair Market Value Purchase Price of the Leased Property as of such Purchase Option Date or the Original Purchase Price of the Leased Premises paid by Lessor plus an adjustment increase for the increase in the Cost of Living Index from the Commencement Date plus the Fair Market Added Value as of such Purchase Option Date.  If the Lessor and Lessee cannot agree on the purchase price, then the Appraisal Method set forth in Article 34 shall be used.  The Lessor shall have the right in its sole discretion to extend the Purchase Option Date to any date less than one year after the Purchase Option Date by written notice to the Lessee, and there may be more than one such extension during the one-year period.

32.2  **Lessor's Option to Purchase Lessee's Personal Property.**  Upon termination of this Lease, whether by expiration of the Term or otherwise, Lessor shall have the option to purchase all or any portion of Lessee's Personal Property, if any, at the expiration or termination of this Lease, for an amount equal to the then net market value thereof (current replacement cost as determined by appraisal less accumulated depreciation on the books of Lessee pertaining thereto), subject to, and with appropriate price adjustments for, all equipment leases, conditional sale contracts, UCC-1 financing statements and other encumbrances to which such Lessee's Personal Property is subject.  Notwithstanding the foregoing, if Lessee is in default under this Lease, at Lessor's option, all Lessee's Personal Property may be used by Lessor pursuant to the terms of Article 6 of this Lease.

32.3  **Right of First Refusal.**  During the Term of this Lease (provided that Lessee is not then in default hereunder), Lessee shall have a first refusal option to purchase the Leased Property upon the same terms and conditions as Lessor, or its successors and assigns, shall propose to sell Leased Property, or shall have received an offer from a third party to purchase the Leased Property which Lessor intends to accept (or has accepted subject to Lessee's right of first refusal herein).  A sale of the Leased Property shall not include any transfers of stock by Lessor, any refinancings of the Leased Property, or any foreclosure sales or mortgagee sales in lieu of foreclosure.  If, during the Term, Lessor reaches such agreement with a third party or proposes to offer the Leased

Property for sale, Lessor shall promptly notify Lessee of the purchase price and all other material terms and conditions of such agreement or proposed sale and Lessee shall have thirty (30) days after receipt of such notice from Lessor within which time to exercise Lessee's option to purchase. If Lessee exercises its option, then such transaction shall be consummated, in accordance with the terms and conditions set forth therein and in accordance with the provisions of Article 18 hereof. This right of first refusal shall terminate upon termination for whatever reason of this Lease.

## ARTICLE 33

### EXTENDED TERMS

33.1  If no Event of Default shall have occurred and be continuing, Lessee is hereby granted the right to extend the Term of this Lease for three (3) additional five- (5-) year periods ("Extended Terms") for a maximum Term if all such options are exercised of fifteen (15) years after the expiration of the Fixed Term, upon giving written notice to Lessor of each such extension at least one hundred eighty (180) days, but not more than three hundred sixty (360) days, prior to the termination of the then current Term or Extended Term, subject, however, to the provisions of Section 14.7 hereof. Lessee may not exercise its option for more than one Extended Term at a time. During each Extended Term, all of the terms and conditions of this Lease shall continue in full force and effect, except that the Minimum Rent for each such Extended Term shall be an amount equal to the greater of (a) the then fair market rental value of the Leased Premises, which unless mutually agreed to by Lessor and Lessee shall be determined by appraisal pursuant to Article 34, or (b) the Rent Adjustment Rate using a Rent Adjustment Date of the calendar month prior to the start of the Extended Term (but in any event an amount no less than the Minimum Rent for the last Lease Year of the Term or the Extended Term, as the case may be) plus a lease renewal fee equal to one (1) percent of the Original Purchase Price payable on the date of Lessee's notice to Lessor requesting an extension to this Lease.

## ARTICLE 34

### APPRAISAL

34.1  In the event that it becomes necessary to determine the Fair Market Value of the Leased Property for any purpose of this Lease, the party required or permitted to give notice of such required determination shall include in the notice the name of a person selected to act as appraiser on its behalf. Within ten (10) days after receipt of any such notice, Lessor (or Lessee, as the case may be) shall by notice to Lessee (or

