# EXHIBIT "F"

LEASE MODIFICATION AGREEMENT

This Lease Modification Agreement is made as of the 30Th day of April, 1993 by and among:

Meditrust, a Massachusetts business trust ("Meditrust"), Meditrust of Missouri, Inc., a Delaware corporation, Meditrust of Alabama, Inc., an Alabama corporation, Treemont of Dallas Limited, a Texas limited partnership, Meditrust of Michigan, Inc., a Delaware corporation, Meditrust at Alpine, Inc., a Pennsylvania corporation, Meditrust of Ohio, Inc., a Delaware corporation, and Meditrust at Mountainview, Inc., a Pennsylvania corporation (collectively, the "Lessors");

Integrated Health Services of Somerset Valley, Inc., a Delaware corporation, Integrated Health Services of Cliff Manor, Inc., a Delaware corporation, Briarcliff Nursing Home, Inc., a Pennsylvania corporation, Cambridge Group, Inc., a Texas corporation, Integrated Health Services of Riverbend, Inc., a Delaware corporation, Alpine Manor, Inc., a Pennsylvania corporation, Elm Creek of IHS, Inc., a Pennsylvania corporation, Spring Creek of IHS, Inc., a Pennsylvania corporation, Carriage-By-The-Lake of IHS, Inc., a Pennsylvania corporation, Firelands of IHS, Inc., a Pennsylvania corporation, and Integrated Health Group, a Pennsylvania limited partnership (collectively, the "Lessees");

Integrated Health Services, Inc., a Delaware corporation ("Integrated"); and

Citicorp USA, Inc., a Delaware corporation, as agent under the Revolving Credit Agreement (hereinafter defined) ("Citicorp"), solely with respect to Section 2 hereof.

WHEREAS, the Lessors are the landlords and the Lessees are the tenants under their respective leases identified on Exhibit A attached hereto and made a part hereof (collectively, the "Leases"; and each Lease individually as defined in Exhibit A);

WHEREAS, the premises demised by the Leases constitute various nursing home and other health care facilities, as identified on Exhibit A (collectively, the "Facilities");

WHEREAS, Integrated is the corporate parent of each of the Lessees, excepting only Integrated Health Group, the Lessee under the Laurel View Lease;

WHEREAS, with respect to said Integrated Health Group, Integrated is the corporate parent of the sole and managing general partner thereof, Integrated Health of Locust Valley Road, Inc.;

WHEREAS, Integrated has guaranteed to the Lessors all of the Lessees' obligations under the Leases by virtue of various guaranty instruments previously executed and delivered by Integrated (collectively, the "Lease Guaranties");

WHEREAS, the Lessors and Lessees desire to amend and supplement the Leases as hereinafter provided;

WHEREAS, Citicorp is the agent for various lenders under and pursuant to that certain Revolving Credit and Term Loan Agreement dated as of April 14, 1993, among Integrated, Citicorp, The Bank of Nova Scotia, as LC Bank, and the other financial institutions party thereto (as amended from time to time in accordance with the terms thereof, the "Revolving Credit Agreement");

WHEREAS, as security for performance of Integrated's obligations under the Revolving Credit Agreement and the documents related thereto, Integrated has pledged to Citicorp all of the issued and outstanding shares of capital stock of the Lessees, except in the case of Lessee Integrated Health Group, where the pledge is of all of the issued and outstanding shares of capital stock of Integrated Health of Locust Valley Road, Inc. ("IHLVR"), a Pennsylvania corporation and sole general partner of Integrated Health Group (all such stock collectively, the "Lessees' Stock" and such stock of IHLVR alone, the "IHLVR Stock") under that certain Pledge and Security Agreement dated as of April 14, 1993, by and between Integrated and Citicorp (as amended from time to time and together with any other pledge agreement executed in connection with the Revolving Credit Agreement, the "Citicorp Pledge Agreements"); and

WHEREAS, Citicorp and the Lessors desire to provide conditions under which Citicorp may exercise its rights under the Citicorp Pledge Agreements as hereinafter provided.

