7 : 122

ALPINE NORTH 1:31
alpine
North

FACILITY LEASE AND SECURITY AGREEMENT

by and between

MEDITRUST OF MISSOURI, INC.,

Lessor

and

INTEGRATED HEALTH SERVICES OF CLIFF MANOR, INC.,

Lessee

Dated as of March 24, 1988

For Premises Located At
Riverside, Platte County, Missouri

Alpine North

#122   (MO)

MEDITRUST

TABLE OF CONTENTS

Page

1.   LEASED PROPERTY; TERM............................ 1

     1.1   Leased Property............................ 1
     1.2   Term....................................... 2

2.   DEFINITIONS...................................... 2

3.   RENT............................................. 12

     3.1   Rent for Land, Leased Improvements,
           Related Rights and Fixtures............... 12
     3.2   Quarterly Calculation and Payment of
           Additional Rent; Annual Reconciliation... 13
     3.3   Confirmation of Additional Rent.......... 14
     3.4   Additional Charges........................ 15
     3.5   Equipment and Renovation Reserves........ 15
     3.6   Net Lease................................. 16

4.   IMPOSITIONS; TAXES; UTILITIES;
     INSURANCE PAYMENTS............................... 16

     4.1   Payment of Impositions.................... 16
     4.2   Notice of Impositions..................... 17
     4.3   Adjustment of Impositions................. 17
     4.4   Utility Charges........................... 17
     4.5   Insurance Premiums........................ 18

5.   NO LESSEE TERMINATION; ABATEMENTS OF RENT..... 18

     5.1   No Lessee Termination..................... 18
     5.2   Abatement of Rent Procedures.............. 19

6.   OWNERSHIP OF LEASED PROPERTY AND
     PERSONAL PROPERTY; SECURITY INTEREST;
     COLLATERAL PLEDGE OF STOCK; REMOVAL AND
     REPLACEMENT OF PERSONAL PROPERTY;
     EQUIPMENT RESERVES.............................. 19

     6.1   Ownership of Leased Property.............. 19
     6.2   Personal Property; Security Interest;
           Collateral Pledge of Stock; Removal
           and Replacement of Personal
           Property.................................. 19
     6.3   Equipment Reserves for Replacement
           of Personal Property..................... 19

Page

7.   CONDITION AND USE OF THE LEASED PROPERTY;
     MANAGEMENT AGREEMENTS........................... 21

     7.1  Condition of the Leased Property......... 21
     7.2  Use of the Leased Property............... 21
          7.2.1. Obligation to Operate............. 21
          7.2.2. Permitted Uses; Compliance
                 With Insurance Requirements....... 21
          7.2.3. No Waste.......................... 22
          7.2.4. No Improvement.................... 22
          7.2.5  The Lessee........................ 22

     7.3  Management Agreements.................... 22

8.   LEGAL REQUIREMENTS AND
     INSURANCE REQUIREMENTS.......................... 22

     8.1  Compliance with Legal and
          Insurance Requirements................... 22
     8.2  Legal Requirement Covenants.............. 23
     8.3  Permitted Contest of Certain
          Legal Requirements....................... 23

9.   REPAIRS; RESTRICTIONS.......................... 24

     9.1  Maintenance and Repair................... 24
     9.2  Encroachments; Restrictions.............. 25

10.  CAPITAL ADDITIONS.............................. 26

     10.1 Construction of Capital Additions........ 26
     10.2 Non-Capital Additions.................... 26
     10.3 Salvage.................................. 26

11.  LIENS.......................................... 26

12.  PERMITTED CONTESTS............................. 27

13.  INSURANCE...................................... 28

     13.1 General Insurance Requirements........... 28
     13.2 Replacement Cost......................... 29
     13.3 Additional Insurance..................... 30
     13.4 Waiver of Subrogation.................... 30
     13.5 Form of Insurance........................ 30
     13.6 Increase in Limits....................... 30
     13.7 Blanket Policy........................... 30
     13.8 No Separate Insurance.................... 30

|  |  | Page |
|---|---|---|
| 14. | FIRE AND CASUALTY | 31 |
| 14.1 | Insurance Proceeds | 31 |
| 14.2 | Reconstruction in the Event of Damage or Destruction Covered by Insurance | 32 |
| 14.3 | Reconstruction in the Event of Damage or Destruction Not Covered by Insurance | 33 |
| 14.4 | Lessee's Property | 34 |
| 14.5 | Restoration of Lessee's Property | 34 |
| 14.6 | Abatement of Rent | 34 |
| 14.7 | Damage Near End of Term | 34 |
| 14.8 | Termination of Purchase Option | 35 |
| 14.9 | Waiver | 35 |
| 15. | CONDEMNATION | 35 |
| 15.1 | Definitions | 35 |
| 15.2 | Parties' Rights and Obligations | 35 |
| 15.3 | Total Taking | 35 |
| 15.4 | Partial Taking | 35 |
| 15.5 | Restoration | 36 |
| 15.6 | Award Distribution | 36 |
| 15.7 | Temporary Taking | 37 |
| 16. | DEFAULT | 37 |
| 16.1 | Events of Default | 37 |
| 16.2 | Certain Remedies | 40 |
| 16.3 | Damages | 41 |
| 16.4 | Waiver | 42 |
| 16.5 | Application of Funds | 43 |
| 16.6 | Failure to Conduct Business | 43 |
| 16.7 | Lessee's Obligation to Purchase | 43 |
| 17. | LESSOR'S RIGHT TO CURE | 44 |
| 18. | PURCHASE OF THE LEASED PROPERTY | 44 |
| 19. | HOLDING OVER | 45 |
| 20. | RISK OF LOSS | 45 |
| 21. | INDEMNIFICATION | 46 |
| 22. | SUBLETTING AND ASSIGNMENT | 47 |
| 22.1 | Subletting and Assignment | 47 |
| 22.2 | Attornment | 47 |

(iii)

                                                                          Page

23.   OFFICER'S CERTIFICATES; FINANCIAL STATEMENTS
      AND ANNUAL BUDGETS...........................     48

      23.1 Officer's Certificates...................     48
      23.2 Financial Statements.....................     48
      23.3 Licensing Information....................     49
      23.4 Annual Budgets...........................     49

24.   INSPECTION....................................     49

25.   NO WAIVER.....................................     49

26.   REMEDIES CUMULATIVE...........................     50

27.   SURRENDER OF LEASED PROPERTY; OF LEASE.........     50

28.   NO MERGER OF TITLE............................     50

29.   TRANSFERS BY LESSOR...........................     51

30.   QUIET ENJOYMENT...............................     51

31.   NOTICES.......................................     51

32.   PURCHASE RIGHTS...............................     53

      32.1  Lessee's Option to Purchase the Leased
            Property................................     53
      32.2  Lessor's Option to Purchase Lessee's
            Personal Property.......................     53
      32.3  Right of First Refusal..................     53

33.   EXTENDED TERMS................................     54

34.   APPRAISAL.....................................     54

35.   DEFAULT BY LESSOR.............................     56

36.   LIENS ON THE LEASED PROPERTY..................     56

37.   SUBORDINATION AND NON-DISTURBANCE.............     57

38.   MISCELLANEOUS.................................     58

      38.1 General..................................     58
      38.2 Transfer of Licenses.....................     58

39.   MEMORANDUM OF LEASE...........................     58

40.   LIMITATION OF LIABILITY.......................     58

| | Page |
|---|---|
| SIGNATURES | 60 |

EXHIBIT A:  Legal Description

EXHIBIT B:  Permitted Title Exceptions

(v)

This Facility Lease and Security Agreement (the "Lease") is dated as of the 24th day of March, 1988 and is between Meditrust of Missouri, Inc. ("Lessor"), a Delaware corporation, having an office at 15-A Walnut Street, Wellesley, Massachusetts 02181, and Integrated Health Services of Cliff Manor, Inc. ("Lessee"), a Delaware corporation, having an office at 11019 McCormick Road, Suite 400, Hunt Valley, MD 21031.

