IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTEGRATED HEALTH SERVICES OF, | ) | |
| CLIFF MANOR, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-910 (GMS) |
| | ) | |
| THCI, COMPANY LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

**I. INTRODUCTION**

On July 28, 2004, the above-captioned action was transferred to the court from the Western District of Missouri. Presently before the court is IHS Long Term Care, Inc. ("LTC"), Integrated Health Services at Cliff Manor, Inc., Integrated Health Services of Riverbend, Inc., Integrated Health Services at Somerset Valley, Inc., Alpine Manor, Inc., Briarcliff Nursing Home, Inc., Integrated Health Group, Inc., Spring Creek of IHS, Inc., Firelands of IHS, Inc., and Elm Creek of IHS, Inc.'s (collectively, the "plaintiffs") motion to disqualify Arent Fox PLLC ("Arent Fox") from representing the defendant THCI, Company LLC ("THCI") in this action.

**II. BACKGROUND**

The present case arises out of issues pertaining to the bankruptcy of Integrated Health Services ("IHS") and its subsidiaries, operators of nursing homes throughout the United States. In February 2000, IHS and its subsidiaries (collectively, "IHS") filed for bankruptcy under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). (D.I. 52, at 2; D.I. 55, at 4.) As part of its plan of reorganization, IHS entered into a Stock Purchase Agreement (the "SPA") with Abe Briarwood Corporation ("Briarwood"), on

January 28, 2003 to accomplish a transfer of ownership. (D.I. 52, at 2; D.I. 55, at 4.) The SPA provided for the creation of LTC as a subsidiary of IHS and the assignment by IHS to LTC of the stock of IHS' subsidiaries that operated the nursing homes. (D.I. 55, at 4.) After IHS created and assigned its stock to LTC, IHS would then sell and transfer LTC's stock to Briarwood, which would become the ultimate owner and operator of the nursing homes.

Arent Fox was specifically retained under an Order of the Bankruptcy Court to serve as "special corporate and regulatory counsel" to IHS. (D.I. 55, Ex. 3A.) Arent Fox advised IHS about the regulatory obligations associated with the transfer contemplated in the SPA, as the transaction required numerous filings with state and federal regulatory agencies on behalf of IHS, LTC, and Briarwood. (D.I. 52, at 2-3; D.I. 55, at 4.) Arent Fox also represented LTC for the period prior to the closing on the transaction, and in connection with the regulatory and licensing applications and filings. (D.I. 55, at 5.) Arent Fox's representation of LTC terminated when LTC's ownership was transferred to Briarwood. (*Id.* at 5.)

THCI is the current owner of the properties on which the plaintiffs operate nursing home facilities. (D.I. 52, at 3.) The plaintiffs leased the properties underlying their respective facilities from THCI.[1] In addition, IHS was bound to guaranties on the leases and guaranteed the performance of all obligations and liabilities of the lessees. (D.I. 55, at 6.) During the IHS bankruptcy proceedings, THCI and IHS disputed whether, and upon what terms and conditions, IHS might be permitted under the Bankruptcy Code to assume or reject the leases. (*Id.*) In March 2002, however, THCI, IHS, and the plaintiffs entered into a settlement agreement that was approved and entered as

---

[1] The plaintiffs originally leased the properties from the Meditrust Corporation, or one of its subsidiaries ("Meditrust"). During the IHS bankruptcy proceedings, THCI succeeded to Meditrust's interests under the leases. (D.I. 55, at 6.)

an Order by the Bankruptcy Court. (*Id.*) The Order provided for the creation of a Master Lease between THCI, IHS, and the plaintiffs for the nursing home facility properties.

