# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

———————————————————

| | |
|---|---|
| INTEGRATED HEALTH SERVICES OF CLIFF MANOR, INC., INTEGRATED HEALTH SERVICES AT RIVERBEND, INTEGRATED HEALTH SERVICES AT SOMERSET VALLEY, INC., ALPINE MANOR, INC., BRIARCLIFF NURSING HOME, INC., INTEGRATED HEALTH GROUP, INC., SPRING CREEK OF IHS, INC., FIRELANDS OF IHS, INC., ELM CREEK OF IHS, INC., IHS LONG TERM CARE SERVICES, INC., ABE BRIARWOOD CORP., JOHN DOES I THROUGH X, JOHN ROES I THROUGH Y, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs-Counterclaim Defendants, | ) ) |
| v. | ) )    C.A. No. 04-910 (GMS) |
| THCI COMPANY LLC, | ) ) ) |
| Defendant-Counterclaim Plaintiff. | ) ) |

———————————————————

## SECOND AMENDED COUNTERCLAIMS

Defendant-Counterclaim Plaintiff THCI Company LLC ("THCI"), by its

undersigned counsel, as for its second amended Counterclaims against Plaintiffs-

Counterclaim Defendants IHS Long Term Care Services, Inc. ("LTC"), Integrated Health

Services of Cliff Manor, Inc., Integrated Health Services at Riverbend, Inc., Integrated

Health Services at Somerset Valley, Inc., Alpine Manor, Inc., Briarcliff Nursing Home,

Inc.; Integrated Health Group, Inc., Spring Creek of IHS, Inc.; Firelands of IHS, Inc., and

Elm Creek of IHS, Inc., Counterclaim Defendant Abe Briarwood Corp. ("Briarwood"),

Counterclaim Defendants Abe Briarwood Corporation ("Briarwood"), John Does 1 through 4 ("Doe Defendants") and John-Roes I through 5 ("Roe Defendants" and, collectively with John Doe Defendants, the "Additional Counterclaim Defendants"), hereby alleges as follows:

## PARTIES

1.      Defendant-Counterclaimant THCI Company LLC ("THCI") is a limited liability company organized under the laws of the State of Delaware and having its principal place of business in Hackensack, New Jersey.  THCI is in the business of owning and managing health care facilities, including nursing homes, and leasing them to health care facility operators.

2.      Plaintiffs-Counterclaim-Defendants Integrated Health Services of Cliff Manor, Inc., Integrated Health Services at Riverbend, Inc., Integrated Health Services at Somerset Valley, Inc., Alpine Manor, Inc., Briarcliff Nursing Home, Inc., Integrated Health Group, Inc., Spring Creek of IHS, Inc., Firelands of IHS, Inc., and Elm Creek of IHS, Inc. ("Nine Subsidiaries" and, collectively with LTC, the "IHS Plaintiffs") are corporations fully-owned by LTC.  The Nine Subsidiaries lease nine nursing homes ("each a "Facility" and collectively, the "Facilities") owned by THCI.  The Facilities are currently operated and managed on a day-to-day basis by Tri-State Health Investors, LLC. ("Tri-State"), a third party specializing in the management of health care facilities.

3.      Plaintiff-Counterclaim-Defendant LTC is a parent company of the Nine Subsidiaries.

4.      Counterclaim Defendant Briarwood is a corporation organized under the laws of the State of Nevada and is in the business of operating health care facilities.

Briarwood directly owns LTC and is an indirect parent of the Nine Subsidiaries. Briarwood is controlled and managed by Harry M. Grunstein ("Grunstein"). In addition to Briarwood, Grunstein owns, directly or indirectly, Mariner Health Care, Inc., ("Mariner") and National Senior Care, Inc., ("National") and controls hundreds of direct and indirect subsidiaries of Mariner and National, through which Mariner and National conduct business in the nursing home and healthcare industries. Upon information and belief, Grunstein is only a nominee owner of the Briarwood, Mariner and National, and the real owner of Briarwood, Mariner, National and their subsidiaries is Rubin Schron ("Schron").

5.    Doe Counterclaim-Defendants 1 through 4 ("Doe Counterclaim Defendants") are unnamed entities in addition to the named Counterclaim Defendants that were involved in the transactions described below or otherwise benefited from the actions described below.

6.    Roe Counterclaim Defendants 1 through 5 ("Roe Counterclaim Defendants," and, collectively with Doe Counterclaim Defendants, the "Additional Counterclaim Defendants") are unnamed persons in addition to the named Counterclaim Defendants that were involved in the transactions described below or otherwise benefited from the actions described below.

## BACKGROUND

7.    Prior to February 2000, Integrated Health Services, Inc. ("IHS") was one of the largest operators of long-term care facilities in the United States. IHS conducted its operations through numerous direct and indirect subsidiaries. Generally, each subsidiary operated a single long-term care facility.

8.    IHS' subsidiaries, including the Nine Subsidiaries, leased ten facilities (including the Facilities) from Meditrust Corporation or its subsidiaries in the states of Ohio, Pennsylvania, New Jersey, Alabama, Michigan, and Missouri pursuant to long-term leases (each a "Lease" and collectively, the "Leases").

9.    To support the its subsidiaries' obligations under the Leases, IHS as a guarantor ("Guarantor") executed ten guaranty agreements (each a "Guaranty," and collectively, the "Guaranties") simultaneously with the Leases.  Pursuant to the Guaranties, IHS "absolutely and unconditionally" guaranteed to Meditrust "the full, faithful, and punctual performance, fulfillment, observance, and payment of all of the obligations and liabilities" of its subsidiaries under the Leases.

10.    The Guaranties further provided that "[e]ach reference . . .  to Guarantor . . . shall be deemed to include the . . . successors . . . of Guarantor . . . who[] shall be bound by the provisions of this guaranty."

11.    In 1993, the Leases were amended pursuant to a modification agreement ("Lease Modification Agreement").  IHS was a party to the Lease Modification Agreement and expressly "acknowledge[d] and agree[d] that all of its obligations under the Lease Guaranties shall remain in full force and effect and shall hereafter apply to the Leases as amended by this Agreement."  The Lease Modification Agreement contained numerous cross-default provisions with the Leases and Guaranties, forming a single integrated master lease agreement between Meditrust, and IHS and its subsidiaries, including the Nine Subsidiaries.

12.    In February 2000, IHS and virtually all of its subsidiaries, including the Nine Subsidiaries, filed petitions for relief under Chapter 11 of the Bankruptcy Code in

-4-

the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court").

