UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTEGRATED HEALTH SERVICES OF CLIFF MANOR, INC., INTEGRATED HEALTH SERVICES AT RIVERBEND, INTEGRATED HEALTH SERVICES AT SOMERSET VALLEY, INC., ALPINE MANOR, INC., BRIARCLIFF NURSING HOME, INC., SPRING CREEK OF IHS, INC., FIRELANDS OF IHS, INC., ELM CREEK OF IHS, INC., and IHS LONG TERM CARE SERVICES, INC.,<br><br>   Plaintiffs,<br><br>  v.<br><br>THCI COMPANY LLC,<br><br>   Defendant,<br><br>  v.<br><br>ABE BRIARWOOD CORPORATION and JOHN DOES 1-10,<br><br>   Additional Counterclaim Defendants, | Civil Action No. 04-910 |

### DECLARATION OF LEONARD GRUNSTEIN IN SUPPORT OF MOTION

**LEONARD GRUNSTEIN** declares:

1. I am a Member of the Firm of Troutman Sanders LLP, which is of counsel to the plaintiffs, and to the additional counterclaim defendant, Abe Briarwood Corporation ("Briarwood"). We also appear for nonparties Rubin Schron and myself, in connection with the application to quash subpoenae addressed to Mr. Schron and me.

2. Defendant, THCI Company, LLC ("defendant" or "THCI"), has recently interposed Third Amended Counterclaims. It has also, even prior to serving that pleading, served, or purported to serve, subpoenae duces decum for depositions upon three nonparties, Uri Kaufman, Rubin Schron, and me. This Declaration supports the present motion (the "Motion"), which has two branches: (i) It seeks to dismiss the Second through Seventh Counterclaims of the Third Amended Counterclaims. (ii) The Motion also seeks to quash the subpoenae served upon the nonparty witnesses.[1] The reasons why the counterclaims should be dismissed are set forth in the accompanying Memorandum of Law. This Declaration is concerned with the motion to quash.

3. Preliminarily, with respect to the subpoena served upon me, there is a controlling reason to quash it: I was never served. Indeed, THCI does not claim to have served me personally. A copy of the Declaration of Service, obtained from the Clerk's file herein, is annexed hereto as Exhibit "A". As can be seen therefrom, the claim is that service was made upon one "Izzy Zimmerman", who supposedly "stated that he was authorized to accept service on behalf of Mr. Grunstein. Mr. Zimmerman also stated he was authorized to accept all corporation papers too."[2] Isidore Zimerman, who is Managing Clerk of this Office, flatly denies these assertions, and affirmatively asserts that he told the process server that he did not have authority to accept service for me (See his Declaration, Exh. "B"), as indeed he did not. This is not the first time process servers have come to this office seeking to serve papers on someone who works or once worked at this Firm, or on some individual or entity who is or

---

[1] Non-party Uri Kaufman appears by his own counsel, and by separate motion also seeks to quash the subpoena served upon him.

[2] There were no papers being sought to be served upon any corporation. This only highlights the mechanical nature of the entire recitation in the process server's Declaration of Service. That part of his declaration was false; so was his recitation of the conversation with Mr. Zimerman. See the Declaration of Isidore Zimerman, Exh. "B".

2

once was a client of this Firm. Mr. Zimerman's standing instructions, as Managing Clerk, is that he is not authorized to accept any papers sought to be served upon anyone other than the Firm. He followed those instructions here. Service of the subpoena must be quashed.

4. In addition to the service issue (and the other two parties supposedly served also have service issues, see the accompanying Declaration of Rubin Schron, and the affidavit of Uri Kaufman supporting his motion to quash), there are other good and sufficient reasons to quash all three subpoenae herein. This action arises from a controversy between plaintiffs and defendant THCI. Plaintiff IHS Long Term Care Services, Inc. ("LTC") is the sole shareholder of the other nine corporate plaintiffs. LTC is in turn owned by additional counterclaim defendant Briarwood. The nine plaintiffs other than LTC operate health care facilities, through an unrelated party, in nine sites located in six States. The sites are owned by defendant THCI.

5. Annexed hereto as Exhibit "C" is the complaint in this action. It was initially served in an action in State Court in Missouri. Defendant removed it to the local Federal Court, and transferred it to this Court, on the ground that it was related to an appeal presently under advisement in this Court from an Order of the Bankruptcy Court in this District (03-610 [GMS] [the "Appeal"]). The Appeal will determine whether a certain Master Lease between the nine plaintiffs other than LTC, as tenants, and defendant, as landlord, is in effect.

