# EXHIBIT "C"

FILED

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

2003 DEC 18 AM 10: 14

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          )   Case No. 00-389(MFW)
                                )
INTEGRATED HEALTH SERVICES,     )
INC., et al.,                   )
                                )   Bankruptcy Courtroom No. 1
                 Debtors.       )   824 Market Street
                                )   Wilmington, Delaware 19801
                                )
                                )   December 10, 2003
                                )   11:59 A.M.

TRANSCRIPT OF OMNIBUS HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:            Young Conaway Stargatt & Taylor, LLP
                        By:  ROBERT BRADY, ESQ.
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801

                        Kaye Scholer, LLP
                        By:  ARTHUR STEINBERG, ESQ.
                        425 Park Avenue
                        New York, New York 10022

For Premiere            The Bayard Firm
Committee:              By:  CHARLENE D. DAVIS, ESQ.
                        222 Delaware Avenue, Suite 900
                        P.O. Box 25130
                        Wilmington, Delaware 19899-5130

ECR Operator:           Judy Fisher


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

---

**TRANSCRIPTS PLUS**
435 Riverview Circle, New Hope, Pennsylvania 18938
e-mail CourtTranscripts@aol.com

215-862-1115    (FAX) 215-862-6639



2

Appearances:
(Continued)

For Unsecured
Creditors' Committee:

Klehr Harrison Harvey
Branzburg & Ellers
By:  STEPHANIE FOX, ESQ.
919 Market Street, Suite 1000
Wilmington, Delaware 19801

Otterbourg Steindler Houston & Rosen
BY:  JENETTE BARROW-BOSSHART, ESQ.
230 Park Avenue, 29th Floor
New York, New York 10169

For THCI:

Greenberg Traurig, LLP
By:  VICTORIA COUNIHAN ESQ.
     PAUL FOX, ESQ.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, Delaware 19801

For Briarwood:

Backenroth, Frankel & Krinsky
By:  ABE BACKENROTH, ESQ.
489 Fifth Avenue
New York, New York 10017,

3

<u>INDEX</u>

<u>Agenda Items</u>

<u>Page</u>

Item 16, Kaye Scholer application
Item 22, Motion of THCI

4
5

4

1    MR. BRADY:  Good morning, Your Honor.

2    THE COURT:  Good morning.

3    MR. BRADY:  Robert Brady on behalf of Integrated

4 Health Services, Inc., et al., and on behalf of the liquidating

5 LLC.

6    Just one contested matter going forward today, Your

7 Honor.  Before we get to that, just one comment on Matter 16.

8 With respect to the Kaye Scholer final fee application, at the

9 last hearing Your Honor approved it on a final basis with

10 respect to fees.  It was continued to today for expenses.  The

11 Trustee had raised issues with approximately $50,000 worth of

12 expenses.

13    UNIDENTIFIED ATTORNEY:  Thirty.

14    MR. BRADY:  I'm sorry, thirty.  Thirty thousand.  And

15 they have resolved that.  Kaye Scholer has agreed to take a

16 voluntary reduction of 15,000, and a revised form of order and

17 certification of counsel was filed on that.

18    THE COURT:  And I think I entered the order.

19    MR. BRADY:  Thank you, Your Honor.

20    With that, Your Honor, I have no other comments on

21 any other of the matters.  That would take us to Matter 22,

22 which is the motion of THCI.

