25

1  is that if there was an equity in one lease and positive value
2  in one lease, it would help support the other lease.  That's
3  what they were getting.

4          In March, 2002, we were in bankruptcy for two years.
5  IHS, as an entity itself, once it was in bankruptcy, IHS was
6  worthless for its creditors because IHS really owned just the
7  stock interest of its subsidiaries.  The stock interest of its
8  subsidiaries was worthless because each of its operating
9  subsidiaries had jointly and severally guaranteed to the
10 lending group $2.1 billion which, when you back off the Rotech
11 distribution, it was like $1.3 billion.

12         So, that the equity that IHS had in the operating
13 subsidiaries was zero.  The monies that were paid by Briarwood
14 was because we did have operating subsidiaries that did have
15 value, which were really going to the creditors of the
16 operating subsidiaries.  And that primarily is 75 percent of
17 that body is the bank lenders who held the $1.3 billion worth
18 of guarantees.  To argue that you've been stripped of a value
19 even if it was an IHS obligation is sort of a -- sort of a
20 feudal concept.  And the idea that they should be able to go
21 against the liquidating LLC for that money, which really is the
22 fund that was generating for the operating subsidiary creditors
23 and we did a substantive consolidation for purposes of
24 distribution because it was under the assumption that it would
25 not strip the operating creditors of anything meaningful or

26

1  tangible.  To come back after the fact is, I think, a -- I

2  agree with Mr. Backenroth, that there are clearly res judicata

3  concepts.  There clearly was an opportunity to raise all of

4  these things in the connection with the confirmation of the

5  plan and none of these were raised.  In fact, they were all

6  agreed to and the objection was withdrawn and no appeal was

7  taken.

8        The concept of the plan which Mr. Fox continuously

9  ignores in this motion, although he did say -- he did set it

10 forth correctly in other pleadings that he filed with this

11 Court, is that there were assets and liabilities of IHS.  If

12 there was a guarantee, whether it was a pre-petition liability

13 or a post petition liability, that affected who got the

14 liability.  But the liability went somewhere.

15       If it was a post petition liability of IHS because

16 there was a ratification of the guarantee, that would have gone

17 to the LTC subsidiary, that's the way that the plan was set up.

18 The plan set up is --

19       THE COURT:  Well --

20       MR. STEINBERG:  -- that IHS assets and liabilities

21 went to the LTC subsidiary unless it was an excluded asset or

22 an excluded liability.

23       Excluded liabilities were pre-petition obligations.

24 So, if it was a pre-petition guarantee, we are -- the

25 liquidating LLC is administering all of the pre-petition

27

1  claims.

2           If it was a post petition obligation, it went to the

3  LTC subsidiary.  We didn't separately list in the context of

4  the plan or anything else all of the IHS administrative

5  liabilities that were taken over by LTC.  And the fact of the

6  matter is, Your Honor, is that the confirmation order was set

7  up to enjoin actions against IHS as the surviving entity.

8  Because IHS has nothing.  IHS transferred its assets and its

9  liabilities.  The excluded administrative assets and the

10 excluded administrative liabilities went to the liquidating

11 LLC.  Those which didn't fit with those -- within those

12 specific definitions went to the LTC subsidiary.  That was the

13 structure that was put forth in the plan.  That was the

14 structure that was explained at the confirmation hearing.  In

15 fact --

16           THE COURT:  So, even if their consent was required,

17 the fact that they did not object at confirmation means that

18 they waive that?

19           MR. STEINBERG:  It happens all the time, Your Honor.

20 That when you establish a liquidating LLC or a surviving

21 entity, you're pushing the claims to where they are.  I mean

22 the whole concept of adequate protection is you're taking lien

23 rights and you're taking it from one asset and you're giving it

24 to another asset in accordance with the provisions of the

25 Bankruptcy Code.

1     All of the cases that he cited are State law

2 concepts, but they're totally overridden by a Federal

3 Bankruptcy Code where you establish that an entity is going to

4 push its assets to its -- to its -- to specific entities.

5 That's where it goes.  I don't need their consent.  That's what

6 the voting process is, that's what the confirmation of a plan

7 process is.

8     Your Honor, when they move for reargument, and I will

9 say this only once because I don't want Mr. Fox to say it ever

10 again -- he makes a big deal of the fact that on July 21 we

11 made a presentation to Your Honor amending the stipulation --

12 amending the stock purchase agreement and then we subsequently

13 further amended it to reverse ourselves when he made a motion

14 when Briarwood said it didn't matter to it.  So, we reversed

15 the provision that he found offensive.

