# EXHIBIT "E"



F I L E D
APR 0 5 2004
SANDRA L. DOWD
Clerk of the Circuit Court Platte County, MO

IN THE CIRCUIT COURT OF THE COUNTY OF PLATTE
STATE OF MISSOURI

INTEGRATED HEALTH SERVICES OF
CLIFF MANOR, INC., a Delaware corporation,
INTEGRATED HEALTH SERVICES AT
RIVERBEND, a Delaware corporation,
INTEGRATED HEALTH SERVICES AT
SOMMERSET VALLEY, INC., a Delaware
Corporation,
ALPINE MANOR, INC., a Pennsylvania
Corporation,
BRIARCLIFF NURSING HOME, INC.,
A Pennsylvania corporation,
INTEGRATED HEALTH GROUP, INC.,
A Pennsylvania corporation;
SPRING CREEK OF IHS, INC., a Pennsylvania
Corporation,
FIRELANDS OF IHS, INC., a Pennsylvania
Corporation,
ELM CREEK OF IHS, INC., a Pennsylvania
Corporation,
IHS LONG TERM CARE SERVICES, INC.,
A Delaware corporation,

       Plaintiffs,

v.

THCI COMPANY, LLC, a Delaware limited
liability company
Serve: CSD Lawyers, Inc. Service Company
221 Bolivar Street
Jefferson City, Missouri  65101

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 04CV8 2966

Division  I

Judge _____

## PETITION FOR DECLARATORY JUDGMENT AND OTHER RELIEF

COME NOW Plaintiffs IHS Long Term Care Services, Inc., and nine of its

subsidiaries, Integrated Health Services of Cliff Manor, Inc., Integrated Health Services

of Riverbend, Inc., Integrated Health Services at Somerset Valley, Inc., Alpine Manor,

Inc., Briarcliff Nursing Home, Inc., Integrated Health Group, Inc., Spring Creek of IHS,

61674 DOC                    1                    April 5, 2004

Inc., Firelands of IHS, Inc., and Elm Creek of IHS, Inc., by their undersigned counsel, and for their claims against THCI Company, LLC ("Defendant") state and allege as follows:

<u>General Allegations Applicable to All Counts</u>

1.   Plaintiff Integrated Health Services of Cliff Manor, Inc. ("Cliff Manor") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Delaware, and is authorized to do business in the state of Missouri, with its principal place of business located at 4700 Cliffview Drive in the city of Kansas City, Platte County, Missouri.

2.   Plaintiff Integrated Health Services of Riverbend, Inc ("Riverbend") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Delaware, with its principal place of business located at 1194 Belsay Road in the city of Grand Blanc, Michigan.

3.   Plaintiff Integrated Health Services at Somerset Valley, Inc. ("Somerset Valley") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Delaware, with its principal place of business located at 1621 Route 22 West in the city of Bound Brook, New Jersey.

4.   Plaintiff Alpine Manor, Inc. ("Alpine Manor") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Pennsylvania, with its principal place of business located at 4144 Schaper Avenue in the city of Erie, Pennsylvania.

5.   Plaintiff Briarcliff Nursing Home, Inc. ("Briarcliff") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of

Pennsylvania, with its principal place of business located at 850 N.W. 9th Street in the city of Alabaster, Alabama.

6.    Plaintiff Integrated Health Group, Inc. ("Integrated Health Group") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Pennsylvania, with its principal place of business located at 890 Weatherwood Lane in the city of Greensburg, Pennsylvania.

7.    Plaintiff Spring Creek of IHS, Inc. ("Spring Creek") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Pennsylvania, with its principal place of business located at 5440 Charlesgate Road in the city of Huber Heights, Ohio.

8.    Plaintiff Firelands of IHS, Inc. ("Firelands") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Pennsylvania, with its principal place of business located at 204 West Main Street, Route 162 in the city of New London, Ohio.

9.    Plaintiff Elm Creek of IHS, Inc. ("Elm Creek") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Pennsylvania, with its principal place of business located at 115 Elmwood Circle in the city of West Carrollton, Ohio.

