# EXHIBIT "B"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| INTEGRATED HEALTH SERVICES OF CLIFF MANOR, INC., INTEGRATED HEALTH SERVICES AT RIVERBEND, INTEGRATED HEALTH SERVICES AT SOMERSET VALLEY, INC., ALPINE MANOR, INC., BRIARCLIFF NURSING HOME, INC., INTEGRATED HEALTH GROUP, INC., SPRING CREEK OF IHS, INC., FIRELANDS OF IHS, INC., ELM CREEK OF IHS, INC., and IHS LONG TERM CARE SERVICES, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 04-910 (GMS) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| THCI COMPANY LLC, | ) ) ) | |
| Defendant, | ) ) ) | |
| v. | ) ) ) | |
| ABE BRIARWOOD CORPORATION and JOHN DOES 1-10, | ) ) ) | |
| Additional Counterclaim Defendants. | ) ) ) ) | |

## <u>THIRD AMENDED COUNTERCLAIMS</u>

THCI Company LLC, by its undersigned counsel, by way of Third Amended

Counterclaims against plaintiffs IHS Long Term Care Services, Inc., Integrated Health Services

of Cliff Manor, Inc., Integrated Health Services at Riverbend, Inc., Integrated Health Services at

Somerset Valley, Inc., Alpine Manor, Inc., Briarcliff Nursing Home, Inc., Integrated Health

Group, Inc., Spring Creek of IHS, Inc., Firelands of IHS, Inc., Elm Creek of IHS, Inc., and

additional counterclaim defendants ABE Briarwood Corporation and John Does 1 through 10, alleges as follows:

## The Parties and Jurisdiction

1.    THCI Company LLC ("THCI") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in New Jersey. THCI is in the business of owning and managing health care facilities, including nursing homes, throughout the United States. THCI leases certain health facilities that it owns to third parties.

2.    Plaintiffs Integrated Health Services of Cliff Manor, Inc., Integrated Health Services at Riverbend, Inc., Integrated Health Services at Somerset Valley, Inc., Alpine Manor, Inc., Briarcliff Nursing Home, Inc., Integrated Health Group, Inc., Spring Creek of IHS, Inc., Firelands of IHS, Inc., and Elm Creek of IHS, Inc. (collectively, the "Nine Subsidiaries") are wholly-owned subsidiaries of plaintiff IHS Long Term Care Services, Inc. ("LTC").

3.    Additional counterclaim defendant Abe Briarwood Corporation ("Briarwood") is a corporation organized under the laws of the State of Nevada. Briarwood is in the business of operating health care facilities.

4.    Additional counterclaim defendants John Does 1 through 10 (the "Additional Fraudulent Transfer Defendants") are currently unidentifiable individuals and entities who, as described below, have received fraudulent transfers of assets from the Nine Subsidiaries, LTC, and/or Briarwood.

5.    This Court has subject matter jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1334(b).

2

*l*

### The Leases and Guaranties

6.    Prior to February 2000, Integrated Health Services, Inc. ("IHS") was one of the largest operators of long-term care facilities in the United States. IHS conducted its operations through numerous direct and indirect subsidiaries; generally, each subsidiary operated a single long-term care facility. Prior to becoming wholly-owned subsidiaries of LTC, the Nine Subsidiaries were subsidiaries of IHS.

7.    IHS' subsidiaries, including the Nine Subsidiaries, leased ten health care facilities from a business trust called Meditrust and certain subsidiaries or affiliates of Meditrust (collectively, "Meditrust") pursuant to long-term leases (each a "Lease" and collectively, the "Leases"). As described more fully below, THCI succeeded to Meditrust's rights and interests with respect to the Leases.

8.    This action involves nine of the ten health care facilities that IHS subsidiaries leased from Meditrust – the nine facilities leased by the Nine Subsidiaries (each a "Facility" and collectively, the "Facilities"). Three of the nine Facilities are located in Ohio, two of the Facilities are located in Pennsylvania, and the remaining Facilities are located in Alabama, Michigan, Missouri, and New Jersey. On information and belief, each of the Facilities is operated and managed on a day-to-day basis by Tri-State Health Investors, LLC.

