## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTEGRATED HEALTH SERVICES OF CLIFF MANOR, INC., INTEGRATED HEALTH SERVICES AT RIVERBEND, INTEGRATED HEALTH SERVICES AT SOMERSET VALLEY, INC., ALPINE MANOR, INC., BRIARCLIFF NURSING HOME, INC., INTEGRATED HEALTH GROUP, INC., SPRING CREEK OF IHS, INC., FIRELANDS OF IHS, INC., ELM CREEK OF IHS, INC. and IHS LONG TERM CARE SERVICES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>THCI COMPANY LLC,<br><br>Defendant,<br><br>and,<br><br>ABE BRIARWOOD CORPORATION and JOHN DOES 1-10,<br><br>Additional Counterclaim Defendant. | Civil Action No.: 04-910 (GMS) |

---

## BRIEF IN SUPPORT OF MOTION TO ENFORCE STIPULATION AND ORDER OF SETTLEMENT AND DISMISSAL

---

On the Brief:
Catherine P. Wells, Esq.
Drew Dickson, Esq.
Nancy A. Del Pizzo, Esq.

**WOLFF & SAMSON PC**
The Offices at Crystal Lake
One Boland Drive
West Orange, NJ 07052
973-325-1500

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ............................................................................................ 1

NATURE AND STAGE OF THE PROCEEDINGS ..................................................... 2

STATEMENT OF FACTS ............................................................................................... 2

LEGAL ARGUMENTS ..................................................................................................... 8

POINT I ............................................................................................................................. 8

THIS COURT HAS THE INHERENT AUTHORITY TO ENFORCE THE
       EXPRESS TERMS OF THE SETTLEMENT AGREEMENT AND
       SHOULD GRANT THCI'S MOTION ............................................................... 8

POINT II ........................................................................................................................... 10

THE PLAIN AND UNAMBIGUOUS TERMS OF THE SETTLEMENT
       AGREEMENT SHOULD COMPEL THIS COURT TO AUTHORIZE
       THCI TO RETAIN THE LTC RECEIVABLES ............................................. 10

POINT III .......................................................................................................................... 11

THCI IS ENTITLED TO AN AWARD OF SANCTIONS BASED UPON LTC
       AND THE LTC PLAINTIFF'S MISCONDUCT ............................................ 11

CONCLUSION .................................................................................................................. 12

1055616 7

# TABLE OF AUTHORITIES

## FEDERAL CASES

Fox v. Consol. Rail Corp., 739 F.2d 929 (3d Cir. 1984) ...................................................5

Halderman v. Pennhurst State Sch. & Hosp., 901 F.2d 311 (3d Cir.), cert. denied, 498
U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990).........................................................4

Leonard v. Univ. of Delaware, 204 F.Supp.2d 784 (D. Del. 2002) ...............................4, 5

Liberate Technologies LLC v. Worldgate Commc'ns, Inc., 133 F.Supp.2d 357 (D. Del.
2001) ...............................................................................................................................5

New Castle County v. U.S. Fire Ins. Co., 728 F. Supp. 318 (D. Del. 1989) .....................6

Read v. Baker, 438 F. Supp. 737 (D. Del. 1977)...............................................................5

Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P., 243 F.Supp.2d 145
(D. Del. 2003) ..................................................................................................................4

Sherman v. Wellbrock, 761 F. Supp.1135 (D.N.J. 1991) ..................................................4

Tiernan v. Devoe, 923 F.2d 1024 (3d Cir. 1991)...............................................................4

The Intellisource Group, Inc. v. Williams, No. C.A. 98-57-SLR, 1999 WL. 615114 (D.
Del. Aug. 11, 1999) .........................................................................................................4

## FEDERAL RULES

Fed. R. Civ. P. 56(c) .........................................................................................................4

## SUMMARY OF ARGUMENT

THCI Company LLC ("THCI") has been forced to file this motion to enforce the terms of the Stipulation and Order of Settlement and Dismissal (the "Settlement Agreement") based upon the failure of IHS Long Term Care Services, Inc. ("LTC") and the remaining plaintiffs, Integrated Health Services of Cliff Manor, Inc., Integrated Health Services at Riverbend, Integrated Health Services at Somerset Valley, Inc., Alpine Manor, Inc., Briarcliff Nursing Home, Inc., Integrated Health Group, Inc., Spring Creek of IHS, Inc., Firelands of IHS, Inc., Elm Creek of IHS, Inc. (collectively, the "LTC Plaintiffs") to fulfill their obligations under the Settlement Agreement.

Significantly, LTC and the LTC Plaintiffs have flagrantly disregarded their obligations to pay the existing payables as of the date that the nine nursing home facilities were transferred to THCI, i.e., October 1, 2006 ("Transition Date"). As a result of this default by LTC and the LTC Plaintiffs, THCI has been forced to pay over $2 million of the pre-Transition Date obligations of LTC and the LTC Plaintiffs in order to continue the operations of these nursing home facilities. In some instances, the failure of LTC and the LTC Plaintiffs to pay their outstanding liabilities has resulted in the filing of lawsuits against THCI and/or its subsidiaries. In addition, LTC and the LTC Plaintiffs also have failed and refused to provide THCI with the requisite closing statements for each facility and to provide Medicare and Medicaid Terminating Costs Reports for the facilities. The failure to provide and file such Terminating Cost Reports is likely to impact THCI's ability to obtain reimbursement from Medicare and Medicaid.

