WOLFF & SAMSON
THE OFFICES AT CRYSTAL LAKE
ONE BOLAND DRIVE
WEST ORANGE, NEW JERSEY 07052
973-325-1500
Attorneys for Defendant
THCI Company LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTEGRATED HEALTH SERVICES OF
CLIFF MANOR, INC , INTEGRATED
HEALTH SERVICES AT RIVERBEND,
INTEGRATED HEALTH SERVICES AT
SOMERSET VALLEY, INC., ALPINE
MANOR, INC , BRIARCLIFF NURSING
HOME, INC., INTEGRATED HEALTH
GROUP, INC., SPRING CREEK OF IHS,
INC., FIRELANDS OF IHS, INC., ELM
CREEK OF IHS, INC. and IHS LONG
TERM CARE SERVICES, INC.

        Plaintiffs,

        v.

THCI COMPANY LLC,

        Defendant,

        and,

ABE BRIARWOOD CORPORATION and
JOHN DOES 1-10,

        Additional Counterclaim
Defendant.

Civil Action No.: 04-910 (GMS)

**AFFIDAVIT OF ROBERT W. HEYERT
IN SUPPORT OF THE MOTION BY
THCI COMPANY LLC TO ENFORCE
THE STIPULATION AND ORDER OF
SETTLEMENT AND DISMISSAL**

      1.      I am the Vice President and Controller of HealthBridge Management, LLC, a management company which manages the nine nursing homes that are the subject of the Stipulation and Order of Settlement and Dismissal entered in this matter (the "Settlement Agreement"). The nine nursing homes are operated by subsidiaries of THCI Company, LLC

1055643 9

("THCI"), the Defendant in this matter. As such, I am fully familiar with the facts set forth herein.

2.      LTC, the LTC Plaintiffs (as defined in the Settlement Agreement) and THCI executed the Settlement Agreement, which was filed and entered on the docket on September 28, 2006 by the Hon. Gregory M. Sleet, U.S.D.J. As set forth in paragraph 14 of the Settlement Agreement, a true copy of which is attached hereto as Exhibit A, this Court expressly retained jurisdiction over this matter for purposes of enforcing the terms of the Settlement Agreement.

3.      The Settlement Agreement stipulated that on September 30, 2006, LTC and the LTC Plaintiffs were to begin vacating, surrendering and transferring possession and control of nine nursing homes and all tangible items thereof, including but not limited to outstanding "accounts receivable records, accounts payable records, employee records, and patient records" to the New Operators, as those entities were defined in the Settlement Agreement. (Ex. A, Settlement Agreement, paragraph 1).

4.      Pursuant to the Settlement Agreement, the transfers were to take place as THCI or its subsidiaries ("New Operators") obtained the licenses and permits necessary to operate the nursing homes. The transfers were completed by October 1, 2006, and, therefore, under the terms of the Settlement Agreement, the Transition Date for all nine facilities is October 1, 2006.

5.      For the period preceding the Transition Date, LTC and the LTC Plaintiffs were obligated under the terms of the Settlement Agreement to retain full responsibility for the accounts payable of each of the nine locations and pay the obligations from "their own resources." (Ex. A, Settlement Agreement, paragraph 4(b)(i)). The Settlement Agreement also provides that the pre-Transition Date receivables may be collected by the New Operators and

that the New Operators would hold such receivables in trust for LTC and the LTC Plaintiffs. (Ex. A, Settlement Agreement, paragraph 4(b)(i)).

6.      Pursuant to paragraph 4(b)(i) of the Settlement Agreement, LTC and the LTC Plaintiffs also were obligated to deliver prior to the Transition Date a closing statement setting forth the amounts of retained payables pro rated, accrued or due and owing as of that date, and the LTC Plaintiffs were required to pay such liabilities.    (Ex. A, Settlement Agreement, paragraph 4(b)(i)).

7.      Notwithstanding LTC and the LTC Plaintiffs' obligations under Paragraph 4(b)(i), they have failed and refused to provide THCI with a closing statement, and more importantly, they have not paid a significant portion of the liabilities owed to various third parties.

8.      Attached hereto as Exhibit B is a Closing Statement that I have prepared that sets forth the liabilities that are the responsibility of LTC and the LTC Plaintiffs and which: (a) were paid the New Operators or (b) remain unpaid.

9.      In some cases, because LTC and the LTC Plaintiffs have not rendered the required Closing Statement, we have been required to estimate the outstanding unpaid liability. In other cases, such as the utilities, LTC and the LTC Plaintiffs have disputed our calculation, but they failed to provide any documentation or rationale to support their position that the calculation is somehow inaccurate.  In fact, THCI (or the New Operators) have been required to pay more than $100,000 of the utility and related bills for services provided prior to the Transition Date in order to rescind utility cancellation and/or shut-off orders issued to the facilities for non-payment.  (See Ex. B, Closing Statement.)

10.     Each day, THCI discovers yet another instance where LTC and the LTC Plaintiffs failed to live up to their obligations under the Settlement Agreement, as well as other agreements with third parties.  Recently, THCI was notified that LTC and the LTC Plaintiffs underpaid their workers compensation premium for 2005 to the State of Ohio by approximately $48,644.  In order to qualify for a group rate premium for 2007, THCI was forced to pay the $48,644 underpayment for 2005 as well as an additional sum of $57,080, which was the unpaid premium for the period of July 1, 2006 through September 30, 2006.

11.     In addition, we have recently been advised that there are at least six lawsuits filed against LTC and the LTC Plaintiffs based upon their failure to pay pre-Transition Date liabilities.  In three instances, Healthbridge, THCI or the New Operators have been named as additional parties.  For instance, in one action, captioned Enduracare Therapy Management Inc. v. Integrated Health Services of Cliff Manor, et. al., Judicial Circuit Court of Missouri, Case No. 0716-CV01599 ("Enduracare action"), the plaintiff Enduracare alleges a failure of LTC and the LTC Plaintiffs to pay for physical, occupational and speech therapy services provided to residents of the Cliff Manor facility for the period of July 17, 2006 through October 1, 2006 in the aggregate amount of $61,559.25.  (Ex. C, Missouri Complaint, ¶6.)  In that action, not only did the vendor sue the New Operator (4700 NW Cliffview Drive Operating Company LLC), but it also sued Lynn Carroll, a former employee of LTC and the LTC Plaintiffs, in her individual capacity.

12.     I am advised that, Lynn Carroll, the individual defendant in the Enduracare action, called her former employer demanding that it defend and indemnify her in that action and that LTC and the LTC Plaintiffs refused to do so.  As the result, the New Operators

volunteered to provide her a defense, even though it has no obligation to do so pursuant to the terms of the Settlement Agreement.

13.    In Langer v. Hamilton and IHS of Pittsburgh, Inc., Court of Common Pleas of Westmoreland County, Pennsylvania, Docket No. 9860 of 2005, we are being forced to defend Leslie Hamilton in an action for an incident that allegedly occurred on October 18, 2005, prior to the Transition Date.    IHS originally entered a defense but later withdrew, leaving Ms. Hamilton without representation.

14.    In Climatech Inc. v. Rehabilitation Nursing Center, Commonwealth of Pennsylvania, Docket No. CV-76-07, which was filed on February 27, 2007, we are being forced to defend a New Operator for failure to pay vendor invoices plus interest for services incurred prior to the Transition Date.

15.    Another New Operator, 890 Weatherwood Lane Operating Co., LLC, also was improperly named as a defendant in a case captioned James v. IHS of Greater Pittsburgh, Commonwealth of Pennsylvania, Docket No. 11523 of 2006. Since we have yet to be served with a copy of this Complaint, we have no idea of the nature of these allegations. Another New Operator has also been sued in Alabama by a former employee of LTC who alleges that LTC and/or Healthbridge failed to provide her with continued health benefits under COBRA.  For the Court's convenience, I have attached a copy of the Alabama action, captioned Poe v. Healthbridge Management, Inc., District of Alabama, Southern Division, CV-07-B-0113 5, as Ex. D.

16.    As a result of the wrongful conduct of LTC and the LTC Plaintiffs in failing and refusing to pay the accounts payable which they have agreed and have been ordered to pay by this Court, THCI has been required to pay the obligations described in Paragraphs 7 through 10

hereof, in order to ensure the continued operations of the nursing home facilities, and now will be compelled to defend lawsuits by virtue of LTC and the LTC Plaintiffs' egregious conduct.

17.    To date, THCI's calculations indicate that LTC and the LTC Plaintiffs failed to pay approximately $6,495,416 in outstanding payables. Consequently, to date, THCI has been forced to pay $2,257,057 of the LTC Plaintiffs' pre-Transition Date payables, which were financial obligations that LTC and the LTC Plaintiffs should have paid. At the same time, the New Operators have only collected $1,624,902 in receivables, so that the total outstanding payables (including accrued payables which still remain unpaid at this time) currently exceed the collected receivables by $4,870,514.

18.    Pursuant to the express terms of the Settlement Agreement, the New Operators shall pay the LTC Receivables to LTC and the LTC Plaintiffs without offset "against payment of the LTC Receivables collected by the New Operators except if and to the extent that the LTC Plaintiffs have failed to satisfy or defaulted under their financial obligations under paragraphs 4(a), 4(b)(i)(1),(2),(3), and (4) and 9(a). (Settlement Agreement, paragraph 4(b)(iv)) (emphasis added). As set forth more fully above, LTC and the LTC Plaintiffs have failed to satisfy and/or have defaulted under the terms of the Settlement and, therefore, THCI should be permitted to retain the LTC Receivables.