Lessor, as the case may be) appoint a second person as appraiser on its behalf. The appraisers thus appointed, each of whom must be a member of the American Institute of Real Estate Appraisers (or any successor organization thereto), shall, within 45 days after the date of the notice appointing the first appraiser, proceed to appraise the Leased Property to determine the Fair Market Value thereof as of the relevant date (giving effect to the impact, if any, of inflation from the date of their decision to the relevant date); provided, however, that if only one appraiser shall have been so appointed, or if two appraisers shall have been so appointed but only one such appraiser shall have made such determination within 50 days after the making of Lessee's or Lessor's request, then the determination of such appraiser shall be final and binding upon the parties. To the extent consistent with sound appraisal, such appraisal shall be made on a basis consistent with the basis on which the Leased Property was appraised for purposes of determining its Fair Market Value at the time the Leased Property was acquired by Lessor. If two appraisers shall have been appointed and shall have made their determinations within the respective requisite periods set forth above and if the difference between the amounts so determined shall not exceed ten per cent (10%) of the lesser of such amounts, then the Fair Market Value shall be an amount equal to 50% of the sum of the amounts so determined. If the difference between the amounts so determined shall exceed ten percent (10%) of the lesser of such amounts, then such two appraisers shall have 20 days to appoint a third appraiser, but if such appraisers fail to do so, then either party may request the American Arbitration Association or any successor organization thereto to appoint an appraiser within 20 days of such request, and both parties shall be bound by any appointment so made within such 20 day period. If no such appraiser shall have been appointed within such 20 days or within 90 days of the original request for a determination of Fair Market Value, whichever is earlier, either Lessor or Lessee may apply to any court having jurisdiction to have such appointment made by such court. Any appraiser appointed by the original appraisers, by the American Arbitration Association or by such court shall be instructed to determine the Fair Market Value within 30 days after appointment of such Appraiser. The determination of the appraiser which differs most in terms of dollar amount from the determinations of the other two appraisers shall be excluded, and 50% of the sum of the remaining two determinations shall be final and binding upon Lessor and Lessee as the Fair Market Value for such interest. This provision for determination by appraisal shall be specifically enforceable to the extent such remedy is available under applicable law, and any determination hereunder shall be final and binding upon the parties except as otherwise provided by applicable law. Lessor and Lessee shall each pay the fees and expenses of the appraiser appointed by it and each shall

pay one-half of the fees and expenses of the third appraiser and one-half of all other cost and expenses incurred in connection with each appraisal.

## ARTICLE 35

### DEFAULT BY LESSOR

35.1  Lessor shall be in default of its obligations under this Lease if Lessor shall fail to observe or perform any term, covenant or condition of this Lease on its part to be performed and such failure shall continue for a period of thirty (30) days after notice thereof from Lessee (or such shorter time as may be necessary in order to protect the health or welfare of any patients of the Facility), unless such failure cannot with due diligence be cured within a period of thirty (30) days, in which case such failure shall not be deemed to continue if Lessor, within said thirty (30) day period, proceeds promptly and with due diligence to cure the failure and diligently completes the curing thereof. The time within which Lessor shall be obligated to cure any such failure shall also be subject to extension of time due to the occurrence of any Unavoidable Delay.

## ARTICLE 36

### LIENS ON THE LEASED PROPERTY

36.1  *Lessor May Grant Liens*. Without the consent of Lessee, Lessor may, subject to the terms and conditions set forth below in this Section 36.1, from time to time, directly of indirectly, create or otherwise cause to exist any lien, encumbrance or title retention agreement ("Encumbrance") upon the Leased Property, or any portion thereof or interest therein, whether to secure any borrowing or other means of financing or refinancing. Any such Encumbrance shall contain the right to prepay (whether or not subject to a prepayment penalty) and shall provide that it is subject to the rights of Lessee under this Lease, including the rights of Lessee to acquire the Leased Property pursuant to the applicable provisions of this Lease, except that Lessee's right of option to purchase the Leased Property shall not be applicable upon a foreclosure sale or transfer in lieu thereof; provided, however, that any such purchaser or transferee (a) shall take title subject to Lessee's rights to acquire the Leased Property pursuant to Article 32, (b) shall agree to give Lessee the same notice, if any, given to Lessor of any default or acceleration of any obligation underlying any such mortgage or any sale in foreclosure under such mortgage, and (c) shall agree to permit Lessee to appear by its representative and to bid at any sale in foreclosure made with respect to any such mortgage. Upon the reasonable request of Lessor, Lessee shall subordinate this

Lease to the lien of a new mortgage on the Leased Property, on the condition that the proposed mortgagee executes a non-disturbance agreement in conformity to Section 37.1 recognizing this Lease and agreeing, for itself and its successors and assigns, to comply with the provisions of this Article 36, including all other options, preemption, substitution and other rights of Lessee under this Lease.