NOW, THEREFORE, for consideration paid, the receipt and sufficiency of which are hereby acknowledged, the parties hereby act and agree as follows:

1.    The Leases are amended and supplemented as follows:

(a)    Except for the Treemont Lease, the original terms of all of the Leases (not including any of the Lessees' extension or renewal options), however denominated or described in the Leases (for each Lease, an "Original Lease Term"), are amended so that they shall all expire on May 31, 2001.  Except for the Treemont Lease, from and after the last day of the Original Lease Term of each of the Leases (without giving effect to the amendment in the immediately preceding sentence) through and including the new Lease expiration date of May 31, 2001, the amount of "Additional Rent", as defined and described in each of the Leases, payable annually shall not exceed the

greatest of the amount of Additional Rent that was payable annually under each Lease in each of the last three (3) years ending on the last day of the Original Lease Term of such Lease. The Treemont Lease shall remain unchanged by this Section 1(a).

(b) Except for the Treemont Lease, all of the Lessees' extension, renewal or similar options contained in the Leases, however denominated or described, are deleted. Instead, so long as no Event of Default (as defined in the Leases) shall have occurred under any of the Leases and be continuing, the Lessees shall have the right and option to extend the terms of all, but not less than all, of the Leases (excluding the Treemont Lease) for five (5) consecutive 5-year periods (each such period an "Extended Term") resulting in a maximum Lease term, if all such options are exercised, expiring on May 31, 2026. Such extension options shall be exercised by the Lessees giving written notice to the Lessors of the exercise of each such extension option at least 180 days, but not more than 360 days, prior to the expiration of the then current Lease term, it being the intention of the parties that all of the Leases shall be extended collectively and simultaneously for the same Extended Term or Terms, or none of the Leases be so extended. The Lessees may not exercise their options for more than one Extended Term at a time. During each Extended Term, all of the terms and conditions of the Leases shall continue in full force and effect. The limitation in Section 1(a) above on the amount of "Additional Rent" payable under the Leases (excluding the Treemont Lease) shall not apply to any Extended Term. The Treemont Lease shall remain unchanged by this Section 1(b).

(c) The parties acknowledge that the Somerset Valley Lease, Cliff Manor Lease, Briarcliff Lease, Riverbend Lease and Alpine Manor Lease each contain similar options on the part of the Lessees thereunder to purchase the Facilities demised thereby. The purpose of this section 1(c) is to provide similar options with respect to the Elm Creek Facility, Spring Creek Facility, Carriage-By-The-Lake Facility, Firelands Facility and Laurel View Facility and to provide that all of the options under all of the Leases (except the Treemont Lease) be exercised or none be exercised, and that all of the Facilities (except the Treemont Facility), and not less than all of the Facilities, be purchased by the Lessees thereunder simultaneously. It is also the intention of the parties that the Lessee's option to purchase in the Treemont Lease remain unchanged and, accordingly, nothing in this Section 1(c) shall affect the Treemont Lease.

To accomplish the foregoing, the options to purchase the leased premises granted to the Lessees under the Somerset Valley Lease, Cliff Manor Lease, Briar Cliff Lease, Riverbend Lease and Alpine Manor Lease are deleted. All of the Leases (excepting only the Treemont Lease) are amended to include the