## ARTICLE 1

### LEASED PROPERTY; TERM

1.1 **Leased Property.** Upon and subject to the terms and conditions hereinafter set forth, Lessor leases to Lessee and Lessee rents from Lessor all of Lessor's rights and interest in and to the following real and personal property (collectively, the "Leased Property"):

(i)    the real property located at 4700 Cliffview Drive, Riverside, Platte County, Missouri, more particularly described in Exhibit A attached hereto (the "Land"),

(ii)-   all buildings, structures, fixtures (as hereinafter defined) and other improvements of every kind including, but not limited to, alleyways and connecting tunnels, sidewalks, utility pipes, conduits and lines (on-site and off-site), and parking areas and roadways appurtenant to such buildings and structures presently or hereafter situated upon the Land (collectively, the "Leased Improvements"),

(iii)   all easements, rights and appurtenances relating to the Land and the Leased Improvements (collectively, the "Related Rights"), and

(iv)    all equipment, machinery, fixtures, and other items of real and/or personal property, including all components thereof, now and hereafter located in, on or used in connection with, and permanently affixed to or incorporated into the Leased Improvements, including, without limitation, all furnaces, boilers, heaters, electrical equipment, heating, plumbing, lighting, ventilating, refrigerating, incineration, air and water pollution control, waste disposal, air-cooling and air-conditioning systems and apparatus, sprinkler systems and fire and theft protection equipment, and built-in oxygen and vacuum systems, all of which, to the greatest extent permitted by law, are hereby deemed by the parties hereto to constitute real estate, together with all replacements, modifications, alterations and additions thereto, but specifically excluding all items included within the category of Personal Property as defined below (collectively the "Fixtures").

The Leased Property is demised in its present condition without representation or warranty by Lessor and subject to the rights of parties in possession, and to the existing state of title including all covenants, conditions, restrictions, easements and other matters of record including all applicable laws, the lien of financing instruments, mortgages, deeds of trust and including other matters which would be disclosed by an inspection of the Leased Property or by an accurate survey thereof. The Leased Property is leased subject to all covenants, conditions, restrictions, easements and other matters set forth in Exhibit B.

1.2  **Term**.  The initial term of the Lease shall be for a fixed term (the "Term") commencing on March 21, 1988 (the "Commencement Date") and ending at the later of (1) midnight on March 25, 1998, and (2) the Extended Terms provided for in Article 33, unless this Lease is sooner terminated as hereinafter provided.

## ARTICLE 2

## DEFINITIONS

2.1  **Definitions**.  For all purposes of this Lease, except as otherwise expressly provided or unless the context otherwise requires, (i) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular, (ii) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as at the time applicable, (iii) all references in this Lease to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Lease and (iv) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Lease as a whole and not to any particular Article, Section or other subdivision:

Additional Charges:  As defined in Article 3.

Additional Rent:  As defined in Article 3.

Affiliate:  As used in this Lease the term "Affiliate" shall mean (i) any person which, directly or indirectly, controls or is controlled by or is under common control with such person, (ii) any other person that owns, beneficially, directly or indirectly, five percent (5%) of the outstanding capital stock, shares or equity interests of such person, or (iii) any officer, director, employee, general partner or trustee of such person or any person controlling, controlled by or under common control with such person (excluding trustees

-2-

and persons serving in similar capacities who are not otherwise an Affiliate of such person). The term "person" means and includes individuals, corporations, general and limited partnerships, stock companies or associations, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts, or other entities and governments and agencies and political subdivisions thereof. For the purposes of this definition, "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, through the ownership of voting securities, partnership interests or other equity interests.

Assumed Indebtedness: Any subsequent indebtedness resulting from Lessor's financing of, or Lessor's reimbursement of Lessee's financing of, any Capital Additions during the Term which have been approved of by Lessee, but specifically excluding any indebtedness or other obligations of Lessee not assumed by Lessor prior to or during the Term.

Award: As defined in Article 15.

Base Gross Revenues: The Gross Revenues of the Base Period annualized for a twelve (12) month period.

Base Rent: As defined in Article 3.1.

Base Period: The period beginning January 25, 1988 and ending June 30, 1988.

Business Day: Each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which national banks in the state where the Leased Property is located are authorized, or obligated, by law or executive order, to close.

Capital Additions: One or more new buildings, or one or more additional structures annexed to any portion of any of the Leased Improvements, or the material expansion of existing improvements, which are constructed on any parcel or portion of the Land, during the Term, including the construction of a new wing or new story, or the renovation of existing improvements on the Leased Property in order to provide a functionally new facility needed to provide services not previously offered, or any expansion, renovation, construction or conversion in order to increase the bed capacity of a Facility, to change the purpose for which such beds are utilized or to improve the quality of the Facility.

Capital Additions Cost: The term "Capital Additions Cost" shall mean the cost of any Capital Addition proposed to be made by Lessee whether paid for by Lessee or Lessor. Such cost

shall include (a) the cost of construction of the Capital Additions including site preparation and improvement, materials, labor, supervision, developer and administrative fees, legal fees, and related design, engineering and architectural services, the cost of any fixtures, the cost of construction financing (including but not limited to capitalized interest) and other miscellaneous costs approved by Lessor, (b) if agreed to by Lessor in writing, in advance, the cost of any land contiguous to the Leased Property which is to become a part of the Leased Property purchased for the purpose of placing thereon the Capital Additions or any portion thereof or for providing means of access thereto, or parking facilities therefor, including the cost of surveying the same, (c) the cost of insurance, real estate taxes, water and sewage charges and other carrying charges for such Capital Additions during construction, (d) the cost of title insurance, (e) reasonable fees and expenses of legal counsel, (f) filing, registration and recording taxes and fees, (g) documentary stamp taxes, if any, and (h) all reasonable costs and expenses of Lessor and any Lending Institution which has committed to finance the Capital Additions, including, but not limited to, (i) the reasonable fees and expenses of their respective legal counsel, (ii) all printing expenses, if any, (iii) the amount of any filing, registration and recording taxes and fees, (iv) documentary stamp taxes, if any, (v) title insurance charges, appraisal fees, if any, (vi) rating agency fees, if any, and (vii) commitment fees, if any, charged by any Lending Institution advancing or offering to advance any portion of the financing for such Capital Additions.

Code: The Internal Revenue Code of 1986, as amended.

Commencement Date: As defined in Article 1.

Condemnation, Condemnor: As defined in Article 15.

Consolidated Financials: For any fiscal year or other accounting period for Lessee and/or Guarantor (as the case may be) and its consolidated subsidiaries, statements of earnings and retained earnings and of changes in financial position for such period and for the period from the beginning of the respective fiscal year to the end of such period and the related balance sheet as at the end of such period, together with the notes thereto, all in reasonable detail and setting forth in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, and prepared in accordance with generally accepted accounting principles.

Consolidated Net Worth: At any time, the sum of the following for Lessee and its consolidated subsidiaries, on a consolidated basis determined in accordance with generally accepted accounting principles:

(1)  the amount of capital or stated capital (after
     deducting the cost of any treasury shares), plus

(2)  the amount of capital surplus and retained earnings
     (or, in the case of a capital surplus or retained
     earnings deficit, minus the amount of such deficit),
     minus

(3)  the sum of the following (without duplication of
     deductions in respect of items already deducted in
     arriving at surplus and retained earnings):  (a)
     unamortized debt discount and expense and (b) any
     write-up in book value of assets resulting from a
     revaluation thereof subsequent to the most recent
     Consolidated Financials prior to the date thereof,
     except any net write-up in value of foreign currency
     in accordance with generally accepted accounting
     principles; any write-up resulting from a reversal of
     a reserve for bad debts or depreciation; and any
     write-up resulting from a change in methods of
     accounting for inventory.

Cost of Living Index:  The Consumer Price Index, Urban Wage
Earners and Clerical Workers, All Items, Base 1982-84=100,
published by the Bureau of Labor Statistics, U.S. Department of
Labor, for the geographical area which includes the Leased
Property, or if said Index is not available, then an available
index for the state in which the Leased Property is located, or
if not available, for the entire United States, published by
said bureau or its successor, or if none, by any other
instrumentality of the United States or of the state in which
the Leased Property is located, in the order mentioned.

Date of Taking:  As defined in Article 15.

Encumbrance:  As defined in Article 36.

Event of Default:  As defined in Article 16.

Excess Gross Revenues:  Gross Revenues less Base Gross
Revenues.

Extended Terms:  As defined in Article 33.

Facility:  The existing health care facility situated on
the Leased Property on the Commencement Date, comprising 186
long-term nursing home beds, as it may be modified from time to
time with approval of Lessor.

Facility Mortgage:  As defined in Article 13.

Facility Mortgagee:  As defined in Article 13.