In 2003, IHS filed its plan of reorganization (the "Plan"), which was confirmed by the Bankruptcy Court. As previously stated, the Plan established the SPA transaction between IHS and Briarwood that called for the creation of LTC and, ultimately, the transfer of LTC's stock to Briarwood. Prior to confirmation of the Plan, IHS filed a motion with the Bankruptcy Court seeking leave to reject the leases and guarantees. (D.I. 55, at 7.) THCI opposed the motion and filed a cross-motion to compel IHS and the plaintiffs to comply with the March 2002 Order and enter into a Master Lease. (*Id.*) In April 2003, the Bankruptcy court entered an Order imposing the terms of the leases and guaranties upon IHS and the plaintiffs. (*Id.*) The plaintiffs appealed the April 2003 Order to this court.[2]

On April 5, 2004, the plaintiffs commenced the current declaratory judgment action against THCI in the Circuit Court of Platte County Missouri. The petition requests the court to order: (a) that the Master Lease is null and void if the District Court of Delaware rules in favor of the plaintiffs on appeal; (b) that if the Master Lease is held valid by the District Court of Delaware, then the plaintiffs are not required to pay rent to THCI because it terminated the Master Lease; ©) that the plaintiffs pay rent in escrow until the court makes a determination with respect to the validity and enforceability of the leases; (d) that there were no lease guaranties in effect after May 31, 2001; (e) that LTC is not obligated under any guaranty requirement; and (f) that THCI is not entitled to damages under any guaranty. *See* Petition for Declaratory Judgment and Other Relief ("Petition"), Case No. 04cv82966, Counts I & II.

---

[2] The bankruptcy appeal is still pending.

Subsequent to the plaintiffs' filing in state court, THCI filed a notice of removal, pursuant to 28 U.S.C. §§ 1452 and 1334, and based on the declaratory judgment action's relationship to the IHS bankruptcy appeal pending in this court. The case was removed to the Western District of Missouri. THCI then filed a motion to transfer venue to this court, which the district court in Missouri granted on July 28, 2004. On September 9, 2004, the plaintiffs filed the motion to disqualify that is presently before the court.

### III.   DISCUSSION

#### A.   Disqualification

The court has inherent power to supervise the professional conduct of attorneys appearing before it. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). This power includes the authority to disqualify an attorney. *Id.* At the outset, however, the court wants to emphasize that motions to disqualify are generally disfavored. *See Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994). The party seeking disqualification must "clearly show[] that continued representation would be impermissible." *Id.* As such, "[v]ague and unsupported allegations are not sufficient to meet this standard." *Id.*

In the present case, IHS contends that Arent Fox has violated Rule 1.7(a), Rule 1.9, and Rule 1.6 of the Model Rules of Professional conduct and, therefore, should be disqualified from further representing THCI. Conversely, THCI asserts that Arent Fox has not violated any ethical rule because (a) it does not currently represent the plaintiffs and, therefore, Rule 1.7(a) is inapplicable; (b) the current litigation is not substantially related to Arent Fox's prior representation of IHS and does not implicate Rule 1.9; and ©) Arent Fox did not obtain any confidential information relating

to the plaintiffs in its representation of IHS, thereby precluding a violation of Rule 1.6.[3] The court must determine if Arent Fox has violated Rule 1.7(a), Rule 1.9, and/or Rule 1.6, and if so, whether disqualification is an appropriate sanction for such a violation. The court will address each of these issues in turn.

### B.  Application of Rule 1.7(a)

Pursuant to Local Rule 83.6(d)(2), the District of Delaware has adopted the Model Rules of Professional Conduct. Rule 1.7 of the Model Rules provides that an attorney may not represent two clients when representation of one would be "directly adverse" to or would "materially limit" representation of the other, unless the attorney "reasonably believes" that he or she "will be able to provide competent and diligent representation to each affected client," and both clients consent, in