13.     During the Chapter 11 proceeding, THCI succeeded to the rights and interests of Meditrust with respect to the Leases, the Lease Modification Agreement, and the Guaranties.

14.     During the Chapter 11 proceeding, IHS proposed to reject certain Leases and a dispute arose between IHS and THCI over whether IHS had the right under the Bankruptcy Code to assume or reject *selectively* some of the Leases, because the Lease Modification Agreement formed a single integrated master lease between THCI, and IHS and its subsidiaries, making it impossible to selectively accept some and reject some of the Leases.

15.     The dispute was litigated extensively in the Delaware Bankruptcy Court. In the course of the litigation, the parties presented, and the litigation came to encompass and subsume, multiple issues including but not limited to, whether the Leases were valid, whether they had previously been terminated or expired by their terms, and whether the Leases were susceptible to assumption under the Bankruptcy Code.

16.     The dispute in its entirety was resolved in March 2002, when THCI, IHS, and the Nine Subsidiaries entered into a settlement agreement that was approved and entered as an order by the Delaware Bankruptcy Court ("March 2002 Order").

17.     The March 2002 Order, in pertinent part, resolved all issues about the validity of the Leases.  The Order allowed IHS and the Nine Subsidiaries to assume nine Leases ("Nine Leases"), and reject the Lease for a Facility in Bellbrook, Ohio.

18.     The March 2002 Order also modified certain terms and conditions of the Nine Leases and the Lease Modification Agreement, and otherwise restated the terms of the Nine Leases and the Lease Modification Agreement, except insofar as specific provisions of the March 2002 Order superceded the terms of the Nine Leases and the Lease Modification Agreement.  THCI, IHS and the Nine Subsidiaries executed the March 2002 Order, which effectively continued the Guaranties in full force and effect as post-petition liabilities of IHS.

19.     The March 2002 Order also directed IHS, the Nine Subsidiaries, and THCI to enter into a "Master Lease" that would "amend and restate" the Nine Leases into a formal single document collating the terms of the Nine Leases, the Lease Modification Agreement, the March 2002 Order, and such other terms as to which the parties might agree mutually in the course of reviewing and restating these documents into a unified master lease.

20.     While the IHS Plaintiffs and THCI did not agree upon the "Master Lease" contemplated by the March 2002 Order, the Nine Subsidiaries continued to occupy and operate the Facilities in compliance with the material terms of the Nine Leases as modified by the Lease Modification Agreement and the March 2002 Order.

21.     By early 2003, IHS had worked out a Chapter 11 plan of reorganization pursuant to which all of the assets and liabilities associated with its long term care business, including the capital stock of all of its long term care subsidiaries (including, but not limited to the capital stock of the Nine Subsidiaries), would be sold in a best-and-highest bid process under the authority of Chapter 11 and the Delaware Bankruptcy Court.

22.    Briarwood ultimately emerged as the successful bidder for the IHS long-term care business, including the Nine Subsidiaries.

23.    The sale of IHS's long-term care business to Briarwood became the cornerstone of IHS's plan of reorganization proposed to the Delaware Bankruptcy Court for confirmation.

24.    Consistent with its proposed plan of reorganization, IHS entered into a Stock Purchase Agreement ("SPA") with Briarwood dated January 28, 2003.

25.    Under section 5.9 of the SPA, but contingent on the ultimate confirmation of the proposed plan of reorganization by the Delaware Bankruptcy Court, IHS was required to create a new subsidiary, defined in the SPA as the "LTC Subsidiary."

26.    Pursuant to section 5.9(b) of the SPA,

> Seller [IHS] shall assign, and the LTC Subsidiary shall assume . . . all of Seller's assets *and liabilities* . . . including without limitation the capital stock of all of the Subsidiaries that conduct Seller's long-term care businesses . . . .

(emphasis added).

27.    LTC was formed as the "LTC Subsidiary" contemplated by the SPA, to serve as a vehicle for transferring to Briarwood (i) the rights, assets, liabilities, and obligations of the IHS long term care subsidiaries, including, but not limited to, the Nine Subsidiaries, and (ii) the rights, assets, and liabilities of IHS related to those subsidiaries.

28.    Pursuant to section 2.1 of the SPA, Briarwood was required to purchase the stock of the LTC Subsidiary for a designated price.

29.    Notwithstanding its commitments under the SPA, in or about March 2003 Briarwood advised IHS that it would not accept transfer of the stock of the Nine Subsidiaries to LTC, and caused and directed IHS to file a motion with the Delaware

Bankruptcy Court seeking to escape the effect of the March 2002 Order, which ordered IHS to assume the Nine Leases.

30.    Upon information and belief, Grunstein, Schron and Additional Counterclaim-Defendants caused Briarwood to direct IHS and the Nine Subsidiaries to file a motion in the Delaware Bankruptcy Court in April 2003 ("IHS Motion to Reject") to reject the Nine Leases—the very same Leases that IHS and the Nine Subsidiaries had agreed to assume and had been ordered to assume in the March 2002 Order.

31.    In the IHS Motion to Reject, the IHS Plaintiffs took a position that the March 2002 Order made assumption of the Nine Leases by IHS and the Nine Subsidiaries contingent upon the execution of a single master lease, and because such master lease had not been executed, the IHS Plaintiffs were free of their obligations under the March 2002 Order and, therefore, free to reject the Nine Leases.

32.    THCI filed a cross-motion in the Delaware Bankruptcy Court ("Motion to Compel") seeking to compel the IHS Plaintiffs to comply with the March 2002 Order and to enter into the single master lease called for by that Order.  In addition, THCI filed an objection to IHS's proposed plan of reorganization.

33.    In April 2003, the Delaware Bankruptcy Court entered an Order ("April 2003 Order") granting THCI's Motion to Compel.  The Bankruptcy Court continued the IHS Motion to Reject so as not to preclude a later rejection if the April 2003 Order was subsequently reconsidered by the Bankruptcy Court or reversed on appeal.

34.    In the April 2003 Order, the Delaware Bankruptcy Court addressed the proper construction and interpretation of the March 2002 Order, and finally resolved and

decided all issues related to the viability and validity of the Nine Leases and the Lease

Modification Agreement.

35.    The Delaware Bankruptcy Court ruled that:

[w]ithin five (5) business days of the entry of this Order, the parties may execute a form of Master Lease on such terms as may be mutually agreeable by the parties, *provided, however*, that if within such time the parties do not execute a Master Lease on mutually agreeable terms, *a Master Lease shall be deemed to exist, which Master Lease shall be deemed to incorporate the terms set forth in paragraphs 3(a), (b), (c) (d), (e) and (f) of the March 2002 Stipulation and shall further be deemed to incorporate by reference all terms of the existing Leases to the extent not inconsistent with the March 2002 Stipulation.*

April 2003 Order ¶ 2 (emphasis added).