6. Annexed as Exhibit "D" is the last pleading served by defendant containing an answer to the complaint (Its later pleadings have consisted solely of counterclaims). Annexed as Exhibit "E" is the pleading of defendant denominated "Third Amended Counterclaims". Annexed as Exhibit "F" is one of the subpoenae in issue, the one addressed to me. The three subpoenae apparently differ only in the name of the party to whom

addressed, and the return date. In particular, the seventeen-page, sixty-seven item "Rider to Subpoena" appears to be the same for all.

7. This action is in a peculiar posture. Normally a party files a pleading, and then seeks discovery to prove the assertions and denials of that pleading. Here defendant has done the opposite. It has first served subpoenae, and thereafter has framed "Third Amended Counterclaims" in an attempt to justify the subpoenae. What defendant is attempting to do, both in the subpoenae and in the pleading seeking to make them viable, is to enforce a judgment against LTC by means of fraudulent transfer and veil-piercing claims against Briarwood and others. However, defendant is presently several steps away from obtaining such a judgment against LTC and Briarwood, and may never obtain it. (i) There must be a Master Lease in effect, a question whose determination is not even to be made in this lawsuit. In the absence of a Master Lease, there is not even a suggestion of a guaranty by LTC, and any transfers made by it, or how impenetrable or diaphanous its corporate veil may be, is irrelevant. (ii) Even if there is a Master Lease in force, defendant must establish that there is a guaranty of those lease obligations by LTC. Plaintiffs' complaint in this action seeks a declaratory judgment that there is no such guaranty. This Court presently has under advisement plaintiffs' motion, and defendant's crossmotion, for partial summary judgment on that issue, thus demonstrating that both sides believe this to be a question of law upon undisputed documents. The question of whether, as a matter of law, defendant can successfully state a claim based upon an alleged guaranty is also raised by that branch of this motion seeking dismissal of the counterclaims for failure to state facts upon which relief may be granted. There are also a number of affirmative defenses to the assertion that there exists a guaranty. Defendant has at

this point in the proceedings not even successfully alleged the existence of a guaranty, nor has it gotten past motions for summary judgment and to dismiss on the issue of a guaranty.

        8.       Furthermore, even if there were a Master Lease, and even if there were a guaranty, defendant has made, and can make, no showing that LTC made transfers without fair consideration, or that it is or ever was insolvent. Instead, what is happening here is that defendant is using these subpoenae, and the counterclaims pleaded to support them, in bad faith, to harass persons and entities associated (or whom defendant thinks might be associated) with LTC and Briarwood, in order to apply settlement pressure in the case. In particular, as will be noted below, its subpoenae are improper and abusive.

        9.       There is no reason at this time to have discovery of nonparties in general, and me as attorney for parties in the litigation in particular, when, as will be demonstrated, the discovery is aimed, at best, solely at enforcing a non-existent judgment against LTC, or, if defendant could only reach one step further, against Briarwood; and at worst, is aimed at harassing LTC, Briarwood, and nonparties. The premise of this case, that there is a Master Lease in effect, will not even be determined in this case, so any alleged issue as to it cannot justify discovery. Whether there is a guaranty is also not an issue upon which discovery is needed, but turns upon the legal effect of undisputed documents. Indeed, plaintiffs have made a motion for partial summary judgment on this issue, which is currently under advisement. Defendant, by crossmoving for partial summary judgment, has demonstrated that it also considers the question not dependent upon discovery. Considering that a guaranty, which is a promise to answer for the debt of another, is subject to the Statute of Frauds, it is difficult to perceive how oral testimony would be relevant in any event -- either the documents defendant proffers constitute a guaranty, or they do not. Moreover, even to the extent that the question

may be disputed-fact-dependent (and there is no suggestion of that), I had no involvement with, or contemporaneous knowledge of, any of the transactions memorialized in the undisputed documents, which all predate my involvement with this matter even in my limited role of counsel. As the affidavits of the other two subpoenaed nonparties show, they also had no involvement with, or contemporaneous knowledge of, those transactions or documents.