23    THE COURT:  Okay.

24    MR. FOX:  Good morning, Your Honor.  Paul Fox and

25 Victoria Counihan on behalf of THCI Company, LLC.

5

1        Your Honor, this matter is set today on our motion
2   for the allowance of an administrative claim.  I'm not going to
3   spend a lot of time going into the background of how the
4   assumed leases came to be an element of this case.  But I do
5   think that the timing of when the Court ruled that the leases
6   were to be deemed assumed and the confirmation process and the
7   interrelationship of those two issues does have an important
8   bearing on what brought us here today.  Because I think the
9   bottom line, Judge, is that neither the plan nor the
10  confirmation order really ever contemplated that -- at least as
11  originally scripted, ever contemplated that these would be
12  assumed leases or would be performed by the debtors or the
13  reorganized debtors.  And it was only by inserting this
14  Paragraph 49(b) into the confirmation order that the THCI
15  leases came to be addressed in the confirmation order.
16        On May 7 --
17        THE COURT:  Well, wait a minute.  Clearly since you
18  are asserting that the debtor couldn't reject them, they had to
19  be dealt with in the plan.
20        MR. FOX:  Well, I agree that they have been dealt
21  with in the plan.  But I don't agree that if you read through
22  the plan that they really were addressed.  They weren't on the
23  schedule of assumed obligations.  They weren't really addressed
24  except in some sort of general terms in the plan itself.  There
25  was no reference to the THCI obligations as assumed objections

6

1 or as obligations that either the debtor or Briarwood were

2 going to have to deal with.

3      In fact, Judge, on May 7, on the second day of the

4 confirmation hearing, I stood up and I said, I need to know

5 that somebody's going to perform my leases. And it was at that

6 point that the lawyer for Briarwood got up and said, well, it

7 wasn't our expectation that we would have to do that, if we

8 have to --

9      THE COURT: Right.

10      MR. FOX: -- we will perform. So, you know, even as

11 of that moment, it was apparently being addressed for the first

12 time. How does that become important?

13      THE COURT: But the confirmation order was entered

14 after that.

15      MR. FOX: Yes.

16      THE COURT: And you weren't objecting.

17      MR. FOX: Because Paragraph 49(b) of the confirmation

18 order required up to the effective date of the plan that the

19 debtors perform our leases.

20      THE COURT: Okay.

21      MR. FOX: And after the effective date of the plan,

22 that the reorganized debtors perform our leases. What it

23 didn't address was the guarantee, in any way.

24      And here's how we get to that issue. In 1993, the

25 parties entered into -- prior to 1993, we had ten leases and we

7

1 had ten separate guarantees. In 1993, the parties entered into
2 a lease modification agreement in connection with some
3 financing that the debtors were -- you're familiar with this.
4           THE COURT: I'm all -- very familiar with all of
5 that.
6           MR. FOX: You're on top of all of this.
7           THE COURT: Yes.
8           MR. FOX: Well, the important part of that, Your
9 Honor, is that Section 4 of that lease modification agreement
10 contained -- and this was an amendment to each of the leases,
11 contained a specific reaffirmation of the guarantees by
12 Integrated. Integrated was a party to that agreement.
13           So, in March, 2002 when the parties entered into the
14 stipulation and order which basically said that the leases --
15 that the parties are free to try and enter into a new master
16 lease. If they can't do it, the master lease will be the nine
17 leases restated, except as amended in the March, 2002
18 stipulation and order.
19           THE COURT: Right.
20           MR. FOX: And there were six specific amendments,
21 none of which dealt with the guarantee reaffirmation.
22           THE COURT: Well, aren't you making their argument?
23 Therefore, the only guarantee claim you have is based on a pre-
24 petition guarantee which has to have been affected by the plan.
25           MR. FOX: Your Honor, it isn't because when the

8

1  leases were deemed assumed, and became post petition

2  obligations --

3          THE COURT:  Right.

4          MR. FOX:  -- the terms of the leases, including the

5  amending 1993 provisions, were restated as part of that new

6  master lease.  So, what we have then is we have an agreement in

7  1993 to which Integrated was a party, which was, according to

8  your April 23, 2003 order, restated as the terms of the new

9  master lease, the post petition obligation of the parties.

10         That post petition obligation had to include

11 Integrated's guarantee because it was a term of the leases that

12 was restated.  And by restated, I think the Court well

13 understands what that means.

14         So, we have, in April of this year, a restated master

15 lease which was amended solely as provided for in the March,

16 2002 stipulation which included a specific reaffirmation of

17 Integrated guarantee.

18         Now, in September of this year, we entered into an

19 agreed order and the agreed order reflected that the leases and

20 guarantees --

21         THE COURT:  Where does it -- where does it say that?

22              (Pause)

23         THE COURT:  All right.  But prior to the approval of

24 the stipulation was the pre-petition guarantee.