16     But if you look at the sign-in sheet, and Mr. Brady,

17 I think, was the one who told me this.  When you look at the

18 sign in sheet on July 21, Meditrust had -- THCI had their

19 counsel there when all this was going on.  So, all of the

20 claims of surprise and whatever, they were here when the

21 presentation was made.  And Your Honor may recall that there

22 was probably a three-hour delay for the presentation and Your

23 Honor signing the order because the Premier Committee wanted to

24 review it and they hadn't had an opportunity to do that.  And

25 so we had to wait until a latter part of the afternoon to do

29

1  it.

2       THE COURT:  I don't know why I don't remember that.

3       MR. STEINBERG:  Your Honor, but when they did move to

4  reargue on Paragraph 12 of their motion for reargument, which

5  is dated -- I don't know when it's dated.  It was dated at the

6  end of August.  It said, "Pursuant to the disclosure statement

7  of the amended joint plan of reorganization of IHS and its

8  subsidiaries, the stock of IHS and its subsidiaries was to be

9  sold to ABE Briarwood.  The disclosure statement further

10 provides that the assets and liabilities of IHS would be split

11 into two wholly owned direct subsidiaries of IHS to be called

12 IHS Long-Term Care, Inc., (LTC Subsidiary and IHS Therapy Care,

13 Inc.,) Therapy Subsidiary."

14       So, when they moved for reargument, they knew exactly

15 what every other creditor knew in this case, and they were

16 reiterating it in a pleading to Your Honor that they knew that

17 the structure of this plan was that whatever IHS had was going

18 to either go to the liquidating LLC or to the LTC subsidiary,

19 depending on whether it fit within the definition of excluded

20 liability.

21       And in this particular case, there is no issue and

22 there's never been anything that's raised that the Meditrust

23 leases are not excluded liabilities.  No question.  They never

24 challenged that in their papers.  So, if it's not an excluded

25 liability, it's not a liquidating LLC obligation.  And as I've

1    said, Your Honor, to the last time we were here, I represent --

2    the only person I represent at this point in time is the

3    liquidating LLC.

4            Mr. Backenroth is the counsel for the reorganized

5    debtors and the LTC subsidiary. He makes those arguments.

6            But the thing that has to be clear and the thing that

7    -- the reason why I rise in the Court today is that the

8    liquidating LLC doesn't have this obligation.

9            There is a dispute as to whether there's a guarantee

10   or not guarantee. And I agree with Mr. Backenroth that he can

11   litigate that dispute in a forum outside of this Court because

12   that really relates to what the post effective date obligations

13   are.

14           The plan was actually very clear that up until the

15   effective date, the debtor operates and then post effective

16   date the reorganized debtor operates. Well, I mean it's clear

17   because the sale doesn't take place until the effective date,

18   so you don't have a reorganized debtor. You don't have

19   Briarwood in control of these entities until we've gone

20   effective, until we done the sale.

21           So, prior to that time, it's the debtors. And under

22   the structure of the plan, Briarwood assumes the administrative

23   expenses, or whatever is not an excluded administrative claim

24   or an excluded liability. And that was clear that we -- that

25   was the presentation we made at the confirmation hearing. That

31

1  is clearly spelled out in the plan and disclosure statement.
2  And the fact that we're here today having to defend an attempt
3  to, in effect, assert a lien on the liquidating LLC is a -- is
4  something that cost the liquidating LLC and the confirmation
5  order did specifically provide that this would not happen.
6  That they would be enjoined from taking this type of action and
7  we've cited in our papers to the two sections of the
8  confirmation order which specifically says, A, in Paragraph
9  67(c) of the confirmation order, they're enjoined from suing
10 IHS.  And what they've done in their reply brief constitutes a
11 suit against IHS.
12          And Paragraph 64 of the confirmation order enjoins
13 them from suing the liquidating LLC, except if they have an
14 excluded liability which they know they don't have.  They have
15 violated the confirmation.  And a violation of a Court-
16 appointed order is subject to sanctions.
17          Now, we've -- when we responded and cross moved, they
18 did not withdrawal their motion as compared to the liquidating
19 LLC.  They pressed this motion requiring us to file additional
20 briefs.  And I think that they and any other creditor who tries
21 to do what they did should be sanctioned for violating the
22 order.  I think the creditors have paid for that benefit.
23 There was a two-day confirmation order hearing where all of
24 these issues were raised.  The idea that somehow the guarantee
25 was left as an open issue as part of the plan process is

32

1  ridiculous.