10.    Plaintiff IHS Long Term Care, Inc. ("Plaintiff LTC") is and was, at all times material hereto, a corporation organized and existing under the laws of the state of Delaware, with its principal place of business located at The Highlands, 910 Ridgebrook Road in the city of Sparks, Maryland. Plaintiff LTC is the parent corporation of all of the

C 004

other plaintiffs herein ("Plaintiff Subsidiaries"). Plaintiff LTC is not the same corporation as Integrated Health Services hereinafter mentioned in Paragraph 18.

11.    Each of the Plaintiff Subsidiaries operates a nursing home facility at its principal place of business, and the nine properties together are referred to as the "Nursing Home Properties."

12.    THCI Company, LLC. ("Defendant") is and was, at times material hereto, a corporation organized and existing under the laws of the state of Delaware. Defendant is authorized to do business in the state of Missouri, with its principal place of business located at 4700 Cliffview Drive in the city of Kansas City, in Platte County, Missouri. Defendant's registered agent for service of process is CSD Lawyers, Inc. Service Company, located at 221 Bolivar Street in Jefferson City, Cole County, Missouri.

13.    Upon information and belief, Defendant is the successor-in-interest to Meditrust Corporation ("Meditrust") and the following subsidiary companies (the "Meditrust Subsidiaries"): Meditrust of Alabama, Inc., Meditrust, a Massachusetts business trust, Meditrust of Missouri, Inc., Meditrust of Michigan, Inc., Meditrust of Alpine, Inc., Meditrust of Mountainview, Inc; and Meditrust of Ohio, Inc.

14.    Defendant is the fee simple owner of the Nursing Home Properties. Defendant was named as the landlord of the Nursing Home Properties pursuant to a Stipulation and Order approved by the Bankruptcy Court in March, 2002 (the "March 2002 Stipulation and Order"), under which a Master Lease (the "Master Lease") was to be entered into in the future. Defendant claims that it presently leases the Nursing Home Properties to Plaintiff Subsidiaries pursuant to such Master Lease approved by the Bankruptcy Court

of the State of Delaware (the "Bankruptcy Court"), the specific terms and conditions of which, if said Master Lease exists, are to be determined by this Court.

15. Subject matter jurisdiction properly lies in the Circuit Court of the State of Missouri by reason of § 527.040 RSMo., because the Master Lease is composed, in part, of property located in Missouri and this action is brought to declare the rights of the Plaintiff Subsidiaries and Plaintiff LTC under the Master Lease.

16. Venue in Platte County, Missouri is proper because one of the Nursing Home Properties is located at 4700 Cliffview Drive in the city of Kansas City in Platte County, Missouri. This Court has venue over the entire controversy because Defendant is doing business within the State of Missouri as a lessor of property in Platte County and if there is any lease of the Nursing Home Properties it is a single Master Lease covering all of the Nursing Home Properties.

17. The Plaintiff Subsidiaries were previously the tenants of the Nursing Home Properties under nine leases (the "Original Nine Leases"), all of which have expired, identified as follows:

> a. Lease dated December 30, 1986, by and between Meditrust, a Massachusetts business trust, as landlord, and Integrated Health Services, as tenant, of the nursing home property located at 1621 Route 22 West, Bound Brook, New Jersey 08805 ("Somerset Valley Nursing Home"), which lease was assigned to and assumed by Somerset Valley by Assignment dated April 30, 1993, and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

b. Lease dated August 13, 1987, by and between Meditrust of Alabama, Inc., as landlord, and Briarcliff, as tenant, of the nursing home property located at 850 N.W. 9th Street, Alabaster, Alabama 35007 ("Briarcliff Nursing Home"), and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

c. Lease dated December 30, 1987, by and between Meditrust at Alpine Inc., as landlord, and Alpine Manor, as tenant, of the nursing home property located at 4114 Schaper Avenue, Erie, Pennsylvania 16508 ("Alpine Manor Nursing Home"), and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

d. Lease dated March 24, 1988, by and between Meditrust of Missouri, Inc., as landlord, and Cliff Manor, as tenant, of the nursing home property located at 4700 Cliffview Drive, Kansas City, Missouri 64150 ("Cliffview Nursing Home"), and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

e. Lease dated May 5, 1988, by and between Meditrust of Michigan, Inc., as landlord, and Riverbend, as tenant, of the nursing home property located at 11941 Belsay Road, Brand Blanc, Michigan 48439, and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

f. Lease dated December 7, 1990, by and between Meditrust of Ohio, Inc., as landlord, and Spring Creek, as tenant, of the nursing home property located at 5440 Charlesgate Road, Huber Heights, Ohio 45424 ("Spring