9.    In conjunction with entering into the Leases, and to induce Meditrust to enter into the Leases, IHS executed ten guaranty agreements (each a "Guaranty," and collectively, the "Guaranties") pursuant to which IHS guaranteed the obligations of its subsidiaries, including the Nine Subsidiaries, under the Leases.

10.    Pursuant to each of the Guaranties, IHS "absolutely and unconditionally" guaranteed "the full, faithful, and punctual performance, fulfillment, observance, and payment of

3

all of the obligations and liabilities" of the Nine Subsidiaries under each Lease, including attorneys' fees and costs.

11.    Pursuant to each of the Guaranties, IHS agreed that "successors and assigns" of IHS would by bound by the provisions thereof and that all of the lessor's rights and remedies under the Guaranties and the Leases would survive the bankruptcy of any of the Nine Subsidiaries and/or IHS.

### The 1993 Lease Modification Agreement

12.    On or about April 30, 1993, Meditrust, IHS, and subsidiaries of IHS, including the Nine Subsidiaries, entered into a Lease Modification Agreement (the "Lease Modification Agreement") pursuant to which the parties agreed to amend and supplement the Leases as stated therein.

13.    The recitals to the Lease Modification Agreement state that "[IHS] has guaranteed to [Meditrust] all of the Lessees' obligations under the Leases by virtue of various guaranty instruments previously executed and delivered by [IHS] . . . ."

14.    The Lease Modification Agreement provides, among other things, that "[IHS] acknowledges and agrees that all of its obligations under the Lease Guaranties shall remain in full force and effect and shall hereafter apply to the Leases as amended by this Agreement."

15.    The Lease Modification Agreement contains cross-default provisions with the Leases and Guaranties and formed an integrated lease agreement between Meditrust, on the one hand, and IHS and ten IHS subsidiaries, including the Nine Subsidiaries, on the other hand.

4

16.     Paragraph 9 of the Lease Modification Agreement provides that "[t]his Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns."

### The IHS Bankruptcy

17.     In February 2000, IHS and virtually all of its subsidiaries, including the Nine Subsidiaries, filed petitions for relief under Chapter 11 of the Bankruptcy Code (the "IHS Bankruptcy") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").

18.     In or about April 2001, while the IHS Bankruptcy was pending, THCI succeeded to the rights and interests of Meditrust with respect to the Leases, the Lease Modification Agreement, and the Guaranties.

19.     During the Chapter 11 proceeding, IHS sought to reject certain of the Leases, and a dispute arose between IHS and THCI regarding whether IHS had the right to assume certain of the Leases and to reject others.

20.     The dispute was litigated before the Delaware Bankruptcy Court and, in the course of the litigation, the parties and the Delaware Bankruptcy Court addressed several issues, including but not limited to whether the Leases were valid, whether the Leases had terminated or expired by their terms, and whether the Leases were susceptible to assumption under the Bankruptcy Code.

<u>The March 2002 Stipulation and Order</u>

21.    The dispute between IHS and THCI regarding the Leases was addressed and resolved by the Delaware Bankruptcy Court in a Stipulation and Order dated March 18, 2002 (the "March 2002 Stipulation and Order").

22.    Pursuant to the March 2002 Stipulation and Order, in pertinent part, the parties agreed, and the Delaware Bankruptcy Court ordered, as follows:  (a) IHS and one of its subsidiaries rejected one of the ten Leases – the lease for the "Carriage-by-the-Lake" facility located in Bellbrook, Ohio; and (b) IHS and the Nine Subsidiaries assumed the Leases for the nine other Facilities (the "Nine Leases").

23.    The March 2002 Stipulation and Order also directed IHS, the Nine Subsidiaries, and THCI to enter into a "master lease agreement amending and restating the Leases" (the "Master Lease") because the parties agreed that the Nine Leases would be integrated into a single portfolio of properties.