In view of the contumacious conduct of LTC and the LTC Plaintiffs to patently ignore their obligations under this Court's Order and the Settlement Agreement, this Court should grant THCI's motion to enforce the Settlement Agreement by (i) authorizing THCI to retain an offset

1

in the amount of $2,257,057; (ii) authorizing the New Operators to disburse the Receivables held in trust to THCI without restriction to satisfy the amount THCI paid to third parties; (iii) requiring LTC and/or the LTC Plaintiffs to pay all outstanding payables within ten (10) days of the date of the Order, including the $4,870,514 of accounts payable obligations of LTC and the LTC Plaintiffs; and (iv) compelling LTC and the LTC Plaintiffs to deliver the applicable Terminating Cost Reports to the New Operators for review and approval within ten (10) business days of the Court's Order here.

## NATURE AND STAGE OF THE PROCEEDINGS

Prior to 2006, the parties herein became involved in disputes over the status and guaranties owed under a series of leases. The parties came to an agreement on terms of settlement, and on September 25, 2006, LTC, the LTC Plaintiffs, and THCI executed the "Settlement Agreement" which was entered on the docket by the Hon. Gregory M. Sleet, U.S.D.J. (See Ex. A to Affidavit of Robert Heyert, hereinafter "Heyert Aff.") Pursuant to the Settlement Agreement, the Court expressly retained jurisdiction over this matter. (Ex. A. to Heyert Aff., Paragraph 14.)

## STATEMENT OF FACTS

Under the terms of the Settlement Agreement, commencing on September 30, 2006, LTC and the LTC Plaintiffs were to begin vacating, surrendering and transferring possession and control of nine nursing homes and all tangible items, including but not limited to outstanding "accounts receivable records, accounts payable records, employee records, and patient records" to the New Operators, as those entities were defined in the Settlement Agreement. (See Ex. A to Heyert Aff., Paragraph 1.) Pursuant to the Settlement Agreement, the transfers were to take place as the New Operators obtained the necessary licenses and permits necessary to operate

2

nursing homes. (See Ex. A to Heyert Aff., ¶4.) All of the transfers were completed by October 1, 2006 and, therefore, pursuant to the Settlement Agreement, the final Transition Date for all nine facilities was October 1, 2006. (Heyert Aff., ¶4.)

For the period preceding the final Transition Date, LTC and the LTC Plaintiffs were obligated under the terms of the Settlement Agreement to retain full responsibility for the accounts payable of each of the nine locations and to pay those obligations from "their own resources." (See Ex. A to Heyert Aff., Paragraph 4(b)(i).) The Settlement Agreement also provides that the LTC Plaintiffs' pre-Transition Date receivables were to be collected by the New Operators, and the New Operators would hold the receivables in trust for the LTC Plaintiffs. (Ex. A to Heyert Aff., Paragraph 4(b)(i).) In addition, prior to the final Transition Date, LTC and the LTC Plaintiffs were directed to deliver a closing statement setting forth the amounts of retained payables accrued or due and owing as of that date, and they were also required to pay such liabilities. (See Ex. A to Heyert Aff., Paragraph 4(b)(i).)

LTC and the LTC Plaintiffs have not rendered such a closing statement, and have not paid a significant portion of the liabilities owed. (See Heyert Aff., ¶7.) The Closing Statement annexed to the Heyert Affidavit palpably demonstrates that the liabilities that are the responsibility of the LTC Plaintiffs were either paid by the New Operators or still remain unpaid. (See Heyert Aff., ¶8.) In some cases, because LTC and the LTC Plaintiffs have not rendered the required Closing Statement, THCI has been required to estimate the outstanding unpaid liability. (Heyert Aff., ¶9.) In other cases, such as the utilities, LTC and the LTC Plaintiffs dispute THCI's calculation, but they have failed to provide any documentation or rationale that supports their position that the calculation is somehow inaccurate. (Heyert Aff., ¶9.) In fact, THCI was

compelled to pay more than $100,000 of the utility and related bills which accrued prior to the Transition Date to rescind utility cancellation and/or shut-off orders. (Heyert Aff., ¶9.)

Each day, THCI discovers yet another instance where LTC and the LTC Plaintiffs failed to live up to their obligations to third parties. (Heyert Aff., ¶10.) Recently, THCI was notified that LTC and the LTC Plaintiffs underpaid their worker's compensation premium for calendar year 2005 by approximately $48,644. (Heyert Aff., ¶10.) In order to qualify for a group rate premium for 2007, THCI was forced to pay the $48,644 underpayment for 2005 as well as an additional sum of $57,080, which was the unpaid premium for the period of July 1, 2006 through September 30, 2006. (Heyert Aff., ¶10.)