19.    There are additional contingent liabilities of LTC and the LTC Plaintiffs owing to Medicare, Medicaid and other third party payors which, if not paid, may be collected from the New Operators. Specifically, pursuant to the Settlement Agreement, LTC and the LTC Plaintiffs remain liable for all Medicare, Medicaid and third party payor overpayments made prior to the Transition Date. Although the Settlement Agreement provides for a $700,000 recoupment escrow fund to cover such claims, we currently estimate these overpayment

amounts to be approximately $1,145,000 in the aggregate. In the event LTC and the LTC Plaintiffs fail or refuse to repay Medicare, Medicaid and other third parties, the amount of these overpayments will be deducted by Medicare, Medicaid and other third parties from amounts payable to the New Operators.

20.    In addition to the aforementioned issues, LTC and the LTC Plaintiffs have not complied with their obligations under Paragraph 6 of the Settlement Agreement, which requires LTC and the LTC Plaintiffs to provide Terminating Cost Reports to THCI for review and reasonable approval prior to filing.

21.    Although LTC and the LTC Plaintiffs submitted the Terminating Cost Reports for Pennsylvania and Ohio, those reports were submitted to THCI only three days before the filing deadline. Moreover, the Terminating Cost Report for the Alabama facility, which was due on December 15, 2006, still has not been filed, and THCI has yet to be provided with a draft for review and approval.

22.    The Terminating Cost Reports for Medicaid in Missouri and Michigan as well as the Medicare Cost Report for all nine facilities were originally due on February 28, 2007. On March 1, 2007, the LTC Plaintiffs provided THCI only with a proposed Terminating Cost Report for Michigan which contained possible inaccurate cost allocations. We have since learned that the LTC Plaintiffs arranged a thirty day extension from February 28, 2007 to file the Medicare Terminating Cost Reports; however, the LTC Plaintiffs have in large part refused to answer our telephone calls or emails and provide any further proposed reports. We have a serious and legitimate concern that more deadlines will be missed by the LTC Plaintiffs to file the Terminating Cost Reports.

23.     In view of the failure to timely file these reports, Medicaid and Medicare can withhold payments for billings submitted by the New Operators, and those governmental entities can also levy penalties against the individual facilities for failing to timely file the Terminating Cost Reports. The failure to timely submit Terminating Cost Reports constitutes yet another event of default under the terms of the Settlement Agreement.

24.     As a result of the foregoing, THCI seeks enforcement of the Settlement Agreement: (i) authorizing the New Operators to offset the pre-Transition payables they already paid ($2,257,057) against the Receivables (currently $1,624,902) as expressly provided for in Paragraph 4(b)(iv) of the Settlement Agreement; (ii) authorizing the New Operators to disburse the Receivables held in trust to itself without restriction; (iii) requiring LTC and the LTC Plaintiffs to pay the remaining outstanding payables as set forth on the Closing Statement within 10 days of the Court's Order; and (iv) requiring LTC and the LTC Plaintiffs to pay those receivables which have resulted in the filing of lawsuits against the New Operators or, in the alternative, compelling them to defend and indemnify the New Operators and their employees; and (v) delivering to the respective New Operators the applicable Terminating Cost Reports as set forth above within 10 business days of the Court's Order.

Robert W. Heyert

Sworn to and subscribed before me
this ___ date of March, 2007

Jennifer M. Villamar
Notary Public of New Jersey
My Commission Expires 09/26/2010

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTEGRATED HEALTH SERVICES OF CLIFF MANOR, INC., INTEGRATED HEALTH SERVICES AT RIVERBEND, INTEGRATED HEALTH SERVICES AT SOMERSET VALLEY, INC., ALPINE MANOR, INC., BRIARCLIFF NURSING HOME, INC., INTEGRATED HEALTH GROUP, INC., SPRING CREEK OF IHS, INC., FIRELANDS OF IHS, INC., ELM CREEK OF IHS, INC., and IHS LONG TERM CARE SERVICES, INC., <br><br>                    Plaintiffs, <br><br>          v. <br><br> THCI COMPANY LLC, <br><br>                    Defendant, <br><br>          v. <br><br> ABE BRIARWOOD CORPORATION and JOHN DOES 1-10, <br><br>                    Additional Counterclaim Defendants. | Civil Action No. 04-910 (GMS) |

## STIPULATION AND ORDER
## OF SETTLEMENT AND DISMISSAL

Plaintiffs Integrated Health Services of Cliff Manor, Inc., Integrated Health Services at Riverbend, Inc., Integrated Health Services at Somerset Valley, Inc., Alpine Manor, Inc., Briarcliff Nursing Home, Inc., Integrated Health Group, Inc., Spring Creek of IHS, Inc., Firelands of IHS, Inc., and Elm Creek of IHS, Inc., (collectively, the "LTC Plaintiffs"), and IHS Long Term Care Services, Inc. ("LTC"), additional counterclaim defendant Abe Briarwood Corporation

NEWYORK01 1140534v7 038796-000003

("Briarwood"), and defendant THCI Company LLC ("THCI") hereby stipulate and agree that this action is settled and dismissed on the following basis:

1.    In accordance with the provisions of this Stipulation and Order, on September 30, 2006 or such other date as may be agreed to in a writing signed by the parties hereto (for each facility, the "Transition Date") subject to obtaining any applicable licensing, the LTC Plaintiffs shall vacate, surrender, and transfer, and the "New Operators" (as defined below) shall simultaneously take possession of all and no fewer than all of the following nine nursing home facilities (the "Facilities") and all tangible items contained therein (to the extent permitted by law or contract), including but not limited to all outstanding accounts receivable records, accounts payable records, employee records, and patient records ("Business Records"), computers, software access codes, keys, billing systems, telephones and telephone numbers, equipment, personal property, supplies, patient deposits, furniture, fixtures and policy and procedure manuals:

(1)    Alpine Manor, Inc.
4114 Schaper Avenue
Erie, Pennsylvania;

(2)    Integrated Health Group, Inc.
890 Weatherwood Lane
Greensburg, Pennsylvania;

(3)    Elm Creek of IHS, Inc.
115 Elmwood Circle
West Carrollton, Ohio;

(4)    Integrated Health Services of Riverbend, Inc.
11941 Belsay Road
Grand Blanc, Michigan;

(5)    Firelands of IHS, Inc.
204 West Main Street
New London, Ohio;

    (6)    Briarcliff Nursing Homes, Inc. ("Briarcliff")
            850 N.W. 9th Street
            Alabaster, Alabama;

    (7)    Integrated Health Services of Somerset Valley, Inc.
            1621 Route 22 West
            Bound Brook, New Jersey

    (8)    Spring Creek of IHS, Inc.
            5440 Charlesgate Road
            Huber Heights, Ohio; and

    (9)    Integrated Health Services of Cliff Manor, Inc. ("Cliff Manor")
            4700 Cliffview Drive
            Kansas City, Missouri.

As used herein, the "New Operators" shall consist of the following entities, respectively to the nine named facilities: 850 NW 9th Street Operating Company, LLC; 11941 Belsay Road Operating Company, LLC; 4700 NW Cliff View Drive Operating Company, LLC; 1621 Route 22 West Operating Company, LLC; 5440 Charlesgate Road Operating Company, LLC; 204 W. Main Street Operating Company, LLC; 115 Elmwood Circle Operating Company, LLC; 4114 Schaper Avenue Operating Company, LLC; and 890 Weatherwood Lane Operating Company, LLC.

      If the New Operators are unable to obtain the necessary licenses and permits from any of the appropriate licensing authorities by the Transition Date for all of the Facilities, then the transfer of the Facilities shall occur as follows:

      a)    if, by the Transition Date, the applicable New Operators have received the necessary licenses and permits for the Briarcliff and Cliff Manor Facilities, then, on the Transition Date, the LTC Plaintiffs shall vacate, surrender, and transfer and the appropriate New Operators shall simultaneously take possession of the Cliff Manor and Briarcliff Facilities and all other Facilities for which the

NEWYORK01 1140534v7 038796-000003

necessary licenses and permits have been procured, and the LTC Plaintiffs shall vacate, surrender, and transfer and the appropriate New Operators shall simultaneously take possession of such other Facilities upon receipt of the necessary licenses and permits for each such Facility; or

b) if, by the Transition Date, the applicable New Operators have not received the necessary licenses and permits for the Briarcliff and Cliff Manor Facilities, then the New Operators agree that they will instruct the licensing authorities to hold the transfer documents for all Facilities until the necessary permits and licenses for Cliff Manor and Briarcliff have been received, at which time the LTC Plaintiffs shall vacate, surrender, and transfer, and the appropriate New Operators shall simultaneously take possession of the Cliff Manor and Briarcliff Facilities and all other Facilities for which the necessary licenses and permits have been procured, and the LTC Plaintiffs shall vacate, surrender, and transfer and the appropriate New Operators shall simultaneously take possession of any such other Facilities upon receipt of the necessary licenses and permits for each such Facility.