## ARTICLE 37

### SUBORDINATION AND NON-DISTURBANCE

37.1    Upon Lessee's request, Lessor will use reasonable efforts to obtain and deliver to Lessee agreements by the holder of any Encumbrances entered into after the date hereof which (a) consent to this Lease and agree that, notwithstanding any such overlease, mortgage, deed of trust, right, title or interest or any other Encumbrance, or any default, expiration, termination, foreclosure, sale, entry or other act or omission under, pursuant to or affecting any of the foregoing, Lessee shall not be disturbed in peaceful enjoyment of the Leased Property nor shall this Lease be terminated or cancelled at any time, except in the event Lessor shall have the right to terminate this Lease under the terms and provisions expressly set forth herein; (b) agreeing that for any period while it may be Lessor hereunder, it will perform, fulfill and observe all of Lessor's representations, warranties and agreements set forth herein; and (c) agreeing that all proceeds of the casualty insurance described in Article 14 of this Lease and all Awards described in Article 15 will be made available to Lessee for restoration of the Leased Property as and to the extent required by this Lease, subject only to reasonable regulation regarding the disbursement and application thereof; provided, however, that Lessee delivers an agreement of the type described in the following paragraph if so requested by the holder of an Encumbrance.

At the request from time to time by one or more holders of any Encumbrance that may hereafter be placed upon the Leased Property or any part thereof by Lessor, and any and all renewals, replacements, modifications, consolidations, spreaders and extensions thereof, Lessee will subordinate this Lease and all of Lessee's rights and estate hereunder to each such Encumbrance and agree with each such holder that Lessee will attorn to and recognize such holder or the purchaser at any foreclosure sale or any sale under a power of sale contained in any such Encumbrance as Lessor under this Lease for the balance of the Term then remaining, subject to all of the terms and provisions of this Lease; provided, however, that each such holder simultaneously executes, delivers and records a written agreement as provided in the preceding paragraph.

## ARTICLE 38

### MISCELLANEOUS

38.1 **General.** Anything contained in this Lease to the contrary notwithstanding, all claims against, and liabilities of, Lessee or Lessor arising prior to any date of termination of this Lease shall survive such termination. If any term or provision of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other application of such term or provision shall not be affected thereby. If any late charges provided for in any provision of this Lease are based upon a rate in excess of the maximum rate permitted by applicable law, the parties agree that such charges shall be fixed at the maximum permissible rate. Neither this Lease nor any provision hereof may be changed, waived, discharged or terminated except by an instrument in writing and in recordable form signed by Lessor and Lessee. All the terms and provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. The headings in this Lease are for convenience of reference only and shall not limit or otherwise affect the meaning hereof. This Lease shall be governed by and construed in accordance with the laws of the state in which Leased Property is located. Lessee waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance and waives all notices of the existence, creation, or incurring of new or additional obligations, except as expressly granted herein.

38.2 **Transfer of Licenses.** Upon the expiration of earlier termination of the Term, Lessee shall use its best efforts to transfer to Lessor or Lessor's nominee all licenses, operating permits and other governmental authorizations and all contracts, including contracts with governmental or quasi-governmental entities which may be necessary or useful in the operation of the Facility.

## ARTICLE 39

### MEMORANDUM OF LEASE

39.1 Lessor and Lessee shall, promptly upon the request of either, enter into a short form memorandum of this Lease, in form suitable for recording under the laws of the state in which the Leased Property is located, in which reference to this Lease, and all options contained herein, shall be made.

## ARTICLE 40

### LIMITATION OF LIABILITY

The Declaration of Trust establishing MEDITRUST, a Massachusetts business trust and 100% owner of Lessor, dated

August 6, 1985, a copy of which, together with all amendments thereto (the "Declaration"), is duly filed in the office of the Secretary of State of the Commonwealth of Massachusetts, provides that the name "MEDITRUST" refers to the trustees under the Declaration collectively as Trustees, but not individually or personally. Lessee specifically agrees that no trustee, officer, shareholder, employee or agent of MEDITRUST or its subsidiaries shall be held to any personal liability, jointly or severally, for any obligation of, or claim against MEDITRUST or Lessor, Lessee agreeing to look solely to Lessor's equity interest in the Leased Property for recovery of any judgment from MEDITRUST or Lessor. The provisions contained in the foregoing sentence are not intended to, and shall not, limit any right that Lessee might otherwise have to obtain injunctive relief against Lessor or Lessor's successors in interest, or any action not involving the personal liability of Lessor (original or successor). In no event shall Lessor (original or successor) be required to respond in monetary damages from Lessor's assets other than Lessor's equity interest aforesaid in said properties, including the Leased Property. Furthermore, except as otherwise expressly provided herein, in no event shall Lessor (original or successor) ever be liable to Lessee for any indirect or consequential damages suffered by Lessee from whatever cause.