-1-

following option rights.  So long as no Event of Default (as
defined in the Leases) shall have occurred under any of the
Leases and be continuing, the Lessees shall have the option of
purchasing all, but not less than all, of the Facilities (other
than the Treemont Facility) on May 31, 2001, or on the
expiration date of the last Extended Term that has been
exercised, if any (the "Closing Date").  Such option to
purchase shall be exercised by written notice given by the
Lessees to the Lessors no less than 180 days prior to the
Closing Date.  The purchase price for each Facility shall be
the greater of (i) the Fair Market Value Purchase Price (as
defined in the Riverbend Lease) of such Facility as of the
Closing Date, or (ii) the Original Purchase Price (as
hereinafter defined) of such Facility, plus an adjustment
increase for any increase in the Cost of Living Index (as
defined in the Riverbend Lease) from the Commencement Date (as
defined in each Lease with respect to the Facility being
valued) through the Closing Date, plus the Fair Market Added
Value (as defined in the Riverbend Lease) of such Facility, if
any, as of the Closing Date.  If the parties cannot agree on
the purchase price of any Facility, thereby requiring a
determination of Fair Market Value (as defined in the Riverbend
Lease) by appraisal, the appraisal method in Article 34 of the
Riverbend Lease shall be used.  For each Facility, the
"Original Purchase Price" shall be the full consideration paid
by each Lessor for such Facility, i.e., $2,800,000 for the
Somerset Valley Facility, $8,797,900 for the Cliff Manor
Facility, $7,759,000 for the Briarcliff Facility, $6,620,000
for the Riverbend Facility, $7,483,800 for the Alpine Manor
Facility, $3,700,069 for the Elm Creek Facility, $3,767,360 for
the Spring Creek Facility, $2,999,134 for the
Carriage-By-The-Lake Facility, $2,133,437 for the Firelands
Facility and $6,069,012 for the Laurel View Facility.

     Should such option to purchase be exercised, the Lessees
and Integrated shall be firmly bound to complete the purchases
and the closing of the purchases shall occur for all the
Facilities simultaneously at 11:00 a.m. on the Closing Date at
the offices of Nutter, McClennen & Fish, One International
Place, Boston, Massachusetts  02110-2699, it being the
intention of the parties that all of the Facilities (other than
the Treemont Facility) be sold and transferred to the Lessees
or none of the Facilities be sold and transferred to the
Lessees.  In the event the Lessees purchase the Facilities from
the Lessors, the Lessors shall, upon receipt from the Lessees
of the full purchase price, together with full payment of any
unpaid rent due and payable with respect to any period ending
on or before the Closing Date, deliver to the Lessees
appropriate deeds or other instruments of conveyance conveying
the entire interest of the Lessor in and to the Facilities
subject to all encumbrances of record other than encumbrances
created by the Lessors with respect to each Facility on and
after the date of the Lease of such Facility.  If any
mortgages, deeds of trust or similar financing instruments,

permitted to be imposed on the Facilities by the Lessors under
the provisions of the Leases, are outstanding on the Closing
Date, the same shall be discharged as part of the closing,
unless such financings are assumable at no cost to the Lessees
or to which the Lessees may take title subject to without cost
to the Lessees.

THE FACILITIES SHALL BE CONVEYED AND DELIVERED TO LESSEES
BY LESSORS IN "AS IS" CONDITION AND LESSEES AND INTEGRATED
WAIVE ANY CLAIM OR ACTION AGAINST LESSORS IN RESPECT OF THE
CONDITION OF THE FACILITIES.  LESSORS DO NOT MAKE, AND LESSEES
AND INTEGRATED HEREBY WAIVE THE BENEFIT OF, ANY WARRANTY OR
REPRESENTATION, EXPRESS OR IMPLIED, IN RESPECT OF THE
FACILITIES OR ANY PART THEREOF, EITHER AS TO THEIR FITNESS FOR
USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR
OTHERWISE, OR AS TO DEFECTS IN QUALITY OF THE MATERIAL OR
WORKMANSHIP THEREIN, LATENT OR PATENT, IT BEING AGREED THAT ALL
SUCH RISKS ARE TO BE BORNE BY LESSEES AND INTEGRATED.

The purchase prices shall be paid in cash to the Lessors,
or as the Lessors may direct, in federal or other immediately
available funds except as otherwise mutually agreed by the
Lessors and the Lessees.  All expenses of such conveyances,
including, without limitation, the cost of title examination,
title insurance, attorneys' fees incurred by the Lessors in
connection with such conveyances, transfer taxes, recording
fees and similar charges shall be paid by the Lessees and
Integrated.

(d)   All provisions in the Leases that treat a default
by Integrated under any credit or other financing arrangement
in connection with its major lines of credit as a default or an
event of default on the part of any Lessee are deleted.

(e)   All financial covenants made in the Leases by any
Lessee that incorporate by reference the financial covenants
contained in Integrated's general line of credit documents are
deleted.