-5-

Fair Market Value: The fair market value of the Leased Property, including all Capital Additions, and (a) assuming the same is unencumbered by this Lease, (b) determined in accordance with the appraisal procedures set forth in Article 14 or in such other manner as shall be mutually acceptable to Lessor and Lessee, and (c) not taking into account any reduction in value resulting from any encumbrance to which the Leased Property is subject and which encumbrance Lessee or Lessor is otherwise required to remove at or prior to closing of the transaction. In determining such Fair Market Value the positive or negative effect on the value of the Leased Property attributable to the interest rate, amortization schedule, maturity date, prepayment penalty and other terms and conditions of any mortgage on the Leased Property which is not so required or agreed to be removed shall be taken into account in determining such Fair Market Value. The Fair Market Value shall be determined by using alternative forms of appraisal such as the "income" approach and the "bricks and mortar" approach; however, the Fair Market value shall be the higher of those values.

Fair Market Added Value: The Fair Market Value of the Leased Property (including all Capital Additions) less the Fair Market Value of the Leased Property determined as if no Capital Additions financed by Lessee had been constructed.

Fair Market Value Purchase Price: The Fair Market Value of the Leased Property less the Fair Market Added Value.

Fiscal Quarter: Each of the three- (3-) month periods commencing July, October, January and April.

Fiscal Year: The twelve- (12-) month period from July 1 to June 30.

Fixtures: As defined in Article 1.

Gross Revenues: The term "Gross Revenues" shall mean all revenues received or receivable from or by reason of the operation of the Facility (including any Capital Additions), or any other use of the Leased Property, including without limitation, all patient revenues received or receivable for the use of or otherwise by reason of all rooms, beds and other facilities provided, meals served, services performed, space or facilities subleased or goods sold on the Leased Property, including without limitation, and except as provided below, any consideration received under any subletting, licensing, or other arrangements with third parties relating to the possession or use of any portion of the Leased Property and all revenues from all ancillary services provided, however, that Gross Revenues shall not include non-operating revenues such as

interest income or gain from the sale of assets not sold in the ordinary course of business; and provided, further, that there shall be deducted from such revenues:

(i)    contractual allowances (relating to any period during the Term of this Lease) for billings not paid by or received from the appropriate governmental agencies or third party providers.

(ii)    allowances according to generally accepted accounting principles for uncollectible accounts.

(iii)    all proper patient billing credits and adjustments according to generally accepted accounting principles relating to health care accounting.

(iv)    federal, state or local sales, use, gross receipts and excise taxes and any tax based upon or measured by said Gross Revenues which is added to or made a part of the amount billed to the patient or other recipient of such services or goods, whether included in the billing or stated separately;

(v)    provider discounts for hospital or other medical facility utilization contracts.

(vi)    the cost of any federal, state or local governmental program imposed specially to provide or finance indigent patient care, and

(vii)    revenues attributable to Capital Additions financed by Lessee as provided for in Section 10.2.

To the extent that the Leased Property is subleased by Lessee to an Affiliate, Gross Revenues shall be calculated for all purposes of this Lease by including the Gross Revenues of such sublessees with respect to the subleased property, i.e., the Gross Revenues generated from the operations conducted on such subleased portion of the Leased Property shall be included directly in the Gross Revenues for the purpose of determining Additional Rent payable under this Lease and the rent received or receivable by such Affiliate lessee from or under such subleases shall be excluded from Gross Revenues for such purpose.  As to any lease of a portion of the Leased Property to a non-Affiliate of Lessee, only the rental actually received by Lessee from such non-Affiliate shall be included in Gross Revenues.

Guarantor:  Integrated Health Services, Inc., a Delaware corporation.

Guaranty:  The guaranty executed by Guarantor to Lessor.

-7-

Hazardous Substances: collectively, (1) any material which
may be dangerous to health or the environment, either
separately or in combination with any other substance, when
improperly stored, treated, disposed, or otherwise managed,
including without limitation, hazardous substances as defined
in the Comprehensive Environmental Response, Compensation and
Liability Act of 1980, as amended, 42 U.S.C. §9601, and (2)
crude or refined oil, including waste oil. Hazardous
Substances shall not include pharmaceuticals, insecticides,
cleaning substances, office supplies and disinfectants of the
types and in quantities normally stocked by health care
providers similar to the Facility.

Impositions: Collectively, all taxes (including, without
limitation, all capital stock and franchise taxes of Lessor,
all ad valorem, sales and use, single business, gross receipts,
transaction privilege, rent or similar taxes), assessments
(including, without limitation, all assessments for public
improvements or benefits, whether or not commended or completed
prior to the date hereof and whether or not to be completed
within the Term), ground rents, water, sewer or other rents and
charges, excises, tax levies, fees (including, without
limitation , license, permit, inspection, authorization and
similar fees), and all other governmental charges, in each case
whether general or special, ordinary or extraordinary, or
foreseen or unforeseen, of every character in respect of the
Leased Property and/or the Rent (including all interest and
penalties thereon due to any failure in payment by Lessee),
which at any time prior to, during or in respect of the Term
hereof may be assessed or imposed on or in respect of or be a
lien upon (a) Lessor or Lessor's interest in the Leased
Property, (b) the Leased Property or any part thereof or any
rent therefrom or any estate, right, title or interest therein,
or (c) any occupancy, operation, use or possession of, sales
from, or activity conducted on, or in connection with, the
Leased Property or the leasing or use of the Leased Property or
any part thereof; provided, however, nothing contained in this
Lease shall be construed to require Lessee to pay (1) any tax
based on net income (whether denominated as a franchise or
capital stock or other tax) imposed on Lessor or any other
person or (2) any transfer or net revenue tax of Lessor or any
other Person except Lessee and its successors or (3) any tax
imposed with respect to the sale, exchange or other disposition
by Lessor of any portion of the Leased Property or the proceeds
thereof, or (4) except as expressly provided elsewhere in this
Lease, any principal or interest on any Encumbrance on the
Leased Property, however, the provisos set forth in this
sentence shall not be applicable to the extent that any tax,
assessment, tax levy or charge which Lessee is obligated to pay
pursuant to the first sentence of this definition and which is
in effect at any time during the Term hereof is totally or
partially repealed, and a tax, assessment, tax levy or charge

set forth in clause (1) or (2) is levied, assessed or imposed expressly in lieu thereof.

Insurance Requirements: All terms of any insurance policy required by this Lease and all requirements of the issuer of any such Policy.

Land: As defined in Article 1.

Lease: As defined in the preamble.

Lease Year: A twelve- (12-) month period commencing on the Commencement Date or on each anniversary date thereof, as the case may be.

Leased Improvements; Leased Property: Each as defined in Article 1.

Legal Requirements: All federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions affecting either the Leased Property or the construction, use or alteration thereof, whether now or hereafter enacted and in force, including any which may (i) require repairs, modifications or alterations in or to the Leased Property or (ii) in any way adversely affect the use and enjoyment thereof, and all permits, licenses, authorizations and regulations relating thereto, including all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Lessee (other than encumbrances created by Lessor without the consent of Lessee), at any time in force affecting the Leased Property, or (iii) require clean-up of Hazardous Substances.

Lending Institution: Any insurance company, federally insured commercial or savings bank, national banking association, savings and loan association, employees' welfare, pension or retirement fund or system, corporate profit-sharing or pension trust, college or university, or real estate investment trust, including any corporation qualified to be treated for federal tax purposes as a real estate investment trust, having a net worth of at least $50,000,000.

Lessee: Integrated Health Services of Cliff Manor, Inc., a Delaware corporation.

Lessor: Meditrust of Missouri, a Delaware corporation, and its successors and assigns.

Management Agreement: Any agreement, whether written or oral, between Lessee and any other party (including but not limited to an Affiliate of Lessee) to manage or operate the Facility on behalf of Lessee.

-9-

Minimum Rent: As defined in Article 3.

Officer's Certificate: A certificate of Lessee signed by the Chairman of the Board of Directors, the President, any Vice President or the Treasurer of Lessee or another officer authorized to so sign by the Board of Directors or By-Laws of Lessee, or any other person whose power and authority to act has been authorized by delegation in writing by any of the persons holding the foregoing offices.

Original Purchase Price: $8,797,900..

Overdue Rate: On any date, a rate per annum equal to the greater of 18% or 120% of the Prime Rate, but in no event greater than the maximum rate then permitted under applicable law.

Payment Date: Any due date for the payment of the installments of Minimum Rent, Additional Rent or any other sums payable under this Lease.

Personal Property: All machinery, equipment, furniture, furnishings, movable walls or partitions, computers or trade fixtures or other personal property, and consumable inventory and supplies, used or useful in Lessee's business on the Leased Property and removable without causing material damage to the Leased Property, including without limitation all items of furniture, furnishings, equipment, vehicles, supplies and inventory, together with all replacements, modifications, alterations, and additions thereto, except items, if any, included within the definition of Fixtures.