---

[3] Arent Fox also asserts, as a threshold matter, that the plaintiffs have waived any potential conflict that may have arisen out of the current litigation because they delayed filing the motion to disqualify for four months. (D.I. 55, at 11.) The court disagrees. Although Arent Fox correctly states that courts have held that waiver is appropriate when litigants delay filing motions to disqualify for tactical purposes, see *Central Milk Producers Cooperative v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir. 1978), the cases it cites in support of that proposition have found waiver only when the delay was significant (*i.e.* the motion was filed years after the conflict issue arose) and/or the motion was filed shortly before trial. *See Commonwealth Ins. Co. v. Graphix Hotline, Inc.*, 808 F. Supp. 1200, 1209 (E.D. Pa. 1992) (finding waiver when the movant filed the motion to disqualify more than two years after the case began and three weeks prior to trial); *Central Milk Producers*, 573 F.2d at 992 (finding waiver when movant filed motion to disqualify more than two years after discovering conflict); *Georgia Baptist Health Care Sys. v. Hanafi*, 559 S.E.2d 746, 748 (Ga. App. 2002) (finding waiver when movant waited seventeen months after learning of conflict); *Concerned Parents of Jordan Park v. Housing Authority*, 934 F. Supp. 406, 408 (M.D. Fl. 1996) (finding waiver when movant filed motion to disqualify two months before the close of discovery and five months after filing suit when movant knew of conflict months before filing suit).
  Here, the plaintiffs filed their motion on September 9, 2004, four months after filing their petition in the Missouri state court and less than two months after the case was transferred to this court. Further, the parties have not yet proposed a Scheduling Order, no discovery has occurred, and a trial date has not been set. Accordingly, the court concludes that the plaintiffs have not substantially delayed filing the motion to disqualify Arent Fox in order to gain a tactical advantage.

writing, to the representation. *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 (2002).

The plaintiffs contend that Arent Fox represents LTC's related entities in connection with the licensing of nursing homes in Oklahoma. (D.I. 52, at 5 n.1.) The plaintiffs further contend that Arent Fox's representation of Trans Healthcare, Inc. ("THI") in obtaining approval to operate nursing home facilities in Oklahoma acts as a representation of LTC and its related entities for purposes of Rule 1.7(a). (D.I. 58, at 5.) According to the plaintiffs, acquiring the operating license (*i.e.* obtaining regulatory approval) for THI is necessary to effectuate LTC's contractual agreement with IHS under the SPA. (*Id.*) That is, Arent Fox is representing THI whose interest arises through LTC and, therefore, Arent Fox is effectively representing LTC.

To support their contentions, the plaintiffs submitted the affidavit of Harry Grunsten, President of LTC (the "Grunsten Affidavit"). The Grunsten Affidavit states that LTC has a contractual agreement with IHS to acquire the assets of IHS 100, a subsidiary of IHS located in Oklahoma. (D.I. 59 ¶ 3.) The assets of IHS 100 include the lease for a skilled nursing facility in Oklahoma. (*Id.*) LTC has agreed to sublease the Oklahoma facility to THI. (*Id.* ¶ 4.) Under the terms of the sublease, once THI obtains regulatory approval it will operate the Oklahoma facility. (*Id.*) However, until regulatory approvals are obtained from Oklahoma, the sublease arrangements between LTC and THI cannot be concluded. (*Id.* ¶ 5.) Therefore, according to the Grunsten Affidavit, since any rights that THI may have to operate the Oklahoma facility emanate from LTC's contract to purchase IHS 100, Arent Fox is representing both THI and LTC in terms of obtaining regulatory approval for the Oklahoma Facility. The court is not persuaded by the plaintiffs' arguments.

First, while the court agrees that THI and LTC have a short-term common interest in obtaining regulatory approval in order to conclude the sublease transaction, it does not follow that Arent Fox is representing both of their overall interests. That is, it cannot be said that Arent Fox is representing both parties interests in the sublease transaction. If that was the case then Arent Fox would have a current conflict of interest because it would be representing parties that were directly adverse – a landlord and a tenant. Here, it is in both parties' interests to obtain regulatory approval – LTC in order to sublease the Oklahoma facility (to THI or *any* potential sublessee) and THI in order to lease the facility from LTC. However, this does not mean that the party's attorney (or law firm) who undertakes the task of obtaining regulatory approval is representing both parties in the overall transaction, or even in obtaining approval. In the present case, Arent Fox represents only THI as to the regulatory matters (D.I. 55 Ex. 3, at 8.) and has not been retained by LTC for regulatory or any other matters relating to the sublease transaction. Therefore, the fact that LTC is also interested in regulatory approval is irrelevant. Accordingly, under the circumstances of the THI and LTC sublease transaction, the court does not conclude that Arent Fox is representing LTC or any of the plaintiffs in this case.[4] Thus, Arent Fox has not violated Rule 1.7.