36.    Pursuant to the April 2003 Order, the IHS Plaintiffs were required to

comply with, and were bound by, all terms of the Nine Leases as modified by the Lease

Modification Agreement except those as to which the March 2002 Order specifically

superseded the Nine Leases and the Lease Modification Agreement, without regard to

whether THCI and the IHS Plaintiffs would agree upon and/or formally execute a single-

source master lease.  Nothing in the April 2003 Order affected IHS's obligations under

the Guaranties.

37.    The April 2003 Order continued the Nine Leases, the Lease Modification

Agreement and their incorporated Guaranties, in full force and effect as post-petition

liabilities of the IHS Plaintiffs.  The parties did not execute a formal master lease within

five days as required by the April 2003 Order, and became parties to the master lease

("Master Lease") which "*incorporate[d] the terms set forth in paragraphs 3(a), (b), (c)*

*(d), (e) and (f) of the March 2002 Stipulation and ... incorporate[d] by reference all*

*terms of the existing Leases to the extent not inconsistent with the March 2002*

*Stipulation.*"  April 2003 Order ¶ 2.

38.    The IHS Plaintiffs appealed to the Delaware District Court from the April 2003 Order.[1]  No stay pending this appeal was either sought or granted.  The appeal remains pending before the Delaware District Court.

39.    By Order dated May 12, 2003 ("Confirmation Order"), the Bankruptcy Court confirmed the Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (the "Plan").  The Plan memorialized and confirmed the results of, and the arrangements and agreements surrounding, the bid process in which Briarwood had been successful.

40.    The Confirmation Order specifically addressed the status of the Nine Subsidiaries and the Nine Leases, and of the March 2002 and April 2003 Orders, in its ¶ 49(b).

41.    The Confirmation Order approved and implemented the SPA, and directed IHS to "contribute and assign to the LTC Subsidiary all of its [pertinent] assets . . . and post-petition liabilities," Confirmation Order ¶49(b), effectively ordering LTC to succeed to IHS's obligations under the Nine Leases, the Lease Modification Agreement and the Guaranties, as carried forward by the March 2002 and April 2003 Orders.

42.    Specifically addressing the March 2002 and April 2003 Orders, the Confirmation Order first recited in paragraph 49(b) that:

---

[1] In July 2003, IHS and Briarwood entered into an additional agreement intended (i) to accommodate the decisions of the Bankruptcy Court construing the March 2002 Order and (ii) to resolve issues between them in order to proceed to closing on the SPA. Under this additional agreement, IHS formally ceded to Briarwood the "sole right and authority to prosecute" the appeal that IHS had filed on Briarwood's behalf with respect to the April 2003 Order, and Briarwood confirmed its obligation to compensate IHS for all its costs from and after the Confirmation Order for pursuing that appeal, and further to compensate IHS for all its costs incurred in "cooperating" with Briarwood's conduct of litigation designed to attack that Order.

[o]n April 23, 2003, the Court entered an Order [the April 2003 Order] on the Motion to Compel which provided . . . that pursuant to the [March 2002 Order], a master lease agreement was deemed to exist between the parties effective May 1, 2003 . . . .

43.    The Confirmation Order then further provided that:

[t]he Master Lease [contemplated by the March 2002 Order and deemed to be in existence under the April 2003 Order] shall be treated as an *assumed* lease pursuant to section 365 of the Bankruptcy Code, and the applicable Debtor(s) party to such Master Lease shall perform the Master Lease until the Effective Date of the Plan, after which the Master Lease shall be performed by the applicable Reorganized Debtor(s) *unless and until an order is entered by this Court or another court of competent jurisdiction permitting rejection* of the THCI Leases [Nine Leases] . . . .

Confirmation Order ¶49(b) (emphasis added).

44.    Thus, the Confirmation Order treated the IHS Plaintiffs to have assumed the Nine Leases and required them to comply with and be bound by all of the terms of the Nine Leases to the extent not inconsistent with the March 2002 Order, subject only to being permitted to "reject" the Nine Leases in compliance with Chapter 11.

45.    The possible "rejection" contemplated by the Confirmation Order, could only be authorized by the Delaware Bankruptcy Court, by another United States bankruptcy court (*e.g.*, in a subsequent Chapter 11 proceeding), or by the Delaware District Court on IHS's appeal from the Delaware Bankruptcy Court's April 2003 Order.

46.    Recognizing specifically the latter alternative, the Confirmation Order preserved all parties' rights to pursue the appeal and expressly stated that only the outcome of the appeal would affect the status of the Nine Leases, by providing that if the District Court on appeal issued an order

nullifying or invalidating the Master Lease [deemed to be in existence by the April 2003 Order] . . . nothing contained in this Order shall be deemed to have effected an assumption of the Master Lease or the THCI Leases.

Confirmation Order ¶49(b).

-11-

47.    Correspondingly, with respect to THCI, the Confirmation Order provided that "[n]othing *in the Plan* [of Reorganization being confirmed] shall be deemed to provide for the rejection of the Master Lease or the THCI Leases." Confirmation Order ¶49(b) (emphasis added.)

48.    The Confirmation Order effectively continued the Guaranties in full force and effect as post-petition obligations of IHS assigned to LTC. These obligations were subject only to "rejection" under Chapter 11 of the Bankruptcy Code if the District Court, on IHS's appeal, would reverse the Delaware Bankruptcy Court's April 2003 Order, which (i) denied IHS's motion to reject the Nine Leases and (ii) deemed the existence of a Master Lease that incorporated the terms of the Nine Leases.

49.    Under the Plan and the SPA, LTC succeeded to, and became bound to obligations of IHS under the Guaranties.

50.    Briarwood closed on the purchase of LTC on August 29, 2003, with full knowledge of the March 2002 and the April 2003 Orders.

51.    The Master Lease requires the Nine Subsidiaries to provide financial and other operational information ("Required Facility Information"), including but not limited to monthly statements setting forth the gross revenues of each of the Nine Subsidiaries' facility operations, on a monthly basis to THCI.

52.    The Guaranties require LTC as the Guarantor to cause and ensure that the Nine Subsidiaries comply with their duty to provide the Required Facility Information to THCI.

53.    The Guaranties also require the Guarantor to provide current financial statements for itself and its subsidiary operations ("Required Financial Information," and

collectively with the Required Facility Information, the "Required Information" ) on no less than a monthly basis to THCI.