10. That leaves only THCI's counterclaims for veil-piercing or fraudulent transfer. Discovery regarding such matters is more properly sought in an enforcement-of-judgment proceeding, on a judgment which, as noted, THCI is several steps away from obtaining, and is unlikely ever to obtain. In any event, THCI's claims in that regard are nothing but a fishing expedition, and cannot justify discovery, certainly at this premature stage, of other parties' business. Thus, the Third Amended Counterclaims, in its attempt to support the subpoenae THCI had served before it served the pleading, alleges (Par. 106), upon information and belief, that "Briarwood is controlled and managed by various individuals, including ... [seven individuals, myself among them]"). This is just not so. While I as an attorney at least had *some* contact with Briarwood, although I certainly never "controlled or managed" it, some of the other names are of individuals who have never had any contact or connection whatsoever, in any capacity at all, with Briarwood. Obviously, THCI is just guessing at this stage. Before it may be permitted to take such unfocused discovery in its attempt to enforce, via fraudulent transfer or veil-piercing claims, a judgment against Briarwood, it should first obtain, or at the very least be a lot closer to obtaining, a judgment at least against LTC, to say

nothing of against Briarwood. Since THCI is not such a judgment creditor, and may well never be, it should not be permitted at this time to engage in this form of discovery.[3]

11. The seventeen-page, sixty-seven item Rider to Subpoena demonstrates that its purpose is as described above. For instance, the relevant time period for the requests (Instruction 1, p. 13) is "from January 1, 2003, to the present." Were the defendant interested, say, in the documents which presumably form the basis for the claim that there is a guaranty, the period begins too late to encompass the relevant documents. In extending past the commencement of this lawsuit, the period also runs too late, for a guaranty either existed before commencement of this lawsuit questioning its existence, or it did not.

12. A brief review of the sixty-seven items shows what defendant's purpose is, and the abusive way it seeks to go about it.[4] In particular, defendant is attempting to enforce anticipated judgments far over the horizon. Thus, Items 1-6 seek documents concerning the organization, shareholders, stock transfers and assets of Briarwood, ending in Request No. 6, for "All Books and Records of Briarwood". Items 7 through 12 inquire similarly about LTC, ending, again, with "All Books and Records of LTC and LTC Subsidiaries" (Item 12). Item 13 asks for records of transactions between Briarwood and LTC. Item 50 seeks all documents "submitted or prepared for submission to any state or federal agency in connection with the

---

[3] It should also be noted that an allegation that an entity is "controlled or managed" by another entity or person does not state a claim imputing vicarious liability, nor does it justify discovery of the alleged controller or manager's personal finances and business affairs.

[4] A number of these requests ask not only about the entity named, but any "Affiliate" it may have. The definition of that term (Definition 1, p.8), however, while apparently attempting to be burdensome, ends up as incomprehensible: "'Affiliate' means a person, entity, member, partner and the like, holding directly or indirectly five percent (5%) or more of shares of stock of any class, partnership, or membership interest and the like in another entity, or an entity in which another person entity, member or, partner and the like holds directly or indirectly five percent (5%) of more of shares of stock of any class, or partnership, or membership interest and the like. The term 'Affiliates' also includes entities persons, officers, directors, members, partners and the like under common control."

7

healthcare services provided by Briarwood and its Affiliates, including LTC and LTC Subsidiaries", with Item 51 seeking the same with respect to submissions to lenders or insurers. Item 62 asks for documents relating to Briarwood's purchase of LTC in August 2003. Item 64 seeks documents "relating to any agreement concerning any assets owned, controlled or operated by LTC and/or LTC Subsidiaries". All these items seek to enforce non-existent judgments against LTC (which defendant would like to hold vicariously liable for the judgment it hopes to obtain against LTC's subsidiaries), and against Briarwood (which defendant, hoping to go one step further, would like to hold vicariously liable for the judgment it hopes to obtain against LTC). The judgment docket does not justify any such discovery today, nor may it ever.

    13. Items 14 through 18 ask about the structure and assets of "National", meaning National Senior Care, Inc. Items 19 to 23 inquire about "Mariner", meaning Mariner Health Care, Inc. Items 29-34 inquire about "SMV", meaning SMV Property Holdings, LLC. The history of these entities is the following: National and Mariner operated chains of nursing homes. National merged into Mariner. At that point, Mariner sold or caused the sale of the self-owned sites (only a portion of Mariner's portfolio) to entities in which SMV is interested. Rubin Schron has involvement with SMV; he had no previous relationship at all with National, or Mariner, or any of those sites. None of this has anything whatsoever to do with the nine facilities in issue in this case, nor with LTC, nor with Briarwood. It is nothing more than an attempt to inquire into Mr. Schron's affairs (See, e.g., Item 34: "All documents concerning SMV's and/or its Affiliates' application for a portion of the financing required in connection with the merger between National and Mariner").