25         MR. FOX:  I'm sorry.  Say that again.

9

1      THE COURT:  Prior to the approval of the stipulation,
2  you still had only the pre-petition guarantee.
3      MR. FOX:  Which stipulation are we talking about?
4      THE COURT:  This July 21st, the --
5      MR. FOX:  I disagree.  Because in March, 2002, what
6  this Court -- the order this Court entered pursuant to the
7  agreement of the parties, including Integrated, basically said
8  that you're free to try and find a new master lease.  If you
9  don't, the master lease, the post petition obligation master
10  lease shall be the restated terms of the leases, except as
11  amended in the stipulation.
12      The restated terms included the reaffirmation of the
13  guarantee and brought the guarantee into the play.  So, what we
14  have -- and, of course, then we got into this struggle, which
15  began in April and is continuing unabated to date, over whether
16  or not the debtors are really going to have to -- the
17  reorganized debtors are really going to have to perform these
18  leases.
19      But the issue remains what about the guarantee?  The
20  guarantee was brought into the post petition obligations by the
21  1993 amendment and which was specifically reaffirmed.  We've
22  got -- we've got Integrated basically now saying, well, it was
23  waived in the March, 2002 stipulation.  But if it wasn't
24  waived, it became the LTC subsidiary's obligation.
25      And in arguing that, they rely upon language in

10

1  Section 5.9 of the plan.  Now, they have characterized the

2  language in Section 5.9 of the plan.  You're still -- should I

3  go back to the restatement issue?  Is that --

4          THE COURT:  Yeah, I'm not past that, the March --

5          MR. FOX:  Okay.  We've got --

6          THE COURT:  Give me the -- tell me where the March

7  order is.  And I have a problem because they're not all --

8          MR. FOX:  I have --

9          THE COURT:  -- tabbed here.

10         MR. FOX:  I have it right here.  And I --

11         THE COURT:  Yeah.

12                       (Pause)

13         THE COURT:  And the guarantee was contained in the

14  leases?

15         MR. FOX:  If I could have the book back for a moment,

16  Your Honor, I'll direct the Court's attention to the 1993

17  agreement.

18         THE COURT:  Right.

19         MR. FOX:  Here's the 1993 lease modification

20  agreement, which amended each of the ten leases.  Directing the

21  Court's attention to Section 4 of that agreement, you'll find

22  the guarantee reaffirmation.

23         THE COURT:  Okay.  All right.

24         MR. FOX:  Tell me when you'd like me to proceed.

25         THE COURT:  You may.

11

1        MR. FOX: So, Your Honor, just to recap this issue,

2  and I do want to make sure that you're comfortable with it.  In

3  1993, each of the leases was amended by that agreement you have

4  in front of you.  Section 4 of that agreement contained a

5  specific reaffirmation by Integrated which became an amended

6  term of each of the leases.

7        So, in March, 2002 when the parties entered into

8  their agreement by which Carriage by the Lake was rejected, and

9  the other nine facilities were assumed, the language of the

10 stipulation order -- and this Court has already so found in

11 April of this year -- basically was that if the parties were

12 unable to reach agreement on the terms of a different master

13 lease, the master lease would consist of all of the terms,

14 including that one, of the leases, except as amended in the

15 March, 2002 stipulation.

16       So, the leases which were deemed assumed in your

17 April 23, 2003 order contained a provision by which Integrated,

18 as a party to the 1993 agreement, the March, 2002 stipulation

19 and order and as an active participant in all of the

20 proceedings before this Court in March and April and May,

21 reaffirmed its guarantees.

22       The plan, in our view, does not address that

23 obligation because what it says is -- and although Integrated

24 keeps on talking about the plan and the orders providing for

25 the, quote, "transfer," and, quote, "whole sale transferring,"

12

1  quote, of assets and liabilities.  What it, in fact, says is

2  that Integrated, and this is in Section 5.9 of the plan, will

3  contribute and assign assets and liabilities.