2          The plan deals with all claims.  The plan provides

3  for a discharge of all claims that existed through the

4  effective date unless the plan otherwise provides for a

5  different treatment.

6          THE COURT:  Well, time out on your Paragraph 67, is

7  it --

8          MR. STEINBERG:  Yes.

9          THE COURT:  -- B and C argument.  Are you suggesting

10 that if I enter such an injunction, which is typical in

11 confirmation orders, that it would bar a party from filing an

12 administrative claim or a motion for allowance in payment of an

13 administrative claim?

14         MR. STEINBERG:  I think, Your Honor, that they are

15 entitled --

16         THE COURT:  And isn't that what this motion is?

17         MR. STEINBERG:  No.  To the extent that they're

18 asserting it as against the liquidating LLC when they don't

19 have a claim, that's what they --

20         THE COURT:  Well, isn't that what I'm being asked to

21 decide, whether they have a claim or not?  But does the

22 injunction mean that they can't come to Bankruptcy Court and

23 file a claim.

24         MR. STEINBERG:  No, no, no.  Your Honor, the --

25         THE COURT:  And if they lose, they have to, you know,

1   pay attorneys' fees?

2          MR. STEINBERG:  Well, I --

3          THE COURT:  I'm not sure that's what the injunction

4   means.

5          MR. STEINBERG:  No, no, no.  I think, Your Honor, in

6   this particular case, you can obviously find that if there was

7   a good faith basis to assert a claim as against the liquidating

8   LLC, and you determine that even though there was a good faith

9   basis, it did not properly rely, then obviously it's in your

10  discretion not to sanction it.

11         But really, the purpose of the injunction was to, in

12  effect, impose the equivalent of actions as against the

13  liquidating LLC so that to the extent that Briarwood didn't pay

14  administrative claims that it otherwise assumed as part of the

15  plan may have a legitimate right to come in before Your Honor

16  if it's an administrative claim prior to the effective date and

17  ask Your Honor to determine what the amount is and that

18  Briarwood has a responsibility.  When I say Briarwood, I mean

19  the reorganized debtor, not Briarwood.

20         But that to the extent that they try to assert that

21  against the liquidating LLC, when it's clear what the concept

22  of the plan was as the liquidating LLC was not responsible for

23  those actions, that was what was supposed to be enjoined.  That

24  was what -- they were supposed to enjoin actions against IHS

25  because under the disclosure statement, we disclosed to

34

1  everybody that once this happens, we were going to dissolve

2  IHS.  I mean that's in the disclosure statement.  So, we want

3  to be able to administer this plan.  We want to be able to

4  administer it with the minimum of cost.  And once we've

5  established the precepts that are in the confirmation order and

6  the precepts of the plan of reorganization, we would ask Your

7  Honor to enforce.

8        Again, if Your Honor feels uncomfortable about it,

9  this is not something that is worth a lot of my time trying to

10 convince you to the contrary.

11        THE COURT:  All right.

12        MR. STEINBERG:  The important thing for me to try to

13 convince you today is that the liquidating LLC does not have an

14 obligation for this dispute.  It is clear that the reorganized

15 debtors, post effective date, were going to deal with this

16 circumstance.  The reorganized debtors are controlled by

17 Briarwood.  If they have an ongoing dispute, even though

18 they've been paid rent --

19        THE COURT:  All right.

20        MR. STEINBERG:  -- through November, and even though

21 there's been no notice of default, that probably belongs in a

22 forum other than this courtroom.

23        THE COURT:  All right.  Thank you.

24        MR. FOX:  Briefly, Your Honor?

25        THE COURT:  Yes.

35

1    MR. FOX: Well, I'll try and strike a balance between
2 Mr. Steinberg and Mr. Backenroth in terms of my level of
3 presentation.

4    THE COURT: All right.

5    MR. FOX: Your Honor, we've got a huge problem. And
6 our problem is that we've got significant evidence that our
7 facilities are not being operated properly and the regulatory
8 problems we're talking about, by the way, are all pre-effective
9 date audits or survey results. So, you know, this is not a
10 situation as I think Mr. Steinberg would have you believe,
11 where these are issues that have arisen since the effective
12 date and the reorganized debtors took control.

13    We've got Integrated basically saying that it's the
14 LTC subsidiary's problem.

15    THE COURT: Right.

16    MR. FOX: And we've got Briarwood saying that there's
17 no guarantee at all. Or if there is, it's not their problem.