Creek Nursing Home"), and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

g. Lease dated December 7, 1990, by and between Meditrust of Ohio, Inc., as landlord, and Firelands, as tenant, of the nursing home property located at 204 West Main Street Route 162, New London, Ohio 44851 ("Firelands Nursing Home"), and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

h. Lease dated December 7, 1990, by and between Meditrust of Ohio, Inc., as landlord, and Elm Creek, as tenant, of the nursing home property located at 115 Elmwood Circle, West Carrolton, Ohio 45499 ("Elm Creek Nursing Home"), and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

i. Lease dated December 17, 1991, by and between Meditrust at Mountainview, Inc., as landlord, and Integrated Health Group, as tenant, of the nursing home property located at 890 Weatherwood Lane, Greensburg, Pennsylvania 15601 ("Mountainview Nursing Home"), and amended by Lease Modification Agreement dated April 30, 1993, as described more fully in Paragraph 21.

18. Integrated Health Services, Inc. ("IHS") was the original parent company of the Plaintiff Subsidiaries at the time the Plaintiff Subsidiaries entered into the leases for the Nursing Home Properties, and remained the parent company until on or about September 9, 2003.

19.    IHS entered into nine separate guaranty agreements with the Meditrust Subsidiaries, respectively (together, the "Guaranties"), that each guaranteed performance and payment of a specific lease and the obligations thereunder.  The Guaranties are identified as follows:

a.  Guaranty and Agreement, dated December 30, 1986 for the Somerset Valley Nursing Home.

b.  Guaranty of Payment and Performance of Lease Obligations, dated March 24, 1988, for the Cliff Manor nursing home facility.

c.  Guaranty of Payment and Performance of Lease Obligations, dated May 5, 1988, for the Riverbend Nursing Home.

d.  Guaranty of Payment and Performance of Lease Obligations, dated August 13, 1987, for the Briarcliff Nursing Home.

e.  Guaranty of Payment and Performance of Lease Obligations and Guaranty and Reimbursement of Special Agreement, dated December 30, 1987, for the Alpine Manor Nursing Home.

f.  Guaranty and Agreement, dated December 7, 1991, for the Spring Creek Nursing Home.

g.  Guaranty and Agreement, dated December 7, 1991, for the Firelands Nursing Home.

h.  Guaranty and Agreement, dated December 7, 1991, for the Elm Creek Nursing Home.

i.  Guaranty and Agreement, dated December 17, 1991, for the Mountainview Nursing Home.

C 009

20.    The leases described in paragraph 17, above, were modified by a "Lease Modification Agreement" dated April 30, 1993 (the Original Nine Leases, as modified, the "Nine Leases"). The Lease Modification Agreement extended the initial term of each of the Original Nine Leases to May 31, 2001. The Lease Modification Agreement provided, in part, that Plaintiff Subsidiaries had an option to extend the term of all of the Nine Leases upon notice given not less than one-hundred and eighty (180) days but no more than three-hundred and sixty (360) days prior to May 31, 2001.

21.    On February 2, 2000, IHS filed, and, thereafter, its subsidiaries, including, but not limited to, the Plaintiff Subsidiaries, filed, voluntary petitions for reorganization pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") in the Bankruptcy Court.

22.    From and after the filing of the voluntary petitions in bankruptcy, and up to September 9, 2003, each of the Plaintiff Subsidiaries remained in possession of the premises constituting its portion of the Nursing Home Properties as a debtor in possession, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

23.    On or about November 21, 2000, each of the Plaintiff Subsidiaries sent a letter to Defendant requesting renewal of its lease for an additional five (5) year period in accordance with the terms of the option provision of the Lease Modification Agreement.

24.    On or about January 30, 2001, Defendant replied by letter to each of the Plaintiff Subsidiaries rejecting each of the Plaintiff Subsidiaries' attempted exercise of its respective option to extend the terms of its lease, claiming that the Nine Leases were in default by reason of a number of events of default, including, but not limited to, the

bankruptcy filing by IHS and Plaintiff Subsidiaries. Defendant stated that the Nine Leases would expire by their own terms on May 31, 2001.