24.    Pursuant to the March 2002 Stipulation and Order, the Master Lease includes, among other things, a ten-year term for all Facilities (subject to two consecutive five year extensions), base rent for all of the Facilities in the aggregate amount of $8,100,000 for the first year, and 2.5% escalation in base rent in each subsequent year.

25.    The Nine Subsidiaries continued to occupy and operate the Facilities subsequent to the March 2002 Stipulation and Order.

<u>The Sale of LTC and the Nine Subsidiaries to Briarwood</u>

26.    By early 2003, IHS had prepared a Chapter 11 plan of reorganization pursuant to which all of the assets and liabilities associated with its long term care business,

6

including the capital stock of all of its long term care subsidiaries (including, but not limited to, the Nine Subsidiaries), would be sold in a bid process under the authority of Chapter 11 and the Delaware Bankruptcy Court.

27.    Briarwood was the successful bidder for the IHS long-term care business, including the Nine Subsidiaries, and IHS entered into a Stock Purchase Agreement with Briarwood dated January 28, 2003 (the "SPA").

28.    Pursuant to section 5.9 of the SPA, but contingent on the confirmation of the proposed plan of reorganization by the Delaware Bankruptcy Court, IHS was required to create a new subsidiary, defined in the SPA as the "LTC Subsidiary," and IHS agreed to assign its "assets and liabilities ... including without limitation the capital stock of all of the Subsidiaries that conduct Seller's long-term care businesses . . ." to the "LTC Subsidiary."

29.    LTC was formed as the "LTC Subsidiary" contemplated by the SPA and by which Briarwood would acquire (a) the rights, assets, liabilities, and obligations of the IHS long term care subsidiaries, including, but not limited to, the Nine Subsidiaries, and (b) the rights, assets, and liabilities of IHS related to those subsidiaries.

30.    The assets and liabilities of IHS that were transferred to LTC pursuant to the SPA specifically included the Nine Leases and the Guaranties, each of which is identified in the SPA or the schedules to the SPA.

<u>The April 2003 Order Providing for a Master Lease</u>

31.    Notwithstanding the March 2002 Stipulation and Order and the SPA, in or about March 2003, Briarwood advised IHS that Briarwood did not want its acquisition of LTC to include the stock of the Nine Subsidiaries.

7

ǃ

32. In or about April 2002, as a result of Briarwood's desire to exclude the stock of the Nine Subsidiaries from the SPA, IHS and the Nine Subsidiaries filed a motion to reject the Nine Leases in the Delaware Bankruptcy Court.

33. THCI filed a cross-motion seeking to compel IHS and the Nine Subsidiaries to enter into the Master Lease required by the March 2002 Stipulation and Order, and THCI also filed an objection to IHS's proposed plan of reorganization.

34. On April 22, 2003, the Delaware Bankruptcy Court entered an Order Granting Motion of THCI Company, LLC to Compel Debtors' Entry Into Master Lease Agreement in Compliance with Stipulation and Order: Docket No. 9325 (the "April 2003 Order").

35. The April 2003 Order addressed and denied Briarwood's attempt to have IHS reject the Nine Leases and thereby exclude the Nine Subsidiaries from the SPA, and the April 2003 Order further resolved the issues relating to the Nine Leases, the Lease Modification Agreement, and the Master Lease. In this regard, the April 2003 Order included the following requirement:

> Within five (5) business days of the entry of this Order, the parties may execute a form of Master Lease on such terms as may be mutually agreeable by the parties, provided, however, that if within such time the parties do not execute a Master Lease on mutually agreeable terms, a Master Lease shall be deemed to exist, which Master Lease shall be deemed to incorporate the terms set forth in paragraphs 3(a), (b), (c) (d), (e) and (f) of the March 2002 Stipulation and shall further be deemed to incorporate by reference all terms of the existing Leases to the extent not inconsistent with the March 2002 Stipulation.

8

36. The parties did not execute a Master Lease within five days as required by the April 2003 Order, and, therefore, a Master Lease was deemed to exist in accordance with the April 2003 Order.