In addition, THCI has recently been advised that there are at least six lawsuits filed against LTC and the LTC Plaintiffs based upon their failure to pay pre-Transition Date liabilities. In three instances, THCI, the New Operators or Healthbridge Management, a management company retained by the New Operators, have been named as additional parties. (Heyert Aff., ¶11.) For instance, in one action, captioned <u>Enduracare Therapy Management Inc. v. Integrated Health Services of Cliff Manor, et. al.</u>, Judicial Circuit Court of Missouri, Case No. 0716-CV01599 ("Enduracare action"), the plaintiff alleges a failure of LTC and the LTC Plaintiffs to pay for physical, occupational and speech therapy services provided to residents of the Cliff Manor facility for the period of July 17, 2006 through October 1, 2006 in the aggregate amount of $61,559.25. (Ex. C to Heyert Aff., Missouri Complaint, ¶6.) In that action, not only did the vendor sue the New Operator (4700 NW Cliffview Drive Operating Company LLC), but it also sued Lynn Carroll, a former employee of LTC and the LTC Plaintiffs, in her individual capacity. (Heyert Aff., ¶11.)

4

THCI is advised that Lynn Carroll, the individual defendant in the Enduracare action, called her former employer demanding that it defend and indemnify her in that action and that LTC and the LTC Plaintiffs refused to do so. (Heyert Aff., ¶12.) As a result, the New Operators volunteered to provide her a defense, even though it has no obligation to do so pursuant to the terms of the Settlement Agreement. (Heyert Aff., ¶12.)

In <u>Langer v. Hamilton and IHS of Pittsburgh, Inc.</u>, Court of Common Pleas of Westmoreland County, Pennsylvania, Docket No. 9860 of 2005, we are being forced to defend Leslie Hamilton in an action for an incident that allegedly occurred on October 18, 2005, prior to the Transition Date. (Heyert Aff., ¶13.) IHS originally entered a defense but later withdrew, leaving Ms. Hamilton without representation. (<u>Id.</u>) In <u>Climatech Inc. v. Rehabilitation Nursing Center</u>, Commonwealth of Pennsylvania, Docket No. CV-76-07, which was filed on February 27, 2007, we are being forced to defend a New Operator for failure to pay vendor invoices plus interest for services incurred prior to the Transition Date. (Heyert Aff., ¶14.)

Another New Operator, 890 Weatherwood Lane Operating Co., LLC, ("Weatherwood") also was improperly named as a defendant in a case captioned <u>James v. IHS of Greater Pittsburgh</u>, Commonwealth of Pennsylvania, Docket No. 11523 of 2006. (Heyert Aff., ¶15.) Since Weatherwood has yet to be served with a copy of this complaint, it has no idea of the nature of these allegations. (<u>Id.</u>) Another New Operator also has been sued in Alabama by a former employee of LTC who alleges that LTC failed to provide her with continued health benefits under COBRA. (<u>Id.</u>)

As a result of the wrongful conduct of LTC and the LTC Plaintiffs in failing and refusing to pay the accounts payable which they have agreed and have been ordered to pay by this Court, THCI has been required to pay these obligations in order to ensure the continued operations of

the nursing home facilities, and now will be compelled to defend lawsuits by virtue of LTC and the LTC Plaintiffs' egregious conduct. (Heyert Aff., ¶16.) To date, THCI's calculations indicate that LTC and the LTC Plaintiffs failed to pay approximately $6,495,416 in outstanding payables. (Heyert Aff., ¶17.) Consequently, to date, THCI has been forced to pay $2,257,057 of LTC and the LTC Plaintiff's pre-Transition Date payables, which were financial obligations that LTC and the LTC Plaintiffs should have paid. (Heyert Aff., ¶17.) At the same time, the New Operators have only collected $1,624,902 in receivables, so that the total outstanding payables (including accrued payables which still remain unpaid at this time) exceed the receivables by $4,870,514. (Heyert Aff., ¶17.)

Pursuant to the Settlement Agreement, the New Operators shall pay the LTC Receivables to LTC and the LTC Plaintiffs against payment of the LTC Receivables collected by the New Operators **except if and to the extent that the LTC Plaintiffs have failed to satisfy or defaulted under their financial obligations under paragraphs 4(a), 4(b)(i)(1), (2)."** (See Ex. A to Heyert Aff., paragraph 4(b)(iv)). As set forth more fully above, LTC and the LTC Plaintiffs have failed to satisfy and/or have defaulted under the terms of the settlement and, therefore, THCI should be permitted to retain the LTC Receivables. (Id.)

There are additional contingent liabilities of LTC and the LTC Plaintiffs owing to Medicare, Medicaid and other third party payors which, if not paid, may be collected from the New Operators. (Heyert Aff., ¶19.) Specifically, pursuant to the Settlement Agreement, LTC and the LTC Plaintiffs remain liable for all possible overpayments made to them prior to the Transition Date. (Id.) Although the Settlement Agreement provides for a $700,000 recoupment escrow fund, we currently estimate these amounts to be approximately $1,145,000 in the aggregate. (Heyert Aff., ¶19.) In the event LTC and the LTC Plaintiffs fail or refuse to repay

these overpayments, the amounts of these overpayments will be deducted by Medicare, Medicaid and other third party payors from amounts payable to the New Operators. (Id.)