2.   a)   Immediately upon the execution of this Stipulation, the LTC Plaintiffs shall provide the New Operators, upon at least 24 hours, and up to 48 hours, notice to the LTC Plaintiffs, with reasonable access to Business Records for each Facility and such cooperation as is appropriate to effectuate the transition by the Transition Date and to provide for the continuation of patient care. The execution of this Stipulation shall constitute initial notice to the LTC Plaintiffs and the LTC Plaintiffs shall provide the New Operators with access on

Tuesday, September 26, 2006. Thereafter, notice shall be provided to the LTC

Plaintiffs by facsimile, electronic mail, hand delivery or overnight mail

addressed as follows:

> Allison Stone, Esq.
> Allison Stone, Esq. LLC
> 1680 Michigan Avenue
> Suite 736
> Miami Beach, Florida 33139
> Telephone: (305) 538-2171
> Facsimile: (305) 538-2699
> Email: attorneystone@hotmail.com

with a copy to Aurora Cassirer, Esq. as provided in paragraph 9.

b) This Stipulation and Order, and the transactions described herein, shall not be

used to or be deemed to transfer any governmental or regulatory license or

permit. The New Operators shall, at their own expense, file all applications and

take all necessary steps for the transfer and/or issuance of all necessary licenses

and permits to the New Operators, and the LTC Plaintiffs shall promptly

cooperate and provide such information and assistance as may be reasonably

requested for such purpose.

Without limiting the foregoing, the LTC Plaintiffs and the New Operators,

through their regulatory counsel, shall cooperate fully and keep the other

regularly informed as to the status of the regulatory application and approval

process for the Facilities and any matters which could reasonably cause a delay

or objections to be raised. References in this Stipulation and Order to

"regulatory approval" and to "obtaining or receiving the necessary licenses and

permits" for the transfer of a Facility to a New Operator shall mean that it is

legally permissible for the New Operator to commence operating the applicable Facility; the same does not require the actual physical issuance of licenses and permits to the New Operator, which may occur later, but rather that it is legally permissible to close the transfer either by informal, preliminary, verbal or written approval contemplating final approval retroactive to the transfer date, as customary in the particular state jurisdiction in which the Facility is located.

3.     The LTC Plaintiffs and LTC shall not transfer any tangible or intangible items or assets from the Facilities or incur or assume any liabilities relating to the Facilities through the Transition Date except in the ordinary course of business, and the LTC Plaintiffs shall continue to operate the Facilities in accordance with past practice. On the Transition Date, the LTC Plaintiffs shall transfer or pay to the applicable New Operators in trust all patient needs accounts, resident security deposits, advance payments, made by or on behalf of residents, and any other account or monies funded by residents and/or third parties for the direct benefit of the residents, but the LTC Plaintiffs shall retain all other cash on hand at the Facilities or being held on behalf of the Facilities.

4.(a)  Settlement Payment.  In full and final settlement of all claims between the parties to this action and subject to the terms and considerations of this Stipulation, and in consideration of the execution, delivery and performance of this Stipulation and Order of Settlement by THCI, the LTC Plaintiffs shall pay to THCI the amount of $14,000,000 (FOURTEEN MILLION DOLLARS), at the times and in the manner provided for in this Agreement (the "Settlement Payment"). The first $10,000,000 (TEN MILLION DOLLARS) ("Initial Payment") of the Settlement Payment shall be made on September 30, 2006 ("Settlement Date") and the balance of $4,000,000 (FOUR MILLION DOLLARS) ("Final Payment") of the Settlement Payment shall be made on the Transition Date after the New

- 6 -

Operators shall have taken possession of all and no fewer than all of the Facilities. On the Settlement Date, the Final Payment shall be paid into escrow with the escrow agent under an Escrow Agreement to be entered into simultaneously with this Stipulation (the "Escrow Agreement"), to be held in escrow until the occurrence of the Transition Date after the New Operators shall have obtained regulatory approval and taken possession of all and no fewer than all of the Facilities. Interest on the Final Payment shall accrue to the benefit of THCI. Notwithstanding the foregoing, in the event that pursuant to the terms and conditions of subparagraphs a) or b) of Section 1 of this Agreement, the New Operators receive the necessary licenses and permits for the Briarcliff and Cliff Manor Facilities and simultaneously take possession of the Cliff Manor and Briarcliff Facilities and all other Facilities for which the necessary licenses and permits have been procured at such time ("First Transfer Facilities") then a pro-rata portion of the Final Payment shall be released from escrow to THCI within two (2) business days after such transition of the First Transfer Facilities, calculated as $4,000,000 multiplied by a fraction, the numerator of which is the number of Facilities included in the First Transfer Facilities, and the denominator of which is nine (9). If, after the transition of the First Transfer Facilities, the New Operators from time to time receive the necessary licenses and permits for, and simultaneously take possession of, additional Facilities, but less then all of the remaining Facilities, then an additional pro-rata portion of the Final Payment shall be released from escrow to THCI within two (2) business days after each such transition of additional Facilities, calculated as $4,000,000 multiplied by a fraction, the numerator of which is the number of Facilities included in the additional transition, and the denominator of which is nine (9). The aggregate amounts of the Final Payment released following the transition of the First Transfer Facilities and any additional Facilities, which are fewer than all of the Facilities, shall

NEWYORK01 1140534v7 038796-000003

not exceed Three Million Dollars ($3,000,000) and such that at least One Million Dollars ($1,000,000) of the Final Payment shall remain in escrow until the transition of all nine (9) Facilities. There shall <u>not</u> be any pro-rated release of the Final Payment, and the entire $4,000,000 shall remain in escrow, until the transition of the Briarcliff and Cliff Manor Facilities. The balance of Final Payment shall be released from escrow to the LTC Plaintiffs if, two (2) years from the Settlement Date, not all of the Facilities have transitioned to the New Operators. Each installment of the Settlement Payment, when it is due, shall be made to THCI by wire transfer of immediately available funds, to the following account:

> Commerce Bank
> ABA#021200957
> THCI Savings
> acct: 510259553

(b)  <u>Accounts Receivable/Accounts Payable.</u>

(i) The LTC Plaintiffs shall retain the accounts receivable and accounts payable of each Facility generated or accrued through the Transition Date applicable to such Facility (such receivables, the "LTC Receivables" and such payables, the "LTC Retained Payables" as defined below). The LTC Plaintiffs shall retain ownership of LTC Receivables and full responsibility for the LTC Retained Payables, notwithstanding that the New Operators may be collecting such receivables on behalf of the LTC Plaintiffs, and the New Operators shall not pledge, assign, grant or permit any lien or encumbrance on, the LTC Receivables. All LTC Receivables collected by the New Operators shall be deemed held in trust for the benefit of the LTC Plaintiffs to be paid solely to the LTC Plaintiffs as provided in this Stipulation and Order of Settlement. The LTC Retained Payables shall include all obligations incurred at the Facilities prior to the Transition Date applicable to each Facility, pro-rated and accrued through such Transition Date, including

- 8 -

real estate taxes, provider taxes, personal property taxes, utilities, bed taxes, payroll and related payroll obligations, and employee benefits required by law pro-rated through the Transition Dates applicable to each Facility, but shall exclude any payables, rent, accruals, or obligations to THCI or its affiliates which are released by this Stipulation and Order of Settlement. Prior to the applicable Transition Date for each Facility, the LTC Plaintiffs shall deliver a closing statement setting forth the amounts of the LTC Retained Payables in such categories, pro rated and accrued through the Transition Date, and the LTC Plaintiffs (1) shall pay all real estate taxes, provider taxes, personal property taxes, utilities, and bed taxes in full as of the Transition Dates, (2) shall pay, on or prior to the applicable Transition Date, all reasonably estimated payroll and related payroll obligations through the Transition Date into escrow (the "Payroll Escrow"), (3) shall pay, on or prior to the Settlement Date, $400,000 into escrow (the "PTO Escrow") as an estimate of the amount necessary to satisfy any accrued employee benefits required by law through the Transition Date, which amount shall be finally determined for each Facility within forty-five (45) days after the applicable Transition Date, and the amount, as so determined, shall be released from the PTO Escrow to the New Operators, and (4) shall pay and/or transfer, as required by paragraph 3 of this Stipulation, all patient needs accounts, resident security deposits, advance payments, made by or on behalf of residents, and any other account or monies funded by residents and/or third parties for the direct benefit of the residents. The Payroll Escrow and the PTO Escrow shall be in a form substantially similar to the Escrow Agreement required in paragraph 4(a) of this Stipulation and shall be executed immediately following the execution of this Stipulation. The LTC Plaintiffs shall be responsible for payment of the LTC Retained Payables from their own resources, including the LTC Receivables, except that the LTC Plaintiffs may direct state authorities to offset certain receivables and direct applicable amounts

-9-

to the payment of provider taxes, and proof of such direction to the state authority, to the extent the receivable due from the state authority exceeds the outstanding provider taxes, shall be sufficient to evidence such payment.

(ii) During the period prior to Thirty (30) days after the Transition Date applicable to each Facility, no change will be made by the New Operators in the electronic funds or other method of payment to account designations or addressee designations of the Facilities utilized by Medicare, Medicaid and other payors of receivables for the Facilities. This will enable the LTC Plaintiffs to collect directly a significant component of the LTC Receivables existing on the Transition Date and to implement billing for receivables generated during the periods ending on the Transition Date. By the Settlement Date, the LTC Plaintiffs will execute and provide to counsel for the LTC Plaintiffs any necessary authorizations to enable the New Operators to change such electronic funds and other method of payment to account designations or addressee designations for the Facilities, and the New Operators may change such designations effective thirty (30) days after the Transition Date applicable to each Facility. Counsel for the LTC Plaintiffs shall provide the New Operators with such authorizations within twenty-five (25) days after the applicable Transition Date. After such account change is implemented, LTC Receivables will be paid, in the first instance, to such New Operators' accounts, and shall be deemed collected by the New Operators on behalf of the LTC Plaintiffs. Payment accounts and addresses for payors that pay in advance, such as social security, can be changed on the applicable Transition Date for a Facility.