EXHIBIT A

All of Tract C, and part of Tract D, CLIFF MANOR, a subdivision of land in the City of Riverside, Platte County, Missouri, according to the recorded plat thereof, and all of a tract of land described by Quit Claim Deed in Document No. 24232 in the Platte County Recorders Office, lying in the Southwest Quarter of Section 4, Township 50, Range 33, Platte County, Missouri, all being bounded and described as follows: Beginning at the Northeast corner of said Tract C; thence South 30 degrees 51 minutes 40 seconds East along the Easterly line of said Tract C, 252.84 feet; thence South 2 degrees 43 minutes 00 seconds East along said Easterly line, 30.01 feet; thence South 33 degrees 28 minutes 41 seconds West along said Easterly line, 211.14 feet to the Southeast corner of said Tract C; thence North 87 degrees 03 minutes 00 seconds West along the South line of said Tract C, 169.73 feet; thence Westerly on a curve to the right, having a radius of 982.00 feet, an arc distance of 111.64 feet; thence South 86 degrees 27 minutes 23 seconds West along a line not tangent to the last described curve, 72.70 feet to a point on the West line of the aforementioned Tract D, being also a point on the East right of way line of Interstate Route 635, as now established; thence North 17 degrees 32 minutes 41 seconds West along said East line, 113.56 feet to the Southeast corner of the tract described in the aforementioned Quit Claim Deed; thence South 72 degrees 27 minutes 19 seconds West, 6.50 feet to the Southwest corner of said tract; thence North 17 degrees 32 minutes 41 seconds West, 66.00 feet to the Northwest corner of said tract; thence North 72 degrees 27 minutes 19 seconds East, 6.50 feet to the Northeast corner of said tract; thence North 17 degrees 32 minutes 41 seconds West along said East right of way line, 206.88 feet to the Northwest corner of said Tract C; thence North 72 degrees 27 minutes 19 seconds East along the Northerly line of said Tract C, 196.11 feet to a point on the South right of way line to Cliff View Drive, as now established; thence Southerly and Easterly along said right of way line on a curve to the left, having a radius of 164.74 feet, an arc distance of 228.55 feet; thence North 59 degrees 08 minutes 20 seconds East along said Right of Way line, tangent to the last described curve, 70.00 feet to the point of beginning.

*IHS of Erie of Bayside*

July 20, 1989

## ALPINE ERIE LEASE

Lessor: Meditrust at Alpine, Inc.

Lessee: Alpine Manor, Inc.

Date of lease: Original - December 30, 1987
Amendment - March 23, 1989
Amended to relect $375,000 funded by Meditrust for a 20 bed alzheimer's unit).

Term: December 30, 1987 - December 30, 1997
Three 5-year renewal options

Rent: Minimum rent -

   a. Base rent - $53,000/month    12/30/87 - 3/22/89
                  56,984/month      3/23/89 - 12/30/92

   b. Rent adjustment evaluation on 12/30/92
      New base rent will be greater of

      1. The current base rate
      2. Original purchase price plus $375,000 both multiplied by a rent adjustment rate equal to 350 basis points over the 5 year treasury rate.

   Additional Rent -

   a. Calculated quarterly

   b. 5% of increase in gross revenues over the base period gross revenues

   c. Base period: 7/1/87 - 6/30/88

   d. Gross revenues excludes revenues attributed to capital additions (financed by lessee) which would add beds or services or improve the quality of the facility

Rent during renewal periods: Rent for renewal periods shall be the current fair market rental mutually agreed to by lessor and lessee or by an appraisal (additional rent calculation does not apply).

Alpine Erie Lease
Page 2

| | |
|---|---|
| Renovations: | Lessee must complete renovations totaling $500,000 as specified in escrow agreement |
| Purchase Option: | June 30, 2000<br>Six to twenty four month notice<br>Purchase price would be greater of |

    a. Fair market value of facility as if no capital additions financed by lessee had been constructed less total mortgage debt

    b. Original purchase price ($5,088,000) less total mortgage debt + increase in cost of living index based on CPI + fair market added value (calculated as FMV of facility less FMV of facility without capital additions) + $375,000 adjusted for cost of living increase.

Right of First Refusal: Lessee has right of first refusal at same terms lessor offers to third party