(f)   The occurrence of any of the following shall
constitute an Event of Default under the Leases on the part of
the Lessees:

(i)   Integrated fails to maintain a Current Ratio
(as defined in the Revolving Credit Agreement) of at least
1.25 to 1;

(ii)   Integrated fails to maintain a Base Tangible
Net Worth (as defined in the Revolving Credit Agreement) of
Seventy-Five Million Dollars ($75,000,000) or more; and

(iii)   The Cash Flow Coverage Ratio for all of the
Facilities on an aggregated basis is less than 1.5 to 1 for
two (2) consecutive fiscal quarters, where "Cash Flow

Coverage Ratio" means the ratio of aggregated Cash Flow (as hereinafter defined) for all the Facilities for each fiscal quarter to the total of all amounts paid or payable by the Lessees to the Lessors during such fiscal quarter or accrued for such fiscal quarter under all of the Leases, excluding Additional Rent (as defined in the Leases).

As used herein, "Consolidated Net Income" (or "Consolidated Net Loss") means the net income (or net loss, expressed as a negative number) of a party for any period, consolidated with the net income (or net loss) of such party's subsidiaries in accordance with generally accepted accounting principles for the same period, after all taxes actually paid or accrued and all expenses and other charges, determined in accordance with generally accepted accounting principles consistently applied.

As used herein "Cash Flow" means the Consolidated Net Income (or Consolidated Net Loss) for any period plus the amount of the provision for depreciation and amortization actually deducted on the books of the applicable party for the purposes of computing such Consolidated Net Income (or Consolidated Net Loss) for the period involved, plus (i) lease obligations on account of regular monthly rent plus additional or percentage rent payable to Meditrust or its subsidiaries for the same period and (ii) subordinated management fees for the same period.

(g)  If appropriate, the Lessors and the Lessees shall execute and deliver for recording one or more notices or memoranda of amendment to lease reflecting the lease amendments made by this Agreement.

(h)  The provisions of the Leases prohibiting the sale, transfer, assignment, pledge or any similar action with respect to the Lessees' Stock are modified so as to permit (i) the pledges evidenced by the Citicorp Pledge Agreements and subsequent transfers thereunder by way of collateral sale in accordance with Section 2 below, and (ii) for purposes of replacing the financing evidenced by the Revolving Credit Agreement and providing Integrated with its principal line of credit, a pledge of all, but not less than all, of the Lessees' Stock to a lender or syndicate of lenders (such lender or agent for such syndicate, the "Citicorp Replacement"), provided that the Citicorp Replacement is a commercial bank with total assets of at least twenty billion dollars ($20,000,000,000), and provided further that the Citicorp Replacement agrees with the Lessors that any collateral sale of the Lessees' Stock by the Citicorp Replacement shall be in accordance with Section 2 below.

2.  Citicorp and, if applicable, the Citicorp Replacement, agree that in the event of enforcement of their rights to sell, transfer or otherwise dispose of the Lessees' Stock, all, and not less than all, of the Lessees' Stock of Lessees who are

then tenants under Leases with Meditrust or any affiliate of
Meditrust, as landlord, (and of the IHLVR Stock as well, so
long as IHLVR is then a partner of the Lessee under the Laurel
View Lease and Meditrust or any affiliate of Meditrust is
landlord under such lease), shall be sold or transferred to a
Permitted Transferee.  As used herein, "Permitted Transferee"
shall mean a single person or entity as buyer or transferee of
all such Lessees' Stock and which transferee (i) has a net
worth in an amount reasonably acceptable to Meditrust which is
sufficient to assure future performance of the obligations of
the lessees under the Leases, (ii) has management skills and
experience substantially equal to that of Integrated on the
date hereof in the operation of health care facilities similar
to the Facilities, and (iii) is otherwise acceptable to
Meditrust in its reasonable discretion.