Primary Intended Use: Use of the Facility as a health care facility licensed for 186 long-term nursing home beds, plus such additional uses which are permitted by Lessor from time to time.

Prime Rate: The annual rate publicly announced by The First National Bank of Boston to be its base rate for 90-day unsecured loans to its United States corporate borrowers of the highest credit standing, as in effect from time to time.

Purchase and Sale Agreement: The Agreement dated as of March 1, 1988 among Lessee and Lessor relating to the acquisition by Lessor of the Leased Property.

Purchase Option Date: March 30, 1998.

Rent: Collectively, the Minimum Rent, Additional Rent and the Additional Charges.

**Rent Adjustment Date**: The fifth anniversary of the Commencement Date and every fifth anniversary date thereafter during the Term.

**Rent Adjustment Rate**: 400 basis points over the monthly average yield to maturity for actively traded marketable United States treasury securities bearing a fixed rate of interest adjusted for a constant maturity of five (5) years as calculated by the Federal Reserve Board using the monthly average for the month preceding the Rent Adjustment Date.

**State**: The state or commonwealth in which the Leased Property is located.

**Subsidiaries**: Corporations or partnerships, of which Lessee owns, directly or indirectly, more than 51% of the voting stock (individually, a "subsidiary").

**Taking**: A taking or voluntary conveyance during the Term hereof of all or part of the Leased Property, or any interest therein or right accruing thereto or use thereof, as the result of, or in settlement of any Condemnation or other eminent domain proceeding affecting the Leased Property whether or not the same shall have actually been commenced.

**Term**: Collectively, the Fixed Term and any Extended Term, as the context may require, unless earlier terminated pursuant to the provisions hereof.

**United States Treasury Securities**: The uninsured treasury securities issued by the United States Federal Reserve Bank.

**Unsuitable for Its Primary Intended Use**: As used anywhere in this Lease, the term "Unsuitable for its Primary Intended Use" shall mean that, by reason of damage or destruction, or a partial Taking by Condemnation, in the good faith judgment of Lessee, reasonably exercised, the Facility cannot be operated on a commercially practicable basis for its Primary Intended Use, taking into account, among other relevant factors, the number of usable beds affected by such damage or destruction or partial Taking.

**Unavoidable Delays**: Delays due to strikes, lockouts, inability to procure materials, power failure, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes beyond the control of the party responsible for performing an obligation hereunder, provided that lack of funds shall not be deemed a cause beyond the control of either party hereto.

## ARTICLE 3

### RENT

3.1  Rent for Land, Leased Improvements, Related Rights and Fixtures.  Lessee will pay to Lessor, in lawful money of the United States of America, at Lessor's address set forth herein or at such other place or to such other person, firms or corporations as Lessor from time to time may designate in writing, rent for the Leased Property, as follows:

(a)  Minimum Rent:

(i)  A base rent ("Base Rent") per annum, payable in advance in equal, consecutive monthly installments due on the first day of each calendar month.

> A.  For the first eighteen (18) months of the Lease Term, of $967,769, and

> B.  For the period from the nineteenth (19th) to the sixtieth (60th) month of the Lease Term, inclusive, of $1,077,743.

The first monthly payment of such rent shall be payable on the Commencement Date (prorated as to any partial month at the beginning of the Term).

(ii)  On the day that the Base Rent installment for the eighteenth (18th) month of the Lease Term is payable, a one-time payment of $175,958.

(iii)  On each Rent Adjustment Date, the Base Rent shall be adjusted to equal the greater of (i) the current Base Rent or (ii) an amount equal to the Original Purchase Price multiplied by the Rent Adjustment Rate, and from that Rent Adjustment Date until the next Rent Adjustment Date the Base Rent shall be the Base Rent as so adjusted.

(iv)  An amount equal to the monthly sum of all principal, interest and other payments of any kind payable in connection with any Assumed Indebtedness (except for any penalty or interest which may be assessed solely due to Lessor's failure to make timely payments), which portion of the Minimum Rent shall be due and payable no less than ten (10) days in advance of the due dates of such payments to the respective lender.

(b)  Additional Rent:  In addition to the Minimum Rent, Lessee shall pay to Lessor Additional Rent in an amount equal to 5% of Excess Gross Revenues.  Additional Rent shall be payable quarterly during the Term commencing

on the first day of the calendar quarter beginning after the Base Period, ("Additional Rent Commencement Date"), and there shall be an annual reconciliation, as provided in Section 3.2 below.

3.2    Quarterly Calculation and Payment of Additional Rent; Annual Reconciliation.

(a)    Lessee shall calculate and pay Additional Rent quarterly on the first day of each Fiscal Quarter for the prior Fiscal Quarter, based on one quarter of the Excess Gross Revenues for the previous Fiscal Year.

(b)    In addition, on or before the first day of the second Fiscal Quarter of each Fiscal Year, commencing with July 1, 1986, Lessee shall deliver to Lessor an Officer's Certificate reasonably acceptable to Lessor and certified by the chief financial officer of Lessee, setting forth the Gross Revenues for the immediately preceding Fiscal Year. The first annual reconciliation and adjustment of Additional Rent shall be made as of the last day of the Fiscal Year in which the Base Period ends (unless the Fiscal Year and the Base Period are coterminous, in which case the reconciliation shall be made as of the last day of the Fiscal Year following the Base Period) and will reflect the Additional Rent payable with respect to the pro rata portion of the Excess Gross Revenues for the period commencing on the Additional Rent Commencement Date and ending on the last day of that Fiscal Year.

(c)    If the Additional Rent, as finally determined for any Lease Year, exceeds the sum of the quarterly payments of Additional Rent previously paid by Lessee with respect to said Lease Year, Lessee shall, within thirty (30) days after such determination should have been made under Section 3.2(b), pay such deficit to Lessor plus interest on such deficit from the last day of the Lease Year at the Prime Rate plus two (2) percentage points.

(d)    If the Additional Rent for any year is less than the amount previously paid with respect thereto by Lessee, Lessee shall notify Lessor either (i) to pay to Lessee an amount equal to such difference, or (ii) to grant Lessee a credit against Additional Rent next coming due in the amount of such difference.

(e)    The obligation to pay Additional Rent shall survive the expiration or earlier termination of the Term, and a final reconciliation, taking into account, among other relevant adjustments, any contractual allowances which related to Gross Revenues accrued prior to such termination date but which have been determined to be not

-13-

payable after such termination date, and Lessee's good
faith best estimate of the amount of any unresolved
contractual allowances, shall be made not later than two
(2) years after said expiration or termination date.
Lessee shall advise Lessor within sixty (60) days after
such expiration or termination date of Lessee's best
estimate at that time of the approximate amount of such
adjustments, which estimate shall not be binding on Lessee
or have any legal effect whatsoever.

3.3     Confirmation of Additional Rent.  Lessee shall
utilize, or cause to be utilized, an accounting system for the
Leased Property in accordance with its usual and customary
practices and in accordance with generally accepted accounting
principles which will accurately record all Gross Revenues.
Lessee shall retain, for at least three (3) years after the
expiration of each Lease Year, (and in any event until the
final reconciliation described in Section 3.2 above has been
made), reasonably adequate records conforming to such
accounting system showing all Gross Revenues for such Lease
Year.  Lessor, at its own expense except as provided
hereinbelow, shall have the right from time to time, within
three (3) years after the expiration of each Lease Year to have
its accountants or representatives audit the information set
forth in the Officer's Certificate referred to in Section 3.2
and in connection with such audits to examine Lessee's records
with respect thereto (including supporting data and sales tax
returns), subject to any prohibitions or limitations on
disclosure of any such data under applicable law or
regulations, including without limitation, any duly enacted
"Patients' Bill of Rights" or similar legislation, including
such limitations as may be necessary to preserve the
confidentiality of the Facility-patient relationship and the
physician-patient privilege.  If any such audit discloses a
deficiency in the reporting of Gross Revenues, and either
Lessee agrees with the result of such audit or the matter is
compromised, Lessee shall forthwith pay to Lessor the amount of
the deficiency in Additional Rent which would have been payable
by it had such deficiency in reporting Gross Revenues not
occurred, as finally agreed or determined, together with
interest on the additional Additional Rent which should have
been payable by it, at the Overdue Rate from the date when said
payment should have been made by Lessee to the date of payment
thereof; provided, however, that as to any audit that is
commenced more than two (2) years after the date Gross Revenues
for any Lease Year are reported by Lessee to Lessor, the
deficiency, if any, with respect to Additional Rent shall bear
interest as permitted herein only from the date such
determination of deficiency is made, unless such deficiency is
the result of gross negligence or willful misconduct on the
part of Lessee.  If any such audit discloses that the Gross
Revenues actually received by Lessee for any Lease Year exceed

-14-

those reported by Lessee by more than 3%, Lessee shall pay the
reasonable cost of such audit and examination.  Any
proprietary information obtained by Lessor pursuant to the
provisions of this Section shall be treated as confidential,
except that such information may be used in any litigation or
arbitration proceedings between the parties and except,
further, that Lessor may disclose such information to
prospective lenders, subject in each case to appropriate
confidentiality safeguards.  The obligations of Lessor and
Lessee contained in this Section shall survive the expiration
or earlier termination of this Lease.