**C.    Application of Rule 1.9**

The plaintiffs next contend that if Arent Fox is no longer representing LTC, then disqualification is appropriate under Model Rule 1.9. Rule 1.9(a) states, in pertinent part that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse

---

[4] The plaintiffs also rely on Comment 34 to Rule 1.7 to support their theory of Arent Fox's "effective representation" of LTC. This reliance, however, fails for the same reasons stated above.

to the interests of the former client unless the former client gives informed consent, confirmed in writing." MODEL RULES OF PROF'L CONDUCT R. 1.9 (2002). Thus, the appropriate standard for ruling on the plaintiffs' motion based on Rule 1.9 is the "substantial relationship" test. *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F. Supp. 1281, 1282-83 (D. Del. 1987). In determining whether a "substantial relationship" exists, "the court need not, nor should it, inquire into whether an attorney actually acquired confidential information during the prior representation related to the current representation. Rather, the court's primary concern is whether 'confidential information that might have been gained in the first representation [may be] used to the detriment of the former client in the subsequent action.'" *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F. Supp. 1200, 1204 (E.D. Pa. 1992) (citing *Realco Servs., Inc. v. Holt*, 479 F. Supp. 867, 871 (E.D. Pa. 1979).

In order to determine whether Arent Fox has violated Rule 1.9(a), the court must "undertake a 'painstaking analysis of the facts'" and answer the following three questions: (1) "What is the nature and scope of the prior representation at issue"; (2) "[w]hat is the nature of the present lawsuit against the former client"; and (3) "[i]n the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action" and, "[i]n particular, could any such confidences be detrimental to the former client in the current litigation?" *Satellite Fin. Planning*, 652 F. Supp. at 1283 (citing *INA Underwriters v. Nalibotsky*, 594 F. Supp. 1199, 1206 (E.D. Pa. 1984). As the moving party, the plaintiffs have the burden of proving that there is a substantial relationship. *See id.* The court will consider each of the questions in turn.

*1. The Nature and Scope of the Prior Litigation*

When considering the nature and scope of the prior litigation, courts "should focus upon the reasons for the retention of counsel and the tasks which the attorney [or firm] was employed to perform." *Commonwealth Ins. Co.*, 808 F. Supp. at 1204. As to this question, the plaintiffs contend that Arent Fox was hired to obtain regulatory approvals in order to enable LTC to operate the nursing home facilities acquired from IHS under the SPA and the Plan. (D.I. 58, at 6-7.) The plaintiffs then summarily state, without evidentiary support, that "Arent Fox's tasks necessarily involved obtaining information about both LTC and IHS in order to evaluate and determine the appropriate information to provide to regulatory agencies." (*Id.* at 7.)

Arent Fox, on the other hand, asserts that its former representation of IHS in connection with the SPA is not in any way related to the current THCI litigation. (D.I. 55, at 15.) It further asserts that its attorneys provided regulatory authorities notices of the stock transfer, completed applications for licensing, and advised IHS and LTC as to the proper mechanism for the transfer. (*Id.* at 15-16.) Notably, its attorneys did not represent IHS in negotiating the SPA. (*Id.* at 5.) According to Arent Fox, its prior representation of LTC, as a subsidiary of IHS, occurred only before LTC was transferred to Briarwood under the SPA. (*Id.* at 16.) Arent Fox has submitted the declaration of Michael Blass, a member of its law firm who has acted as counsel for IHS for over 17 years, (the "Blass Declaration") to support its assertions.