54.     Prior to the closing with Briarwood on the SPA, IHS and the Nine Subsidiaries did, in fact, regularly and consistently provide the Required Information to THCI.

55.     After the closing of the SPA, THCI has repeatedly demanded that the Nine Subsidiaries, LTC, and Briarwood comply with their obligations to provide the Required Information.

56.     Representatives of the IHS Plaintiffs have declined to provide, and in fact have not provided, the Required Information, and have asserted that Briarwood has directed them not to provide such information.  Upon information and belief, Grunstein, Schron and Additional Counterclaim-Defendants caused Briarwood to direct the IHS Plaintiffs and Tri-State not to provide the Required Information.

57.     After the closing of the SPA, THCI has repeatedly demanded that LTC comply with its obligations as the Guarantor under the Master Lease and Guaranties, and provide the Required Information, but LTC has refused to do so, contending that its guaranty obligations under the Master Lease and Guaranties did not survive the Confirmation Order.

58.     Upon information and belief, Grunstein, Schron and Additional Counterclaim-Defendants directed Briarwood to cause LTC to breach the Master Lease by disclaiming its obligations under the Guaranties and further directing IHS Plaintiffs to file a Complaint against THCI in the Circuit Court for Platte County, Missouri ("Missouri

Complaint") on April 5, 2004, in which the IHS Plaintiffs sought, *inter alia*, a declaratory judgment that LTC was not liable or responsible under the Guaranties.

59.     On May 4, 2004, THCI removed the Missouri Complaint to the United States District Court for the Western District of Missouri.  On May 21, 2004, THCI moved to transfer the Missouri Complaint to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1404(a), and the United States District Court for the Western District of Missouri transferred the Missouri Complaint to the District of Delaware.

60.     On July 26, 2004, LTC filed a notice of appeal from the United States District Court for the Western District of Missouri's decision to transfer the Missouri Complaint.  On July 28, 2004, the United States District Court for the District of Delaware received the Missouri Complaint from the Western District of Missouri.  LTC filed a petition for mandamus against the Honorable Gary A. Fenner, the United States Judge for the Western District, which was denied by the United States Court of Appeals for the Eighth Circuit.

61.     On June 4, 2004, THCI filed a complaint against Briarwood ("Briarwood Complaint") in this Court for a declaratory judgment and injunctive relief declaring that Briarwood was a guarantor of, and compelling it to perform as, the Guarantor of the Master Lease, and seeking, *inter alia*, to invalidate various fraudulent transfers to Briarwood and its affiliated entities, that have depleted the assets of LTC and the Nine Subsidiaries.  On July 7, 2004, Briarwood moved to dismiss the Briarwood Complaint, and on August 9, 2004, THCI moved to consolidate the Missouri Complaint with the Briarwood Complaint.

62.     On August 15, 2005, the United States Court of Appeals for the Eighth

Circuit affirmed the transfer of the Missouri Complaint to the District of Delaware and

held that the issues raised in the Missouri Complaint were "related to" the appeal from

the decision of the Bankruptcy Court for the District of Delaware, and were properly

before the Court.  Thus, the Eight Circuit has completely resolved the issue of whether

the Court has jurisdiction over the dispute raised in the Missouri Complaint.

63.     While this litigation proceeded, the Nine Subsidiaries continued to

perform their fundamental obligations under the Master Lease by directing Tri-State to

timely pay the rent in the amount specified in the Master Lease:

| Lease year | | Base rent | |
|---|---|---|---|
| Begin | End | Annual | Monthly |
| May 1, 2003 | May 31, 2004 | $8,100,000.00 | $675,000.00 |
| May 1, 2004 | May 31, 2005 | $8,302,500.00 | $691,875.00 |
| May 1, 2005 | May 31, 2006 | $8,510,062.50 | $709,171.88 |

64.     In addition to timely paying the rent, the IHS Plaintiffs also directed Tri-

State to timely pay real estate taxes and other charges as expressly required under the

Master Lease and the 2003 Order, which specifically incorporates section 3(a) of the

2002 Stipulation, stating that the Master Lease shall be a triple net lease – which means

that the tenant is responsible for all expenses of the Facilities including but not limited to

real estate taxes.   The IHS Plaintiffs never objected to or questioned either the amount of

the rent, or their obligations to pay the rent and make other payments required under the

Master Lease.

65.     However, starting in June 2005, the IHS Plaintiffs breached the Master

Lease by ceasing to pay the rent despite THCI's repeated demands, and this default is

continuing.  The IHS Plaintiffs have not responded to THCI's default letters regarding

non-payment of rent, and their representatives have not returned phone calls either. The IHS Plaintiffs have not objected to their obligation to pay the rent and make other payments required under the Master Lease, and the IHS Plaintiffs' monetary defaults to THCI and other creditors continue to increase daily. Upon information and belief, the IHS Plaintiffs defaulted on their obligations under the Master Lease at the direction of Grunstein, Schron, Briarwood and Additional Counterclaim-Defendants.

66.     In addition to not paying the rent, the IHS Plaintiffs also failed to pay past due real estate taxes and other charges, and have accrued substantial liability to Defendants for unpaid real estate taxes and other charges. Upon information and belief, Grunstein, Schron and Additional Counterclaim-Defendants directed Briarwood to cause the IHS Plaintiffs to default on their obligation to pay real estate taxes and other charges. The IHS Plaintiffs have not objected to their obligation to pay the real estate taxes and other charges, and the IHS Plaintiffs' unpaid real estate taxes and other charges continue to increase daily.

67.     Moreover, upon information and belief, the IHS Plaintiffs are also substantially in arrears to state agencies and vendors of health care products and services. Upon information and belief, Grunstein, Schron and Additional Counterclaim-Defendants directed Briarwood to cause the IHS Plaintiffs to default on their obligations to state agencies and vendors of health care products and services.

68.     Pursuant to the Master Lease, a failure to pay rent when due, which remains uncured within seven days, constitutes an event of default, and

> [i]f any Event of Default shall have occurred and be continuing, whether or not this Lease has been terminated pursuant to Paragraph (a) of this Section, Lessee shall, to the extent permitted by law, if required by Lessor so to do, upon not less than ten (10) days prior notice from Lessor,

immediately surrender to Lessor the Leased Property pursuant to the provisions of Paragraph (a) of this Section and quit the same, and Lessor may enter upon and repossess the Leased Property by reasonable force, summary proceeding, ejectment or otherwise, and may remove Lessee and all other persons and any and all of Lessee's Personal Property from the Leased Property subject to the rights of any residents or patients and to any requirement of law, or Lessor may claim ownership of Lessee's Personal property as set forth in Article 32 hereof. [2]

69.    The IHS Plaintiffs are absolutely obligated to surrender the Facilities pursuant to Section ¶ 16.2(c) of the Missouri Lease and similar provisions of the Master Lease.  In addition, the IHS Plaintiffs' failure to pay rent warrants immediate ejectment of the IHS Plaintiffs under the laws of every state in which Facilities are located, and renders the IHS Plaintiffs liable under the Master Lease and/or applicable state law.