    14. Items 24-28 inquire into the structure, ownership and assets of "MetCap", meaning MetCap Securities, LLC. MetCap, which has substantial experience in the

8

healthcare business, has been acting as an advisor to some of the parties in this transaction (much as I have been acting as counsel). While defendant has yet to subpoena anyone from MetCap, it is obviously next on its list, and its all-purpose Rider to Subpoena has been prepared with that in mind. There is no legitimate reason to inquire into the affairs of business or legal advisors to parties. The implication of an intent to harass is clear.

15. Items 35-39 inquire into the structure, ownership and assets of "Tri-State", defined as Tri-State Health Investors, LLC. Tri-State is the entity, unrelated to LTC (or, for that matter, to Messrs. Kaufman, Schron or myself) which operates the facilities on behalf of the nine other plaintiffs. Defendant is obviously trying to trace assets here, although its motivation appears to be strictly harassment.[5]

16. Defendant then begins a series of requests (41-48), all of the form "All documents identifying any entity in which [name] serves or served as an officer, director or was/is an Affiliate thereof". There are eight individuals named in the eight requests: Harry Grunstein (my brother, who is a consultant in the health-care professional field); Rubin Schron; Murray Forman (a principal of MetCap); myself; Avi Klein (from Tri-State); Uri Kaufman; Tony Gilburt (an accountant); and Arthur Cohen, a real estate investor who has some investments in common with Rubin Schron. So far, defendant has attempted to subpoena only three people on this list, but no doubt if plaintiffs resist its harassment it intends to continue down the list. To emphasize that, defendant has a catch-all request, Item 40: "All documents concerning any transaction by and among Briarwood, National, Mariner, SMV, LTC, Tri-State,

---

[5] Defendant cannot seriously contend that the nine tenant plaintiffs fraudulently transferred assets, because there never were any such assets to transfer. The single-site tenants have no assets other than their respective lease interests. These, however, are in effect liabilities, not assets, because the properties do not generate the income necessary to operate and also to pay defendant the monies it wants for rent under the Master Lease. That is why defendant has raised the contention, which it has yet to articulate, that despite the Statute of Frauds there is still somehow here a guaranty by LTC of the tenants' obligations. Defendant knows full well that the rent it demands is fatally excessive, and cannot be paid in that amount if the tenants are to survive.

LTC [again, although it named it two names earlier], LTC Subsidiaries, [the eight individuals mentioned above], and their related persons and/or Affiliates." How this irrelevant and massively overbroad and burdensome request relates to any legitimate discovery in this action is impossible to determine.

17. Item 49 concerns entities occupying the Maryland premises which used to be the headquarters of Integrated Health Services, Inc. ("IHS"), before and during its bankruptcy proceedings. The IHS bankruptcy estate sold the property some time ago to local real estate interests. Neither LTC nor (what defendant wants to know) Rubin Schron had anything to do with the sale, or any connection with the purchaser, or ever had any interest in the property. This is completely irrelevant to this lawsuit, and shows the fishing expedition nature of defendant's discovery, as to possible assets of potential judgment debtors (judgments which defendant herein is many, many steps away from realizing).

18. Items 53 and 59 seek documents concerning "the SPA", defined as "the stock purchase agreement referred to in Paragraph 36". There are two different paragraphs numbered 36 in the Rider, but neither refers to a stock purchase agreement. The term "SPA" is meaningless.

19. Item 63 seeks "documents relating to the LTC Subsidiaries' performance under the Nine Leases". The "Nine Leases" are defined as the "leases for the Facilities referred to in Paragraph 17". Again, there are two paragraphs with the same paragraph number in the document. One refers to "real property owned, leased or operated by National and its Affiliates". However, the LTC Subsidiaries never had anything to do with such properties. The other Paragraph 17 does not refer to any facilities, but does refer to one of the plaintiffs herein, namely Elm Creek of IHS, Inc. If understood as inquiring of the lease for the premises

that Elm Creek occupies (and it would be only one lease, not nine), the request is patently irrelevant. Either the Master Lease is in effect (defendant's contention), or there is no lease in effect (plaintiffs' contention). Under neither side's view of the facts would the prepetition lease, in any event long ago expired, be in effect, and there accordingly could not be performance under said lease. The request is not only irrelevant, but meaningless.

20. Items 65-67 seek documents dealing with the LTC Subsidiaries' "failure" to perform various actions. The requests are, to say the least, argumentative. Plaintiffs do not accept that any such non-performance constitutes a failure. In any event, the requests are too broad, and otherwise burdensome and irrelevant.

21. I declare, under penalty of perjury, that the foregoing is true and correct. Executed on March 13, 2006.

_____
Leonard Grunstein