4          Now, it's reasonably black letter law, Your Honor,

5  that an obligor cannot escape its obligation by assigning it to

6  a third party without the agreement of the person to whom the

7  obligation is owed.  They have essentially, by the stroke of

8  their own pen, tried put this obligation off on the LTC

9  subsidiary and argued that that's the entity which owes this

10  obligation to us.  We've got a number of concerns with that,

11  Your Honor, not the least of which is that as far as we can

12  tell, the LTC subsidiary has sold off virtually all of its

13  assets.  We don't believe that the proceeds have wound up in

14  LTC subsidiary's asset column.  We've basically been stripped

15  of our guarantee.  I mean that's really what's happened here.

16  We've been stripped -- or at least they've tried to strip us of

17  our guarantee.  And when they couldn't do it in the July 21

18  stipulation -- and I'll bring you to that now for just a moment

19  -- January -- July 21, Integrated and Briarwood stood before

20  the Court and presented the Court with an agreement which was

21  supposed to settle some disputes they had between themselves

22  over the stock purchase agreement.

23          THE COURT:  Right.

24          MR. FOX:  They represented to this Court in open

25  court that it had no effect on any third parties, including

13

1  THCI.  When, in fact, just the opposite was true.  In Section

2  12, what they were purporting to do was to move just our nine

3  facilities into a separate segregated holding company,

4  essentially a leper colony, and that would be our, quote, "new

5  guarantor," end quote.

6         And we had to come in on -- I know this Court -- I

7  know the Court recalls it.  We had to come in on an emergency

8  motion to unwind that.  And, in fact, no doubt understanding

9  what they were really doing, they had a specific provision in

10 the agreement which provided that, you know, severability

11 basically, and that if it was unwound, it would revert to where

12 they were before they entered into the stipulation.

13        So, our concern is that what they couldn't do through

14 the July 21 stipulation, they've now tried to do by essentially

15 stripping the LTC subsidiary of assets.  And this is -- this is

16 a real issue for us, Judge, and here's sort of the guts of the

17 problem.  Briarwood -- we've requested a number of times and

18 for a long period of time that they provide us with information

19 about the financial condition of the lessees and of the

20 entities that the contend are going to stand behind the

21 lessees.  Information about liability insurance.  And the

22 liability insurance issue is a huge issue, Your Honor.  Because

23 as we said in our papers, there are significant regulatory

24 deficiencies which have been found in these properties.  There

25 had been more found since the time our papers were filed.  A

14

1  number of these facilities have G level violations, which are

2  significant problems that run with the facility and will

3  adversely effect the value of our assets on an ongoing basis

4  whether Briarwood or its designee is running them or not.

5          We've got no evidence that they have the financial

6  wherewithal to perform.  No evidence that they're properly

7  insured.  Evidence that there are significant regulatory

8  problems.  And as far as things are proceeding now, nobody

9  standing behind them, nobody with any wherewithal anyway.

10         And, you know, basically Integrated and Briarwood

11 were giving us one of these, they're pointing at each other and

12 saying it's their problem, no it's their problem.  Well, it's

13 going to wind up being our problem unless we can get some

14 relief from the Court to address our rights under the guarantee

15 which everybody is essentially trying to ignore.

16         THE COURT:  All right.

17         MR. BACKENROTH:  Good morning, Your Honor.  Abe

18 Backenrock on behalf of, A, Briarwood, and, B, reorganized

19 debtors, the IHS subsidiaries that we've purchased as part of

20 the plan of reorganization.

21         I can deal with the first issue first, which is we

22 don't believe that there's a guarantee.  The plan doesn't

23 provide for an assumption of the guarantee, just the lease.