18    THE COURT: Well, saying it's the subs -- if the subs
19 are in default, then sue them.

20    MR. FOX: Well, if the subs are in default, the
21 likelihood is that a lawsuit against them would be a somewhat a
22 puric exercise because if they're in default, it's probably
23 because they don't have the cash flow to support the lease
24 payments and we're not going to be able to get any relief from
25 them anyway. That was the whole point of the guarantee in the

36

1  first place.

2          The point of the guarantee --

3          THE COURT:  But you didn't raise the guarantee issue

4  at confirmation.

5          MR. FOX:  Why would we have, Your Honor?  What is

6  there --

7          THE COURT:  Others did.

8          MR. FOX:  Others who were approached by the debtors

9  in a consensual negotiating posture and who worked out

10  arrangements with the debtors where they were fighting with us

11  to establish that they didn't have to assume our leases in the

12  first place.  I submit to Your Honor that we stood in a very

13  different place than the handful of other owners who they

14  identified and said, well, we entered into agreements with

15  these other people and resolved these issues.  Well, great.

16  That's wonderful.  Because --

17          THE COURT:  Yeah, but you didn't preserve anything in

18  the plan or the confirmation order that preserved your claims

19  on the guarantee.

20          MR. FOX:  The plan -- neither the plan nor the

21  confirmation order addressed our guarantees.  The closest they

22  come to --

23          THE COURT:  Sure they do.  They say that everything's

24  transferred to ABE Briarwood, except the excluded obligations

25  so --

37

1          MR. FOX:  You're using their --

2          THE COURT:  -- you're not listed.

3          MR. FOX:  You're using their word.

4          THE COURT:  Yeah.

5          MR. FOX:  The word that was used in the plan was not

6    transferred.  It was contributed and assigned.  And the last

7    time I checked, an obligor can't assign an obligation.

8          THE COURT:  Well, you can if there's an order entered

9    and you don't raise the objection.  Haven't you waived that

10   argument?

11         MR. FOX:  Your Honor, if the -- if the plan and the

12   confirmation order don't address the issue, I don't have an

13   obligation --

14         THE COURT:  Well, sure they did.  They transferred

15   the obligation.

16         MR. FOX:  Again, it was an assignment, and not a

17   transfer.  But more --

18         THE COURT:  Well, they assigned it.

19         MR. FOX:  More fundamentally, Your Honor, from our

20   perspective, Section 49(b) of the confirmation order provided

21   that the obligations under the leases, including Integrated's

22   reaffirmation, survived and were the obligation of the debtors

23   up to the effective date and then the performances of the

24   leases became the obligation of the reorganized debtors.

25         Nothing in the plan changed that.  Nothing said and

38

1  the guarantees of Integrated signed on behalf of THCI are

2  discharged or released or waived. There's nothing in the plan

3  that says anything like that.

4            THE COURT: Well, yeah, they say everything is

5  assigned to Briarwood except what was excluded.

6            MR. FOX: Because --

7            THE COURT: And this wasn't excluded so, therefore,

8  it doesn't have to be part of what was assigned.

9            MR. FOX: And now we get into the issue of the moving

10 parts at the time that this was all going on. Because at the

11 time of the confirmation hearing, the Court had just entered

12 its order deeming the leases assumed.

13            THE COURT: Right.

14            MR. FOX: Their motion to reconsider -- the motion to

15 stay was denied after the first confirmation hearing. The

16 motion to reconsider was heard two weeks after the conclusion

17 of the confirmation hearing. So, while they were out

18 negotiating with these other landlords to resolve issues

19 related to guarantees, they were basically fighting with us to

20 avoid having to accept these leases. And ultimately, they lost

21 that fight, now we're up in the District Court on appeal. But

22 what we wound up with, Your Honor, is a provision -- and

23 significantly a provision in the Section of the confirmation

24 order which deals with rejected executory contracts, that's

25 where the provision relating to THCI is found. Not in the

39

1  provision --

2            THE COURT:  But it's in there.

3            MR. FOX:  It's in there and there is nothing in there

4  that says that the guarantee falls by the wayside.  It says

5  that the leases are assumed and they shall be performed.  And

6  it --

7            THE COURT:  All right.

8            MR. FOX:  And part of those leases, a provision of

9  those leases is Integrated, reaffirmation of its guarantee.

10           THE COURT:  Not quite.  Isn't it simply that the

11 guarantee is not affected or eliminated because the lease has

12 been modified?