25.    The Guaranties provided, in relevant part, that in the event of a default of the Nine Leases, the Guaranties would become immediately due and payable. In such case, they would have provided a basis for Defendant to assert a creditor's claim against IHS and to file a proof of claim with the Bankruptcy Court prior to May 12, 2003. No such proof of claim was ever filed by Defendant.

26.    On May 31, 2001, the Nine Leases expired by their express terms.

27.    Upon the expiration of the Nine Leases, on May 31, 2001, Plaintiff Subsidiaries became holdover tenants, respectively, of the premises constituting the Nursing Home Properties.

28.    Upon the expiration of the Nine Leases, on May 31, 2001, the Guaranties automatically expired by their own terms.

29.    On or about May 7, 2001, pursuant to §365(d)(4) of the Bankruptcy Code, IHS and Plaintiff Subsidiaries filed a motion with the Bankruptcy Court (the "Motion to Assume or Reject") to assume the leases for Somerset Valley Nursing Home, Riverbend Nursing Home, Alpine Manor Nursing Home, Spring Creek Nursing Home, and the Mountainview Nursing Home, and to reject the leases for Cliff Manor Nursing Home, Briarcliff Nursing Home, Elm Creek Nursing Home and Firelands Nursing Home.

30.    On or about September 10, 2001 and October 18, 2001, Defendant objected to the Motion to Assume or Reject, asserting, agreeing and stating that each of the Nine Leases had expired by its own terms on May 31, 2001 Defendant further stated that the "Bankruptcy Code provides no remedy to resurrect an expired lease. Accordingly, there

are no leases for the Debtors to assume or reject." Therefore, there was no lease in effect after May 31, 2001. Plaintiff Subsidiaries remained in occupancy of the respective Nursing Home Properties pursuant to a month-to-month holdover tenancy.

31.    On or about March 22, 2002, IHS, Plaintiff Subsidiaries and Defendant entered into the "March 2002 Stipulation and Order" which provided, in pertinent part:

> 1.    "Within thirty (30) days of the date of this Stipulation, or at such time thereafter as the Parties may agree, the Parties shall enter into a master lease agreement amending and restating the [Nine] Leases (the "Master Lease"). The parties agree that because of the related nature of the leases for the 9 Leased Properties, the parties intend to integrate the Leased Properties into a single portfolio of properties. The Parties also agree that the Leased Properties must be tied together economically so that the revenue from the entire portfolio of the Leased Properties will be, in the aggregate, profitable, and will be used to run each of the Leased Properties with adequate funding and staffing";

32.    The March 2002 Stipulation and Order did not determine that the Nine Leases were still in full force and effect.

33.    The March 2002 Stipulation and Order did not amend, extend or renew the Nine Leases.

34.    No new guaranties were created, nor were the Guaranties, or any of their terms or provisions, extended, renewed or even incorporated by reference in the terms of the March 2002 Stipulation and Order.

35.    Subsequent to March 22, 2002, neither Plaintiff Subsidiaries nor Defendant executed a Master Lease, and no such Master Lease was entered into.

C 012

36.   On or about January 28, 2003, Abe Briarwood Corporation ("Briarwood") entered into an agreement with IHS (the "Stock Purchase Agreement") pursuant to which a new corporation, Plaintiff LTC, would be created immediately after confirmation of the bankruptcy plan; Briarwood would acquire all of the stock of Plaintiff LTC and Plaintiff Subsidiaries; and Plaintiff LTC would hold, among other things, all of the stock of Plaintiff Subsidiaries.

37.   On or about April 10, 2003, the Plaintiff Subsidiaries moved to reject the Nine Leases. On the same day, Defendant filed a motion to compel the Plaintiff Subsidiaries to enter into a new Master Lease ("Motion to Compel") in accordance with the March 2002 Stipulation and Order.

38.   On or about April 22, 2003, the Bankruptcy Court granted Defendant's Motion to Compel (the "April 2003 Order") and stated, in relevant part:

> "Within five (5) business days of the entry of this Order, the parties may execute a form of Master Lease on such terms as may be mutually agreeable by the parties, provided, however, that if within such time the parties do not execute a Master Lease on mutually agreeable terms, a Master Lease shall be deemed to exist, which Master Lease shall be deemed to incorporate the terms set forth in paragraphs 3(a), (b), (c), (d), (e), and (f) of the March 2002 Stipulation and shall further be deemed to incorporate by reference all terms of the existing Leases to the extent not inconsistent with the March 2002 Stipulation. (Emphasis in original).