37. IHS filed a motion for reconsideration of the April 2003 Order, which the Delaware Bankruptcy Court denied.

38. IHS appealed the April 2003 Order to this Court, and that appeal remains pending. No stay pending appeal was requested or granted.

### The Confirmation Order

39. On May 12, 2003, the Delaware Bankruptcy Court entered Findings of Fact, Conclusions of Law, and Order Under 11 U.S.C. § 1129(a) and (b) and Fed. R. Bankr. P. 3020 Confirming Amended Joint Plan of Reorganization of Integrated Health Services, Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code (the "Confirmation Order").

40. The Confirmation Order approved and implemented the SPA and directed IHS to "contribute and assign to the LTC Subsidiary all of its [pertinent] assets . . . and post-petition liabilities."

41. Paragraph 49(b) of the Confirmation Order specifically addressed the Nine Subsidiaries, the Nine Leases, the March 2002 Stipulation and Order, and the April 2003 Order and provides, *inter alia*, as follows:

> the Master Lease shall be treated as an assumed lease pursuant to section 365 of the Bankruptcy Code, and the applicable Debtor(s) party to such Master Lease shall perform the Master Lease until the Effective Date of the Plan, after which the Master Lease shall be performed by the applicable Reorganized Debtor(s) unless and until an order is entered by this Court or another court of competent jurisdiction permitting rejection of the THCI Leases . . . .

9

42.    Under the Confirmation Order and the SPA, LTC succeeded to, and became bound by, the obligations of IHS under the Guaranties.

### Briarwood's Attempt to Amend the SPA and the Confirmation Order

43.    Notwithstanding the March 2002 Stipulation and Order, the April 2003 Order, the Confirmation Order, and the SPA, Briarwood continued to seek to avoid the LTC's acquisition of the Nine Subsidiaries prior to Briarwood's acquisition of LTC.

44.    Briarwood and IHS entered into a Stipulation of Settlement dated July 21, 2003 (the "Stipulation of Settlement") pursuant to which they purported to resolve "all outstanding disputes" with regard to the SPA, including certain motions filed by IHS and Briarwood in the Delaware Bankruptcy Court. Paragraph 12 through 14 of the Stipulation of Settlement addressed certain disputes between IHS and Briarwood relating to the Leases.

45.    In an effort to circumvent the March 2002 Stipulation and Order and the April 2003 Order, and contrary to the requirements in the SPA and the Confirmation Order, Briarwood and IHS purported to agree in paragraph 12 of the Stipulation of Settlement that IHS would transfer the capital stock of the Nine Subsidiaries to a new and different subsidiary.

46.    On information and belief, Briarwood sought to segregate the Nine Subsidiaries from LTC because, among other reasons, Briarwood was aware that the entity that acquired the capital stock of the Nine Subsidiaries would be obligated under the Guaranties, and Briarwood wanted LTC to avoid those obligations.

47.    The Stipulation of Settlement also provided that (a) Briarwood would receive a $3 million credit against the approximately $95 million purchase price under the SPA in settlement of certain disputes regarding the Nine Subsidiaries and the Leases, and (b)

10

Briarwood would pay for all expenses relating to the appeal of the April 2003 Order in this Court and would have the sole right to prosecute the appeal upon the closing of the SPA.

48.    IHS and Briarwood entered into the Stipulation of Settlement without notice to THCI. Upon learning of the Stipulation of Settlement, THCI filed a motion to strike paragraph 12 of the Stipulation and Order because, among other reasons, the new company to which Briarwood intended to transfer the Nine Subsidiaries would not have sufficient assets to cover the liabilities arising under the Master Lease or the Guaranties.

49.    On September 4, 2003, the Delaware Bankruptcy Court entered an Agreed Order striking paragraph 12 of the Stipulation of Settlement, thus rejecting Briarwood's attempt to segregate the Nine Subsidiaries from LTC.

### The Closing of the SPA and the Obligations of the Nine Subsidiaries and LTC Under the Leases and Guaranties

50.    Briarwood closed on the purchase of LTC on or about August 29, 2003, with knowledge of and subject to, among other things, the Master Lease (which incorporates the Leases) and the Guaranties.