In addition to the aforementioned issues, LTC and the LTC Plaintiffs have also breached Paragraph 6 of the Settlement Agreement which requires LTC and the LTC Plaintiffs to provide Medicare and Medicaid Terminating Cost Reports to each New Operator for review and reasonable approval. (Heyert Aff., ¶20.) Although LTC and the LTC Plaintiffs submitted Terminating Cost Reports for Pennsylvania and Ohio, those reports were submitted to THCI only three days before the filing deadline. (Heyert Aff., ¶21.) Moreover, the Terminating Cost Report for the Alabama facility, which was due on December 15, 2006 still has not been filed and THCI has yet to be provided with a draft for review and inspection. (Heyert Aff., ¶21.) The Terminating Cost Reports for Medicaid for the facilities located in Missouri and Michigan and the Medicare Terminating Cost Reports for all nine facilities were originally due February 28, 2007, which THCI recently learned has been extended by thirty days. (Heyert Aff., ¶22.) The LTC Plaintiffs have in large part refused to answer telephone calls or emails and provide any further proposed reports. (Heyert Aff., ¶22.)

On March 1, 2007, the LTC Plaintiffs provided THCI only with a proposed Terminating Cost Report for Michigan which contains possible inaccurate cost allocations. (Heyert Aff., ¶22.) In view of the failure to timely file these reports, Medicare and Medicaid can withhold payments for billings submitted by the New Operators, and those governmental entities can also levy penalties against the individual facilities for failing to timely file the Terminating Cost Reports. (Heyert Aff., ¶23.) The failure to timely file the Terminating Cost Reports constitutes yet another event of default under the terms of the Settlement Agreement. (Heyert Aff., ¶23.)

As a result of the foregoing, THCI seeks enforcement of the Settlement Agreement: (i) authorizing the New Operators to offset the pre-Transition payables they already paid ($2,257,057) against the Receivables (currently $1,624,902) as expressly provided for in Paragraph 4(b)(iv) of the Settlement Agreement; (ii) authorizing the New Operators to disburse the Receivables held in trust to itself without restriction; (iii) requiring LTC and the LTC Plaintiffs to pay the remaining outstanding payables as set forth on the Closing Statement within 10 days of the Court's Order; (iv) requiring LTC and the LTC Plaintiffs to pay those receivables which have resulted in the filing of lawsuits against the New Operators or, in the alternative, compelling them to defend and indemnify the New Operators and their employees; and (v) delivering to the respective New Operators the applicable Terminating Cost Reports as set forth above within 10 business days of the Court's Order.

## LEGAL ARGUMENTS

### POINT I

#### THIS COURT HAS THE INHERENT AUTHORITY TO ENFORCE THE EXPRESS TERMS OF THE SETTLEMENT AGREEMENT AND SHOULD GRANT THCI'S MOTION

This Court expressly retained jurisdiction over the Settlement Agreement and has the inherent authority to enforce each and every term of the parties' agreement. See Sherman v. Wellbrock, 761 F. Supp.1135, 1141 (D.N.J. 1991) (a district court retains jurisdiction where the Court approves the agreement, incorporates it into the Court's order and includes language suggesting that it intends to retain jurisdiction) (citing Halderman v. Pennhurst State Sch. & Hosp., 901 F.2d 311, 317 (3d Cir.), cert. denied, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990)). In addition, public policy favors the enforcement of settlement agreements, such as the one at issue here. Liberate Technologies LLC v. Worldgate Commc'ns, Inc., 133 F. Supp. 2d

8

357, 358 (D. Del. 2001) (federal courts have inherent power to enforce settlements "entered into in cases originally filed therein") (citing <u>Fox v. Consol. Rail Corp.</u>, 739 F.2d 929, 931 (3d Cir. 1984)). At its foundation, the authority of the district court to enforce the parties' agreement is underscored by public policy favoring "the amicable adjustment of disputes and the avoidance of costly and time-consuming litigation." <u>Liberate</u>, <u>supra</u>, 133 F.Supp.2d at 358; <u>Read v. Baker</u>, 438 F.Supp.737, 741 (D. Del. 1977) (where a binding and enforceable settlement agreement is entered between the parties, the Court should specifically enforce that agreement in the "interest of the policy favoring settlements of disputes and the avoidance of costly and time consuming litigation"). When the parties to a settlement agreement assert the District Court's jurisdiction in that agreement, this "furthers the federal policy" in favor of the Court's enforcement of that agreement. <u>New Castle County v. U.S. Fire Ins. Co.</u>, 728 F. Supp. 318, 320 (D. Del. 1989).