(iii) Following the Transition Date, the New Operators shall use commercially reasonable efforts to collect the LTC Receivables on behalf of the LTC Plaintiffs, but neither THCI nor the New Operators shall have any obligation to commence legal proceedings, or to

- 10 -

incur expenses out of the ordinary course of business. The LTC Plaintiffs, and the New Operators, shall cooperate as to the collection of the LTC Receivables, and shall designate contact persons (Aurora Cassirer, Esq. on behalf of the LTC Plaintiffs and Michael Alpert c/o HealthBridge Management, LLC) and communicate regularly as to progress and status of collections. The LTC Plaintiffs may direct (with the participation of the New Operators) all communications, negotiations, and resolution of disputes as to the LTC Receivables, and the LTC Plaintiffs may, at their own expense, take over collection of any particular LTC Receivable and commence legal proceedings against the payor. The New Operators shall not waive, settle, or compromise any LTC Receivables in a manner which would result in an aggregate reduction of more than $25,000 in any calendar month without the consent of the LTC Plaintiffs.

(iv) The New Operators shall deliver to the LTC Plaintiffs all remittance advices received with respect to the LTC Receivables on a weekly basis on the following Wednesday of each week. The amount of all LTC Receivables collected by the New Operators shall be paid to the LTC Plaintiffs or their designee, by wire transfer or ACH to an account designated by the LTC Plaintiffs on a weekly basis on the following Wednesday of each week. There shall be no offsets against payment of the LTC Receivables collected by the New Operators except if and to the extent that the LTC Plaintiffs have failed to satisfy or defaulted under their financial obligations under paragraphs 4(a), 4(b)(i)(1), (2), (3), & (4), and 9(a) of this Stipulation. The New Operators shall provide such other reports and information, as to the collection of LTC Receivables by the New Operators, in sufficient detail in a format to be reasonably approved by the LTC Plaintiffs. The LTC Plaintiffs shall have the right, by appointment and during reasonable business hours, at their own expense, to review and audit the collection by the New Operators of the LTC Receivables and all Business Records relating thereto. The LTC Plaintiffs

- 11 -

may retain copies of, all Business Records relating to the LTC Receivables and LTC Retained Payables of the Facilities to facilitate the collection and payment thereof and the New Operators shall provide the LTC Plaintiffs with copies of all relevant Business Records which may be generated after the Transition Date.

(v) At the request of the LTC Plaintiffs, an audit of the collection of LTC Receivables by the New Operators shall be conducted after the completion of each the first four calendar quarters after the final Transition Date (each, a "Quarterly Audit Date") for all Facilities, by an independent accounting firm mutually approved by the LTC Plaintiffs and the New Operators (each, "Quarterly Audit"). The cost of each Quarterly Audit shall be borne by the LTC Plaintiffs, and each Quarterly Audit shall be distributed simultaneously to the LTC Plaintiffs and the New Operators. The amount of LTC Receivables so collected by the New Operators as determined by each Quarterly Audit, after comments to such Quarterly Audit (if any) are submitted by the LTC Plaintiffs and the New Operators within five (5) business days of receipt of each Quarterly Audit and considered by the accounting firm, shall be utilized as the definitive amount of LTC Receivables collected, through the applicable Quarterly Audit Date, to be paid to the LTC Plaintiffs. If the Quarterly Audit has determined that there were additional collections of LTC Receivables by the New Operators through the applicable Quarterly Audit Date, such excess collections shall be paid by New Operators to the LTC Plaintiffs within ten (10) business days of delivery of the Quarterly Audit. Following each Quarterly Audit Date, the New Operators will continue to collect LTC Receivables (if any) on behalf of the LTC Plaintiffs and deliver payment thereof to the LTC Plaintiffs pursuant to the procedures set forth in this paragraph 4. Notwithstanding the foregoing, the New Operators shall have no obligation to

- 12 -

make any effort to collect LTC Receivables after the expiration of two (2) years from the applicable Transition Date for a Facility.

(c)     The New Operators shall retain ownership of all accounts receivable generated by services rendered at each Facility after the applicable Transition Date ("New Operator Receivables") and the New Operators shall retain responsibility for payment of all accounts payable incurred or accrued at each Facility after the applicable Transition Date ("New Operator Payables"). In the event that any of the LTC Plaintiffs receive payments of New Operator Receivables, the LTC Plaintiffs shall remit such payments to the applicable New Operators without offset, and in connection with such obligation, all of the provisions of paragraph 4(b) of this Stipulation and Settlement, to the extent relevant to the LTC Plaintiffs' obligation, shall apply reciprocally to the collection and payment of the New Operator Receivables.

5.     The provisions of paragraph 2 and 4, above, are for the sole purpose of facilitating the orderly transition of the Facilities' operations, and neither THCI nor the New Operators shall assume, and nothing in this Stipulation and Order shall be construed as an assumption of, any liabilities whatsoever, accrued or contingent, relating to the Facilities up to and including the Transition Date, and the LTC Plaintiffs shall not be responsible for any liabilities incurred by THCI or the New Operators at the Facilities after the Transition Date. Neither THCI nor the New Operators assume or agree to be bound by any contract, instrument, or agreement relating to the Facilities, except as the New Operators may, at their sole option and in their sole discretion, elect by writing signed duly by the New Operators and identifying the contract, instrument, or agreement which the New Operators elect to assume.

NEWYORK01 1140534v7 038796-000003

6.    The New Operators may, to the extent permitted by applicable law, use the same provider number(s) and provider agreement(s) at the Facilities as used by the LTC Plaintiffs, and prior to each Transition Date, the LTC Plaintiffs shall cooperate with and promptly execute any documents necessary to the assignment of such provider number(s) and provider agreement(s). Subsequent to the Transition Date, the LTC Plaintiffs shall be responsible for filing terminating Medicaid and Medicare cost reports (the "Terminating Cost Reports") for the Facilities within the time required and in accordance with all applicable laws and regulations relating to the preparation of such Terminating Cost Reports. The LTC Plaintiffs shall provide all Terminating Cost Reports to the applicable New Operator for review and reasonable approval prior to submitting such Terminating Cost Reports. The LTC Plaintiffs and the New Operators shall cooperate in obtaining and sharing information that may be required for the preparation of Terminating Cost Reports.

7.    The New Operators shall have the right, but not the obligation, to offer to hire or employ any and all employees employed at the Facilities upon such terms and conditions as the New Operators may deem appropriate in their sole discretion. The LTC Plaintiffs shall not enforce any non-competes or restrictive covenants that may apply to any employees or independent contractors employed at the Facilities in the event the New Operators seek to hire such employees or independent contractors effective on or subsequent to the Transition Date, and the LTC Plaintiffs further agree not to solicit the employment of or hire any such employees or independent contractors at the Facilities pending the Transition and for a period of eighteen (18) months after the Transition Date unless such employment has been terminated for a period of not less than sixty (60) days or unless such employees or independent contractors are not offered employment by the New Operators.

- 14 -

8.     THCI shall cooperate with the LTC Plaintiffs, and make available to the LTC Plaintiffs all relevant information and documentation in the possession of THCI or its affiliates, in connection with the property component of a Medicaid audit of the Facility located at 11941 Belsay Road, Grand Blanc, Michigan on or before the Settlement Date.  Any out-of-pocket expenses incurred by THCI in connection with such cooperation (other than nominal expenses) will be reimbursed by LTC Plaintiffs.

9.(a)(i) On September 30, 2006, the LTC Plaintiffs shall place into escrow with the escrow agent under the Escrow Agreement the sum of $700,000 (the "Recoupment Escrow") to be held in escrow for a maximum period of two (2) years from the Settlement Date ("Recoupment Escrow Period") for the sole purpose of satisfying any retroactive recoupment, assessment or adjustment claims made by Medicare or Medicaid authorities or insurance or managed care providers after the Transition Date with respect to operation of a Facility by the LTC Plaintiffs up to the Transition Date applicable to such Facility ("Recoupment Claim"), in accordance with the terms and conditions of this Section 9.  The Recoupment Escrow shall be in a form substantially similar to the Escrow Agreement required in paragraph 4(a) of this Stipulation and shall be executed immediately following the execution of this Stipulation.  In the event a Recoupment Claim is received by any of the New Operators from any Medicaid or Medicare authority or insurance or managed care provider, the New Operators shall promptly notify the LTC Plaintiff, who shall direct (in consultation with and with the cooperation of the New Operators) all communications, negotiations, appeals, and resolution of disputes as to the Recoupment Claims, and the LTC Plaintiffs may, at their own expense, initiate appeals, litigations and arbitrations of any Recoupment Claim disputes.  The New Operators shall not consent to, waive, settle, or compromise any Recoupment Claim without the consent of the LTC