3.    The Lessees and Integrated agree with the Lessors
that, except as provided in Section 1(h) and Section 2 above,
none of the Lessees' Stock shall be sold, assigned, exchanged,
pledged or otherwise transferred; provided, however, that this
prohibition shall not apply if the Lessees' Stock has been sold
and transferred to a Permitted Transferee in accordance with
Section 2 above, unless the Permitted Transferee is Integrated
or any affiliate of Integrated.

4.    Except as amended by this Agreement, the Leases shall
remain in full force and effect as heretofore.  Integrated
acknowledges and agrees that all of its obligations under the
Lease Guarantees shall remain in full force and effect and
shall hereafter apply to the Leases as amended by this
Agreement.

5.    All of the costs and expenses of the Lessors,
including their reasonable attorneys' fees and expenses, in
connection with the negotiation and preparation of this
Agreement and closing the transaction evidenced by this
Agreement shall be paid by Integrated and the Lessees.

6.    All notices, demands, requests, consents, approvals
and other communications under the Leases and this Agreement
shall be in writing and delivered or mailed (by registered or
certified mail, return receipt requested and postage prepaid),
or delivered by reputable commercial overnight delivery service
with provision for a receipt, with delivery charges prepaid,
addressed to the respective parties, as follows:

       (a)   if to the Lessees:

                  Integrated Health Services, Inc.
                  11011 McCormick Road
                  Hunt Valley, MD  21031
                  Attention:  David N. Chichester, Senior V.P.-Finance

with a copy to:

> Hunton & Williams
> 200 Park Avenue
> New York, NY 10166-0136
> Attention: Edward B. Koehler, Esq.

(b) if to the Lessors:

> Meditrust
> 128 Technology Center
> Waltham, MA 02154-8979
> Attention: David F. Benson, President

with a copy to:

> Nutter, McClennen & Fish
> One International Place
> Boston, MA 02110-2699
> Attention: Michael J. Bohnen, Esquire

(c) if to Citicorp:

> Citicorp USA, Inc.
> 1400 Trammell Crow Center
> 2001 Row Avenue L.B. 114
> Dallas, TX 75201
> Attention: Margaret A. Brown

with a copy to:

> Latham & Watkins
> 633 West Fifth Street
> Los Angeles, CA 90071
> Attention: Hendrik de Jong

or to such other address as any party may hereafter designate to the others, which designation shall be effective upon receipt. This Section 6 shall supercede and replace any similar provisions in the Leases.

7. The Lessees agree that any breach by the Lessees of their agreements contained in this Agreement shall, at the option of the Lessors, constitute an Event of Default under and as defined in the Leases.

8. Notwithstanding anything to the contrary contained in this Agreement, the parties acknowledge and agree that, as of the date hereof, the Lessors' agreements hereunder that amend

either the Treemont Lease or the Briarcliff Lease are not
effective. In order to become effective with respect to the
Treemont Lease, Lincoln National Life Insurance Company
("Lincoln"), Meditrust's lender on the Treemont Facility, must
consent to this Agreement. In order to become effective with
respect to the Briarcliff Lease, Barclays Bank ("Barclays"),
Meditrust's lender on the Briarcliff Facility, must consent to
this Agreement. Meditrust shall request promptly both
Lincoln's and Barclays' consent to this Agreement but shall
have no further obligations concerning the same.
Notwithstanding the current ineffectiveness of this Agreement
as and to the extent described above, the Lessors agree to
conduct their activities with respect thereto as though the
same were effective, except to the extent that Meditrust
determines in its sole judgment, or is notified by Lincoln or
Barclays, as applicable, that such conduct will violate
Meditrust's agreements with Lincoln or Barclays, as
applicable. The parties acknowledge that neither the
Briarcliff Lease nor the Treemont Lease contain (i) any
provisions of the type deleted by Section 1(d) of this
Agreement, (ii) any financial covenants of the type deleted by
Section 1(e) of this Agreement or (iii) any prohibitions on
sale, transfer, etc. of stock modified by Section 1(h) of this
Agreement. Moreover, the parties acknowledge that neither
Section 2 nor Section 1(f) of this Agreement constitute an
amendment of either the Briarcliff Lease or Treemont Lease and,
accordingly, said Section 2 and said Section 1(f) are
applicable to both the Briarcliff Lease and the Treemont Lease
as of the date hereof.