3.4.   Additional Charges.  In addition to the Minimum Rent
and Additional Rent, (1) Lessee will also pay and discharge as
and when due and payable all Impositions and other amounts,
liabilities and obligations which Lessee assumes or agrees to
pay under this Lease, and (2) in the event of any failure on
the part of Lessee to pay any of those items referred to in
clause (1) above, Lessee will also promptly pay and discharge
every fine, penalty, interest and cost which may be added for
non-payment or late payment of such items (the items referred
to in clauses (1) and (2) above being referred to herein
collectively as the "Additional Charges"), and Lessor shall
have all legal, equitable and contractual rights, powers and
remedies provided in this Lease, by statute or otherwise, in
the case of non-payment of the Additional Charges, as well as
the Minimum Rent and Additional Rent.  If any installment of
Minimum Rent, Additional Rent or Additional Charges (but only
as to those Additional Charges which are payable directly to
Lessor) shall not be paid within five (5) Business Days after
its due date, Lessee will pay Lessor on demand, as Additional
Charges, a late charge (to the extent permitted by law)
computed at the Overdue Rate (or at the maximum rate permitted
by law, whichever is less) on the amount of such installment,
from the due date of such installment to the date of payment
thereof.  To the extent that Lessee pays any Additional Charges
to Lessor pursuant to any requirement of this Lease, Lessee
shall be relieved of its obligation to pay such Additional
Charges to the entity to which they would otherwise be due.

3.5   Equipment and Renovation Reserves.  In addition to all
other payments required of Lessee under this Lease, Lessee
shall pay directly to the Lessor under any separate reserve or
escrow agreement with Lessor or to the holder of any Assumed
Indebtedness existing against the Leased Property as and when
due and as its own independent obligation to the lender or
Lessor, as the case may be, all sums required under the terms
of such escrow or reserve agreement for equipment, renovation,
refurbishment or similar reserves ("Equipment Reserves");
provided, however, that Lessee shall have the right to use such
reserve funds subject to the terms of such escrow or reserve
agreements so long as Lessee is not in default hereunder.

-15-

1.6  **Net Lease**.  The Rent shall be paid absolutely net to Lessor, so that this Lease shall yield to Lessor the full amount of the installments of Minimum Rent, and the payments of Additional Rent and Additional Charges throughout the Term, all as more fully set forth in Article 4, but subject to any other provisions of this Lease which expressly provide for adjustment or abatement of Rent or other charges.

## ARTICLE 4

## IMPOSITIONS; TAXES, UTILITIES, INSURANCE PAYMENTS

4.1  **Payment of Impositions**.  Subject to Article 12 relating to permitted contests, Lessee will pay or cause to be paid all Impositions before any fine, penalty, interest or cost may be added for non-payment, such payments to be made directly to the taxing authority where feasible, and Lessee will promptly furnish Lessor copies of official receipts or other satisfactory proof evidencing payment.  If Lessee has failed to make any payments required under this Article 4, or Lessee is otherwise in default under this Lease, upon Lessor's request, Lessee will pay to the Lessor monthly, together with the Minimum Rent, one twelfth (1/12) of the amount from time to time estimated by the Lessor to reflect the Impositions which are assessed or billed to the Lessor by the appropriate governmental authority or authorities, if any.  Lessee's obligation to pay such Impositions shall be deemed absolutely fixed upon the date such Impositions become a lien upon the Leased Property or any part thereof.  Lessee shall have paid such Imposition at least fifteen (15) days before the last day on which the foregoing may be due and payable to the proper authorities before any fine, penalty, interest or cost be added thereto, or be imposed by operation of law for the non-payment thereof.  If any such Imposition may, at the option of the taxpayer, lawfully be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Lessee may exercise the option to pay the same (and any accrued interest on the unpaid balance of such Imposition) in installments and, in such event, shall pay such installments during the Term hereof (subject to Lessee's right of contest pursuant to the provisions of Article 12) as the same respectively become due and before any fine, penalty, premium, further interest or cost may be added thereto. Lessor, at its expense, shall, to the extent permitted by applicable law, prepare and file all tax returns and reports as may be required by governmental authorities in respect of Lessor's net income, gross receipts, franchise taxes and taxes on its capital stock, and Lessee, at its expense, shall, to the extent permitted by applicable laws and regulations, prepare and file all other tax returns and reports in respect of any Imposition as may be required by governmental authorities.  If

no Event of Default shall have occurred hereunder and be
continuing, any refund due from any taxing authority in respect
of any Imposition paid by Lessee shall be paid over to or
retained by Lessee. If an Event of Default shall have occurred
and be continuing, such funds shall be at Lessor's option paid
over to Lessor and/or retained by Lessor and applied as
provided in Article 16. Lessor and Lessee shall, upon request
of the other, provide such data as is maintained by the party
to whom the request is made with respect to the Leased Property
as may be necessary to prepare any required returns and
reports. In the event governmental authorities classify any
property covered by this Lease as personal property, Lessee
shall file all personal property tax returns in such
jurisdictions where it may legally so file. Lessor, to the
extent it possesses the same. and Lessee, to the extent it
possesses the same, will provide the other party. upon request.
with cost and depreciation records necessary for filing returns
for any property so classified as personal property. Where
Lessor is legally required to file personal property tax
returns, Lessee will be provided with copies of assessment
notices indicating a value in excess of the reported value in
sufficient time for Lessee to file a protest. Lessee may, upon
giving notice to Lessor, at Lessee's option and at Lessee's
sole cost and expense. protest, appeal, or institute such other
proceedings as Lessee may deem appropriate to effect a
reduction of real estate or personal property assessments and
Lessor, at Lessee's expense as aforesaid, shall fully cooperate
with Lessee in such protest, appeal, or other action. Billings
for reimbursement by Lessee to Lessor of personal property
taxes shall be accompanied by copies of a bill therefor and
payments thereof which identify the personal property with
respect to which such payments are made.

4.2   Notice of Impositions. Lessor shall give prompt
notice to Lessee of all Impositions payable by Lessee hereunder
of which Lessor at any time has knowledge, but Lessor's failure
to give any such notice shall in no way diminish Lessee's
obligations hereunder to pay such Impositions, except that
Lessee shall not be responsible for interest or penalties
incurred solely because of the failure of Lessor to give notice
to Lessee of such Impositions.

4.3   Adjustment of Impositions. Impositions imposed in
respect of the tax-fiscal period during which the Term
terminates shall be adjusted and prorated between Lessor and
Lessee, whether or not such Imposition is imposed before or
after such termination, and Lessee's obligation to pay its
prorated share thereof shall survive such termination.

4.4   Utility Charges. Lessee will pay or cause to be paid
all charges for electricity, power, gas, oil, water and other
utilities used in the Leased Property during the Term.

4.5    Insurance Premiums.    Lessor will pay or cause to be paid all premiums for the insurance coverage required to be maintained pursuant to Article 13 during the Term.  At Lessor's request, if Lessee fails to make payments required under this Article 4 or if there is otherwise a default under this Lease, Lessee shall pay to Lessor monthly, together with Minimum Rent, one twelfth (1/12) of the amount from time to time estimated by Lessor to reflect the amount necessary to pay premiums for such insurance coverage.