The Blass Declaration states that Arent Fox was retained as special corporate and regulatory counsel to IHS and advised IHS with respect to regulatory issues concerning the stock transfer

9

between it and Briarwood.[5]  (*Id.* Ex. 3 Blass Declaration ¶ 7.)  In order to fulfill the regulatory requirements, Arent Fox advised, identified, and contacted the appropriate officials of each state to verify the state's policies, prepared letters notifying regulatory authorities of the sale and stock transfer, and prepared and filed the notifications and/or other health care regulatory documents.  (*Id.* ¶¶ 10-11, 14.)  Regulatory applications for stock transfers requested general corporate information with respect to the operator of the health care facilities and the transferee, here, Briarwood.  (*Id.* ¶ 15.)  Various regulatory authorities also required more specific information that includes the identity of directors and officers of the transferee and the sources of funding used in the acquisition.  (*Id.* ¶ 16.)  According to the Blass Declaration, Duane Morris was counsel to Briarwood with respect the regulatory matters in connection with the transfer, and provided Arent Fox with the information needed for the regulatory authorities.  (*Id.* ¶¶ 12, 17-18.)

With respect to LTC, the Blass Declaration states that Arent Fox represented the company indirectly for the period prior to the closing on the stock transfer and in connection with the regulatory applications.  (*Id.* ¶ 22.)  However, Arent Fox's representation of LTC terminated upon the transfer of its stock to Briarwood in accordance with the SPA.  (*Id.* ¶ 23.)  That is, as of the closing of the stock transfer, Arent Fox no longer represented LTC, but continued to represent IHS, as well as those affiliates that remained with IHS after the closing (*i.e.* those affiliates whose stock was not transferred to Briarwood under the SPA).  (*Id.* ¶ 26.)  With respect to the sale and transfer of stock, Arent Fox served only as counsel to IHS not Briarwood or its principles.  (*Id.* ¶ 29.)

After having considered the parties submissions with a focus on the reasons for retention of

---

[5] As previously stated, in accordance with the law, IHS was required to notify state regulatory authorities as to the stock transfer.  Arent Fox advised IHS as to the regulatory requirements for approximately 33 states.  (D.I. 55 Ex. 3 Blass Declaration ¶¶ 9-10.)

counsel and the tasks which Arent Fox was employed to perform, the court finds that the scope of its prior representation of IHS and its subsidiaries was discreet. That is, Arent Fox performed the regulatory tasks necessary to effectuate the sale and stock transfer which included ensuring that the proper regulatory authorities were informed of the transaction and filing the proper notifications, documents, and information with the regulatory authorities. Its representation of LTC was limited to regulatory filings and terminated upon the closing of the transfer of stock to Briarwood. Moreover, the record supports the conclusion that Arent Fox did not represent IHS and/or any of its affiliates in connection with the guaranties and leases that are at issue in the present litigation.

    *2. The Nature of the Present Lawsuit*

In considering the nature of the present litigation, a court "should evaluate the issues raised . . . and the underlying facts." *Commonwealth Ins. Co.*, 808 F. Supp. at 1204. Here, the plaintiffs filed a declaratory judgment action to "resolve landlord-tenant issues" (D.I. 58, at 7) regarding whether a Master Lease exists that covers any of the nursing home properties that the plaintiffs presently occupy, whether the plaintiffs have any guaranty obligations to THCI, and whether the plaintiffs assumed leases entered into by IHS and, therefore, have to pay rent to THCI. (*See* Petition, Case No. 04cv82966, Counts I & II.) The parties do not dispute that the present lawsuit was filed to resolve a conflict over the existence and validity of real property leases and guaranties. The plaintiffs, however, contend that the defendant's counterclaims "raise issues which are clearly tied to the type of information that Arent Fox obtained [in] its representation of IHS and LTC, and the conveyance of the nursing home facilities to LTC" and, ultimately Briarwood. (D.I. 58, at 7.) The court disagrees. The present litigation involves some of the same issues that were addressed by the Bankruptcy Court and raised on appeal to this court in a separate action. However, as discussed

above, Arent Fox's representation of IHS as special corporate and regulatory counsel was limited and tangential to the Bankruptcy proceeding, as well as the current litigation. The nature of the current litigation, therefore, is a landlord and tenant dispute stemming from the Orders of the Bankruptcy Court, which required the plaintiffs to comply with the lease rate and guaranty terms of its March 2002 Order.