70.    On July 11, 2005, THCI demanded that the IHS Plaintiffs vacate the Facilities.  The Nine Subsidiaries have failed to either vacate the Facilities voluntarily, or to pay rent, real estate taxes and charges owed to third parties in undisguised attempt to gain financial benefits at THCI's expense by unlawfully remaining in the possession of the Facilities.  The IHS Plaintiffs have similarly failed to articulate any reason why they should be allowed to remain in possession of the Facilities, while continuing to collect the funds from operations thereof, without paying the rent.  Upon information and belief, Grunstein, Schron and Additional Counterclaim-Defendants directed Briarwood to cause the IHS Plaintiffs not to vacate the Facilities.

---

[2] Missouri Lease ¶ 16.2(c); *see id.* ¶ 27.1 ("Unless Lessor shall convey any of the Leased Property to Lessee, Lessee will, upon the expiration or prior termination of the Term, vacate and surrender the Leased Property to Lessor in the condition in which the Leased Property was originally received from Lessor."); ¶ 38.2 ("Upon the expiration or earlier termination of the Term, Lessee shall use its best efforts to transfer to Lessor or Lessor's nominee all licenses, operating permits and other governmental authorizations and all contracts, including contracts with governmental or quasi-governmental entities which may be necessary or useful in the operation of the Facility.").  Each of the remaining eight Leases contains similar provisions.

71.     On September 26, 2005, this Court granted Briarwood's motion to dismiss the Briarwood Complaint without prejudice as to THCI's ability to reinstate its claims asserted in the Briarwood Complaint, as part of the Missouri Complaint.

FIRST COUNTERCLAIM
(Declaratory Judgment Against the IHS Plaintiffs)

72.     THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 71 above as if fully restated herein.

73.     The Guaranties were an integral and inseparable part of the Nine Leases assumed by IHS and the Nine Subsidiaries in the IHS Chapter 11 proceeding in the Delaware Bankruptcy Court.

74.     The March 2002 Order, and the Delaware Bankruptcy Court's April 2003 Order construing, interpreting, and enforcing it, restated the Nine Leases as the integrated Master Lease, which incorporated the Guaranties as post-petition obligations of IHS.

75.     Nothing in the Plan, the Confirmation Order, or any act or event in the IHS Chapter 11 proceeding deleted or amended the Guaranties as obligations under the Master Lease, nor excused or relieved IHS of its obligations under the Guaranties.

76.     By virtue of IHS' assignment to LTC, and LTC's assumption of IHS' assets and liabilities, including the capital stock of the Nine Subsidiaries under the SPA, LTC has succeeded to the rights and obligations of the Nine Subsidiaries and of IHS as related to the Nine Subsidiaries.  LTC accordingly became, and remains, responsible to THCI for and liable to THCI under, the Master Lease and the Guaranties incorporated therein.

77.     A clear and concrete dispute exists between LTC and THCI with respect to whether LTC is and remains obligated under the Guaranties for the performance of the Nine Subsidiaries of their obligations under the Master Lease.

78.     By reason of the foregoing, THCI is entitled to a judgment declaring (i) that the Guaranties were an integral and inseparable part of the Nine Leases as modified by the Lease Modification Agreement, (ii) that the IHS Plaintiffs assumed the Nine Leases as modified by the Lease Modification Agreement pursuant to the March 2002 Order and the April 2003 Order, (iii) that the March 2002 Order and the April 2003 Order created the Master Lease incorporating the terms of the Nine Leases, Lease Modification Agreement and Guaranties to the extent consistent with the March 2002 Order and the April 2003 Order, and (iv) LTC became, and remains, responsible to THCI for and liable to THCI under, the Master Lease and the Guaranties incorporated therein.

SECOND COUNTERCLAIM
(Specific Performance Against the IHS Plaintiffs)

79.     THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 78 above as if fully restated herein.

80.     The Master Lease requires the IHS Plaintiffs to provide the Required Facility Information on a monthly basis to THCI about each of the Nine Subsidiaries' operations, including, but not limited to, monthly statements setting forth the gross revenues of each of the Facilities, which is necessary to THCI's operations as the owner of the Facilities.

81.     The Guaranties also require LTC to provide the Required Financial Information to THCI on a monthly basis and to provide information concerning the financial performance of the Nine Subsidiaries.  IHS did, in fact, regularly and

consistently provide the Required Financial, which is necessary to THCI's operations as the owner of the Facilities.

82.     THCI has repeatedly asked the IHS Plaintiffs for the Required Information, but the IHS Plaintiffs have failed and refused to provide the Required Information to THCI.

83.     THCI is entitled to obtain the Required Information pursuant to the Master Lease and the Guaranties.

84.     By reason of the foregoing, THCI has been damaged and is entitled to an Order enjoining and ordering IHS Plaintiffs to provide the Required Information to THCI.

THIRD COUNTERCLAIM
(For Fraudulent Conveyance Against the IHS Plaintiffs, Briarwood
and Additional Counterclaim Defendants)

85.      THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 84 above as if fully restated herein.

86.     Section 5.9(b) of the SPA provides that LTC "shall assume all of IHS's assets and liabilities . . . including without limitation the capital stock of all the Subsidiaries that conduct [IHS's] long-term care business."

87.     Upon closing on the SPA, LTC held assets that encompassed substantially more than, and greatly exceeded in value, the capital stock of the Nine Subsidiaries. Furthermore, the Master Lease and the Guaranties required LTC, as the successor to IHS's post-petition liabilities associated with IHS's nursing home operations, to maintain certain levels of assets and net worth.

88.     Upon information and belief, Grunstein, Schron, Briarwood and the Additional Counterclaim-Defendants caused and directed LTC to transfer (each a

"Transfer" and collectively, the "Transfers") assets ("Transferred Assets") other than the stock of the Nine Subsidiaries to Briarwood and the Additional Counterclaim-Defendants following the closing on the SPA for the purpose of hindering or defrauding existing creditors of the IHS Plaintiffs, including THCI.

89.     Upon information and belief, LTC received less than fair or reasonably equivalent value in exchange for the Transferred Assets.