24 The guarantee is a separate document than the lease.

25         THE COURT:  Well, but what about their argument that

15

1  the modification -- the entry into the master lease as modified

2  post petition was a restatement of the guarantee pursuant to

3  Paragraph 4 of --

4          MR. BACKENROTH:  The --

5          THE COURT:  -- original lease amendment.

6          MR. BACKENROTH:  The original lease amendment

7  required and did have a separate assumption to that obligation,

8  there's a separate document which is referred to as a lease

9  guarantee in the lease that refers to that document.  The only

10 thing that was assumed was the lease, not the guarantee.  And,

11 in fact, the order of confirmation talks about an assumption of

12 the lease, it doesn't talk about an assumption of the

13 guarantee.

14         When we agreed to assume a responsibility for the

15 administration of these leasehold interests which originally,

16 Your Honor, was not part as far as we're concerned of our

17 package.  All we said to Your Honor, and Your Honor asked me

18 point blank at the hearing, was that part of our presentation.

19 I said, no, we weren't originally supposed to take these

20 leasehold interests.  But I said we would be prepared to

21 administer those IHS subsidiaries because the question is who's

22 going to do that and seek compensation from the debtor for

23 that, which we did.  But we certainly assumed no guarantee and

24 the order of confirmation doesn't provide for the assumption of

25 that guarantee, just the lease.

16

1        In addition, Your Honor, even under the stipulation
2  which -- in which this leasehold interest was assumed, we
3  believe that some of the terms, though they are inconsistent
4  with a guarantee.  And the reason for that is that one of the
5  provisions concerning the seven or eight items that talk about
6  what we modify is an integration of all the leasehold interest
7  into one master lease.

8        THE COURT:  Right.

9        MR. BACKENROTH:  And as far as we understand, as far
10 as we were told, that the reason for that was that they were
11 going to -- their adequate assurance of future performance was
12 going to be in the form of one master lease where each
13 leasehold interest, their leasehold interest basically stood as
14 guarantee for the other.  There was no negotiation or any
15 provision concerning a guarantee which would have been a
16 significant item and which was not in any of those provisions.

17       So, it's not in the order of confirmation, it's not
18 in the lease, and it's not anywhere else.  And we didn't assume
19 that obligation when we agreed to do this.  That's the first
20 issue.

21       The second issue is there an administration claim at
22 all.  And I think that they skip right past all of that.  We
23 went through great length in our papers to show why there is no
24 administration claim.  Perhaps they may have a quarrel with us
25 post confirmation and maybe they want to sue us wherever they

17

1  want to sue us, but the fact of the matter is that up to the

2  date of confirmation and the effective date, that is what

3  defines an administration claim.  The case law is legion that a

4  post -- an alleged post confirmation default or claim or

5  creditor is not an administration claim.  In fact, there's a

6  question of whether or not the Court would have even

7  jurisdiction to deal with that, or should deal with that.

8          THE COURT:  Well, I think they're not dealing -- as I

9  understand the argument, they're really not dealing with their

10 -- or asking me to adjudicate any claims versus Briarwood for

11 post effective date --

12         MR. BACKENROTH:  Well, they throw it all in.

13         THE COURT:  -- activities.

14         MR. BACKENROTH:  They throw it all in and I make the

15 point --

16         THE COURT:  I know.

17         MR. BACKENROTH:  -- that to the extent there is such

18 a claim, there are courts to deal with it.  And it's really not

19 this Court.  What is before this Court is an administration

20 claim which has to do with the period up to the effective date

21 of confirmation.

22         Now, let's take a look at the alleged -- I say the

23 alleged default that supposedly is triggering this $42 million

24 claim.  They're not claiming that the rent wasn't paid.

25 They're claiming basically non-monetary financial covenants is

18

1 basically what they're claiming.  Because up to the filing

2 date, up to confirmation, we're not even administering these

3 facilities.  It's being administered by the same people it was

4 administered until now.

5        So, what is the basis of the claim?  The basis of the

6 claim is is that the didn't comply with certain ratios,

7 financial ratios, things of that nature.  Well, number one, a

8 debtor can assume a lease without compliance with financial

9 covenants, insolvency issues, which is what they're talking

10 about.  They say there's got to be $75 million of equity.