13           MR. FOX:  They expressly recognized and reaffirmed

14 the vitality of their guarantee.  That's essentially what it

15 says.  And when that --

16           THE COURT:  But it's still a guarantee that's a pre-

17 petition contract.

18           MR. FOX:  Until the point in time when I became a

19 restated term of a post petition contract.  And then it became

20 a post petition obligation.

21           THE COURT:  No.  It says that -- acknowledges that

22 the guarantee that is a pre-petition obligation remains in full

23 force and effect and not -- is not -- notwithstanding the

24 amendment of the agreement essentially.

25           MR. FOX:  Right.  And then all the provisions of the

40

1 leases, including that one -- if -- let me put it to you a
2 different way.  In March, 2002, the parties identified six ways
3 in which the leases were going to be amended.  If Integrated
4 didn't want to reaffirm its guarantee, that should have been
5 the seventh term.  And it wasn't.  It wasn't.

6          It was restated along with all the other -- that is a
7 term of the lease, just as surely as the notice provisions are,
8 as the rent provisions are, as any other provision of the lease
9 is.

10          If they didn't want that to be carried forward --
11          THE COURT:  But that is not a new guarantee.
12          MR. FOX:  It is a reaffirmed -- reaffirmation of an
13 existing guarantee.
14          THE COURT:  Well, that --
15          MR. FOX:  In the same way, Your Honor, that the
16 leases which were restated were not new leases, but they were
17 restatements and reaffirmations of existing leases as a post
18 petition obligation.  It is no different.
19          THE COURT:  Well, assuming you're correct, that post
20 petition obligation -- if there was one, was not an excluded
21 obligation or liability.
22          MR. FOX:  Because they were not dealing with the THCI
23 obligations.
24          THE COURT:  The plan was dealing with everything, so
25 they were.

41

1        MR. FOX:  Except to the extent that the confirmation

2  order provided otherwise.  And in 49(b), it did.

3        THE COURT:  But it did not provide that the debtor --

4  that the liquidating LLC will be responsible.  Where does it

5  say the liquidating LLC will include this guarantee as an

6  excluded obligation --

7        MR. FOX:  Your Honor --

8        THE COURT:  -- and be responsible for?

9        MR. FOX:  Obviously it doesn't say that.  But what it

10  does say is that the leases --

11        THE COURT:  All right.

12        MR. FOX:  -- and the restated obligations in the

13  leases are the obligation of the debtor.  And we're here before

14  you today because the performance of these leases is not being

15  attended to properly.  We're going to wind up with, I believe,

16  with --

17        THE COURT:  Well, it doesn't -- it says the

18  applicable debtor party, which are the lessees, will perform

19  until the effective date of the plan.

20        MR. FOX:  Well --

21        THE COURT:  That's what you agreed to in the

22  confirmation.

23        MR. FOX:  The applicable debtor -- it doesn't

24  identify the applicable debtor parties.  And I would submit to

25  the Court that that could as easily be read to include

42

1  Integrated.

2          THE COURT:  Well, the --

3          MR. FOX:  Which under the --

4          THE COURT:  -- applicable party -- debtor party to

5  such master lease shall perform the master lease.

6          MR. FOX:  And Integrated, by virtue of the 1993

7  agreement and the March, 2002 stipulation, was a party.  They

8  signed off on both of those documents.

9          Your Honor, on the --

10          THE COURT:  Well, tell me what performance was due by

11  IHS before the effective date that is the basis for your

12  administrative claim.