39.   The April 2003 Order did not amend, extend or renew the Nine Leases.

40.   No new guaranties were created, nor were the Guaranties or any of their terms or provisions extended, renewed or even incorporated by reference in the terms of the April 2003 Order.

C 013

41.    In the April 2003 Order, the Bankruptcy Court did not state or specify which terms of the Nine Leases were considered by said court to be consistent or inconsistent with the March 2002 Stipulation and Order.

42.    IHS and Plaintiff Subsidiaries have appealed the April 2003 Order of the Bankruptcy Court to the United States District Court of Delaware, asserting (1) that the March 2002 Stipulation and Order did not create a binding contract or any other agreement; (2) that, at most, the March 2002 Stipulation and Order created an agreement to enter into negotiations, and that, in such event, Plaintiff Subsidiaries in good faith complied with their obligation to enter into negotiations for new leases for the Nursing Home Properties; (3) that any agreement to negotiate did not contractually obligate the Plaintiff Subsidiaries to enter into a new Master Lease; and (4) that Plaintiff Subsidiaries are holdover tenants of the Nursing Home Properties.

43.    On or about May 12, 2003 (the "Confirmation Date"), the Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (the "Reorganization Plan") was confirmed by the Bankruptcy Court with Findings of Fact and Conclusions of Law, and Order Under 11 U.S.C. §1129(a) and (b) and Fed. R.Bankr.P. 3020, Confirming Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (the "Confirmation Order"). The Reorganization Plan and Confirmation Order required:

> a.    Formation of a new corporation, Plaintiff LTC, into which the capital stock of IHS and the Plaintiff Subsidiaries would be transferred; and

C 014

    b.  Briarwood to provide evidence of a net worth of $25,000,000, which was required to be maintained until the closing under the Stock Purchase Agreement.

44.    The Reorganization Plan and Confirmation Order provided that all claims for which a proof of claim was not filed prior to May 12, 2003 were discharged.

45.    On or about September 9, 2003, the closing of the sale to Briarwood under the Stock Purchase Agreement occurred.

46.    Thereafter, on or about September 24, 2003, Defendant filed a Motion (the "Administrative Expenses Claim") seeking to recover in excess of $41,667,000 in damages for so-called administrative expenses plus attorney's fees from IHS as guarantor and Plaintiff Subsidiaries, as tenants. Defendant stated that the leases had been breached prior to the Confirmation Date and therefore had been repudiated by Plaintiff Subsidiaries.

47.    On or about January 7, 2004, the Bankruptcy Court denied Defendant's Administrative Expenses Claim finding that Defendant's claim was not an "Excluded Administrative Claim within the meaning of the Plan." The Bankruptcy Court further stated "[w]ith respect to any claims of THCI against Briarwood, such claims constitute third party disputes [over] which [the Bankruptcy] Court has no jurisdiction and which claims and/or defenses must be pursued in a non-Bankruptcy Court or Courts having proper jurisdiction."

48.    Since Defendant failed to file a timely proof of claim, IHS was not liable for any claims for administrative expenses or damages with respect to the Nine Leases or the Master Lease, if such lease exists. Since Plaintiff LTC was not a party to the Nine Leases

61674.DOC                14              April 5, 2004

or to the Master Lease, and did not assume the Nine Leases or the Master Lease, Plaintiff LTC was not liable to Defendant for claims for administrative expenses or damages.

## COUNT I (DECLARATORY JUDGMENT AND INJUNCTION)

### (Termination of Master Lease)

49.     Plaintiffs adopt, reallege and incorporate by reference each and every statement and allegation made, stated or contained in Paragraphs 1 through 48 as if more fully set forth herein.

50.     The Nine Leases terminated by their express terms on May 31, 2001, as affirmed by Defendant's express admissions.

51.     The Bankruptcy Court, in its April 2003 Order, held that a Master Lease was to be deemed created on or about April 27, 2003.