51.    Among other obligations, the Master Lease requires the Nine Subsidiaries to pay monthly base rent, to maintain certain levels of financial solvency, and to provide THCI with financial and other operational information regarding the Nine Subsidiaries and the Facilities.

52.    The Master Lease also provides for the payment of rent in the amount of one and one-half (1.5) times one-twelfth (1/12) of the total rent payable in the preceding lease year and all other charges that accrue each month under the Master Lease in the event any of the Nine Subsidiaries remain in possession of a Facility following termination of the Master Lease.

11

53.    Among other obligations, the Guaranties require LTC to cause and ensure that the Nine Subsidiaries comply with their obligations under the Leases and to provide financial statements to THCI on no less than a monthly basis.

### The Breaches of the Master Lease and Guaranties

54.    The current base rent for the Facilities pursuant to the Master Lease is $709,171.88 per month.

55.    Beginning in June 2005 and continuing thereafter, and despite the demands of THCI, the Nine Subsidiaries have failed to pay base rent to THCI in breach of their obligations under the Master Lease.

56.    Beginning in or about March 2005 and continuing thereafter, the Nine Subsidiaries have failed to pay real estate taxes, penalties, and other charges in breach of their obligations under the Master Lease, and THCI has been forced to pay real estate taxes on their behalf.

57.    Despite their obligations and the demands of THCI, the Nine Subsidiaries have failed to provide THCI with financial and operational information as required by the Master Lease, and LTC has failed to provide THCI with financial information as required by the Master Lease and the Guaranties.

58.    Upon information and belief, the Nine Subsidiaries are in arrears on their financial obligations to state agencies and/or vendors of health care products and services.

59.    Despite demands by THCI, the Nine Subsidiaries and LTC have failed and refused to cure the breaches of their obligations under the Master Lease and the Guaranties, and the Nine Subsidiaries have failed and refused to vacate the Facilities.

60.     The Nine Subsidiaries and LTC have acknowledged their obligation to pay rent to THCI in this action. Indeed, the Nine Subsidiaries and LTC are seeking an order from this Court permitting them to deposit rent payments with the Court. The Nine Subsidiaries and LTC filed a motion seeking leave to commence such deposits but, due to their unwillingness or financial inability to make such deposits, they withdrew their motion.

61.     Despite their obligation to pay rent and the relief they have demanded in this action, the Nine Subsidiaries and LTC have failed to pay, deposit, or otherwise provide for the rent payments due to THCI.

### LTC's Efforts to Avoid its Obligations by Transferring Assets

62.     Pursuant to the SPA, IHS formed LTC and LTC acquired the rights, assets, liabilities, and obligations of the IHS long term care subsidiaries and the rights, assets, and liabilities of IHS related to those subsidiaries.

63.     Briarwood paid approximately $92 million for the stock of LTC (approximately $95 million less the $3 million credit that Briarwood negotiated and received in settlement of disputes regarding the Nine Subsidiaries and the Leases).

64.     On information and belief, after the closing of the SPA, and having been unsuccessful in their efforts to avoid the Master Lease and the Guaranties and to segregate the Nine Subsidiaries from LTC, the Nine Subsidiaries and/or LTC began to divest assets acquired pursuant to the SPA.

65.     On information and belief, after the closing of the SPA, the Nine Subsidiaries and LTC divested and/or transferred assets for the purpose of diminishing or

eliminating the ability of THCI to recover amounts due under the Master Lease and the Guaranties.

## FIRST COUNTERCLAIM
### (Breach of the Master Lease Against the Nine Subsidiaries – Rent)

66.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 65 above as if fully restated herein.

67.    Pursuant to the Master Lease, the Nine Subsidiaries are obligated to pay rent, real estate taxes, and other charges due under the Master Lease.

68.    Since March 2005, the Nine Subsidiaries have failed to pay real estate taxes and other charges in breach of their obligations under the Master Lease.