Under the circumstances of this case, where LTC and the LTC Plaintiffs have completely ignored their obligations under the Settlement Agreement, this Court should not hesitate to exercise its authority to enforce the Settlement Agreement. Significantly, on a motion to enforce a settlement agreement, this Court must analyze the proofs as if this were a motion for summary judgment. <u>Leonard v. Univ. of Delaware</u>, 204 F.Supp.2d 784, 786 (D.Del. 2002) (citing <u>Tiernan v. Devoe</u>, 923 F.2d 1024, 1031-32 (3d Cir. 1991)). Under that standard, the relief sought here "is appropriate . . . if there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." <u>The Intellisource Group, Inc. v. Williams</u>, No. C.A. 98-57-SLR, 1999 WL 615114, at *4 (D. Del. Aug. 11, 1999) (citing Fed. R. Civ. P. 56(c)). Where, as here, there are no material facts in dispute, this Court should grant defendant's motion to enforce the settlement. <u>Leonard</u>, <u>supra</u>, 204 F.Supp.2d at 786 (citing <u>Intellisource</u>, <u>supra</u>, at *4).

9

Significantly, it is undisputed that, notwithstanding the plain and unambiguous language of the Settlement Agreement, THCI has been forced to pay in excess of $2 million dollars in pre-Transition Date liabilities because LTC and the LTC Plaintiffs failed and refused to do so in accordance with the express terms of the Settlement Agreement (Heyert Aff., ¶17.). Similarly, LTC and the LTC Plaintiffs cannot proffer a shred of evidence to show that they ever provided THCI with an accounting after the final Transition Date, a closing statement setting forth the amounts of retained payables or that they submitted and filed Terminating Cost Reports to THCI in accordance with the terms of the Settlement Agreement. (See Ex. A to Heyert Aff., paragraph 4(b)) The uncontrovertible evidence before this Court demonstrates that LTC and the LTC Plaintiffs have utterly failed to abide their obligations under the Settlement Agreement.

## POINT II

### THE PLAIN AND UNAMBIGUOUS TERMS OF THE SETTLEMENT AGREEMENT SHOULD COMPEL THIS COURT TO AUTHORIZE THCI TO RETAIN THE LTC RECEIVABLES

It is firmly established that a contract is to be construed as a whole and, where the language is clear and unambiguous, the parties' intent is ascertained by giving the contract its plain meaning. Intel Corporation v. Broadcom Corporation, 173 F. Supp. 2d 201, 220 (D. Del. 2001). Indeed, where an agreement, such the present one, is unambiguous, the court must interpret it in a manner that gives effect to all of its provisions. Id. At 221.

The Settlement Agreement in this case expressly provides that the New Operators shall pay the LTC Receivables to LTC and the LTC Plaintiffs without offset "against payment of the LTC Receivables collected by the New Operators except if and only to the extent that the LTC Plaintiffs have failed to satisfy or defaulted under their financial obligations under paragraphs 4(a), 4(b)(i)(1)(2)(3) and (4) and 9(a)." (Ex. A to Heyert Aff., paragraph 4(b)(iv). The

uncontrovertible evidence before this Court clearly demonstrates that LTC and the LTC Plaintiffs have defaulted under Paragraph 4 of the Settlement Agreement since they have failed to pay the approximately $2 million of pre-Transition Date payables paid by THCI. In the absence of any genuine issue of material fact, this Court should permit THCI to retain the LTC Receivables as an offset in accordance with the plain and unambiguous language of the Settlement Agreement.

## POINT III

### THCI IS ENTITLED TO AN AWARD OF SANCTIONS BASED UPON LTC AND THE LTC PLAINTIFF'S MISCONDUCT

This Court should impose sanctions against LTC and the LTC Plaintiffs based upon their willful misconduct. It is firmly established that, under the circumstances presented here, the moving party may seek an award of necessary costs, expenses and attorneys' fees, and the Court "has the power to assess attorneys' fees for the willful disobedience of a court order . . . and the authority to award attorneys' fees when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Id. at 789 (citing Hobbs & Co. v. Am. Investors Mgt., Inc., 576 F.2d 29, 35 (3d Cir. 1978)).

Here, the parties executed the Settlement Agreement, which was, in fact, docketed as a Court order. LTC and the LTC Plaintiffs' willful disobedience of this Court's order should not be countenanced, and THCI should be entitled to an award of sanctions equal to the attorneys' fees incurred in connection with this application.

## CONCLUSION

For all of the reasons set forth above, together with the facts set forth in the Motion to Enforce Stipulation and Order of Dismissal, defendant THCI respectfully submits that the Court should enter the proposed Order.

Respectfully submitted,

WOLFF & SAMSON PC

By: _Catherine P. Wells_____
CATHERINE P. WELLS

Dated: 3/27/07

12

PHILLIPS, GOLDMAN & SPENCE, P.A.

LISA C. McLAUGHLIN, ESQUIRE (#3113)
1200 North Broom Street
Wilmington, DE  19806
(302) 655-4200
Attorneys Defendant THCI Company, LLC

Dated:

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615114 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**c**

Intellisource Group, Inc. v. WilliamsD.Del.,1999 Only the Westlaw citation is currently available

United States District Court, D. Delaware.

THE INTELLISOURCE GROUP, INC., Plaintiff,

v.

Richard B. WILLIAMS and Richard B. Williams Family, LLC, Defendants.

**No. C.A. 98-57-SLR.**

Aug. 11, 1999.

Charles Gruver, III, of Taylor, Gruver & McNew, Greenville, Delaware, for plaintiff, James J. Rohn, John A. Guernsey, and Gabriel Holdsman, of Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, Pennsylvania, of counsel.