- 15 -

Plaintiffs and the LTC Plaintiffs shall not take any action in respect of a Recoupment Claim which shall affect any payment to the New Operators for services rendered after the Transition Date. If there is a Recoupment Claim which is an actual assessment under which payment is demanded from the New Operators by the Medicare or Medicaid authority or insurance or managed care provider (or for which such authority or provider offsets or deduct such claim from receivables otherwise payable to the New Operators) then the New Operators and the LTC Plaintiffs shall each be entitled to require a release from the Recoupment Escrow of the amount of such required payment, under the procedures provided in the Escrow Agreement, solely for the purpose of making such payment to the Medicare or Medicaid authority or insurance or managed care provider, or, if such claim has been offset or deducted from receivables otherwise payable to the New Operators, to reimburse the New Operators. Upon expiration of the Recoupment Escrow Period, all remaining funds in the Recoupment Escrow, other than as reserved for pending claims and other than any amounts contributed by the New Operators, shall be released to the LTC Plaintiffs. The Recoupment Escrow shall be an interest bearing escrow in bank or investment accounts identified to and approved by the LTC Plaintiffs and the LTC Plaintiffs shall direct the investment of such escrow funds. All interest or investment income earned on the Recoupment Escrow shall be retained in escrow and available to satisfy the obligations covered thereby pending the release of the Recoupment Escrow to the LTC Plaintiffs. If, within two (2) years of the Settlement Date, the LTC Plaintiffs receive reimbursement as a result of their dispute or appeal of any Recoupment Claim from a Medicare or Medicaid authority or an insurance or managed care provider, the LTC Plaintiffs shall use the proceeds from such reimbursement to fund the Recoupment Escrow to the extent the Recoupment Escrow is below the sum of $700,000. If, after the expiration of two (2) years from the Settlement Date,

- 16 -

any claim or claims are pending, all reimbursement that may be received by the LTC Plaintiffs from a Medicare or Medicaid authority or an insurance or managed care provider as a result of their dispute or appeal of any prior Recoupment Claim shall first be used to fund the Recoupment Escrow to the extent of any claims then pending.

9.(a)(ii) In the event that, after the release to the New Operators of the final amount of PTO Escrow as provided in paragraph 4(b)(ii), a balance remains in the PTO Escrow, then such amount shall be transferred to the Recoupment Escrow.

(b) In the event that there is a Recoupment Claim such that the New Operators are compelled to make payment to Medicaid or Medicare authorities or insurance or managed care providers, or such authority or provider has offset or deducted such claim from receivables otherwise payable to the New Operators, and there are insufficient funds to make such payment from the Recoupment Escrow and/or the Recoupment Escrow period has expired, and such Recoupment Claim is not otherwise paid, satisfied or reimbursed to the New Operators separately by the LTC Plaintiffs, there shall exist a "Recoupment Deficiency". In that event, LTC will be responsible for 50% of the difference between the Recoupment Escrow ($700,000) as supplemented by any transfer from the PTO Escrow, and the sum of $1 million. LTC, pursuant to its Guaranty, shall be responsible for 100% of Recoupment Deficiencies above that sum. By way of illustrations, in the event the Recoupment Escrow had a balance of $700,000 and the New Operators assert a recoupment claim in the amount of $1,000,000, the Recoupment Deficiency would be $300,000, of which the New Operators would be entitled to recover $150,000 from LTC; and, in the event the Recoupment Escrow has a balance of $800,000 (including $100,000 from the PTO Escrow), the Recoupment Deficiency would be $200,000 of which the New Operators would be entitled to recover $100,000 from LTC.

- 17 -

LTC does hereby guaranty to THCI for a period of ten (10) years from the Settlement Date, payment in full of any Recoupment Deficiency as set forth above. Any claim by THCI under such guaranty must be submitted in writing, specifying the circumstances thereof in reasonable detail, prior to the expiration of ten (10) years from the Settlement Date ("Guaranty Claim"). The New Operators will cooperate with LTC with providing documentation relating to the Recoupment Claims or reimbursement efforts. Simultaneous with the execution and delivery of this Agreement, LTC shall execute a Consent Judgment in favor of THCI solely with respect to its failure to pay a Guaranty Claim under such guaranty. Such Consent Judgment shall be retained by counsel for THCI and shall not be released, filed or enforced in any manner unless and until at least fifteen (15) days (within the first two (2) years after the Settlement Date) or thirty (30) days (thereafter) have elapsed following the delivery of a notice of Guaranty Claim as set forth above and LTC has failed to pay such Guaranty Claim or the underlying Recoupment Deficiency. Written notice of a Guaranty Claim and identifying the basis therefore shall be provided to LTC c/o Troutman Sanders, LLC, 405 Lexington Avenue, New York, New York 10171, Attn: Aurora Cassirer, Esq. (aurora.cassirer@troutmansanders.com) by facsimile (212-704-6288), electronic mail, overnight mail (providing proof of delivery), or hand delivery. Upon the expiration of ten (10) years from the Settlement Date, the Consent Judgment automatically shall be released to LTC and shall be void and of no further force or effect.

　　　　10.　　THCI shall cause the New Operators to carry out the obligations they have undertaken in favor of the LTC Plaintiffs in this Stipulation and Order and THCI shall not act inconsistently with such obligations of the New Operators. Notwithstanding the foregoing obligations of THCI to the LTC Plaintiffs, nothing in this Stipulation and Order shall be construed as creating any obligation of THCI to any third party for the obligations of the New

- 18 -

Operators or for the operation of the Facilities, it being understood that the New Operators, and not THCI, shall become the licensed operators of the Facilities.

11.    The LTC Plaintiffs, LTC, and Briarwood, jointly and severally, on the one hand, and THCI, on the other, hereby release each other from any and all claims of any nature whatsoever, excepting only claims arising out of or under this Stipulation, including the LTC Plaintiffs' ongoing obligation to operate the Facilities in the ordinary course of business and consistent with past practice until the Transition Date. Without limiting the foregoing release, the LTC Plaintiffs and LTC are expressly released from all rent relating to the Facilities, and none shall be accrued, due or owing for the period from the date hereof to the Transition Date.

12.    Except as to any security interest that the LTC Plaintiffs, LTC, and Briarwood shall terminate prior to the Settlement Date, the LTC Plaintiffs, LTC, and/or Briarwood warrant and represent that they have not provided a security interest to any vendor or other third party, including Pharmerica, relating to the Facilities except with respect to receivables that are due and owing to the LTC Plaintiffs for services provided prior to the Transition Date.

13.    Notwithstanding anything in this Stipulation to the contrary, the New Operators may, at their sole discretion, provide notice to the LTC Plaintiffs that such New Operators seek to take possession of any Facility or Facilities prior to receiving the necessary licenses and permits for such Facility or Facilities, and the LTC Plaintiffs agree to permit and cooperate with such transfer and convey management responsibilities (and execute a customary management agreement) for any such Facilities to the applicable New Operator or the New Operator's designee upon reasonable notice and effective at month's end provided that the appropriate New Operators take possession of the Cliff Manor and Briarcliff Facilities. The date

- 19 -

on which a Facility is transferred and management responsibilities are conveyed shall be deemed the Transition Date as defined in this Stipulation.

14. The captioned action, together with all claims and counterclaims asserted therein, shall be dismissed, with prejudice and without costs to any party, upon the payment of the Initial Payment, payment of the Final Payment into escrow in accordance with the Escrow Agreement, and funding of the Recoupment Escrow and the PTO Escrow. The Court shall retain jurisdiction to enforce this Stipulation and Order, including for the purpose of entering the Consent Judgment provided for pursuant to paragraph 9 of this Stipulation.

15. In the event that a material portion of the Settlement Payment is set aside as a preference pursuant to the United States Bankruptcy Code or is otherwise disgorged from THCI in legal proceedings that involve the LTC Plaintiffs or Briarwood, then the release provided herein shall be deemed null and void.

16. The parties hereto acknowledge and agree that each party and its counsel have participated in the drafting, negotiation and review of this Stipulation and Order on an equal basis and accordingly, none of the provisions hereof shall be construed as against the draftsman thereof, notwithstanding that one or more parties' counsel has for convenience, prepared or processed the physical documents.

17. Notice required from the LTC Plaintiffs, LTC, or Briarwood under this Stipulation shall be provided in writing by hand delivery, overnight mail (with proof of delivery) or facsimile addressed as follows: THCI, 173 Bridge Plaza North, Fort Lee, New Jersey 07024, Attention: Warren Cole with copy to David Sager, Pitney Hardin LLP, 200 Campus Drive, Florham Park, New Jersey 07932.; and the New Operators, Executive Vice President, Healthbridge Management LLC, 173 Bridge Plaza North, Fort Lee, New Jersey 07024, with

NEWYORK01 1140534v7 038796-000003

copy to General Counsel, Healthbridge Management LLC, 173 Bridge Plaza North, Fort Lee, New Jersey 07024.

18.    Notice required to be given to the LTC Plaintiffs, LTC, or Briarwood shall be given to Aurora Cassirer, Esq, Troutman Sanders, LLP, 405 Lexington Avenue, New York, New York 10175.

19.    The parties acknowledge that this Stipulation is not an admission of liability and shall not be treated as an admission of liability by any party.

20.    This Stipulation is not effective until signed by counsel for the parties and delivered to the attorneys for the other side.