    9.    This Agreement shall be binding upon and inure to the
benefit of the parties hereto and their respective successors
and assigns.

    10.    The Declaration of Trust establishing Meditrust, dated
August 6, 1985 (the "Declaration"), a copy of which, together
will all amendments thereto, is duly filed in the office of the
Secretary of State of the Commonwealth of Massachusetts,
provides that the name "Meditrust" refers to the trustees under
the Declaration collectively as trustees, but not individually
or personally; and that no trustee, officer, shareholder,
employee or agent of Meditrust shall be held to any personal
liability, jointly or severally, for any obligation of, or
claim against, Meditrust. All persons dealing with Meditrust
in any way, shall look only to the assets of Meditrust for the
payment of any sum or the performance of any obligations.

Witness the execution hereof under seal as of the day and year first written above.

Witness:

Meditrust

By: _____
Name:    MICHAEL S. BENJAMIN
Title:   VICE PRESIDENT & GENERAL COUNSEL

Witness:

Meditrust of Missouri, Inc.

By: _____
Name:    MICHAEL S. BENJAMIN
Title:   VICE PRESIDENT & GENERAL COUNSEL

Witness:

Meditrust of Alabama, Inc.

By: _____
Name:    MICHAEL S. BENJAMIN
Title:   VICE PRESIDENT & GENERAL COUNSEL

Witness:

Treemont of Dallas Limited
By:  Meditrust, general partner

By: _____
Name:    MICHAEL S. BENJAMIN
Title:   VICE PRESIDENT & GENERAL COUNSEL

Witness:

Meditrust of Michigan, Inc.

By: _____
Name:    MICHAEL S. BENJAMIN
Title:   VICE PRESIDENT & GENERAL COUNSEL

Witness:

Meditrust at Alpine, Inc.

By: _____
    Name:    MICHAEL S. BENJAMIN
    Title:    VICE PRESIDENT & GENERAL COUNSEL

Witness:

Meditrust of Ohio, Inc.

By: _____
    Name:    MICHAEL S. BENJAMIN
    Title:    VICE PRESIDENT & GENERAL COUNSEL

Witness:

Meditrust at Mountainview, Inc.

By: _____
    Name:    MICHAEL S. BENJAMIN
    Title:    VICE PRESIDENT & GENERAL COUNSEL

Witness:

Integrated Health Services of
Somerset Valley, Inc.

By: _____
    Name:    David N. Chichester
    Title:    Senior Vice President - Fina[...]

Witness:

Integrated Health Services of
Cliff Manor, Inc.

By: _____
    Name:    David N. Chichester
    Title:    Senior Vice President - Fina[...]

Witness:

_Susan P Wilk_

Witness:

_Susan P Wilk_

Witness:

_Susan P Wilk_

Witness:

_Susan P Wilk_

Witness:

_Susan P Wilk_

Briarcliff Nursing Home, Inc.

By: _David N. Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Cambridge Group, Inc.

By: _David N. Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Integrated Health Services of
Riverbend, Inc.

By: _David N. Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Alpine Manor, Inc.

By: _David N. Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Elm Creek of IHS, Inc.

By: _David N. Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Witness:

_Susan P Wilke_

Spring Creek of IHS, Inc.

By: _David N Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Witness:

_Susan P Wilke_

Carriage-By-The-Lake of IHS, Inc.

By: _David N Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Witness:

_Susan P Wilke_

Firelands of IHS, Inc.

By: _David N Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Witness:

_Susan P Wilke_

Integrated Health Group
By:  Integrated Health of Locust
    Valley Road, Inc., general
    partner

By: _David N Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Witness:

_Susan P Wilke_

Integrated Health Services, Inc.

By: _David N Chichester_
    Name:  David N. Chichester
    Title: Senior Vice President - Finance

Witness:                          Citicorp USA, Inc.