## ARTICLE 5

### NO LESSEE TERMINATION:
### ABATEMENTS OF RENT

5.1    No Lessee Termination.    Except as otherwise specifically provided in this Lease, Lessee, to the extent permitted by law, shall remain bound by this Lease in accordance with its terms and shall neither take any action without the consent of Lessor to modify, surrender or terminate the same, nor seek nor be entitled to any abatement, deduction, deferment or reduction of Rent, or set-off against the Rent, nor shall the respective obligations of Lessor and Lessee be otherwise affected by reason of (a) any damage to, or destruction of, any Leased Property or any portion thereof from whatever cause or any Taking of the Leased Property or any portion thereof, (b) the lawful or unlawful prohibition of, or restriction upon, Lessee's use of the Leased Property, or any portion thereof, or the interference with such use by any person, corporation, partnership or other entity, or by reason of eviction by paramount title; (c) any claim which Lessee has or might have against Lessor or by reason of any default or breach of any warranty by Lessor under this Lease or any other agreement between Lessor and Lessee, or to which Lessor and Lessee are parties, (d) any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceedings affecting Lessor or any assignee or transferee of Lessor, or (e) for any other cause whether similar or dissimilar to any of the foregoing other than a discharge of Lessee from any such obligations as a matter of law.  Lessee hereby specifically waives all rights, arising from any occurrence whatsoever, which may now or hereafter be conferred upon it by law to (i) modify, surrender or terminate this Lease or quit or surrender the Leased Property or any portion thereof, or (ii) entitle Lessee to any abatement, reduction, suspension or deferment of the Rent or other sums payable by Lessee hereunder, except as otherwise specifically provided in this Lease.  The obligations of Lessor and Lessee hereunder shall be separate and independent covenants and agreements and the Rent and all other sums payable by Lessee hereunder shall continue to be payable in all events unless the obligations to pay the same shall be

terminated pursuant to the express provisions of this Lease or by termination of this Lease other than by reason of an Event of Default.

5.2   Abatement of Rent Procedures.   In the event of a partial Taking as described in Section 15.4, a temporary Taking as described in Section 15.7, or damage to or destruction of the Leased Property as described in Article 14, which Taking, damage or destruction does not render the Leased Property Unsuitable for Its Primary Intended Use, the Lease shall not terminate, but the Minimum Rent and Additional Rent shall be abated (but only after twelve (12) months, in the case of damage or destruction) to the extent that is fair, just and equitable to both Lessee and Lessor, taking into consideration all relevant factors affecting the Facility resulting from such partial Taking or damage or destruction.   If Lessor and Lessee are unable to agree upon the amount of such abatement within ninety (90) days after such partial or temporary taking or within twelve (12) months after such damage or destruction, the matter shall be submitted to arbitration.

### ARTICLE 6

#### OWNERSHIP OF LEASED PROPERTY AND PERSONAL PROPERTY: SECURITY INTEREST: COLLATERAL PLEDGE OF STOCK: REMOVAL AND REPLACEMENT OF PERSONAL PROPERTY

6.1   Ownership of the Leased Property.   Lessee acknowledges that the Leased Property is the property of Lessor and that Lessee has only the right to the exclusive possession and use of the Leased Property upon the terms and conditions of this Lease.

6.2   Personal Property: Security Interest: Collateral Pledge of Stock: Removal and Replacement of Personal Property. After the commencement of this Lease, Lessee may, at its expense, install, affix or assemble or place on the Leased Property, any items of Personal Property, and such Personal Property and replacements thereof, shall be at all times the property of Lessee.   Notwithstanding the foregoing sentence, in order to secure the payment and the performance of all of Lessee's obligations under this Lease and any obligations in any lease between Lessee and any Affiliates and Lessor, Lessee hereby grants to Lessor a security interest in (and hereby pledges and collaterally assigns to Lessor) all of Lessee's rights, title and interest in and to Lessee's Personal Property (subject to the first security interest of Fidelity Bank, National Association, et al, recorded in Chattel, January 26, 1988, as Document 36319), all whether now existing or hereafter acquired and Lessee hereby further agrees to execute and deliver to Lessor, forthwith after demand by Lessor from time to time, any security agreement in a form determined by Lessor and such additional writings and instruments, including without limitation financing statements, as may be required by Lessor

-19-

for the purpose of effectuating the intent of this sentence, and Lessee agrees that Lessor shall have with respect to all Lessee's Personal Property (in addition to all other rights hereunder), all rights and remedies of a secured party under the Uniform Commercial Code, including but not limited to the right to use or sell Lessee's Personal Property, and Lessor shall not be required to remove any of such Personal Property from the Leased Property and in no event shall Lessor be liable to Lessee for use of such Personal Property. Pending disposition of such Personal Property by Lessor, the Lessor or its successors or assigns shall be entitled to use such Personal Property in connection with the operation (if any) of the Facility. This instrument shall be deemed to satisfy the requirements of a financing statement under the Uniform Commercial Code. Lessee shall not permit the Personal Property or Lease Property to become subject to any liens or encumbrances of any kind without first obtaining the prior written consent of Lessor. In furtherance of the foregoing security interest granted to Lessor and to further secure Lessee's obligation under this Lease, Lessee shall provide Lessor with a Collateral Pledge of Stock Agreement in form and substance satisfactory to Lessor collaterally pledging Lessee's stock to Lessor or its assigns. Lessee shall maintain during the entire Lease Term all Personal Property and shall provide at its expense all necessary replacements thereof, as may be necessary in order to operate the Facility as it is presently operated and necessary to operate the Facility in compliance with all licensure and certification requirements, in compliance with all applicable Legal Requirements and Insurance Requirements and otherwise in accordance with customary practice in the industry for the Primary Intended Use. Lessee shall in addition furnish all necessary replacements of obsolete items of the Personal Property during the term of this Lease. All of Lessee's Personal Property not removed by Lessee within ten (10) days following the expiration or earlier termination of this Lease shall be considered abandoned by Lessee and may be appropriated, sold, destroyed or otherwise disposed of by Lessor without first giving notice thereof to Lessee, without any payment to Lessee and without any obligation to account therefor. Notwithstanding the foregoing, Lessee shall have no right to remove any Personal Property from the Leased Premises except if such Personal Property is simultaneously replaced by equivalent personal property or upon termination of this Lease for reasons other than default by Lessee. Lessee will, at its expense, restore the Leased Property to the condition required by Section 9.1(a), including repair of all damage to the Leased Property caused by the removal of Lessee's Personal Property, whether effected by Lessee or Lessor. Lessor's security interest hereunder shall be subject and subordinate to purchase money financing of the Personal Property for up to eighty (80%) percent of its value for the purpose of replacing such items with those of equivalent or superior value.

-20-

6.3   Equipment Reserves for Replacement of Personal
Property.   Both Lessor and Lessee agree that, before Lessee
shall incur any cost or expense for necessary replacements of
the Personal Property, Lessor and Lessee shall first utilize
Equipment Reserves, if any, that are available under any
Facility Mortgage covering the Leased Property and/or Personal
Property.   To the extent that Lessor incurs any cost or expense
in excess of such available reserves or escrows expended for
the purchase of any replacement property, Lessee shall pay as
an addition to the Minimum Rent, and on the same dates, a sum
equal to the fair market rental value of the replacement
property.   Lessee agrees to comply with any renovation and
escrow agreements with Lessor and with any equipment reserve
agreement with any Facility Mortgagee.

## ARTICLE 7

### CONDITION AND USE OF LEASED PROPERTY:
### MANAGEMENT AGREEMENTS

7.1   Condition of the Leased Property.   Lessee acknowledges
receipt and delivery of possession of the Leased Property and
that Lessee has examined and otherwise has acquired knowledge
of the condition of the Leased Property prior to the execution
and delivery of this Lease and has found the same to be in good
order and repair and satisfactory for its purpose hereunder.
Lessee is leasing the Leased Property "as is" in its present
condition.   Lessee waives any claim or action against Lessor in
respect of the condition of the Leased Property.   LESSOR MAKES
NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN RESPECT
OF THE LEASED PROPERTY OR ANY PART THEREOF, EITHER AS TO ITS
FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR
PURPOSE OR OTHERWISE, OR AS TO DEFECTS IN QUALITY OF THE
MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, IT BEING
AGREED THAT ALL SUCH RISKS ARE TO BE BORNE BY LESSEE.   LESSEE
ACKNOWLEDGES THAT THE LEASED PROPERTY HAS BEEN INSPECTED BY
LESSEE AND IS SATISFACTORY TO IT.

7.2   Use of the Leased Property.

7.2.1   Obligation to Operate.   Lessee covenants
that it will operate continuously the Leased Property in
accordance with its Primary Intended Use and maintain its
qualifications for licensure and accreditation as required
by Legal Requirements.