> 3. *Whether Confidences Might Have Been Disclosed in the Course of the Prior Representation Which Could be Relevant to the Present Action*

With respect to this final question, the court should not look to what information the attorney or law firm actually acquired from the former client but whether the attorney "*might* have acquired information related to the subject matter of his subsequent representation." *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972) (emphasis added). That is, the court should consider whether LTC and Arent Fox "ought to have discussed the relevant facts [of the present litigation] or whether it would not have been unusual for the lawyer and client to have discussed the relevant facts." *Satellite Fin. Planning*, 652 F. Supp. at 1284. The plaintiffs assert that because Arent Fox's representation of LTC "was not simply to prepare regulatory filings" it would not have been unusual for LTC and Briarwood to have discussed matters relating to the structure and financing of LTC and Briarwood with Arent Fox. (D.I. 58, at 9.) However, the plaintiffs do not offer any support as to how Arent Fox represented LTC other than preparing regulatory filings and/or of what matters relating to the structure and financing of LTC and Briarwood Arent Fox would have been privy to by virtue of its representation of LTC.

As previously discussed, the information provided to Arent Fox in its representation of IHS and LTC was information necessary to complete regulatory applications and filings, or general corporate information. This information was provided by Briarwood for the specific purpose of

12

including it in the regulatory applications that were filed with the proper regulatory authorities. This fact, combined with the limited nature of Arent Fox's representation in connection with the transfer of stock leads the court to conclude that it would have been unusual for LTC and/or Briarwood and Arent Fox to discuss matters relevant to the present litigation. In other words, for the court to find that relevant confidential information "might" have been communicated in the present case, it would be forced to hypothesize a conceivable but unlikely situation. *See Satellite Fin. Planning*, 652 F. Supp. at 1284 (advising courts not to "allow [their] imagination[s] to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which would be relevant to the present suit"). As such, the court finds that the answer to the final question is no. Thus, the plaintiffs have not clearly shown that Arent Fox's continued representation of THCI would be impermissible. Accordingly, the court will not disqualify Arent Fox from representing THCI in this matter.[6]

Dated: July 18 , 2005                                            /s/ Gregory M. Sleet
                                                                 UNITED STATES DISTRICT JUDGE

---

[6] The plaintiffs Rule 1.6 argument is essentially the same as their 1.9 argument regarding confidential information. For example, the plaintiffs assert that "the mere fact that Arent Fox was hired as regulatory counsel, does not mean that it did not obtain confidential information," and "it would have been customary for LTC to have discussed confidential matters with Arent Fox related to the structuring and financing of LTC as part of Arent Fox's acquisition of the necessary information to prepare the regulatory filings." (D.I. 58, at 10.) The court has already considered the plaintiffs' assertions and disposed of the "confidential information" issue in Section III.C.3, *supra*. As such, it need not address the application of Rule 1.6, which prohibits a lawyer from revealing information relating to the representation of a client without the client's consent.

IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTEGRATED HEALTH SERVICES OF, ) <br> CLIFF MANOR, INC., et al.,  ) <br> ) <br> Plaintiffs, ) <br> ) <br> v.    ) <br> ) <br> THCI, COMPANY LLC,   ) <br> ) <br> Defendant.  ) | C.A. No. 04-910 (GMS) |

## **ORDER**

For the reasons stated in the courts Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The plaintiffs' Motion to Disqualify Arent Fox PLLC (D.I. 51) is DENIED.


Dated: July 18 , 2005                         /s/ Gregory M. Sleet
                                              UNITED STATES DISTRICT JUDGE