90.     Upon information and belief, LTC (a) was insolvent on the date that the Transfers were made or became insolvent as a result of the Transfers; or (b) was engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the LTC was an unreasonably small capital; or (c) intended to incur, believed, or should have reasonably believed that it would incur, debts beyond LTC's ability to pay as such debts matured.

91.     Upon information and belief, Grunstein, Schron, Briarwood, Additional Counterclaim Defendants, and LTC caused the Nine Subsidiaries to transfer (each a "Subsidiaries' Transfer" and collectively, the "Subsidiaries Transfers") virtually all of their assets ("Subsidiaries Transferred Assets") to various third parties, including, but not limited to LTC, Briarwood and Additional Counterclaim Defendants following the closing on the SPA for the purpose of hindering or defrauding existing creditors of the Nine Subsidiaries, including THCI.

92.     Upon information and belief, the Nine Subsidiaries (a) were insolvent on the date that the Subsidiaries' Transfers were made or became insolvent as a result of the Subsidiaries' Transfer; or (b) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Nine

Subsidiaries was an unreasonably small capital; or (c) intended to incur, believed, or should have reasonably believed that it would incur, debts beyond the Nine Subsidiaries' ability to pay as such debts matured.

93.     The Transfers and the Subsidiaries' Transfers  (collectively, the "Fraudulent Transfers") are, upon information and belief, avoidable and recoverable pursuant to the applicable state fraudulent transfer statutes from LTC, Briarwood and/or Additional Counterclaim Defendants.

94.     By reason of the foregoing, THCI has been damaged and is entitled (i) to a judgment setting aside the Fraudulent Transfers, (ii) to recover the Fraudulent Transfers plus interest, costs and attorneys' fees, (iii) to an order enjoining the IHS Plaintiffs against further disposition of its assets to third parties, (iv) to an order enjoining LTC, Briarwood and Additional Counterclaim Defendants from further disposition of the Transferred Assets and the Subsidiaries' Transferred Assets (collectively, the "Fraudulently Transferred Assets")  to third parties, and (v) to an order imposing constructive trust over the Fraudulently Transferred Assets.

FOURTH COUNTERCLAIM
(Conversion Against Briarwood and Additional Counterclaim Defendants)

95.     THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 94 above as if fully restated herein.

96.     Upon information and belief, subsequent to the closing on the SPA, and at all times relevant, Briarwood and the Additional Counterclaim Defendants have conspired to, and did in fact appropriate and converted the money and property associated with the Nine Leases ("Converted Property") by, *inter alia*, causing the IHS Plaintiffs to transfer money and properties associated with the Nine Leases, and otherwise securing

the IHS Plaintiffs' obligations under the Nine Leases and the Guarantees, to Briarwood and the Additional Counterclaim Defendants.

97.    By reason of the foregoing, THCI has been defrauded and harmed, and demands that (i) the Converted Property be returned to LTC and the Nine Subsidiaries, and (ii) constructive trust be established over the Converted Property.

FIFTH COUNTERCLAIM
(Conversion Against the IHS Plaintiffs, Briarwood and Additional Counterclaim Defendants)

98.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 97 above as if fully restated herein.

99.    Upon information and belief, Briarwood and the Additional Counterclaim Defendants have conspired to, and did in fact knowingly and intentionally converted THCI's property without any justification or valid claim thereto, with intent to deprive THCI of its money and property, by failing to pay the rent, and by continuing to operate and occupy the Facilities.

100.    Upon information and belief, Briarwood caused LTC and the Nine Subsidiaries to convert THCI's money and property, transfer the converted money to Briarwood and the Additional Counterclaim Defendants, and convert the Facilities without any legal justification.

101.    By reason of the foregoing, THCI has been damaged and demands (i) the return of the Facilities, (ii) the return of the converted money; (iii) compensatory damages in the amount equal to the difference of the fair market value of the Facilities at the time of the conversion and at the time the Facilities are returned to THCI; (iv)

consequential damages in the amount to be determined at trial, and (v) punitive damages in the amount equal to the compensatory damages.

SIXTH COUNTERCLAIM
(Breach of the Master Lease and Guaranties Against the IHS Plaintiffs)

102.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 101 above as if fully restated herein.

103.    The Nine Subsidiaries have failed to pay monthly rent for the Nine Facilities in violation of the Master Lease.

104.    Pursuant to the Master Lease, the Nine Subsidiaries were obligated to vacate the Nine Facilities upon demand of THCI.

105.    The Nine Subsidiaries have failed to vacate the Nine Facilities as demanded by THCI, and their continued stay is in breach of the Master Lease and causes and continues to cause irreparable harm to THCI, as well as monetary damages.

106.    In addition to rent, unpaid real estate taxes and other charges due under the Master Lease, the Nine Subsidiaries are also obligated pursuant to the Master Lease to pay penalties for failing to vacate the Facilities, as well as the applicable statutory interest from June 2005.

107.    LTC is liable under the Guaranties to pay for the Nine Subsidiaries' breach of the Master Lease.

108.    By reason of the foregoing, THCI has been damaged, and demands judgment for (i) the unpaid rent, (ii) penalties, (iii) unpaid taxes and (iv) other charges plus applicable statutory interest and in the amount to be determined at trial.

<u>SEVENTH COUNTERCLAIM</u>
(Breach of Monthly Tenancy Against the Nine Subsidiaries)

109.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 108 above as if fully restated herein.

110.    If this Court holds that the Master Lease does not bind the Nine Subsidiaries and holds instead that the Nine Subsidiaries were monthly tenants of the Nine Facilities and paid monthly rent in accordance with the applicable state law, then THCI pleads in the alternative that following the Nine Subsidiaries' refusal to pay monthly rent starting in June 2005, their monthly tenancy was terminated and the IHS Plaintiffs continue to occupy the Nine Facilities as holdover tenants under the applicable state law.

111.    By reason of the foregoing, THCI has been damaged and demands judgment for penalties under the applicable state law from June 2005, plus applicable statutory interest and other applicable charges in the amount to be determined at trial.

<u>EIGHTH COUNTERCLAIM</u>
(Accounts Stated Against the Nine Subsidiaries)

112.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 111 above as if fully restated herein.

113.    THCI has issued just and true monthly accounts to the Nine Subsidiaries evidencing the amounts owed by the Nine Subsidiaries for past rent, starting since April 2005 and continuing (the "Accounts Stated")

114.    The Accounts Stated were received, retained and accepted without objection by the Nine Subsidiaries.

115.    By reason of the foregoing, THCI demands judgment for the Accounts Stated, plus interest, in an amount to be determined at trial.