11 That's basically the argument.  And, of course, the DIP did not

12 have any equity at all.  It was substantially insolvent.

13        Now, so, number one, those provisions, if that's the

14 basis of default, couldn't have triggered a default under those

15 leases, that's number one.

16        And, number two, they never sent the notice of

17 default or notice of termination in the Chapter 11 proceedings.

18 Which, if you assumed the lease, you've got to assume the lease

19 and comply with the lease.  Which means you think there's a

20 default, send a notice of default.  Send a notice of

21 termination.  That $42 million claim that they're alleging is

22 only triggered on a termination of the lease.  If that

23 leasehold interest is in effect, there is no claim.  They are

24 referring in the lease to the provisions concerning in the

25 event of termination, you do a valuation of what is the value

19

1  under the leasehold and what is the fair market value, and you
2  come to some number, and you come to a damage claim. None of
3  that happened.
4          And, in fact, not only didn't it happen, but in point
5  of fact, they file an objection to confirmation based on
6  feasibility. And, of course, they don't deal with this either.
7  And what was the basis of their objection on feasibility.
8  Who's going to administer it, issues concerning feasibility,
9  ability to perform. I mean front and center, those issues are
10 right in front of the Court with their objection and that gets
11 resolved at the May 7th hearing and which they were satisfied
12 that ABE Briarwood or the -- you know, their subsidiaries --
13 when say ABE Briarwood, I'm talking about the various entities
14 involved here -- were prepared to assume responsibility for
15 administering these leasehold interests which were in the name
16 of IHS subsidiaries, and they withdrew their objection.
17         So, all of those issues concerning who was running
18 it, non-monetary default, those are things that were put on the
19 table and they withdrew their objection. The order of
20 confirmation specifically said that all objections to the plan
21 were either settled or overruled. And we go to confirmation
22 and we have an order of confirmation. And that language that
23 they referred to like, you know, somehow it got lost, we didn't
24 coordinate it. That language was negotiated to death. That
25 language was past between myself, Mr. Steinberg, Mr. Fox, many

1  times.  That was language that was added on specifically to

2  deal with Your Honor's ruling concerning the question of the

3  assumed lease and, of course, there was an issue that that was

4  going up on appeal and to preserve the rights of the parties as

5  to that.

6          So, what it basically says, number one, there is a

7  lease.  That's the first thing it says.  And the performance of

8  that lease will be the subject of what IHS, meaning the debtor

9  will do, up to the effective date.  And then afterwards, the

10 IHS subsidiaries, who are the lessees over here, and we've

11 never said the IHS subsidiaries are not liable on the leases,

12 in fact, we continue to perform, they get the rent every month.

13 Those subsidiaries will then continue to perform under those

14 leases.

15         So, number one, it assumes that there is a lease and

16 that there isn't a termination of the lease in the Chapter 11.

17 And to the extent that anybody's going to say that there's a

18 $42 million claim and that I'm responsible for it on a

19 leasehold interest that supposedly was terminated in some

20 philosophical fashion in the Chapter 11, we -- of course we say

21 we're not liable for that.  But we didn't come in and say that

22 the IHS subsidiaries which are the subsidiaries that are the

23 lessees under the lease are not liable.  We continue to perform

24 under those leases.  I don't think there's a guarantee.  I

25 don't think -- certainly ABE Briarwood didn't assume a

21

guarantee. I don't think the other entity has a guarantee. But you know something, I don't know that Your Honor has to even deal with that issue because the first issue before the Court, is there an administration claim. And by the way, they don't challenge any of those claims. They don't challenge the fact that there was no notice of default notice termination, they don't challenge the fact that it's non-monetary, the defaults that they're talking about -- which they couldn't call a default on. They just ignore it in their papers. They simply ignore it. They come over here and make all kinds of allegations about my client.