13          MR. FOX:  The proper operation of the facilities and

14  the fact that they are racking up regulatory deficiencies by

15  the bushel basket, the failure to provide --

16          THE COURT:  Until the effective date.

17          MR. FOX:  Yes.  All of the regulatory deficiencies I

18  identified occurred before the effective date.  We're stuck

19  with them now, but, yes, they occurred before the effective

20  date.  They've admitted that they were not able to satisfy

21  either of the financial covenants.  They've admitted that they

22  didn't have the --

23          THE COURT:  Well, but --

24          MR. FOX:  They've admitted that they didn't have the

25  required insurance in place.  And, Your Honor, that's not a

43

1  whimsical problem. I mean the Carriage by the Lake Facility --
2  the operator of that facility wound up being a convicted of a
3  crime. They were barred from participating in the Medicare or
4  Medicaid programs for five years. That's really what was
5  behind the willingness to enter into the agreement where they
6  rejected Carriage by the Lake, and we took it back with that
7  black eye and it's been a significant issue.
8          So, you know, we're not standing up here today just
9  trying to make noise. I mean these are serious problems.
10 We've got three different facilities in front of us that have G
11 level deficiencies. That is a serious, serious issue. That
12 results in a substandard care finding. And we're looking for
13 somebody to stand behind the guarantee that we had.
14         If the issue is, Your Honor, whether or not the LTC
15 subsidiary is a viable substitute, then let us take the
16 discovery we've noticed up on what's going on with the LTC
17 subsidiary and come back --
18         THE COURT: Well, why is that an issue? Anything
19 after the effective date I don't have jurisdiction over.
20         MR. FOX: Your Honor, I don't disagree that it's not
21 an issue. But if they're offering up the LTC subsidiaries, a
22 viable alternative to Integrated, then I'm just offering that
23 as the answer, which is --
24         THE COURT: They're not offering it up. They're
25 saying that's what the plan says.

44

1        MR. FOX:  And I disagree.

2        THE COURT:  And that's what Paragraph 49 says.

3        MR. FOX:  And I disagree on both scores.  Your Honor,

4   just --

5        THE COURT:  Let me hear from the debtor on 49(b).

6        MR. FOX:  One more thing, Your Honor, on the fee

7   issue.  It's interesting that Mr. Steinberg would ask the Court

8   to award sanctions because the March, 2002 stipulation order

9   did provide that they were to pay us our fees for all of the

10  expenses incurred in connection with the debtors' bankruptcy.

11  They've offered up the fact that it said within 30 days.

12        Your Honor, the fact that this has dragged on and has

13  become far more expensive than it needed to is not our fault.

14        THE COURT:  All right.

15        MR. FOX:  It is not our fault.

16        MR. STEINBERG:  Your Honor, my -- Paragraph 49(b)

17  deals with the so-called master lease determined by Your

18  Honor's interpretation of the March, 2002 stipulation.  And it

19  basically says that the applicable debtors, which are the

20  tenants, are going to perform it.  And then after which time,

21  the reorganized debtors, which are the same entities, are going

22  to perform it.  The  --

23        THE COURT:  Well, why doesn't it include the

24  applicable debtor, IHS, which was a party to the master lease?

25        MR. STEINBERG:  Because --

45

1          THE COURT:  Perform its obligation.

2          MR. STEINBERG:  -- IHS is not a reorganized debtor.

3  IHS will dissolve.

4          THE COURT:  It doesn't say that, though.

5          MR. STEINBERG:  It says after which the master lease

6  will be performed by the applicable reorganized debtors.  IHS

7  didn't have -- our view is IHS didn't have a guarantee

8  obligation.  If it did have a guarantee obligation --

9          THE COURT:  Well, why didn't it have a guarantee

10 application.  It has a guarantee obligation --

11         MR. STEINBERG:  Well, I'm sorry.  Your Honor, there

12 is an argument -- and if it's a pre-petition obligation, there

13 is an argument that if the guarantee wasn't ratified and the

14 leases were assumed, then the guarantee was discharged at that

15 point in time under the assumption.

16         THE COURT:  But if Paragraph 4 was assumed --

17         MR. STEINBERG:  Oh, no, no, no, no.  If Paragraph --

18         THE COURT:  -- and incorporated into the master

19 lease --

20         MR. STEINBERG:  If Paragraph 4 was assumed and

21 incorporated into the master lease, then you're right, Your

22 Honor, then that obligation would have continued.

23         But if it did continue, would have been a liability

24 of IHS and liabilities of IHS under Section 5.9(b) of the plan

25 were assigned to the long-term care subsidiary.

46

1          THE COURT:  But why isn't that trumped by 49(b) which

2  said that the applicable debtor will perform under the master

3  lease until the effective date.

4          MR. STEINBERG:  If it's an applicable debtor, then --

5  the liabilities of the applicable debtor are assumed by the

6  long-term care subsidiary under Section 5.9(b) of the plan.

7          THE COURT:  But not the ones --

8          MR. STEINBERG:  Yes.

9          THE COURT:  -- pre-effective date.

10         MR. STEINBERG:  Yes, they are.  Your Honor, the

11  structure of the plan, to remind you, was that there was at

12  least $100 million of administrative claims that were being

13  assumed by the reorganized debtors.  But they were -- you know,

14  it was the GLPL issues and anything else that had occurred

15  except for excluded liabilities.  Excluded liabilities were

16  essentially the professional fees which they weren't going to

17  pick up.  Everything else was their ticket.  That's why Mr.