52.     Plaintiffs have appealed the April 2003 Order, asserting that no Master Lease was created by the March 2002 Stipulation and Order.

53.     If Plaintiffs are successful in their appeal to the United States District Court of Delaware and that court finds that no Master Lease was created, then no leases exist for of any of the Nursing Home Properties.

54.     Even if the Master Lease were created on or about April 27, 2003, Plaintiff LTC is not liable under the Master Lease. Plaintiff LTC was not a debtor in the Bankruptcy Court or a party to the March 2002 Stipulation and Order or the April 2003 Order. Therefore, Plaintiff LTC could only be obligated under the Master Lease by assumption and assignment.

C 016

55. The Stock Purchase Agreement provided that a list of leases to be assumed or rejected by Plaintiff LTC was to be created prior to March 17, 2003. The Nine Leases were not included in the leases Plaintiff LTC agreed to assume. Plaintiff LTC did not assume the Master Lease.

56. Defendant was not a party to the Stock Purchase Agreement or to the list of leases described in Paragraph 55. Neither the Stock Purchase Agreement nor the list of leases was intended to benefit Defendant; Defendant was not a third-party beneficiary of the Stock Purchase Agreement or the list of leases to be assumed.

57 Each of the Nine Leases contained a provision that, in the Event of Default, Lessor may terminate the Lease by giving notice to Lessee.

58. Each of the Nine Leases contained a clause, entitled Damages, which provided, in relevant part, that: "[i]n the event of any such termination, Lessee shall forthwith pay to Lessor all Rent due and payable with respect to the Leased Property to and including the date of such termination. Thereafter, Lessee shall forthwith pay to Lessor, at Lessor's option:

    i. The worth, on the date of the award described below, of the Rent that is due and unpaid at the time of termination;

    ii. The worth, on the date of award of the amount by which the Rent that would have been earned after termination until the date of the award exceeds the amount of such rental loss that lessee proves could have been reasonably avoided;

    iii. The worth, on the date of the award, if the amount by which the unpaid Rent for the balance of the Term after the date of the award exceeds the amount of such rental loss that Lessee proves could be reasonably avoided; and

61674.DOC                16                April 5, 2004

iv.  Any other amount necessary to compensate Lessor for all the detriment proximately used by Lessee's failure to perform its obligations under this Lease or which in the ordinary course would be likely to result therefrom.

59.   Since a claim by Defendant for damages may only be filed upon termination of the Master Lease after default, Defendant's filing of the Administrative Expenses Claim for damages constituted Defendant's termination of the Master Lease and admission thereof.

60.   As a result of Defendant's termination of the Master Lease, Plaintiff Subsidiaries were not and are not now required to pay further rent to Defendant pursuant to any such lease. Any rent paid to Defendant after such termination was paid by Plaintiff Subsidiaries as holdover tenants.

61.   Since there are no existing leases covering any of the Nursing Home Properties, Plaintiff Subsidiaries as holdover tenants may surrender the Nursing Home Properties to Defendant.

62.   Upon information and belief, Defendant has no assets other than the Nursing Home Properties.

63.   If this Court or the United States District Court determines that no Master Lease is in effect, or if this Court determines that, notwithstanding the creation of a Master Lease, that the Master Lease has been terminated, Plaintiffs will be irreparably harmed by having to continue to pay rent to Defendant when they have no obligation to do so, with no ability to recover such payments from Defendant.

64.   For their protection, it is necessary that Plaintiff Subsidiaries pay their rent into an appropriate escrow account until (a) the United States District Court determines whether

a Master Lease is in effect, and/or (b) this Court determines whether Defendant has terminated any such Master Lease that might be found to exist.

65.     By reason of the foregoing, a controversy exists between Plaintiff Subsidiaries and Defendant as to whether (1) any lease or Master Lease exists that covers any of the Nursing Home Properties and (2) Plaintiff Subsidiaries have to pay rent to Defendant.