69.    Since June 2005, the Nine Subsidiaries have failed to pay rent in breach of their obligations under the Master Lease.

70.    The failure of the Nine Subsidiaries to pay rent, real estate taxes, and other charges due under the Master Lease has damaged THCI.

71.    In addition, THCI has sustained a loss of future rent and other payments that the Nine Subsidiaries were required to make during the term of the Master Lease.

WHEREFORE, THCI demands judgment against the Nine Subsidiaries granting (a) amounts due and owing under the Master Lease, (b) compensatory and consequential damages due to the premature termination of the Master Lease, (c) interest, attorneys' fees, and costs of suit, and (d) such other and further relief as this Court deems just and proper.

## SECOND COUNTERCLAIM
(Breach of the Master Lease Against the Nine Subsidiaries –
Declaratory Judgment, Injunction, and Eviction)

72.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 71 above as if fully restated herein.

73.    Pursuant to the Master Lease, the Nine Subsidiaries are obligated to pay rent, real estate taxes, and other charges due under the Master Lease, and the Nine Subsidiaries also are obligated to provide certain financial and operational information to THCI.

74.    Despite demand from THCI, the Nine Subsidiaries have failed to pay rent, real estate taxes, and other charges and to provide required financial and operational information to THCI in breach of their obligations under the Master Lease.

75.    In the event of a continuing default, the Master Lease requires each of the Nine Subsidiaries to surrender the leased property to THCI.

76.    The failure of the Nine Subsidiaries to pay rent, real estate taxes, and other charges and to provide required financial information to THCI has inflicted and continues to inflict irreparable harm on THCI.

77.    The Nine Subsidiaries' failure to pay rent and to otherwise comply with their obligations under the Leases warrants the termination of and the immediate eviction under the Master Lease in accordance with the laws of each state in which the Facilities are located (Ohio, Missouri, Pennsylvania, New Jersey, Alabama, and Michigan).

78.    THCI has no adequate remedy at law.

79.    No previous injunctive relief has been awarded with respect to this matter.

15

WHEREFORE, THCI demands judgment against the Nine Subsidiaries (a) declaring that the Nine Leases are terminated and that THCI is entitled to possession of the Facilities to be delivered in a manner appropriate to the continuation of patient care, (b) preliminarily and permanently restraining and enjoining the Nine Subsidiaries and all those who act in concert or participation with them from occupying the Facilities, (c) granting a writ of eviction of the Nine Subsidiaries from the Facilities, (d) granting attorneys' fees and costs of suit, and (e) such other and further relief as this Court deems just and proper.

### THIRD COUNTERCLAIM
(Unjust Enrichment Against the Nine Subsidiaries)

80.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 79 above as if fully restated herein.

81.    If the Court determines that the Nine Subsidiaries are not subject to the Master Lease then, in the alternative, the Nine Subsidiaries are liable to THCI for actual damages resulting from their occupancy of the Facilities.

82.    The failure of the Nine Subsidiaries to pay rent or otherwise compensate THCI for their use of the Facilities constitutes unjust enrichment and has damaged THCI.

83.    In addition, based on their failure to pay rent, the Nine Subsidiaries are holdover tenants, subject to penalties under the Master Lease and/or applicable state law.

WHEREFORE, THCI demands judgment against the Nine Subsidiaries for (a) the amounts that should be paid to compensate for the period during which the Nine Subsidiaries occupied the Facilities without paying rent to THCI, (b) relief and other penalties provided under the applicable state law, (c) interest, and (d) such other and further relief as this Court deems just and proper.

16

FOURTH COUNTERCLAIM
(Breach of the Master Lease and Guaranties Against the
Nine Subsidiaries and LTC – Specific Performance)

84.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 83 above as if fully restated herein.

85.    Pursuant to the Master Lease and the Guaranties, the Nine Subsidiaries and LTC are obligated to provide to THCI with financial and operational information.

86.    Despite demand by THCI, the Nine Subsidiaries and LTC have failed and refused to provide the required financial and operational information to THCI.