Edward M. McNally, and John T. Meli, Jr., of Morris, James, Hitchens & Williams, Wilmington, Delaware, for defendants.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 Currently before the court is a motion filed by defendants Richard B. Williams ("Williams") and the Richard B. Williams Family, LLC ("the Williams LLC") to enforce a settlement agreement allegedly accepted by plaintiff The Intellisource Group, Inc. (D.I.19) In the same motion, defendants also move the court to enter final judgment Plaintiff is incorporated under the laws of Delaware and has its principal place of business in Fairfield, Connecticut (D.I.1, ¶ 1) Both defendants are citizens of the State of Illinois (D.I.1, ¶¶ 2-3) Because there is complete diversity between the parties and more than $75,000 in controversy, the court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Defendants have consented to venue in this district Because defendants have not demonstrated that the parties reached a binding settlement agreement on or about September 3, 1998, the court shall deny defendants' motion

II. BACKGROUND

*1 The court gleans the following facts from plaintiff's complaint (D.I.1) and the briefs submitted by the parties. Plaintiff provides technical staffing and other "outsourcing" services to various Fortune 1000 companies throughout the United States Plaintiff was founded by Charles Gibbons ("Gibbons") who, until May 1995, was plaintiff's sole shareholder. In May of 1995, Williams offered to assist Gibbons in attracting investors and improving plaintiff's outsourcing business. In return for this assistance, Williams requested 50% ownership of plaintiff and a "key" position with the company. In July 1995, through Williams' efforts, plaintiff entered discussions with Safeguard Scientifics, Inc. ("Safeguard"), a prospective investor. Williams requested that he receive his shares of plaintiff's stock prior to Safeguard's anticipated investment of capital Gibbons agreed and transferred 50% (or 175,000 shares) of plaintiff's outstanding stock to Williams. Of those 175,000 shares, plaintiff issued 90,000 shares to the Williams LLC. Pursuant to an Option Shares Escrow Agreement, 51,250 shares were transferred to an escrow account held by plaintiff Gibbons also appointed Williams to plaintiff's board of directors. (D.I.1, ¶¶ 6-16)

*1 On September 1, 1995, Safeguard made a substantial investment in plaintiff. In order to protect its investment, Safeguard required plaintiff's key employees, including Williams, to execute employment agreements. (D.I.1, ¶ 18) Williams signed a two year employment contract that imposed a variety of restrictions upon him, including a duty:

*1 • not to solicit (for one year following his employment with plaintiff) any customer or potential customer of plaintiff's and not to compete with, or encourage or assist others to compete with, plaintiff during the term of the agreement and for one year after the termination of the agreement anywhere in the United States; and

*1 • not to disclose any of plaintiff's confidential information (D.I.1, Ex. A at ¶ 7) Less than a year after the Safeguard transaction, Gibbons became increasingly disappointed with Williams' performance and his alleged lack of contribution to plaintiff's development. Gibbons expressed this disappointment to Williams, who offered to resign effective July 31, 1996 Prior to Williams'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 1999 WL 615114 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

resignation, Williams and Gibbons agreed that Williams would abide by the restrictive covenants in his employment agreement and that, in return for the right to remain a shareholder in the company, Williams would deposit an additional 10,000 shares in escrow in accordance with an Option Shares Escrow Agreement. (D.I.1, ¶ ¶ 25-28)

**\*2** Following his resignation, Williams began employment with Alternative Resources Corporation ("ARC"), a competitor of plaintiff's. On or about February 24, 1997, Williams was elected president and Chief Operating Officer of ARC. Plaintiff then filed suit against defendants alleging breach of contract, breach of duty of good faith and fair dealing, breach of fiduciary duty, and misappropriation of trade secrets. (D.I.1, ¶ ¶ 37-60) According to plaintiff, Williams violated his employment agreement with plaintiff by disclosing or disseminating plaintiff's confidential information to ARC and by competing with, and/or encouraging or assisting others to compete with, plaintiff. (D.I.1, ¶ ¶ 29-33) Plaintiff sought, among other things, return of all stock interest in plaintiff and a permanent injunction restraining Williams from violating the noncompetition clause of his employment agreement. Defendants denied these allegations and filed a counterclaim alleging bad faith and seeking attorneys fees and expenses under 6 Del. C. § 2004.

**\*2** The parties initiated settlement in mid-1998. As part of these settlement negotiations, Williams resigned from ARC. On August 11, 1998, plaintiff's counsel made the following settlement offer in a letter to defendants' counsel:
**\*2** We have entered into good faith discussions in order to facilitate the settlement of the above-referenced lawsuit.
**\*2** To that end, we have made a bona fide offer of $.70 per share for all escrowed option shares and $1.00 per share for all other shares Mr. Williams or his family own in the Intellisource Group, Inc., representing a total sum of $626,500.00
**\*2** ...
**\*2** Please be advised that this offer will be withdrawn on August 18, 1998, if no response has been received.