NEWYORK01 1140534v7 038796-000003

Dated: September 25, 2006

DUANE MORRIS LLP

_____

Michael Lastowski (No. 3892)
Christopher M. Winter (No. 4163)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Tel.: (302) 657-4900
Fax: (302) 657-4901


-and-

RICHARDS, LAYTON & FINGER

_____

Daniel A. Dreisbach (No. 2732)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701


-and-

TROUTMAN SANDERS LLP

_____

Aurora Cassirer
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 704-6000
Fax: (212) 704-6288


Attorneys for Plaintiffs and
Additional Counterclaim Defendant


CONNOLLY BOVE LODGE & HUTZ LLP

_____

Collins J. Seitz, Jr. (No. 2237)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Tel.: (302) 888-6278
Fax: (302) 255-4278


-and-

PITNEY HARDIN LLP

_____

David S. Sager
P.O. Box 1945
Morristown, New Jersey 07962
Tel: (973) 966-8121
Fax: (973) 966-1550


Attorneys for Defendant



SO ORDERED this ____ day of _____, 2006.


_____
Hon. Gregory M. Sleet, U.S.D.J.

- 22 -

Dated:  September 25, 2006

**DUANE MORRIS LLP**

_____
Michael Lastowski (No. 3892)
Christopher M. Winter (No. 4163)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Tel.:  (302) 657-4900
Fax:  (302) 657-4901


-and-

**RICHARDS, LAYTON & FINGER**

_____
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel:  (302) 651-7700
Fax:  (302) 651-7701

-and-

**TROUTMAN SANDERS LLP**

_____
Aurora Cassirer
The Chrysler Building
405 Lexington Avenue
New York, NY  10174
Tel:  (212) 704-6000
Fax:  (212) 704-6288

Attorneys for Plaintiffs and
Additional Counterclaim Defendant

**CONNOLLY BOVE LODGE & HUTZ LLP**

_____
Collins J. Seitz, Jr. (No. 2237)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Tel.:  (302) 888-6278
Fax:  (302) 255-4278


-and-

**PITNEY HARDIN LLP**

_____
David S. Sager
P.O. Box 1945
Morristown, New Jersey  07962
Tel:  (973) 966-8121
Fax:  (973) 966-1550

Attorneys for Defendant


```
            FILED

          SEP 2 8 2006

        U.S. DISTRICT COURT
       DISTRICT OF DELAWARE
```

SO ORDERED this ____ day of _____, 2006.

_____
Hon. Gregory M. Sleet, U.S.D.J.

- 22 -

## EXHIBIT B

[wire instructions]

**Wiring Instructions**
**Wolff & Samson PC**
**Attorney Trust Account**
**IOLTA**

**Bank Information**:

North Fork Bank
366 Route 10 West
East Hanover, NJ 07936
ABA #021407912

**For Credit To:**

Wolff & Samson PC Attorney Trust Account
One Boland Drive
West Orange, NJ 07052
Account #4344001583

3

# EXHIBIT B

Closing Statement
5/30/2006 @ 03/16/07

| | Grand Blanc | Elm Creek | Spring Creek | Elmbreth | Presque Isle | Greater Edgbreath | Laurelton | Cliffsview | Somerset Valley | Total | Paid and Assumed by Healthbridge |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Needs Account-subject to reconciliation | 3,195 | 16,283 | 13,525 | 2,284 | 5,472 | 13,756 | 58,274 | 16,883 | 5,510 | 137,182 | |
| (PNA Transferred from prior owner accounts) | (3,195) | (18,283) | (13,525) | (2,284) | (5,472) | (13,756) | (58,274) | (16,883) | (5,510) | (137,182) | |
| Security Deposits | | | | | | | | | | 0 | |
| Advance Payments | | 1,779 | 5,250 | | 1,202 | 38,351 | | 30,563 | 7,930 | 52,793 | 4,260 |
| Other Resident Monies | | | | | | | | | 6,658 | 8,437 | 8,437 |
| Real Estate Taxes + Pre Prop Taxes | 373,150 | 100,727 | 100,467 | 61,445 | 205,256 | 337,850 | 242,308 | 64,231 | 125,703 | 1,611,079 | 1,611,079 |
| Personal Property Taxes | | | | | | | | | | 0 | |
| Current & Prior Periods Provider and Bed Taxes | 518,140 | 692,416 | 596,140 | 309,791 | 563,848 | 348,539 | 43,669 | 0 | 35,708 | 3,108,281 | 0 |
| (Provider and Bed Taxes paid) | | | | | | | | | | 0 | |
| Utilities/Payables (+see below) | 20,461 | 24,043 | 18,531 | 13,045 | 18,713 | 25,621 | 144,785 | 30,553 | 20,884 | 325,647 | 100,593 |
| Estimated Payroll and Payroll Obligations | 237,418 | 98,345 | 94,484 | 39,732 | 307,752 | 206,974 | 239,706 | 114,073 | 176,240 | 1,604,725 | |
| (Pre 101 payrolls paid) | (237,418) | (98,345) | (94,484) | (39,732) | (207,752) | (206,974) | (239,706) | (114,073) | (176,240) | (1,604,725) | |
| Signing and Referral Bonuses, incl. tax | 10,720 | | 236 | 9,896 | 451 | 3,299 | 103,400 | 3,972 | 10,005 | 137,410 | 26,000 |
| Retro Pay | 18,898 | | | | | | 1,364 | | 139 | 25,061 | |
| (Retro payments made) | (18,898) | | | | | | | | | (18,898) | |
| Other Payments | 5,527 | | | | | | 14,385 | | | 19,912 | 19,912 |
| OH-Workers Comp | | 13,059 | 90,371 | 2,284 | | | | | | 105,724 | 105,724 |
| PTO | | | | | | | | | | 0 | |
| Earned | 149,521 | 53,306 | 54,297 | 35,029 | 73,384 | 204,874 | 96,802 | 58,630 | 57,479 | 782,871 | 376,616 |
| Unearned | | | | | | | | | | 0 | |
| Extended Illness | 5,088 | 19,308 | 11,411 | 9,338 | 51,457 | 57,436 | 25,553 | 73,783 | 72,835 | 337,098 | 3,746 |
| Total PTO | 154,628 | 72,705 | 65,707 | 44,367 | 124,841 | 262,310 | 122,425 | 132,413 | 130,314 | 1,119,969 | 380,362 |
| Total Payments | | | | | | | | | | 6,495,416 | 2,257,057 |

Cash Received for per 101/106 service dates:

| | Grand Blanc | Elm Creek | Spring Creek | Elmbreth | Presque Isle | Greater Edgbreath | Laurelton | Cliffsview | Somerset Valley | Total | Paid and Assumed by Healthbridge |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/2-10/6 | (15,936) | (26,125) | (43,392) | (12) | 0 | (82,851) | (21,747) | (270) | (32,372) | (222,699) | (222,699) |
| 10/9-10/13 | (16,050) | (8,852) | (44,936) | (8,018) | (42,189) | (7,355) | (10,386) | (38,061) | (37,081) | (263,910) | (263,910) |
| 10/16-10/20 | (16,066) | (28,848) | (6,186) | (187) | (14,935) | (90,864) | (510) | (15,973) | (20,978) | (203,077) | (203,077) |
| 10/23-10/27 | (13,566) | (17,200) | (11,147) | 0 | (21,464) | (306) | (110,584) | (20,680) | (20,050) | (216,127) | (216,127) |
| 10/30-11/3 | (10,075) | (10,463) | (17,359) | (356) | (6,224) | (15,157) | (39,724) | (20) | (11,450) | (109,847) | (109,847) |
| 11/6/11/10 | (317) | | (5,394) | (7,131) | (56) | (13,865) | (28,070) | | (3,136) | (57,969) | (57,969) |
| 11/13-11/17 | (11,267) | (15,147) | (200) | (75) | (2,377) | (6,983) | (200) | (15,269) | (1,741) | (56,279) | (56,279) |
| 11/20-11/24 | (49) | (2,356) | (1,925) | (60) | (2,793) | (25,165) | (99) | | (3,705) | (36,165) | (36,165) |
| 11/27-12/1 | (9,419) | (648) | (200) | 0 | (94) | (3,051) | (3,572) | (3,125) | (813) | (21,492) | (21,492) |
| 12/4-12/08 | (2,597) | (89) | (2,760) | (10) | (10) | (1,462) | (16,862) | (4,504) | (1,424) | (31,700) | (31,700) |
| 12/11-12/15 | 0 | | (6,519) | (1,180) | | (509) | | (17,517) | (4,662) | (32,527) | (32,527) |
| 12/18-12/22 | 0 | (5,215) | (7,826) | 0 | | 0 | | (4,710) | (4,214) | (21,955) | (21,955) |
| 12/25-12/29 | (165) | (1,453) | (1,576) | (89) | (150) | (20,208) | | (110) | (616) | (37,397) | (37,397) |
| 01/01-01/05 | (714) | (1,608) | (485) | 0 | 0 | | | | (727) | (3,529) | (3,529) |
| 01/08-01/12 | (1,492) | (2,523) | (2,645) | 0 | (3,854) | (3,081) | (688) | (147,740) | (10,318) | (172,453) | (172,453) |
| 01/15-01/19 | (253) | (334) | 0 | (49) | (258) | (200) | | 0 | (3,000) | (4,045) | (4,045) |
| 01/22-01/26 | (35,915) | | (1,451) | | (3,084) | (4,820) | (6,181) | | (1,160) | (52,559) | (52,559) |
| 01/29-02/02 | | | (3,570) | | (216) | | (2,217) | | (5,574) | (11,526) | (11,526) |
| 02/05-02/09 | (3,094) | | (730) | | (3,577) | | | (3,570) | (3,173) | (14,144) | (14,144) |
| 02/12-02/16 | (137) | | | | | | | (40) | (2,580) | (2,760) | (2,760) |
| 02/19-02/23 | | (11,574) | | | | (319) | | (3,828) | (1,979) | (17,291) | (17,291) |
| 02/26-03/02 | | | | | | | | (92) | (1,686) | (2,077) | (2,077) |
| 03/05-03/09 | | | | | | | | | (10) | (519) | (519) |
| 03/12-03/16 | | (783) | (480) | (1,500) | | (928) | (29,520) | | | (32,731) | (32,731) |
| Total | (137,070) | (134,620) | (160,807) | (18,644) | (101,282) | (330,092) | (271,860) | (255,335) | (265,169) | (1,624,902) | (1,624,902) |
| Total Amount | 935,037 | 780,869 | 715,936 | 412,279 | 821,724 | 648,769 | 448,948 | (34,158) | 141,172 | 4,870,514 | 632,155 |