_____         By: _____
                                      Name:
                                      Title:      BARBARA A. COHEN
                                                  Vice President


0743R

## EXHIBIT A

1.    The Facility Lease dated December 30, 1986, by and
between Meditrust, Lessor, and Integrated Health Services,
Inc., Lessee (the "Somerset Valley Lease"), the Lessee's
interest therein having been heretofore assigned to Integrated
Health Services at Somerset Valley, Inc., relating to the
premises located in Bound Brook, New Jersey, known as Somerset
Valley Nursing Home, more particularly described therein (the
"Somerset Valley Facility").

2.    The Facility Lease and Security Agreement dated as of
March 24, 1988, by and between Meditrust of Missouri, Inc.,
Lessor, and Integrated Health Services of Cliff Manor, Inc.,
Lessee (the "Cliff Manor Lease"), relating to the premises
located in Riverside, Missouri, known as Cliff Manor Nursing
Home, more particularly described therein (the "Cliff Manor
Facility").

3.    The Facility Lease and Security Agreement dated
August 13, 1987, by and between Meditrust of Alabama, Inc.,
Lessor, and Briarcliff Nursing Home, Inc., Lessee, as
heretofore amended (the "Briarcliff Lease"), relating to the
premises located in Alabaster, Alabama, known as Briarcliff
Nursing Home, more particularly described therein (the
"Briarcliff Facility").

4.    The Facility Lease dated June 1, 1986, by and between
Treemont of Dallas Limited, Lessor, and Cambridge Group, Inc.,
Lessee (the "Treemont Lease"), relating to the premises located
in Dallas, Texas, known as Treemont (the "Treemont Facility").

5.    The Facility Lease and Security Agreement dated as of
May 5, 1988, by and between Meditrust of Michigan, Inc.,
Lessor, and Integrated Health Services of Riverbend, Inc.,
Lessee (the "Riverbend Lease"), relating to the premises
located in Grand Blanc, Michigan, known as Riverbend, more
particularly described therein (the "Riverbend Facility").

6.    The Facility Lease and Security Agreement dated
December 30, 1987, by and between Meditrust at Alpine, Inc.,
Lessor, and Alpine Manor, Inc., Lessee, as heretofore amended
(the "Alpine Manor Lease"), relating to the premises located in
Erie, Pennsylvania, known as Alpine Manor Nursing Home, more
particularly described therein (the "Alpine Manor Facility").

7.    The Facility Lease and Security Agreement dated
December 7, 1990 by and between Meditrust of Ohio, Inc.,
Lessor, and Elm Creek of IHS, Inc., Lessee (the "Elm Creek
Lease"), relating to the premises located in West Carrollton,
Ohio, known as Elm Creek Nursing Center, more particularly
described therein (the "Elm Creek Facility").

8.    The Facility Lease and Security Agreement dated December 7, 1990, by and between Meditrust of Ohio, Inc., Lessor, and Spring Creek of IHS, Inc., Lessee (the "Spring Creek Lease"), relating to the premises located in Huber Heights, Ohio, known as Spring Creek Nursing Center, more particularly described therein (the "Spring Creek Facility").

9.    The Facility Lease and Security Agreement dated December 7, 1990, by and between Meditrust of Ohio, Inc., Lessor, and Carriage-By-The-Lake of IHS, Inc., Lessee (the "Carriage-By-The-Lake Lease"), relating to the premises located in Sugarcreek, Ohio, known as Carriage-By-The-Lake Nursing Center, more particularly described therein (the "Carriage-By-The-Lake Facility").

10.    The Facility Lease and Security Agreement dated December 7, 1990, by and between Meditrust of Ohio, Inc., Lessor, and Firelands of IHS, Inc., Lessee (the "Firelands Lease"), relating to the premises located in New London, Ohio, known as Firelands Nursing Center, more particularly described therein (the "Firelands Facility").

12.    The Lease and Security Agreement dated as of December 17, 1991, by and between Meditrust at Mountainview, Inc., Lessor, and Integrated Health Group, Lessee (the "Laurel View Lease"), relating to the premises located in Hempfield, Pennsylvania, known as Laurel View Comprehensive Care Center, more particularly described therein (the "Laurel View Facility").