7.2.2   Permitted Uses: Compliance with Insurance
Requirements.   After the Commencement Date and during the
entire Term, Lessee shall use or cause to be used the
Leased Property and the improvements thereon in accordance
with its Primary Intended Use and for such other uses as
may be necessary in connection with or incidental to such
use.   Lessee shall not use the Leased Property or any
portion thereof for any other primary use without the prior

written consent of Lessor.  No use shall be made or permitted to be made of the Leased Property and no acts shall be done which will cause the cancellation (without replacement coverage in the same amounts and under the same terms) of any insurance policy covering the Leased Property or any part thereof, nor shall Lessee sell or otherwise provide to patients therein, or permit to be kept, used or sold in or about the Leased Property any article which may be prohibited by law or by the standard form of fire insurance policies, any other insurance policies required to be carried hereunder, or fire underwriters regulations. Lessee shall, at its sole cost, comply with all of the requirements pertaining to the Leased Property or other improvements of any insurance board, association, organization or company necessary for the maintenance of the insurance, as herein provided, covering the Leased Property.

7.2.3     No Waste.  Lessee shall not commit or suffer to be committed any waste on the Leased Property, or in the Facility, nor shall Lessee cause or permit any nuisance thereon.

7.2.4     No Impairment.  Lessee shall neither suffer nor permit the Leased Property or any portion thereof to be used in such a manner as (i) might reasonably tend to impair Lessor's title thereto or to any portion thereof, or (ii) may reasonably make possible a claim or claims of adverse usage or adverse possession by the public, as such, or of implied dedication of the Leased Property or any portion thereof.

7.2.5     The Lessee.  The Lessee shall be the Guarantor or a wholly-owned subsidiary of the Guarantor.

7.3  Management Agreements.  Lessee shall not enter into any Management Agreement unless the terms thereof have been previously approved in writing by Lessor, and such approval shall be in Lessor's sole discretion.  All such Management Agreements must be in writing and must state that all fees payable thereunder by Lessee are subordinated to all sums due under this Lease.

## ARTICLE 8

### LEGAL AND INSURANCE REQUIREMENTS

8.1   Compliance with Legal and Insurance Requirements. Lessee, at its expense, will promptly (a) comply with all Legal Requirements and Insurance Requirements in respect of the use, operation, maintenance, repair and restoration of the Leased

Property, whether or not compliance therewith shall require structural change in any of the Leased Improvements or interfere with the use and enjoyment of the Leased Property and (b) procure, maintain and comply with all licenses, qualifications, accreditation, certificates of need, provider agreements and other authorizations required for any use of the Leased Property for the Primary Intended Use or other permitted uses then being made, and for the proper erection, installation, operation and maintenance of the Leased Property or any part thereof.

8.2    Legal Requirement Covenants.    Lessee covenants and agrees that the Leased Property shall not be used for any unlawful purpose, and shall acquire and maintain all licenses, certificates, permits, provider agreements and other authorizations and approvals needed to operate the Leased Property in its customary manner for the Primary Intended Use and any other use conducted on the Leased Property as may be permitted from time to time hereunder.    Lessee further covenants and agrees that Lessee's use of the Leased Property and maintenance, alteration, and operation of the same, and all parts thereof, shall at all times conform in all material respects to all applicable local, state and federal laws, ordinances, rules and regulations unless the same are held by a court of competent jurisdiction to be unlawful; however Lessee shall conform in all respects to all laws, ordinances, rules and regulations concerning licensing or occupancy of the Leased Property, unless the same are held by a court of competent jurisdiction to be unlawful, and except for minor violations which shall be cured immediately and which, in the sole discretion of the Lessor, shall not affect the marketability or leaseability of the Leased Property or the reputation of the Lessor.

8.3    Permitted Contest of Certain Legal Requirements. Unless there is a default under this Lease, Lessee may, upon prior written notice to Lessor, contest the legality or applicability of any law, ordinance, rule or regulation, or any licensure or notification decision related to the operation of the Leased Property for the Primary Intended Use or other uses conducted thereon which are permitted by Lessor, if Lessee maintains such action in good faith, with due diligence, without prejudice to Lessor's rights hereunder, and at Lessee's own expense.    If, by the terms of any such law, ordinance, rule or regulation, compliance therewith pending the prosecution of any such proceeding may legally be delayed without the occurrence of any lien, charge or liability of any kind against the Facility or Lessee's leasehold interest therein and without subjecting Lessee or Lessor to any liability, civil or criminal, for failure so to comply therewith, Lessee may delay compliance therewith until the final determination of such proceeding.    If any lien, charge or civil or criminal liability

would be incurred by reason of any such delay, Lessee, on
obtaining the prior written consent of Lessor, may nonetheless
contest as aforesaid any delay as aforesaid provided that such
delay would not subject Lessor to criminal liability and Lessee
both (a) furnishes to Lessor security reasonably satisfactory
to Lessor against any loss or injury by reason of such contest
or delay and (b) prosecutes the contest with due diligence and
in good faith.

## ARTICLE 9

### REPAIRS; RESTRICTIONS

9.1    Maintenance and Repair.

(a)    Lessee, at its expense, will keep the Leased
Property and all private roadways, sidewalks and curbs
appurtenant thereto which are under Lessee's control in
good order and repair (whether or not the need for such
repairs occurs as a result of Lessee's use, any prior use,
the elements or the age of the Leased Property or any
portion thereof) and, except as otherwise provided in
Articles 14 and 15, with reasonable promptness, will make
all necessary and appropriate repairs thereto of every kind
and nature, whether interior or exterior, structural or
non-structural, ordinary or extraordinary, foreseen or
unforeseen or arising by reason of a condition (concealed
or otherwise) existing prior to the commencement of the
Term of this Lease. Lessee shall also be obligated at its
expense to make all repairs, modifications, and renovations
necessary to comply with all licensing, safety, health and
building codes, and regulations applicable to the Leased
Property so that it can be legally operated for its Primary
Intended Use. All repairs shall, to the extent reasonably
achievable, be at least equivalent in quality to the
original work. Lessee will not take or omit to take any
action the taking or omission of which might materially
impair the value or the usefulness of the Leased Property,
or any part thereof for the Primary Intended Use.

(b)    Except to the extent provided in Articles 14 and
15 hereof, Lessor shall not under any circumstances be
required to build or rebuild any improvements on the Leased
Property, or to make any repairs, replacements,
alterations, restorations, or renewals of any nature or
description to the Leased Property, whether ordinary or
extraordinary, structural or non-structural, foreseen or
unforeseen, or to make any expenditure whatsoever with
respect thereto in connection with this Lease, or to
maintain the Leased Property in any way.

(c)  Nothing contained in this Lease and no action or inaction by Lessor shall be construed as (i) constituting the consent or request of Lessor, express or implied, to any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services for the construction, alteration, addition, repair or demolition of or to the Leased Property or any part thereof, or (ii) giving Lessee any right, power or permission to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Lessor in respect thereof or to make any agreement that may create, or in any way be the basis for, any right, title, interest, lien, claim or other encumbrance upon the estate of Lessor in the Leased Property or any portion thereof.

9.2  Encroachments; Restrictions.  If any of the Leased Improvements shall, at any time, encroach upon any property, street or right-of-way adjacent to the Leased Property, or shall violate the agreements or conditions contained in any lawful restrictive covenant or other agreement affecting the Leased Property, or any part thereof, or shall impair the rights of others under any easement or right-of-way to which the Leased Property is subject, then promptly upon the request of Lessor, Lessee shall, at its expense, subject to its right to contest the existence of any encroachment, violation or impairment, (i) obtain valid and effective waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation or impairment, whether the same shall affect Lessor or Lessee or (ii) make such changes in the Leased Improvements, and take such other actions, as Lessee in the good faith exercise of its judgment deems reasonably practicable, to remove such encroachment, or to end such violation or impairment, including, if necessary, the alteration of any of the Leased Improvements and in any event take all such actions as may be necessary in order to be able to continue the operation of the Leased Improvements for the Primary Intended Use substantially in the manner and to the extent the Leased Improvements were operated prior to the assertion of such violation of encroachment.  Any such alteration shall be made in conformity with the applicable requirements of Article 10.  Lessee's obligations under this Section 9.2 shall be in addition to and shall in no way discharge or diminish any obligation of any insurer under any policy of title or other insurance and Lessee shall be entitled to a credit for any sums recovered by Lessor under any such policy of title or other insurance.