NINTH COUNTERCLAIM
(Writ of Eviction Against the Nine Subsidiaries)

116.    THCI repeats and incorporates by reference the allegations contained in

paragraphs 1 through 115 above as if fully restated herein.

117.    The Nine Subsidiaries have failed to pay monthly rent for the Nine

Facilities in violation of the Master Lease.

118.    Pursuant to the Master Lease, the Nine Subsidiaries were obligated to

vacate the Nine Facilities upon demand by THCI.

119.    The Nine Subsidiaries have failed to vacate the Facilities as demanded by

THCI, and their continued stay causes and continues to cause irreparable harm to THCI.

120.    By reason of the foregoing, THCI demands that the Court issue a writ of

eviction obligating the Nine Subsidiaries to vacate the Facilities.

TENTH COUNTERCLAIM
(Preliminary and Permanent Injunction Against the IHS Plaintiffs, Briarwood and
Additional Counterclaim Defendants)

121.    THCI repeats and incorporates by reference the allegations contained in

paragraphs 1 through 120 above as if fully restated herein.

122.    The IHS Plaintiffs,' Briarwood's and Additional Counterclaim-

Defendants' actions, as detailed above, were and are in deliberate violation of the

Guarantees and the Master Lease.

123.    Upon information and belief, subsequent to closing on the SPA,

Briarwood has initiated and caused a pattern of transfers of LTC's assets and

Briarwood's equity ownership of LTC to various parties, including but not limited to the

Additional Counterclaim Defendants, for the purpose of effectuating evasions of

obligations under the Master Lease and the Guaranties and in violation of various state

fraudulent conveyance laws that prohibit the transfer of corporate assets for less than fair value when the corporation is insolvent.

124.    To the extent that Briarwood, LTC and Additional Counterclaim Defendants have received transfers of money or property in relation to the Master Lease and in violation of the Guarantees and the Master Lease, such transfers ought to be enjoined by this Court.

125.    In addition, the IHS Plaintiffs are required to provide the Required Information pursuant to the Master Lease and the IHS Plaintiffs have breached the Master Lease by failing to provide this financial information. If the IHS Plaintiffs and Briarwood are not enjoined to provide, or to cause the Nine Subsidiaries to provide to THCI the financial information required by the Master Lease and the Guarantees, THCI will be irreparably harmed.

126.    By reason of the foregoing, THCI demands that the Court (i) issue a preliminary and temporary injunction enjoining any transfers of money or property in relation to the Nine Leases and in violation of the Guarantees and the Nine Leases by any Plaintiffs-Counterclaim Defendants and (ii) direct Plaintiffs-Counterclaim Defendants to provide to THCI the Required Information.

ELEVENTH COUNTERCLAIM
(Declaratory Judgment for Disregarding of Corporate Entities Against Briarwood and
Additional Counterclaim-Defendants)

127.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 126 above as if fully restated herein.

128.    Since the entry into the SPA in January 2003, Briarwood and Additional Counterclaim-Defendants have dominated, and continue to dominate, the formation, affairs and conduct of LTC and the Nine Subsidiaries entirely for Briarwood's and the

Additional Counterclaim-Defendants' own interests, and have used and manipulated LTC and the Nine Subsidiaries as their *alter ego* for all purposes related to the Master Lease and Guaranties.

129.   By virtue of Briarwood's and Additional Counterclaim-Defendants' complete domination of the affairs of LTC, Fraudulent Transfers, which have completely depleted the IHS Plaintiffs' assets, Briarwood and Additional Counterclaim-Defendants have become, and remain, the *alter ego* of the IHS Plaintiffs responsible to THCI for the breaches of the Master Lease and the Guarantees by the IHS Plaintiffs because these breaches were directed and caused by Briarwood and Additional Counterclaim-Defendant with intent to benefit Briarwood and Additional Counterclaim-Defendant.

130.   In the alternative, if this Court holds that the Master Lease does not bind the Nine Subsidiaries, and LTC is not bound by the Guarantees, and holds instead that the Nine Subsidiaries were monthly tenants of the Nine Facilities and paid monthly rent in accordance with the applicable state law, then THCI pleads in the alternative that Briarwood and Additional Counterclaim-Defendants as *alter ego* of the Nine Subsidiaries are liable for penalties under the applicable state law as holdover tenants following the Nine Subsidiaries' refusal to pay monthly rent, and termination of the Nine Subsidiaries' monthly tenancy in June 2005.

131.   A clear and concrete dispute exists between LTC and Briarwood and Additional Counterclaim-Defendants with respect to whether Briarwood and Additional Counterclaim-Defendants are *alter egos* of the IHS Plaintiffs and should be liable under the Master Lease and the Guarantees, or as holdover tenants.

132.    By reason of the foregoing, THCI is entitled to a judgment declaring (i) that Briarwood and Additional Counterclaim-Defendants have become, and remain, the *alter ego* of the IHS Plaintiffs responsible to THCI under the Master Lease and the Guaranties, (ii) that, in the alternative, if this Court holds that the Master Lease does not bind the Nine Subsidiaries, and LTC is not bound by the Guarantees, and the Nine Subsidiaries were monthly tenants of the Nine Facilities and paid monthly rent in accordance with the applicable state law, then Briarwood and Additional Counterclaim-Defendants are *alter ego* of the Nine Subsidiaries and are liable for penalties under the applicable state law as holdover tenants following the Nine Subsidiaries' refusal to pay monthly rent, and termination of the Nine Subsidiaries' monthly tenancy in June 2005.

TWELFTH COUNTERCLAIM
(Damages, Penalties and Injunctive Relief for Disregarding of Corporate Entities Against Briarwood and Additional Counterclaim-Defendants)

133.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 132 above as if fully restated herein.

134.    Briarwood and Additional Counterclaim-Defendants as *alter ego* of the IHS Plaintiffs have breached the Master Lease and the Guarantees, and damaged THCI in the amount to be determined at trial.

135.    In the alternative, Briarwood and Additional Counterclaim-Defendants are liable to THCI as holdover tenants under the applicable state law as *alter ego* of the Nine Subsidiaries.