And my response to the, gentlemen, you know you think you have a claim against my client who took over these leases. You know, and what bothers me even more than that, we were here in this court. The contract, the stock purchase agreement had specific provisions concerning capitalization, $25 million capitalization. I think that that's what the number was. And, of course, we complied with that. And now he walks in after that whole process takes place and after there's an order of confirmation and he says, you know something, surprise, he says you'd have to be $75 million and I'm going to now call you in default. Well, you know something, let them tell the State Court Judge if that's what he wants to do. I don't think this is the proper court for that and I'll have no problem dealing with that. If he wants to send me a notice of termination, he

22

1  can send it to my office, we'll accept service of that.

2         So, this is all nonsense.  There is no claim.  This

3  should be dismissed based on that basis.  And in terms of the

4  guarantee, I don't think there's a guarantee either.  But at

5  the end of the day, we have not defaulted.  There was a

6  temporary glitch, they won, we changed bank accounts and the

7  bank froze double endorsed checks.  We went out of that bank,

8  he gets a wire every month on the second or the first of the

9  month.  There's no defaults under this thing.  And all of this

10 talk about I don't know what the future will bring.  You know

11 something,  if he had a problem with us taking over the leases

12 -- I'm talking about administering those leases, as to who we

13 use, how we administer, those are issues that he should have

14 raised on May 7th.  He said, Your Honor, it's nice to hear that

15 ABE Briarwood says that they're going to run it, but I want to

16 hear more, I want representations concerning who the person is,

17 what their capitalization is, all of those other things.  None

18 of those things were said.

19        They withdrew their application -- excuse me, their

20 objection to the confirmation based upon that.  Why isn't there

21 a res judicata issue on that issue that was center stage issue?

22 And now they want to sandbag us after we've come out of 11,

23 paid $200 million to this company and they want to shake us

24 down by coming in over here?  I want to do discovery of the

25 debtor.  I want to find out everything that they're doing.

23

1 Why? You think that you have a right to a default, send me a

2 notice of default, send me a notice of termination. That's

3 what the lease requires. You want to fight about whether or

4 not there is --

5     THE COURT: All right.

6     MR. BACKENROTH: That's what -- thank you, Your

7 Honor.

8     THE COURT: Thank you.

9     MR. STEINBERG: Your Honor, usually I'm the one who

10 is raising my voice and excited, I think I'm going to be lower

11 key today.

12     Your Honor, I think if you look at the lease

13 modification agreement that Mr. Fox alluded to, the 1993

14 agreement --

15     THE COURT: I have it.

16     MR. STEINBERG: -- in Paragraph 4, the first sentence

17 says, "Except as amended by this agreement, the leases shall

18 remain in full force and effect as heretofore."

19     The second sentence say, "Integrated acknowledges and

20 agrees that all of its obligations under the lease guarantees

21 shall remain in full force and effect and shall hereafter apply

22 to the leases amended by this agreement."

23     Page 2 of that defines what the lease guarantees are,

24 and you can see that the lease guarantees are separate

25 instruments from the actual leases itself. There's nothing in

24

1  this modification agreement that says that the guarantees have

2  somehow now been incorporated into the lease as a lease

3  document.

4          The argument that is made in connection with the

5  March, 2002 stipulation is that the specific language of that

6  stipulation says that the leases will be amended -- the nine

7  existing leases -- I'm sorry. The parties shall enter into a

8  master lease agreement amending and restated the leases. The

9  leases do not include the guarantee, the guarantee is a

10 separate instrument signed by a separate party. I say that

11 merely for purposes of clarification for Your Honor because I

12 think Mr. Fox has tried to take this 1993 agreement and say

13 that somehow the guarantees have become a part of the lease.

14 All that happened here was that there were modifications to the

15 lease and the guarantor ratified that those modifications were

16 not going to discharge it of its separate guarantee obligation

17 when this lease.

18         When this March, 2002 stipulation took place, all we

19 were talking about was an assumption of the lease pursuant to a

20 master lease to be negotiated. The pick-up that they were

21 getting was what Mr. Backenroth alluded to, which was, in

22 effect, the cross collateralization of the leases. Prior to

23 this time, we were trying to cherry pick the leases, reject or

24 assume five or something to that effect. And what they were

25 getting by virtue of an agreement to enter into a master lease