18  Backenroth can say that they paid $200 million.  They paid less

19  than that in cash.  They obviously assumed a whole bunch of

20  more liabilities or potential liabilities.  That's what

21  happened here, Your Honor.  These liabilities were picked up.

22  I mean it's not -- they acquired the reorganized companies.

23  The reorganized companies had, you know, seventy or $80 million

24  of current assets which they picked up as part of the deal

25  which helped satisfy the accruals of the administrative claims.

47

1  That was the essence of what we went through at the
2  confirmation order.
3          This language was only dedicated to the March
4  stipulation.  The March stipulation only talks about leases.
5  It doesn't talk about guarantees.  This is torturous what he's
6  doing.
7          THE COURT:  Well, because you didn't come up with a
8  master lease that listed everything.
9          MR. STEINBERG:  It said --
10          THE COURT:  And that's why -- so, the entire -- the
11  entire pre-petition lease was incorporated.
12          MR. STEINBERG:  Right.  But the pre-petition lease
13  did not include a separate guarantee instrument.  It was never
14  incorporated.  And the 1993 agreement does not say that the
15  guarantees are now imbedded into the lease and now become part
16  of the lease obligation.  It remained a separate instrument.
17  And the fact of the matter was is that I think when you heard
18  the argument -- and I don't mean to take you into a different
19  direction, but when he talks about Carriage of the Lake
20  facility and what --
21          THE COURT:  That's -- I know, that's not relates.
22          MR. STEINBERG:  But that was, in essence, the
23  argument that we were making as to why that March stipulation
24  was entered into to deal with that specific situation and to
25  put off all the other issues relating to the master lease until

48

1 we can get to a master lease.

2          THE COURT:  All right.

3          MR. STEINBERG:  That was the start of where it is.

4 The fact of the matter is, Your Honor, it was not our burden to

5 address the Meditrust lease specifically.  We addressed all

6 liabilities of --

7          THE COURT:  All right.

8          MR. STEINBERG:  -- IHS, all liabilities of the

9 reorganized debtors.  And we set it forth here.  And when they

10 objected, they objected to say please specify me.  I had 37

11 objections, I had 37 people who said I want to know what it

12 means to me, and sometimes in putting clarification language so

13 we knew this defines what it means to you.  And that's what we

14 did in this case, we said vis-a-vis this master lease, it will

15 be performed -- because that was your question, who's going to

16 perform it.  And although his moving papers said that we made a

17 representation that it was THCI, I guess he's withdrawn from

18 that when he's read the transcript.

19          But we said it was going to be the entities

20 controlled by Briarwood who was going to perform it and we gave

21 the presentation as to feasibility, as to their ability to do

22 it.  This is not the time to try to re-litigate whether we can

23 satisfy the 1129 confirmation standards.  We did that once

24 before and they should not be entitled to use this type of

25 procedure to, in effect, reopen the confirmation hearing, which

49

1  is essentially what they're doing.

2          MR. BACKENROTH:  Your Honor, I will not reiterate

3  arguments that have already been made, I just want to focus

4  Your Honor's attention on Paragraph 49 of the confirmation

5  order.  The structure of it is that not ABE Briarwood, although

6  we keep on using ABE Briarwood in the general sense, would be

7  the guarantor.  There's an LTC entity that was set up as part

8  of the plan which ABE Briarwood owns.  That entity is neither a

9  debtor nor a reorganized debtor.

10         And, therefore, if the argument is that supposedly

11 the guarantee that kicked in to the IHS and then under the

12 plant went to the LTC subsidiary, they cannot explain why

13 Paragraph 49 talks about the debtor and reorganized debtors.

14 It doesn't say anything about LTC.  LTC is a new entity that's

15 not a debtor or a reorganized debtor that was set up under the

16 plan.  That's the entity that, in theory, would have the

17 guarantee, not ABE Briarwood, who owns all of these

18 subsidiaries and glaringly missing from that language is that

19 entity.  It's not a debtor, it's not a reorganized debtor.  The

20 only debtors that are reorganized debtors, you know, this -- in

21 this package are the actual tenants under these leasehold

22 interests.  And we've never said that those tenants are not

23 responsible for their obligations and we have been performing.

24 And if he's got a problem with other things, let him pursue his

25 claims where he has to pursue them.

1          THE COURT:  Well, under the plan, which entity agreed

2     to pay the non-excluded administrative obligation?