66.     Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs pray that the Court (a) order, adjudge, declare and determine that, in the event that the United States District Court of Delaware rules in favor of the Plaintiff Subsidiaries favor on their appeal, that the Master Lease relied upon by Defendant does not exist and is null and void; (b) order, adjudge, declare and determine that, in the event that the Master Lease is held to be valid by the United States District Court of Delaware that Plaintiff Subsidiaries are not required to pay rent to Defendant because Defendant terminated such Master Lease; (c) order, adjudge, declare and determine that Plaintiff Subsidiaries may pay rent in escrow to this Court, subject to the direction of this Court, pending a determination by this Court and/or by the United States District Court of Delaware and grant a preliminary injunction to such effects; (d) award Plaintiffs its costs and fees herein expended and incurred; and (d) grant Plaintiffs such other and further relief as this Court may deem just and proper.

COUNT II (DECLARATORY JUDGMENT)

(Guaranties)

67.     Plaintiffs adopt, reallege and incorporate by reference each and every statement and allegation made, stated or contained in paragraphs 1 through 66 as if more fully set forth herein

61674 DOC                          18                          April 5, 2004

C 019

68.    Defendant filed the Administrative Expenses Claim asserting that Plaintiffs, or some of them, are liable for breach of a guaranty of the Master Lease.

69.    The purpose of each of the Guaranties was to secure payment of sums due and performance of obligations under each of the Nine Leases, respectively.

70.    IHS was not a tenant under any of the Nine Leases.  IHS' sole obligation with respect to the Nine Leases was as guarantor.

71.    Because the Nine Leases expired by their express terms on May 31, 2001, IHS' obligation under the Guaranties simultaneously and automatically terminated.

72.    The March 2002 Stipulation and Order does not contain any provisions relating to the Guaranties or any new guaranty.

73.    There is no Master Lease in effect.

74.    The April 2003 Order, if it created the Master Lease, does not contain any provision relating to the Guaranties or any new guaranty.

75.    There is no guaranty of such Master Lease and there is no other written agreement by which IHS, Plaintiff LTC or Plaintiff Subsidiaries agreed to guaranty such Master Lease, if it is found to exist.

76.    Pursuant to the Statute of Frauds, any renewal of the Guaranties or creation of any new guaranty is required to be in writing and signed by the guarantor.

77.    If a Master Lease exists, there was no guaranty of the Master Lease by IHS,

78.    Any liability of Plaintiff LTC to Defendant would be the result of Plaintiff LTC having assumed the liability of IHS under a guaranty.  The Bankruptcy Court has determined that IHS is not liable to Defendant for any administrative claim or other claim for damages relating to any guaranty.  Since IHS is not liable to Defendant for any

C 020

administrative claim or other claim for damages relating to any guaranty, Plaintiff LTC cannot be liable to Defendant.

79.    Even if Plaintiff LTC assumed any liability for the Guaranties under the Stock Purchase Agreement, Defendant is not a third party beneficiary of the Stock Purchase Agreement.

80.    If a guaranty were found to exist, such guaranty does not obligate Plaintiff LTC because Plaintiff LTC did not exist prior to the March 2002 Stipulation and Order or the April 2003 Order and never assumed any obligation as guarantor.

81.    Since there is no guaranty by Plaintiffs, Defendant is not entitled to damages by Plaintiffs for breach of any obligation relating to the non-existent guaranties.

82.    By reason of the foregoing, a controversy exists as to whether the Guaranties exist with respect to the Master Lease, and whether the obligations of IHS, as guarantor, apply to Plaintiff LTC.

83.    Plaintiffs have no adequate remedy at law.

61674.DOC                    20                    April 5, 2004

C 021

WHEREFORE, Plaintiffs pray (a) that this Court order, adjudge, declare and determine that there were no guaranties of the Nine Leases in effect after May 31, 2001; (b) that this Court order, adjudge, declare and determine that there was no guaranty of the Master Lease; (c) that this Court order, adjudge, declare and determine that Plaintiff LTC is not obligated under any guaranty requirement; (d) order, adjudge, declare and determine that Defendant is not entitled to damages under any guaranty; (e) for its costs and expenses herein expended and incurred; and (f) for such further and additional relief as this Court may deem just and proper.

FREILICH, LEITNER & CARLISLE

By _____
Robin A. Kramer (#49511)
Robert H. Freilich (#22314)
Elisa L. Fuster (#54959)
4435 Main Street, Suite 1150
Kansas City, Missouri  64106
Tel: (816) 561-4414
Fax: (816) 561-7931

ATTORNEYS FOR DEFENDANT

C 022