87.    No previous injunctive relief has been awarded with respect to this matter.

88.    THCI has no adequate remedy at law.

WHEREFORE, THCI demands judgment ordering that the Nine Subsidiaries and LTC provide THCI with all of the financial and operational information required under the Master Lease and the Guaranties, together with attorneys' fees and costs and such other and further relief as this Court deems just and proper.

FIFTH COUNTERCLAIM
(Breach of the Guaranties Against LTC)

89.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 88 above as if fully restated herein.

90.    The Guaranties were an integral and inseparable part of the Nine Leases, as modified by the Lease Modification Agreement, and as incorporated in the Master Lease.

91.    LTC succeeded to the rights and obligations of IHS under the Guaranties.

17

92.    Pursuant to the terms of the Guaranties, LTC agreed, among other things, that upon a default under the Master Lease, it would make the payments and perform the obligations required of the Nine Subsidiaries under the Master Lease.

93.    Despite its obligation to do so, LTC has failed to make any payments or perform or cause the Nine Subsidiaries to perform their obligations under the Master Lease.

WHEREFORE, THCI demands judgment against LTC for all amounts due and owing from the Nine Subsidiaries under the Master Lease, compensatory and consequential damages due to the termination of the Master Lease, interest, attorneys' fees, and costs of suit.

### SIXTH COUNTERCLAIM
(Fraudulent Conveyance and Punitive Damages Against the Nine Subsidiaries,
LTC, Briarwood, and Additional Fraudulent Transfer Defendants)

94.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 93 as if fully restated herein.

95.    On information and belief, following the closing of the SPA, the Nine Subsidiaries and/or LTC transferred and continue to transfer their assets to third parties, including Briarwood and the Additional Fraudulent Transfer Defendants, at less than fair or reasonably equivalent value for the purpose of hindering or defrauding existing creditors.

96.    On information and belief, the Nine Subsidiaries and LTC transferred and continue to transfer their assets to third parties, including Briarwood and the Additional Fraudulent Transfer Defendants, at less than fair or reasonably equivalent value, and the Nine Subsidiaries and LTC have concealed such transfers from THCI by, among other things, failing to provide financial and operational information to THCI as required under the Master Lease and the Guaranties.

18

97.     On information and belief, by virtue of their transfer of assets to third parties at less than fair or reasonably equivalent value, the Nine Subsidiaries and LTC (a) became or have become insolvent, (b) were engaged in business or a transaction, or are about to engage in business or a transaction, for which any assets or property remaining with the Nine Subsidiaries and/or LTC are unreasonably small, or (c) intended to incur, believed, or should have reasonably believed that they would incur, debts beyond the ability of the Nine Subsidiaries and LTC to pay as such debts matured.

98.     On information and belief, the Additional Fraudulent Transfer Defendants are individuals and entities that are affiliated with Briarwood or the individuals and entities that own and control Briarwood.

99.     The transfers by the Nine Subsidiaries and/or LTC to third parties at less than fair or reasonably equivalent value are avoidable and recoverable pursuant to the applicable state fraudulent transfer statutes.

100.    On information and belief, the transfers by the Nine Subsidiaries and/or LTC at less than fair or reasonably equivalent value were made willfully in a malicious and deliberate attempt to evade their obligations under the Master Lease and the Guaranties.

101.    The transfers by the Nine Subsidiaries and LTC have caused and continue to cause irreparable harm to THCI.

102.    No previous injunctive relief has been awarded with respect to this matter.

103.    THCI has no adequate remedy at law.

19

104.    Retention of assets or property that, on information and belief, third parties have received from the Nine Subsidiaries and/or LTC at less than fair or reasonably equivalent value will result in such third parties being unjustly enriched.

WHEREFORE, THCI demands judgment (a) setting aside the fraudulent transfers by the Nine Subsidiaries and LTC to third parties, including Briarwood and the Additional Fraudulent Transfer Defendants, (b) enjoining the Nine Subsidiaries and LTC against further disposition of their assets to third parties, including Briarwood and the Additional Fraudulent Transfer Defendants, (c) imposing a constructive trust over the assets of the Nine Subsidiaries and LTC that were fraudulently transferred to third parties, including Briarwood and the Additional Fraudulent Transfer Defendants, and (d) awarding punitive damages and such other and further relief as this Court deems just and proper.