**\*2** (D.I.23, Ex. B) Defendants rejected this offer and made a counteroffer in an August 17, 1998 letter. That letter stated, in pertinent part, that:**\*2** Mr. Williams ... is prepared to settle this litigation and sell his stock to Intellisource. He will do so upon payment of $4.00 per share for each of the 455,000 shares of Intellisource stock he and the Family, LLC

own outright, and an additional $.70 for the shares subject to an option.

**\*2** (D.I.23, Ex. C) Plaintiff accepted this offer on September 3, 1998 with the following letter:**\*2** The Intellisource Group, Inc. accepts the Williams' offer set forth in your letter of August 17, 1998 for the settlement of the litigation and sale of all stock to Intellisource. The amount to be paid is $4.00 per share for each of the shares of Intellisource stock which Williams and the Family, LLC own outright and $.70 per share for each of the shares subject to the option. According to our calculations, the number of unrestricted shares is 455,000 and the number of shares subject to the option is 245,000.
**\*2** I will prepare a Settlement Agreement And Release and a Stock Repurchase Agreement for your consideration. I am advised that the purchase money can be available by October 15, 1998. By that date we should have agreed on the language of the documents and secured the parties' signatures on them.

**\*3** (D.I.23, Ex. D) The following day, defendants' counsel confirmed plaintiff's acceptance. In this September 4, 1998 letter, defendants' counsel stated that:**\*3** Mr. Williams accepts the considerations set forth in your September 3, 1998 letter. Of course, we do not have a deal until we agree on the language of the Settlement Agreement and Release, and such other documentation as you might request.
**\*3** Mr. Williams is also willing to accept the October 15, 1998 settlement date, but I would want "good funds" on that date so he can invest the money immediately.

**\*3** (D.I.23, Ex. E) Defendants contend that, in stating "of course, we do not have a deal until we agree on the language of the Settlement Agreement," counsel was referring to the customary papers to settle a lawsuit, specifically a stipulation of dismissal and mutual release papers. (D.I.21, ¶ 9)

**\*3** According to defendants, on October 12, 1998, plaintiff's counsel advised defendants' counsel that plaintiff might not have the settlement money by October 15, 1998. In an October 12th letter confirming this conversation, defendants' counsel wrote the following:
**\*3** As we discussed in our telephone conversation this morning, Mr. Williams needs to know whether a settlement is going to occur as scheduled this Thursday, October 15, 1998. You have advised that there is a "financial glitch" so that your client may not have the money by this Thursday. Of course,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615114 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

there was no financial contingency in our agreement to settle. Accordingly, this letter is to demand assurances from your client that a settlement will occur this Thursday.... Mr. Williams reserves all of his rights to enforce the settlement agreement or take such other actions as may be appropriate under the circumstances.

*3 (D.I.21, Ex. F) Plaintiff responded in a letter dated October 12, 1998, stating:*3 Your letter of October 12, 1998 is inconsistent with your letter of September 4, 1998. The parties have not agreed on the language of the Settlement Agreement and Release and related documents. Until that occurs, neither party can give assurances to any closing taking place on October 15, 1998.

*3 (D.I.23, Ex. F) In this October 12th letter, plaintiff enclosed proposed settlement documents. These documents proposed an installment payment of the settlement sum, constituting *3 Ninety-one Thousand Five Hundred dollars ($91,500) in certified check upon execution, and a promissory note in the amount of One Million Nine Hundred Thousand dollars ($1,900,000), bearing no interest and payable in equal annual installments of One Hundred Ninety Thousand dollars ($190,000) commencing on October 15, 1999 and continuing until October 15, 2008; provided, however, that in the event of an initial public offering of [Intellisource] stock, that the then remaining balance of the note then due becomes immediately due and payable.

*3 (D.I. 21, Ex. G at ¶ 5) Plaintiff's proposed settlement agreement also would have prevented Williams from soliciting business from plaintiff's customers (identified in an attached list) for a one year period following settlement. (D.I.21, Ex. G at ¶ 6)

*4 On October 15, 1998, defendants' counsel advised plaintiff that the proposed settlement agreement did not reflect the agreement allegedly accepted by plaintiff in its September 3, 1998 letter. (D.I.21, Ex. H) Defendants thereafter ended settlement negotiations and filed the present motion to enforce. Specifically, defendants seek enforcement of a purported agreement to pay the settlement figure in a lump-sum, cash payment.

### III. STANDARD OF REVIEW

*4 A district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it. *See* Hobbs & Co. v. American Investors Management, Inc., 576 F.2d 29, 33 & n. 7 (3d Cir.1978). Because motions for the enforcement of settlement agreements resemble motions for summary judgment, the court must employ a similar standard of review. *See* Tiernan v. Devoe, 923 F.2d 1024, 1031-32 (3d Cir.1991). Accordingly, the court must treat all the non-movant's assertions as true, and "when these assertions conflict with those of the movant, the former must receive the benefit of the doubt." *Id* at 132 (internal quotation and citation omitted). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Courts should not summarily enforce purported settlement agreements, in the absence of an evidentiary hearing, where material facts concerning the existence or terms of an agreement to settle are in dispute. *See id* at 1031 (quoting Garabedian v. Allstates Eng'g Co., 811 F.2d 802, 803 (3d Cir.1987)).