1.0995 tax on payroll items

Elm Creek-$1,500 of signing/referral bonuses paid in
HealthBridge Management's 1st payroll.
OH-Workers Comp SC includes $40,331 of 2005 underreported premiums
Advance Payments-LR       Refund due resident-4,260
Other Resident Monies-SV   DOHSS complaint-refund due to resident.
Other Resident Monies-EC   Complaint to Attny Genl Counsumer Protection Section
Other Payments-Laurelton   Consolidated Billings-$4,493 and 2006 Business License-$9,892
Other Payments-Grand Blanc CMS Civil Monsr Penalty Case # 200745-LTC-193-S1,755 and employee expense reports-$3,772
                           100,593

Note additional column (F) on Utilities_Payables tab-amounts paid by HealthBridge due to shutoff/disconnect notices

# EXHIBIT C

## IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI, AT KANSAS CITY

ENDURACARE THERAPY
MANAGEMENT, INC.,
2950 South Rainbow Boulevard, Suite 220
Las Vegas, Nevada  89146,

        Plaintiff,

  vs.

INTEGRATED HEALTH SERVICES OF
CLIFF MANOR, INC., d/b/a Alpine North
Nursing and Rehabilitation Center, n/k/a
Cliffview at Riverside Rehabilitation and
Nursing Center
4700 NW Cliff View Drive
Kansas City, Missouri 64150

    SERVE:  IHS Payables
            C/O Mr. Menton
            1680 Michigan Ave., Ste. 736
            Miami Beach, Florida 33140

    SERVE:  National Corporate Research,
            Ltd.
            Statutory Agent
            222 East Dunklin, Suite 102
            Jefferson City, MO 65101

And

4700 NW CLIFF VIEW DRIVE
OPERATING COMPANY, LLC, d/b/a
Cliffview at Riverside Rehabilitation and
Nursing Center, f/k/a/ Alpine North
Nursing and Rehabilitation Center
4700 NW Cliff View Drive
Kansas City, Missouri 64150

And

CASE NO.  0716-CV01599

DIVISION  13

**JURY DEMAND ENDORSED HEREON**

LYNN M. CARROLL
Cliffview at Riverside Rehabilitation and
Nursing Center, f/k/a/ Alpine North
Nursing and Rehabilitation Center
4700 NW Cliff View Drive
Kansas City, Missouri 64150

Defendants.

## PETITION (CA)

Now comes Plaintiff EnduraCare Therapy Management, Inc. ("Plaintiff EnduraCare") and states for its Petition against Defendant Integrated Health Services of Cliff Manor, Inc., d/b/a Alpine North Nursing and Rehabilitation Center ("Defendant IHS"), Defendant 4700 NW Cliff View Drive Operating Company, LLC, d/b/a Cliffview at Riverside Rehabilitation and Nursing Center, f/k/a/ Alpine North Nursing and Rehabilitation Center ("Defendant 4700"), and Defendant Lynn M. Carroll ("Defendant Carroll") (collectively "Defendants") as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff EnduraCare is a Delaware corporation having its principal place of business at 2950 South Rainbow Boulevard, Suite 220, Las Vegas, Nevada 89146. Plaintiff EnduraCare is in the business of providing physical, occupational, and speech therapy services to residents residing in nursing homes owned or operated as licensed long term care and skilled nursing facilities under the requirements of the State of Missouri Department of Health Senior Services and the federal Medicare program, also known as "Title XVIII" by reference to Title XVIII of the Social Security Act (42 U.S.C. §1395 *et seq.*). In addition to the professional therapy services described above, Plaintiff EnduraCare provides ancillary services and products to the long term care facilities where it is providing professional therapy services, including rental equipment and supplies necessary to support wound care and advanced therapy modalities

Hereinafter, all such professional therapy services, rental equipment, and products are referred to as the "Services."

2.    Defendant IHS is a Missouri corporation having its principal place of business at 4700 NW Cliff View Drive, Kansas City, Missouri 64150 and is, or was, the owner and/or operator of a nursing facility that provides skilled nursing, respite, and rehabilitation services to its residents. The facility, Alpine North Nursing and Rehabilitation Center, which is now known as Cliffview at Riverside Rehabilitation and Nursing Center, (the "Alpine North Facility"), is located at 4700 NW Cliff View Drive, Kansas City, Missouri 64150.

3.    Defendant 4700 is a Missouri corporation having its principal place of business at 4700 NW Cliff View Drive, Kansas City, Missouri 64150 and is, or was, the owner and/or operator of the Alpine North Facility that provides skilled nursing, respite, and rehabilitation services to its residents, and is located at 4700 Cliff View Drive, Kansas City, Missouri 64150.

4.    Defendant Carroll is an individual, and based upon information and belief, is a citizen and/or resident of the State of Missouri, whose current business address is known to be at 4700 NW Cliff View Drive, Kansas City, Missouri 64150, and whose principal place of residence is in the State of Missouri. Upon information and belief, Defendant Carroll was the administrator of the Alpine North Facility, and is now the administrator of the Cliffview at Riverside Rehabilitation and Nursing Center, which was formerly known as the Alpine North Facility.

5.    Upon information and belief, Defendant 4700 became, and now is, the successor-in-interest to Defendant IHS, and is, the owner and/or operator of the Alpine North Facility, n/k/a Cliffview at Riverside Rehabilitation and Nursing Center, which is located at 4700 Cliff View Drive, Kansas City, Missouri 64150.

6.   The Court possesses jurisdiction over the subject matter of this action because this action is between corporations and individuals, and citizens and/or residents, of different states and/or different counties, all of whom are involved in the same controversy based upon the same set of facts and legal issues that occurred within Jackson County, Missouri, and which involves an amount in controversy of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), exclusive of interests and costs.

7.   The Court possesses jurisdiction over the person of Defendant IHS, which is a Missouri corporation and/or entity that is conducting business in the State of Missouri, and because it is, or was, the owner and/or operator of the Alpine North Facility, and is, or was, a Missouri citizen and/or resident.

8.   The Court possess jurisdiction over the person of Defendant 4700, which is a Missouri corporation and/or entity that is conducting business in the State of Missouri, and because it is, or was, the owner and/or operator of the Alpine North Facility, and is, or was, a Missouri citizen and/or resident.

9.   The Court possess jurisdiction over the person of Defendant Carroll because she is a citizen and/or resident of the State of Missouri, and was conducting business in the State of Missouri in her personal capacity and/or as the agent and/or representative of, and on behalf of, the owner and/or operator of the Alpine North Facility.

10   Venue in this Court is appropriate pursuant to Mo. Rev. Stat. § 508.010 *et seq.* because the Circuit Court for Jackson County, Missouri, at Kansas City is the judicial district where one or more of the Defendants reside and/or where a substantial part of the events or omissions giving rise to the claims occurred

## FACTS COMMON TO ALL COUNTS

11    On or about July 17, 2006, Plaintiff EnduraCare entered into a written Therapy Services Agreement (the "Agreement") with Defendants. In particular, Defendant Carroll signed the Agreement on behalf of an unincorporated business association, Alpine North Rehabilitation and Nursing Center, and/or on behalf of an undisclosed principal. Pursuant to the Agreement, Plaintiff EnduraCare was to provide the Services to the Alpine North Facility. A true and accurate copy of the Agreement is attached hereto as **EXHIBIT A**.

12    Pursuant to the Agreement, Defendants were to pay Plaintiff EnduraCare for the Services no later than thirty (30) days after being invoiced by Plaintiff EnduraCare. Defendants also agreed to pay the attorneys' fees incurred by Plaintiff EnduraCare in litigating any action to enforce the terms of the Agreement if Plaintiff EnduraCare were to prevail in such litigation.

13.   Beginning on or about July 17, 2006, Plaintiff EnduraCare began providing the Services to the Alpine North Facility's residents

14.   At the time that Plaintiff EnduraCare began to provide the Services to the Alpine North Facility's residents, the Alpine North Facility was owned and/or operated by Defendant IHS.

15.   Based upon information and/or belief, beginning on or about October 1, 2006, Defendant 4700 became the new owner and/or operator of the Alpine North Facility.

16.   Defendant 4700 is listed as the Operator of the Alpine North Facility by the State of Missouri Department of Health and Senior Services.

17.   Plaintiff EnduraCare continued to provide Services to the Alpine North Facility through and inclusive of any change in ownership and/or operator status between and/or among

the Defendants, inclusive of the time period at which time Plaintiff EnduraCare ceased providing Services to the Alpine North Facility, which was on or about October 31, 2006.