## ARTICLE 10

### CAPITAL ADDITIONS

10.1 Construction of Capital Additions. Without the prior written consent of Lessor, which consent may be withheld or granted by Lessor in its sole discretion, Lessee shall make no material structural alterations to the Leased Property or Capital Addition, except as may be expressly required pursuant to Article 9 hereof, and shall not enlarge or reduce the size of the Facility.

10.2 Non-Capital Additions. Lessee shall have the right and obligation to make additions, modifications or improvements to the Leased Property which are not Capital Additions from time to time as it may deem to be desirable or necessary for its uses and purposes, provided that such action will not significantly alter the character or purpose or detract from the value or operating efficiency thereof and will not significantly impair the revenue-producing capability of the Leased Property or adversely affect the ability of the Lessee to comply with the provisions of this Lease. The cost of such Non-Capital Additions, modifications or improvements to the Leased Property shall be paid by Lessee, and all such Non-Capital Additions, modifications and improvements shall, without payment by Lessor at any time, be included under the terms of this Lease and upon expiration or earlier termination of this Lease shall pass to and become the property of Lessor. Lessee hereby agrees to make and complete all renovations required under any escrow or renovation agreements with Lessor or the holder of any mortgage.

10.3 Salvage. All materials which are scrapped or removed in connection with the making of either Capital Additions permitted by Section 10.1 or repairs required by Article 9 shall be or become the property of Lessor or Lessee depending on which party is paying for, or providing the financing for, such work.

## ARTICLE 11

### LIENS

Subject to the provisions of Article 12 relating to permitted contests, Lessee will not directly or indirectly create or allow to remain and will promptly discharge at its expense any lien, encumbrance, attachment, title retention agreement or claim upon the Leased Property resulting from actions of or failures to act by the Lessee or any attachment, levy, claim or encumbrance in respect of the Rent, not including, however, (a) this Lease, (b) the matters, if any, set forth in Exhibit B, (c) restrictions, liens and other

encumbrances which are consented to in writing by Lessor, (d) liens for those taxes of Lessor which Lessee is not required to pay hereunder, (e) subleases permitted by Article 22, (f) liens of mechanics, laborers, materialmen, suppliers or vendors for sums either disputed or not yet due, provided that (1) the payment of such sums shall not be postponed for more than sixty (60) days after the completion of the action giving rise to such lien and such reserve or other appropriate provisions as shall be required by law or generally accepted accounting principles shall have been made therefor or (2) any such liens are in the process of being contested as permitted by Article 12, (g) any liens which are the responsibility of Lessor pursuant to the provisions of Article 36 of this Lease, and (h) liens for Impositions not yet due and payable without addition of any fine or penalty or are in the process of being contested under Article 12.

## ARTICLE 12

### PERMITTED CONTESTS

Lessee, on its own or on Lessor's behalf (or in Lessor's name), but at Lessee's expense, may contest, by appropriate legal proceedings conducted in good faith and with due diligence, the amount, validity or application, in whole or in part, of any Imposition, Legal Requirement, Insurance Requirement, lien, attachment, levy, encumbrance, charge or claim not otherwise permitted by Article 11, provided that (a) in the case of an unpaid Imposition, lien, attachment, levy, encumbrance, charge or claim, the commencement and continuation of such proceedings shall suspend the collection thereof from Lessor and from the Leased Property, (b) neither the Leased Property nor any Rent therefrom nor any part thereof or interest therein would be in any immediate danger of being sold, forfeited, attached or lost, (c) in the case of a Legal Requirement, Lessor would not be  n any immediate danger of civil or criminal liability for failure to comply therewith pending the outcome of such proceedings, (d) in the event that any such contest shall involve a sum of money or potential loss in excess of Fifty Thousand Dollars ($50,000), then, in any such event, Lessee shall deliver to Lessor an Officer's Certificate and opinion of counsel, if appropriate, to the effect set forth in clauses (a), (b) and (c), to the extent applicable, (e) in the case of a Legal Requirement and/or an Imposition, lien, encumbrance or charge, Lessee shall give such reasonable security as may be demanded by Lessor to insure ultimate payment of the same and to prevent any sale or forfeiture of the affected portion of the Leased Property or the Rent by reason of such non-payment or non-compliance; provided, however, the provisions of this Article 12 shall not be construed to permit Lessee to contest the payment of Rent or any other sums payable by Lessee to Lessor hereunder, (f) in

the case of an Insurance Requirement, the coverage required by Article 13 shall be maintained, and (q) if such contest be finally resolved against Lessor or Lessee. Lessee shall, as Additional Charges due hereunder, promptly pay the amount required to be paid, together with all interest and penalties accrued thereon, or comply with the applicable Legal Requirement or Insurance Requirement.  Lessor, at Lessee's expense, shall execute and deliver to Lessee such authorizations and other documents as may reasonably be required in any such contest and, if reasonably requested by Lessee or if Lessor so desires, Lessor shall join as a party therein.  Lessee shall indemnify and save Lessor harmless against any liability, cost or expense of any kind that may be imposed upon Lessor in connection with any such contest and any loss resulting therefrom.

## ARTICLE 13

### INSURANCE

13.1    General Insurance Requirements.  During the Term of this Lease, Lessee shall at all times keep the Leased Property, and all property located in or on the Leased Property insured with the kinds and amounts of insurance described below.  This insurance shall be written by companies authorized to do insurance business in the state in which the Leased Property is located.  The policies must name Lessor as an additional insured and losses shall be payable to Lessor and/or Lessee as provided in Article 14.  In addition, the policies shall name as an additional insured the holder ("Facility Mortgagee") of any mortgage, deed of trust or other security agreement securing any Encumbrance placed on the Leased Property in accordance with the provisions of Article 36 ("Facility Mortgage") by way of a standard form of mortgagee's loss payable endorsement.  Any loss adjustment shall require the written consent of Lessor, Lessee and each affected Facility Mortgagee.  Evidence of insurance shall be deposited with Lessor and, if requested, with any Facility Mortgagee(s).  If any provision of any Facility Mortgage requires deposits for insurance premiums to be made with such Facility Mortgagee, Lessee shall either pay to Lessor monthly the amounts required and Lessor shall transfer such amounts to such Facility Mortgagee or, pursuant to written direction by Lessor, Lessee shall make such deposits directly with such Facility Mortgagee.  The policies on the Leased Property shall insure against the following risks:

13.1.1    All Risk Insurance.  Loss or damage by fire, vandalism and malicious mischief, extended coverage perils commonly known as "All Risk" and all physical loss perils, including but not limited, to sprinkler leakage in an amount not less than the greater of one hundred percent

(100%) of the then full replacement cost thereof (as defined below in Section 13.2) or in such amount which is economically feasible and which is acceptable to Lessor;

13.1.2    **Boiler Insurance**.  Loss or damage by explosion of steam boilers, pressure vessels or similar apparatus, now or hereafter installed in the Facility, in such limits with respect to any one accident as may be reasonably requested by Lessor from time to time;

13.1.3    **Rental Insurance**.  Loss of rental under a rental value insurance policy and/or business interruption insurance covering Lessor's risk of loss by the occurrence of any of the hazards described in Sections 13.1.1 or 13.1.2 in an amount sufficient to prevent Lessor from becoming a co-insurer and to cover Rent and Additional Rent for one (1) year;

13.1.4    **Liability Insurance**.  Claims for personal injury or property damage under a policy of comprehensive general public liability insurance with amounts not less than Five Million Dollars ($5,000,000) per occurrence in respect of bodily injury and death and Three Million Dollars ($3,000,000) for property damage;

13.1.5    **Malpractice Insurance**.  Claims arising out of malpractice in an amount not less than Five Million Dollars ($5,000,000) for each person and Ten Million Dollars ($10,000,000) for each occurrence;

13.1.6    **Flood Insurance**.  Flood (when the Leased Property is located in whole or in part within a designated flood plain area) and such other hazards and in such amounts as may be customary for comparable properties in the area and if available from insurance companies authorized to do business in the state in which the Leased Property is located at rates which are economically practicable in relation to the risks covered.

13.2    **Replacement Cost**.  The term "full replacement cost" as used herein, shall mean the actual replacement cost of the Leased Premises (including all Capital Additions regardless of who paid for such improvements) thereof from time to time, including increased cost of construction endorsement, less exclusions provided in the normal fire insurance policy.  In the event either party believes that the full replacement cost has increased or decreased at any time during the Term, it shall have the right from time to time to have such full replacement cost redetermined by the fire insurance company which is then providing the largest amount of fire insurance carried on the Leased Property, hereinafter referred to as the "impartial appraiser".  The party desiring to have the full

-29-