136.    By reason of the foregoing, THCI is entitled to a judgment against Briarwood and Additional Counterclaim-Defendants awarding (i) the unpaid rent, penalties, unpaid taxes and other charges plus applicable statutory interest and in the amount to be determined at trial for breach of the Master Lease and the Guarantees, (ii)

-29-

the Accounts Stated, plus interest, in an amount to be determined at trial, (iii) the return

of the Facilities, the return of the converted money, compensatory damages for

conversion of the Facilities in the amount equal to the difference of the fair market value

of the Facilities at the time of the conversion and at the time the Facilities are returned to

THCI,  consequential damages for conversion in the amount to be determined at trial, and

punitive damages for conversion in the amount equal to the compensatory damages, (iv) a

writ of eviction, (v) injunctive relief directing Briarwood and Additional Coutnerclaim-

Defendants to provide to THCI the Required Information, and (vi) in the alternative, if

the Court holds that the Master Lease does not bind the Nine Subsidiaries, and LTC is not

bound by the Guarantees, and the Nine Subsidiaries were monthly tenants of the Nine

Facilities, (a) penalties under the applicable state law governing holdover tenancy and (b)

a writ of eviction.

<u>THIRTEENTH COUNTERCLAIM</u>
(Tortious Interference with the Master Lease Against Briarwood and Additional
Counterclaim Defendants)

137.    THCI repeats and incorporates by reference the allegations contained in

paragraphs 1 through 136 above as if fully restated herein.

138.    Briarwood and Additional Counterclaim-Defendants have intentionally,

without legitimate reason, and entirely in its own interests, induced and caused the IHS

Plaintiffs to refuse to perform and to violate their obligations to provide Required

Information under the Master Lease and Guaranties.

139.    Briarwood has intentionally, without legitimate reason, and entirely in its

own interests, induced and caused LTC to violate its obligations under the Guaranties to

maintain certain levels of assets and net worth as required under the Master Lease and

Guaranties.

140.    By reason of the foregoing, THCI has been damaged and is entitled to damages in the amount to be determined at trial.

**WHEREFORE**, THCI prays that the Court enter judgment:

(A)    On the First Counterclaim against LTC, declaring and decreeing that LTC succeeded to the obligations of IHS under the Guaranties and that LTC is responsible and liable to THCI for the Nine Subsidiaries' performance of obligations under the Nine Leases, the March 2002 Order, and the April 2003 Order;

(B)    On the Second Counterclaim against LTC and the Nine Subsidiaries, enjoining and ordering them to provide the Required Information;

(C)    On the Third Counterclaim against all Counterclaim Defendants, enjoining LTC, Briarwood and Additional Counterclaim-Defendants against further disposition of the Transferred Assets to third parties, and avoiding transactions by which LTC and the Nine Subsidiaries have conveyed and will convey its assets to third parties;

(D)    On the Fourth Counterclaim against all Briarwood and Additional Counterclaim Defendants, demanding return of the Converted Assets and creation of Constructive Trust;

(E)    On the Fifth Counterclaim, returning the Facilities, the converted money, and awarding compensatory, consequential and punitive damaged in the amount to be determined at trial.

(F)    On the Sixth Counterclaim against LTC and the Nine Subsidiaries, awarding THCI money damages in an amount to be determined at trial;

(G)    On the Seventh Counterclaim against LTC and the Nine Subsidiaries, awarding THCI money damages in an amount to be determined at trial;

(H)    On the Eighth Counterclaim against LTC and the Nine Subsidiaries, awarding THCI money damages in an amount to be determined at trial;

(I)    On the Ninth Counterclaim, granting a writ of eviction against the Nine Subsidiaries;

(J)    On the Tenth Counterclaim against all Plaintiffs-Counterclaim Defendants, declaring and decreeing that Briarwood and the Additional Defendants are liable in an amount to be determined at trial for transfers of LTC's ownership of assets to alleged third parties, evasions of LTC's obligations under the Guaranties and violations of state fraudulent conveyances laws for transfers made with respect to the Nine Leases and the Guaranties;

(K)    On the Eleventh Counterclaim against Briarwood and Additional Counterclaim-Defendants, declaring and decreeing that Briarwood and Additional Counterclaim-Defendants are *alter egos* of the IHS Plaintiffs and shall be liable for all of the liabilities of the IHS Plaintiffs in this action;

(L)    On the Twelfth Counterclaim against Briarwood and Additional Counterclaim-Defendants as *alter egos* of the IHS Plaintiffs, awarding THCI money damages, penalties, interest and injunctive relief;

(M)    On the Thirteenth Counterclaim against Briarwood and Additional Counterclaim-Defendants, awarding THCI money damages in an amount to be determined at trial; and

(N)    Awarding to THCI and against all the Plaintiffs-Counterclaim Defendants costs, disbursements, attorneys' fees, and such other and further relief as the Court deems just and proper.

-32-

Dated:    November 21, 2005          **GREENBERG TRAURIG, LLP**

By: _____
Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Tel.:  (302) 661-7000
Fax:  (302) 661-7360

-and-

**ARENT FOX PLLC**
Robert E. Grossman
Michael S. Cryan
Igor M. Tsibelman
1675 Broadway
New York, NY  10019
Tel: (212) 484-3900
Fax: (212) 484-3990

*Attorneys for Defendant-Counterclaim Plaintiff*
*THCI Company LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTEGRATED HEALTH SERVICES OF CLIFF MANOR, INC., INTEGRATED HEALTH SERVICES AT RIVERBEND, INTEGRATED HEALTH SERVICES AT SOMERSET VALLEY, INC., ALPINE MANOR, INC., BRIARCLIFF NURSING HOME, INC., INTEGRATED HEALTH GROUP, INC., SPRING CREEK OF IHS, INC., FIRELANDS OF IHS, INC., ELM CREEK OF IHS, INC., IHS LONG TERM CARE SERVICES, INC., ABE BRIARWOOD CORP., JOHN DOES I THROUGH X, JOHN ROES I THROUGH Y,<br><br>Plaintiffs-Counterclaim Defendants,<br><br>v.<br><br>THCI COMPANY LLC,<br><br>Defendant-Counterclaim Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     C.A. No. 04-910 (GMS) |

## CERTIFICATE OF SERVICE

I, Dennis A. Meloro, being duly sworn according to law, deposes and says that I am employed by Greenberg Traurig, LLP, which is counsel for the Defendant-Counterclaimant and that on the 21st of November 2005, I caused to be served copies of the *SECOND AMENDED COUNTERCLAIMS* upon the parties listed below as indicated.

VIA HAND DELIVERY
Michael Lastkowski, Esq.
Richard Riley, Esq.
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington DE 19801

VIA FIRST CLASS MAIL
Robert Freilich, Esq.
Paul, Hastings, Janofsky & Walker LLP
515 South Flower Street
Los Angeles, California 90071-2228

VIA FIRST CLASS MAIL
Amos Alter, Esquire
Troutman Sanders LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174

Dated: November 21, 2005

_____
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
(302) 661-7000
(302) 661-7360 (facsimile)