3          MR. BACKENROTH:  The applicable debtors, the

4     applicable debtors that have that obligation have those

5     obligations.

6          THE COURT:  Well, which was the applicable debtor for

7     the guarantor IHS?

8          MR. BACKENROTH:  If there was -- if a guarantee

9     existed, it would have been the LTC entity which was a newly

10    created entity, not a debtor, not anything of that nature, as

11    part of the plan, that entity held title to all the stock of

12    the IHS subsidiaries.  That's not in Paragraph 49 at all.  And

13    as I said, that language was negotiated to death.  This is not

14    something that just popped up in there, somebody stuck it into

15    some order.  That went back through many, many drafts and it's

16    our position -- and consistent with what we believe all the way

17    through is that there was no guarantee obligation over here.

18    All there was is an obligation of the IHS debtor subsidiaries,

19    both before and after to perform under the lease, which we have

20    been doing.  And if he's got a problem with other things, let

21    him send me a notice of default or let him do whatever he wants

22    to do.  But this is not the forum to do that.  We are answering

23    the lease, we are improving the property, we put in a million

24    and a half dollars into this series of leasehold interest up

25    until now.  And we have not defaulted on any obligation, and

51

1  they've never sent us a notice of default. This is all, I

2  think, an attempt to do discovery and other types of things.

3  These are very litigious people and we are very much concerned.

4          Thank you very much.

5          THE COURT:  Let me just rule.  I'm -- I agree with

6  the debtor.  To the extent that there is any administrative

7  claim under the guarantee based on the argument that the

8  guarantee was reaffirmed as a result of the entry into the new

9  master lease, that administrative claim is the responsibility

10 under the plan of the LTC or the LTC subs because it was not an

11 excluded administrative claim.

12         Therefore, there is no basis to assert that there

13 should be a reserve for that claim under the plan.

14         Because I don't have jurisdiction over any dispute

15 between nondebtors, I'll let THCI pursue the LTC or the LTC

16 subs or whomever for breach of performance.

17         MR. FOX:  Your Honor, it's kind of the tail on the

18 dog.  But on the legal fees provided for in the March, 2002

19 stipulation and order, we also sought those.

20         THE COURT:  No, I'm not going to award fees to either

21 one.  I think that I expressed some skepticism to the debtor

22 regarding whether or not an injunction contained in a

23 confirmation order can bar a party from coming back to the

24 Bankruptcy Court to assert a claim, an administrative claim

25 against an estate.

52

1          I don't think it bars that and I wouldn't award

2   attorney's fees for having a party come here.  I think such an

3   injunction is really to prevent a party who may have an

4   administrative claim against this estate from asserting it in

5   another jurisdiction, administrative or other claim.

6          I agree also with the debtors' interpretation of the

7   stipulation that awarded attorney's fees, I think it was

8   intended to award attorney's fees through the date of the

9   stipulation.

10         I don't think THCI contemplated there would be

11  additional litigation over that issue and I don't know if the

12  debtor contemplated it or not, but I don't think the debtor

13  agreed to pay for attorney's fees for all potential future

14  litigation that there may be between the parties in this case.

15         MR. FOX:  Well, can we submit claim for the fees

16  through the date of the stipulation, Your Honor?

17         THE COURT:  Did you?

18         MR. FOX:  We have not.  We submitted a larger claim

19  which included fees to date, but --

20         THE COURT:  Hadn't you --

21         MR. BACKENROTH:  It hadn't involved -- I don't know

22  if --

23         MR. FOX:  We will be happy to amend to do that

24  without --

25         THE COURT:  Well --

53

1      MR. FOX:  -- waiving our rights under the claim as
2   filed.
3      THE COURT:  Well, I'm not going to decide whether
4   you're barred or not.  I'm stating that the stipulation did not
5   provide for any attorney's fees after the date of the
6   stipulation.
7      MR. FOX:  All right.
8      MR. BACKENROTH:  Your Honor, shall we prepare a
9   proposed order in conformance with Your Honor's ruling?
10      THE COURT:  Yes.
11      MR. BACKENROTH:  Thank you very much, Your Honor.
12      THE COURT:  All right, we'll stand adjourned.
13
14              C E R T I F I C A T I O N
15
16      I, Karen Hartmann, certify that the foregoing is a
17   correct transcript to the best of my ability, from the
18   electronic sound recording of the proceedings in the above-
19   entitled matter.
20
21   _____          Date: December 14, 2003
22   TRANSCRIPTS PLUS
23
24
25