### SEVENTH COUNTERCLAIM
(Damages and Accounting From Briarwood)

105.    THCI repeats and incorporates by reference the allegations contained in paragraphs 1 through 104 as if fully restated herein.

106.    Briarwood owns LTC and is an indirect parent of the Nine Subsidiaries. On information and belief, Briarwood is controlled and managed by various individuals, including Harry M. Grunstein, Rubin Schron, Leonard Grunstein, Uri Kaufman, Murray Forman, David Bodner, and Murray Huberfeld.

107.    Since the entry into the SPA in January 2003, Briarwood has dominated and continues to dominate the formation, affairs and conduct of LTC and the Nine Subsidiaries entirely for its own benefit and interest and for the benefit and interest of certain third parties the identify of which has been concealed from THCI.

20

108.    Briarwood and, on information and belief, certain third parties affiliated with Briarwood, have used and manipulated LTC and the Nine Subsidiaries as their *alter ego* for all purposes related to the Master Lease and Guaranties.

109.    On information and belief, neither LTC nor any of the Nine Subsidiaries maintain an independent corporate existence, manage any properties, or actively conduct any business.

110.    On information and belief, Briarwood treats the assets and property of the Nine Subsidiaries and LTC as its own and commingles the property of the Nine Subsidiaries and LTC to further its own interests.

111.    On information and belief, Briarwood takes advantage of the independent corporate existence of LTC and the Nine Subsidiaries and has transferred and continues to transfer the assets of LTC and the Nine Subsidiaries for less than fair market value in order to leave the Nine Subsidiaries and LTC unable to satisfy THCI's claims under the Guaranties and Master Lease.

112.    Upon closing on the SPA, LTC held assets that encompassed substantially more than, and greatly exceeded in value, the capital stock of the Nine Subsidiaries.

113.    Following the closing of the SPA, on information and belief, Briarwood caused and continues to cause LTC and the Nine Subsidiaries to transfer their assets and available funds to entities affiliated with Briarwood, thus leaving the Nine Subsidiaries and LTC undercapitalized and unable to comply with their obligations on the Master Lease and Guaranties.

21

114.    By virtue of Briarwood's complete domination of the affairs of LTC and the Nine Subsidiaries and use of the corporate form of the Nine Subsidiaries and LTC to thwart THCI's attempts to recover damages, Briarwood is liable to THCI for breaches of the Master Lease and Guaranties.

115.    In the alternative, if this Court holds that the Nine Subsidiaries are not bound by the Master Lease and LTC is not bound by the Guaranties, then Briarwood as the *alter ego* of the Nine Subsidiaries and LTC, is liable for unpaid rent and penalties under the applicable state law as holdover tenants.

116.    THCI has been damaged by Briarwood's misuse of the corporate form to advance its own interests.

WHEREFORE, THCI demands judgment against Briarwood (a) granting damages in the amount of all unpaid rent, taxes, and other liabilities of the Nine Subsidiaries and LTC pursuant to the Master Lease and Guaranties or, alternatively, for amounts due from the Nine Subsidiaries and LTC as a result of the Nine Subsidiaries' occupancy of the Facilities, and (b) directing Briarwood to provide THCI with an accounting of all transfers and transactions concerning or including assets of or at any time within the possession of any of the Nine Subsidiaries or LTC.

Dated:  February 9, 2006

GREENBERG TRAURIG LLP

Victoria W. Counihan (No. 3488)
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Tel.: (302) 661-7000
Fax:  (302) 661-7360

-and-

David S. Sager
Paul R. Marino
PITNEY HARDIN LLP
P.O. Box 1945
Morristown, New Jersey  07962
Tel: (973) 966-6300
Fax: (973) 966-1015

Attorneys for THCI Company LLC

23