### IV. DISCUSSION

*4 The court must determine whether plaintiff's September 3, 1998 "acceptance" letter created an enforceable agreement to settle the litigation for a lump-sum cash payment to defendants. Specifically at issue is whether, viewed objectively, a lump-sum cash payment was an "essential term" of the purported settlement agreement.FN1 Neither party disputes that Delaware law governs the action at bar.

> FN1. Plaintiff's draft settlement proposal also included a restrictive covenant. The parties never discussed a restrictive covenant in their correspondence. Because the court finds that the parties did not enter a binding settlement agreement on September 3, 1998, the court declines to discuss whether a restrictive covenant was material or essential to the parties' settlement agreement.

*4 Under Delaware law, a contract "comes into existence if a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound to their agreement on all

Not Reported in F Supp.2d
Not Reported in F Supp 2d, 1999 WL 615114 (D Del )
(Cite as: Not Reported in F.Supp.2d)

essential terms " Telephone & Data Sys., Inc. v. Eastex Cellular L.P., Civ.A.No. 12888, 1993 WL 344770, at *10 (Del. Ch. Aug. 27, 1993) (emphasis added); *see also* Industrial America, Inc. v. Fulton Indus., Inc., 285 A.2d 412, 415 (Del.1971) (explaining that "overt manifestation of assent-not subjective intent-controls the formation of a contract"). If the parties reached a definite agreement on all essential terms, a valid contract exists See Telephone & Data Sys., 1993 WL 344770, at *11 n. 19 Conversely, there can be no contract when an essential term is missing See Pantzer v. Shields Dev. Corp., 660 F.Supp. 56, 59 (D.Del.1986). The court must look to the parties' "antecedent expressions, their past action and custom, and other circumstances" to determine if the parties regarded a lump-sum cash payment as essential to their agreement See 1 *Corbin on Contracts* § 29, at 88 (1963)

*5 Although defendants contend that "all essential terms of the settlement were agreed to in writing," there is no evidence that both parties agreed on a payment schedule In light of the amount of money at stake and the complexity of repurchasing company stock, the court finds that a reasonable person would conclude that the method of payment would be an essential term in the purported contract at bar. Defendants argue that a lump-sum payment was implicit in their agreement (D.I. 20 at 11), but the court cannot find any evidence in the parties' correspondence to support this claim In their August 17, 1998 letter, defendants made no mention of the method of payment. Defendants merely offered to settle the litigation for "$4 00 per share for each of the 455,000 shares of Intellisource stock [Williams] and the Family, LLC own outright, and an additional $.70 for the shares subject to an option " (D.I.23, Ex. C) Similarly, in its September 3, 1998 acceptance letter, plaintiff confirmed the per share settlement price, but never discussed a payment schedule. In accepting the per share settlement price offered by defendants, plaintiff further suggested that "the purchase money" could be available by October 15, 1998 and that the settlement documents should be agreed to and executed by that date.FN2 Defendants responded, first, by declaring that there is no "deal" until final documentation and, second, by further requiring "good funds" on the settlement date. The parties' next round of communications included plaintiff's observation that it might not have "the settlement money" by October 15, 1998 Still without mentioning a specific dollar figure, defendants

demanded settlement on the 15th regardless of plaintiff's financial condition

> FN2. The court notes that neither party discussed a specific payment schedule on, or prior to, plaintiff's September 3rd "acceptance" of the settlement agreement Because it is defendants' burden of proof, the court need not assume that the phrase "purchase money" meant the entire purchase price. Indeed, the phrase "purchase money" is defined as "[t]he actual money paid in cash or check initially for the property while the balance may be secured by a mortgage and note calling for periodic payments " *Black's Law Dictionary* 1111 (5th ed 1979). Only in an October 8, 1998 facsimile transmission of wire transfer instructions did defendants specifically mention a lump-sum payment (D.I.21, Ex. E) At the time of the purported September 3rd agreement, however, the objective evidence of record does not indicate what payment schedule was contemplated by the parties

*5 It is a well established principle of contract law that
*5 if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

*5 Restatement (Second) of Contracts § 27 cmt b (1981). In the present case, defendants have failed to demonstrate that the parties reached agreement as to a payment schedule, an essential term of the transaction The parties' correspondence further demonstrates that neither party regarded the agreement to settle as complete until formal settlement and stock repurchase agreements had been signed. As such, the court cannot conclude that plaintiff's September 3, 1998 "acceptance" letter created a binding agreement to pay a lump-sum cash settlement to defendants FN3

> FN3. Because the court concludes that no binding contract arose between the parties, the court need not address whether plaintiff's attorney had the authority to bind plaintiff to

© 2007 Thomson/West. No Claim to Orig. U S Govt Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 615114 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

a settlement agreement.

## V. CONCLUSION

**\*5** For the aforementioned reasons, defendants' motion to enforce the settlement agreement is denied. An appropriate order shall issue.

D.Del.,1999
Intellisource Group, Inc. v. Williams
Not Reported in F.Supp.2d, 1999 WL 615114 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.