18.    Plaintiff EnduraCare invoiced Defendants on a monthly basis for the Services provided to the Alpine North Facility's residents.

19.    Defendants obtained payment from Medicare or other third-party payor sources for the Services.

20.    However, Defendants failed to pay Plaintiff EnduraCare for the Services in full.

21.    As a result, Plaintiff EnduraCare determined that Defendants did not satisfy Plaintiff EnduraCare's credit requirements.

22.    Accordingly, Plaintiff EnduraCare ceased providing the Services to the Alpine North Facility's residents on or about October 31, 2006.

23.    As of the date of filing this Petition, Defendants owe Plaintiff EnduraCare the amount of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), plus pre-judgment interest and costs for the provision of the Services.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

24    Plaintiff EnduraCare incorporates herein by reference each and every allegation set forth above.

25.    Plaintiff EnduraCare and Defendants entered into the Agreement, a valid and binding contract, whereby Plaintiff EnduraCare agreed to provide the Services to the Alpine North Facility's residents in exchange for payment.

26.    Plaintiff EnduraCare performed all of its obligations under the Agreement, and all conditions precedent to Plaintiff EnduraCare's recovery of the amounts due have occurred.

27.    Defendants have breached the Agreement by failing to pay the amount due under the Agreement.

28.    Defendants' breach of the Agreement has caused injury to Plaintiff EnduraCare in the amount of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25).

29.    Plaintiff EnduraCare is entitled to recover from Defendants the sum of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), plus pre-judgment interest, post-judgment interest, attorneys' fees, and costs.

## SECOND CLAIM FOR RELIEF
### (Account)

30.    Plaintiff EnduraCare incorporates herein by reference each and every allegation set forth above.

31.    Defendants owe Plaintiff EnduraCare the sum of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), plus pre-judgment interest and costs for the provision of the Services from July 17, 2006, on an open account, for the Services furnished to the Alpine North Facility's residents at Defendants' request. A true and correct copy of the account is attached hereto as **EXHIBIT B**.

32.    Plaintiff EnduraCare is entitled to recover from Defendants the sum of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), plus pre-judgment interest, post-judgment interest, attorneys' fees, and costs.

## THIRD CLAIM FOR RELIEF
### (Quantum Meruit)

33.    Plaintiff EnduraCare incorporates herein by reference each and every allegation set forth above.

34.   Beginning on or about July 17, 2006, and continuing through on or about July 14, 2006, Plaintiff EnduraCare provided the Services to the Alpine North Facility's residents at Defendants' request

35   The Services benefited Defendants in that Plaintiff EnduraCare's performance of the Services permitted Defendants to satisfy their own contractual, licensing, and regulatory obligations to the Alpine North Facility's residents.

36.   Defendants promised to pay Plaintiff EnduraCare for the Services provided to the Alpine North Facility's residents.

37.   Defendants have not paid Plaintiff EnduraCare in full for the Services provided to the Alpine North Facility's residents

38.   Defendants have been reimbursed by Medicare or other third-party payor sources for the Services, but have refused to pay such amounts to Plaintiff EnduraCare

39.   The unpaid Services are reasonably worth the sum of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25).

40.   Defendants' receipt of the benefit of the Services without paying in full for the same is unjust.

41.   Likewise, Defendants' retention of reimbursement from Medicare or other third-party payor sources without reimbursing Plaintiff EnduraCare in full is unjust

42.   Plaintiff EnduraCare is entitled to recover from Defendants the sum of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), plus pre-judgment interest, post-judgment interest, attorneys' fees, and costs.

## FOURTH CLAIM FOR RELIEF
### (Promissory Estoppel)

43    Plaintiff EnduraCare incorporates herein by reference each and every allegation set forth above

44    Defendants made one or more unambiguous promises to Plaintiff EnduraCare that Defendants would pay all sums due and owing to Plaintiff EnduraCare for provision of the Services.

45    Plaintiff EnduraCare reasonably, justifiably, and foreseeably relied upon Defendants' promises by continuing to provide the Services to the Alpine North Facility's residents.

46.   Defendants failed to keep their promises.

47    Defendants' failure to keep their promises has caused injury to Plaintiff EnduraCare in the amount of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25).

48    Plaintiff EnduraCare is entitled to recover from Defendants the sum of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), plus pre-judgment interest, post-judgment interest, attorneys' fees, and costs.

**WHEREFORE,** Plaintiff EnduraCare demands:

1.    Judgment in its favor on all counts;

2.    Judgment in favor of Plaintiff EnduraCare on its First, Second, Third and Fourth Claims for Relief against Defendant IHS, Defendant 4700, and Defendant Carroll in the principal sum of Sixty-One Thousand Five Hundred Fifty-Nine Dollars and Twenty-Five Cents ($61,559.25), plus pre-judgment interest, post-judgment interest, attorneys' fees, and costs; and

3    All other relief in law or equity to which Plaintiff EnduraCare may be entitled

## JURY DEMAND

Plaintiff EnduraCare Therapy Management, Inc hereby demands a trial by jury, by the maximum number of jurors permitted by law, on all issues so triable herein.

Respectfully submitted,

DYSART, TAYLOR, LAY, COTTER & MCMONIGLE, PC

JOHN F WILCOX, JR.    MO Bar #46997
4420 Madison Avenue
Kansas City, Missouri 64111
Telephone: (816) 931-2700
Facsimile: (816) 931-7377
E-mail: jwilcox@dysarttaylor.com

## OF COUNSEL:

BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP

MARC S BLUBAUGH    OH Bar Reg #0068221
JAMES L. ERVIN, JR.    OH Bar Reg #006701
88 East Broad Street, Suite 900
Columbus, Ohio 43215
Telephone:    (614) 223-9300
Facsimile:    (614) 223-9330
E-mail: mblubaugh@bfca.com
E-mail: jervin@bfca.com

*Trial Counsel for Plaintiff EnduraCare Therapy Management, Inc*

# EXHIBIT D

FILED

## IN THE UNITED STATES DISTRICT COURT
2007 JAN 16 PM 3:10 THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

U.S. _____ COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| LINDA POE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | |
| HEALTHBRIDGE MANAGEMENT, INC. | ) | |
| | ) | |
| **Defendant.** | ) | CV-07-B-0113-S |

## COMPLAINT

### PRELIMINARY STATEMENT

1.  The plaintiff, Linda Poe, brings this action against her successor employer seeking continuation health insurance coverage under the Employee Retirement Income Security Act [ERISA], as amended by the Consolidated Omnibus Budget Reconciliation Act [COBRA] 29 U.S.C. § 1162 et seq.

### JURISDICTION AND VENUE

2.  Jurisdiction over plaintiff's claims is conferred on this Court pursuant to 29 U.S.C. § 1132, 28 U.S.C. § 1331 and 28 U.S.C. § 1343 and 28 U.S.C. §§ 2201 and 2202.

### PARTIES

3.  Plaintiff, Linda Poe, [hereinafter "Plaintiff"], is a resident citizen of McCalla, Jefferson County, Alabama.

4.  Defendant, HealthBridge Management, Inc.[hereafter, "HealthBridge" or "Defendant"] is a foreign corporation doing business in Shelby County, Alabama.

## STATEMENT OF FACTS

5.    Prior to September 30, 2006, Plaintiff was employed with Tri-State Health Care Investors at one of its nursing home facilities, doing business as Alabaster Healthcare Center in Alabaster, Alabama.

6.    Tri-State Health Care Investors regularly employed more than twenty [20] employees and sponsored a group health insurance plan in which Plaintiff participated.

7.    On or about September 30, 2006, as a result of a business reorganization, Tri-State Health Care transferred operations of the Alabaster facility to HealthBridge, doing business as Laurelton Rehabilitation & Nursing Center.

8.    On or about September 30, 2006, Tri-State Health Care terminated their group health insurance plan and ceased to provide any group health plan to any employees.

9.    HealthBridge, as successor to Tri-State Health Care, continued the operations of its predecessor without interruption or substantial change and sponsored a similar group health insurance plan and regularly employed more than twenty [20] employees.

10.    HeathBridge did not continue Plaintiff's employment beyond September 30, 2006 and Plaintiff's employment terminated.

## COUNT ONE

### COBRA VIOLATIONS

11.    Plaintiff adopts paragraphs 1-10, above, as if set out in full herein

12.    Plaintiff was a qualified beneficiary and HealthBridge had an obligation to provide COBRA continuation coverage to Plaintiff and other similarly situated employees. See 29 C.F.R. § 54.4980B-9.

13.    Upon Plaintiff's termination, Healthbridge failed to give proper written notice to Plaintiff of her COBRA rights.

14.    Defendant's failure to give Plaintiff notice has never been corrected and constitutes a willful neglect, and there is no reasonable cause for Defendant's failure to give notice.

15.    Plaintiff has incurred medical charges that would have otherwise been paid by Defendant's group health insurance plan.

16.    Plaintiff seeks legal penalties and taxes for the maximum allowed by law, prejudgement interest, reimbursement of medical charges, attorney fees, costs and any and all such other relief this Court may assess.

Respectfully submitted,

Kenneth D. Haynes
State Bar No.: 6190-H36K
Attorney for Plaintiff

3

**OF COUNSEL:**

Kenneth D. Haynes, Esq.
**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama   35226
(205) 879-0377

**DEFENDANT'S ADDRESS:**

Chief Executive Officer
HealthBridge Management, Inc.
57 Old Road To Nine Acre Corner
Concord, MA 01742

4