# Attachment - Unreported Cases

2003 U.S. Dist. LEXIS 9288, *; 51 U.C.C. Rep. Serv. 2d (Callaghan) 268;
30 Employee Benefits Cas. (BNA) 2815

LEXSEE 2003 U.S. DIST. LEXIS 9288

**CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, Plaintiff,
v. TESSIO CONSTRUCTION CO., Defendant.**

**Case No. 02 C 4987**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 9288; 51 U.C.C. Rep. Serv. 2d (Callaghan) 268; 30
Employee Benefits Cas. (BNA) 2815*

**June 3, 2003, Decided**

**DISPOSITION:** [*1] Magistrate recommended Motion to Enforce Adverse Claim should be granted.

**COUNSEL:** For CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, CHICAGO DISTRICT COUNCIL OF CARPENTERS WELFARE FUND, CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS APPRENTICE AND TRAINEE PROGRAM FUND, EARL J OLIVER, JEFFREY ISAACSON, KENNETH BORG, ROBERT QUANSTROM, STANLEY MACENAS, RICHARD A BAGGIO, MELVIN GRAY, BENJAMIN A JOHNSTON, ALBERT KAUFMAN, STANLEY PEPPER, CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION AND WELFARE FUND, BRUCE A NELSON, C DAVID PEPPER, WILLIAM E O'NEIL, ROBERT J CORRIGAN, CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS APPRENTICE & TRAINEE PROGRAM, plaintiffs: Librado Arreola, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL.

For CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, CHICAGO DISTRICT COUNCIL OF CARPENTERS WELFARE FUND, CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS APPRENTICE AND TRAINEE PROGRAM FUND, EARL J OLIVER, JEFFREY ISAACSON, KENNETH BORG, ROBERT QUANSTROM, STANLEY MACENAS, RICHARD A BAGGIO, MELVIN GRAY, BENJAMIN A JOHNSTON, ALBERT KAUFMAN, STANLEY PEPPER, CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION AND WELFARE FUND, [*2] BRUCE A NELSON, C DAVID PEPPER, WILLIAM E O'NEIL, ROBERT J CORRIGAN, CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS APPRENTICE & TRAINEE PROGRAM, plaintiffs: Frank A. Marco, Gregorio & Associates, Chicago, IL.

For CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, CHICAGO DISTRICT COUNCIL OF CARPENTERS WELFARE FUND, CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS APPRENTICE AND TRAINEE PROGRAM FUND, EARL J OLIVER, JEFFREY ISAACSON, KENNETH BORG, ROBERT QUANSTROM, STANLEY MACENAS, RICHARD A BAGGIO, MELVIN GRAY, BENJAMIN A JOHNSTON, ALBERT KAUFMAN, STANLEY PEPPER, CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION AND WELFARE FUND, BRUCE A NELSON, C DAVID PEPPER, WILLIAM E O'NEIL, ROBERT J CORRIGAN, CHICAGO AND NORTHEAST ILLINOIS DISTRICT COUNCIL OF CARPENTERS APPRENTICE & TRAINEE PROGRAM, plaintiffs: Daniel Paul McAnally, Travis J. Ketterman, Whitfield & McGann, Chicago, IL.

For STANLEY PEPPER, plaintiff: Bruce T. Logan, Ash, Anos, Freedman & Logan, Chicago, IL.

For TESSIO CONSTRUCTION, INC., defendant: Scott Murray Levin, Defrees & Fiske, Chicago, IL.

For TESSIO CONSTRUCTION, INC., defendant: Riccardo Anthony DiMonte, Julia Ellen Jensen, [*3] DiMonte & Lizak, Park Ridge, IL.

For TESSIO CONSTRUCTION, INC., defendant: Steven Louis Wiser, Levin, McParland, Phillips & Minetz, LLC, Chicago, IL.

**JUDGES:** ARLANDER KEYS, United States

2003 U.S. Dist. LEXIS 9288, *; 51 U.C.C. Rep. Serv. 2d (Callaghan) 268;
30 Employee Benefits Cas. (BNA) 2815

Magistrate Judge. THE HONORABLE JAMES F. HOLDERMAN, UNITED STATES DISTRICT COURT JUDGE.

**OPINION BY:** ARLANDER KEYS

**OPINION:**

### REPORT AND RECOMMENDATION

Currently before this Court is adverse claimant Oxford Bank & Trust's (the "Bank") Motion to Enforce an Adverse Claim. Plaintiff, Chicago District Council of Carpenters Pension Fund (the "Pension Fund"), and Defendant, Tessio Construction, Inc. (the "Debtor"), entered into an Agreed Judgment to recover contributions that the Debtor owed to the Pension Fund. The Pension Fund sought to satisfy the Agreed Judgment with the proceeds from the Debtor's accounts receivable. The Bank subsequently appeared in this action, contending that, as the Debtor's sole secured creditor, it alone is entitled to the Debtor's accounts receivable. For the reasons set forth below, the Court recommends granting the Bank's Motion.

### BACKGROUND FACTS

The Debtor is a defunct construction company, which has employed numerous skilled trade workers, including carpenters, through [*4] the years. To fund its various construction projects and payroll, the Debtor relied upon construction loans from commercial lending institutions. In 1998, the Bank and the Debtor entered into their first loan agreement. The Bank periodically reviewed the terms of the loan, and adjusted the balance to reflect the Debtor's needs and financial status.

As collateral for the loan, the Bank took a security interest in, among other things, the Debtor's existing and future accounts receivable. On August 17, 2000, the Bank filed its first Uniform Commercial Code ("UCC") statement, perfecting its security interest in the Debtor's collateral. In June of 2002, the Bank reduced the commercial loan amount from $ 1,000,000 to $ 700,000, but the Bank insists that it was unaware of any financial problems that the Debtor may have been experiencing. The Bank filed a second UCC statement n1 on July 10, 2002, again perfecting its security interest in the Debtor's existing and future accounts receivables n2. In July 2002, the Debtor ceased operations and closed its business.

> n1 Specifically, the Security Agreement describes the collateral as all "Inventory, Chattel Paper, Accounts, Equipment and General Intangibles." *See* Bank's Mot., Ex. A. The UCC financing statement describes the collateral

exactly as it is described in the Security Agreement, but further includes the language "whether any of the foregoing is owned now or later acquired." *See* Bank's Mot. Ex. A, B.

[*5]

> n2 This Report & Recommendation later distinguishes between perfecting accounts receivable that the Debtor was entitled to at the time the UCC statement was filed, and future accounts receivable, which would not be perfected until the Debtor was entitled to be paid on those accounts.

Although the Bank may have been unaware of the Debtor's failing financial health, the Pension Fund was acutely aware of the problem. In March 2002, the Debtor ceased filing its contribution reports and making its payments to the Pension Fund, on behalf of the carpenters it employed. On July 15, 2002, the Pension Fund filed suit against the Debtor, seeking to recover the Debtor's owed contributions, as well as its reasonable attorneys' fees and costs, pursuant to the terms of its Collective Bargaining and Trust Agreements, Section 502 of the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1132 (West 2003)*, and Section 301 of the Taft-Hartley Act, *29 U.S.C. § 185 (West 2003)*. The case was assigned to Judge James F. Holderman.

On September 25, 2002, an Agreed [*6] Judgment was entered against the Debtor in favor of the Pension Fund in the amount of $ 192,672.83, thereby terminating the case. On October 25, 2002, the Pension Fund filed its Citations to Discover the Debtor's Assets, seeking to claim the monies awarded to it. In an attempt to discover monies owed to the Debtor, which could then presumably be used to satisfy the agreed judgment, the Pension Fund served citations upon James McHugh Development, Chicago Carpet World, Craig Greenwood, Johnathan K. Moyer, Triad Construction Services, Wright Construction Services, George Sollitt Construction, Sollitt Construction Company, Ledcor Industries, The Edge construction Company, Gunderson Construction, Inc., Edge Construction, The Drew Company, Capital Construction Group, Alden-Bennett Construction co., Alter Design Builders, Inc. and "Oxford Bands" (sic).

In the interim, the Debtor defaulted on the Bank's loan, leaving an unpaid balance of $ 417,991.14, plus interest and fees. On February 26, 2003, the Bank filed an adverse claim in this action, seeking to present its claim of entitlement to the Debtor's accounts receivable

2003 U.S. Dist. LEXIS 9288, *; 51 U.C.C. Rep. Serv. 2d (Callaghan) 268;
30 Employee Benefits Cas. (BNA) 2815

to cover the defaulted loan amount of $ 417,991.14, plus interest and [*7] late fees. The Bank is seeking to recoup these funds from the Debtor's various account debtors that have outstanding balances owing to the Debtor. Not surprisingly, the Pension fund seeks to rely upon these same account receivables to satisfy its judgment. Judge Holderman referred the Bank's Motion to this Court on March 24, 2003.

### DISCUSSION

The issue before the Court is whether the Bank's security interest has priority over the Pension Fund's judgment lien with regard to the Debtor's accounts receivable. The Bank insists that it does; because it perfected its security interest long before the Pension Fund received its judgment, the Bank argues, black letter security law dictates that its security interest is superior to the Bank's judgment lien.

In its Response to the Bank's Motion to Enforce its Adverse Claim, the Pension Fund has not cited a single case or statute to contradict the Bank's well-supported position regarding the Uniform Commercial Code ("UCC") and the law of perfection. Instead, the Pension Fund claims that the Bank's Motion should be denied for six primary reasons. First, the Pension Fund claims that this Court does not have the authority to entertain the [*8] Bank's Motion. Next, the Pension Fund insinuates that the timing of the Bank's loans were suspicious and casts doubt upon whether the Bank exercised due diligence in loaning the Debtor the sums in question. The Pension Fund then insists - without relying on any authority whatsoever- that permitting the Bank's security interest to take priority over its judgment lien would be contrary to the purposes of ERISA, the Trustees' fiduciary duties, and the equitable interests of the carpenters who labored for these health insurance and retirement benefits.

The Pension Fund then argues that the Bank's Motion is premature, because Alter Designs, one of the many companies owing the Debtor monies, contends that the amounts that it admits it owes to the Debtor "will not be due until Tessio delivers to Alter a Final Waiver of Mechanics Lien." In addition, the Pension Fund argues, the Bank has not yet presented sufficient evidence demonstrating its entitlement to the proceeds, or even verified the exact amount of the debt it is owed. Finally, the Pension Fund contends that the Illinois common fund doctrine prevents the Bank from recovering from the accounts receivable before the Pension Fund's attorneys [*9] are paid their fees.

The Court will first address the black letter law regarding security interests - which the Pension Fund

neglects to do - and then discuss the Pension Funds's arguments asking the Court to ignore that law.

### A. Priority of Secured Interests

The law unequivocally shows that the Bank's security interest trumps Plaintiff's lien. In order for a security interest to be created in favor of the creditor, the following requirements must be met: (1) the creditor must give value to the debtor; (2) the debtor must have or acquire rights in the collateral; (3) the creditor and the debtor must agree that a security interest shall attach to the collateral; and (4) either the collateral must be in the possession of the creditor or there must be a written security agreement signed by the debtor that contains a description of the collateral. *Metro Life Ins. Co. v. Am. Nat'l Bank & Trust Co., 288 Ill. App. 3d 760, 682 N.E.2d 72, 76, 224 Ill. Dec. 511 (Ill. App. Ct. 1997)*; *810 ILL. COMP. STAT. 5/9-203 (2002)*.

In this case, the Bank has established that it has a security interest against the accounts receivables of the Debtor. First, the Bank has given [*10] value to the Debtor by lending it funds. Second, the Debtor has rights in the accounts receivables, because the payments due are for services already performed by the Debtor prior to it ceasing operations. Finally, the Debtor and the Bank entered into a Security Agreement, which describes the collateral covered under the Security Agreement, and includes "all...Accounts...."

However, the law is clear that in order to have priority over other creditors, attachment of a security interest alone is insufficient. *See*, U.C.C. § 9-308. Instead, the party who first perfects its security interest has the superior right in the collateral. *Internal Revenue Serv v. McDermott, 507 U.S. 447, 449, 123 L. Ed. 2d 128, 113 S. Ct. 1526 (1993)*; U.C.C. § 9-322. Perfection of account receivables only occurs when the financing statement is filed and the security interest has attached. *Slodov v. U.S. 436 U.S. 238, 257 n.22, 56 L. Ed. 2d 251, 98 S. Ct. 1778 (1978)* (also noting that a perfected security interest is superior to a judgment lien.)

However, a security interest in after-acquired property is not generally perfected when the financing statement is filed, but, [*11] rather, when the debtor acquires that property. *McDermott, 507 U.S. at 449-51*. Specifically, a security interest in after-acquired accounts receivable is perfected - assuming the appropriate UCC statement has already been filed - once the debtor completes the work and is entitled to collect payment for that work. *See D&A Partners v. United States of America, 1997 U.S. Dist LEXIS 3927, No. CV-96-1234-ST, 1997 WL 328010, at *4 (D. Or. Mar. 12, 1997)* ("The account receivable came into existence when

Case 1:04-cv-00910-GMS    Document 215-2    Filed 04/20/2007    Page 5 of 23

Page 4

2003 U.S. Dist. LEXIS 9288, *; 51 U.C.C. Rep. Serv. 2d (Callaghan) 268;
30 Employee Benefits Cas. (BNA) 2815

Precision earned monies due under the subcontractor agreement by performing work on the project. Thus, the 'property' was 'fixed' by the time Precision completed its performance on the project.")

The Bank filed a UCC financing statement on July 10, 2002, prior to the September 25, 2002 agreed judgment in favor of the Pension Fund, and prior to Pension Fund's filing of its Citations to Discover the Debtor's Assets on October 25, 2002. In addition, the Bank argues -- and the Pension Fund does not deny - that the Debtor obviously became entitled to receive any future accounts receivable prior to the entry of the judgment lien in September of 2002, because the Debtor ceased all operations [*12] in July of 2002. Thus, the Bank's security interest in any accounts receivable, due either before or after the UCC statement was filed on July 12, 2002, was perfected prior to the entry of judgment against the Debtor in September of 2002 n3. Therefore, the Bank's perfected security interest is superior to the Pension Fund's judgment lien against the Debtor.

> n3 Notably, the Pension Fund does not even attempt to dispute the Bank's claim that the Bank's security interest was perfected prior to its lien.

**B. The Bank's Motion Is Properly Before the Court**

*Federal Rule of Civil Procedure 69(a)* permits federal courts to hold supplemental proceedings to enforce judgments in accordance with the practice and procedure of the state where the district court is sitting. *Fed. R. Civ. P. 69(a)*. Illinois law provides as follows:

> If it appears that any property, chose in action, credit or effect discovered, or any interest therein, is claimed by any person other than the judgment debtor, the court shall, as [*13] in garnishment proceedings, permit or require the claimant to appear and maintain his or her right. The rights of the person cited (other than the judgment debtor) and the rights of any adverse claimant shall be asserted and determined pursuant to the law relating to garnishment proceedings.

*735 ILCS 5/2-1402(e)* (West 2003). *See also, Schwartz v. Yo-Whip, Inc., 1994 U.S. Dist. LEXIS 6478, No. 92 C*

*2586, 1994 WL 201024, at *3 (N.D. Ill. May 18, 1994)* ("This provision plainly entitled lien holders to assert their rights before a turnover order is entered.") Illinois law permits any third party with an interest in the assets at issue to appear and be heard on their claim. *Michelson v. Schor, 1997 U.S. Dist. LEXIS 7307, No. 95 C 6573, 1997 WL 282929, at *3 (N.D. Ill. May 16, 1997)* (citing *Resolution Trust Corp. v. Ruggiero, 994 F.2d 1221, 1226 (7th Cir. 1993))*. "The procedure is left largely to the judge's discretion, and the proceedings are meant to be swift, cheap, and informal." *Id*

Illinois law does not require the Bank to formally join this lawsuit in order for it to be heard on its claim to the assets in question; the law only requires the Bank to appear. The Pension Fund's [*14] argument that the Court is without authority to entertain the Bank's Motion because the Bank is not a party in this case is without merit.

**C. The Bank's Alleged Lack Of Due Diligence Has No Bearing On the Issue of Priority**

The Pension Fund then insinuates that it was improper for the Bank to extend credit to the Debtor in the spring and/or summer of 2002. However, the Pension Fund has not presented any evidence in support of this assertion. More importantly, the Pension Fund has not cited to any authority suggesting that this "fact" would have bearing on the Court's analysis.

**D. The Pension Fund's Equitable Arguments**

The Pension Fund passionately argues that permitting the Bank's security interest to trump its judgment lien would be contrary to ERISA and the Trustees' fiduciary duties, and would be terribly unfair to the carpenters who worked for the Debtor. Notably, ERISA is devoid of any provisions that would authorize this Court to disregard the Bank's perfected security interest, in favor of the Pension Fund's judicially-created lien. Nor does the UCC suggest that its provisions should apply less stringently in an effort to alleviate harsh consequences when [*15] ERISA is merely implicated. Further, the Court fails to see - and the Pension Fund does not articulate -- how the Fund Trustees' fiduciary obligations to the beneficiaries of their Fund has any bearing on the issue at hand.

Finally, the Court is not unsympathetic to the plight of the beneficiaries who *may* be impacted by the enforcement of the Bank's perfected security interest. However, as the Bank points out, the equities are not clearly in the Pension Fund's favor; it is debatable whether the Bank's financing or the carpenters' work played a more significant role in contributing to the

2003 U.S. Dist. LEXIS 9288, *; 51 U.C.C. Rep. Serv. 2d (Callaghan) 268;
30 Employee Benefits Cas. (BNA) 2815

creation of the accounts receivable. More importantly, the certainty provided to businesses by the UCC enables commercial enterprises to analyze risk and make business decisions with a certain degree of predictability. The Court is not inclined to abandon this well-established system of relative reliability created by the UCC, simply because it might work a hardship on the Pension Fund's beneficiaries in this case.

## E. The Bank's Adverse Claim is Not Premature

Next, the Pension Fund asserts that the Bank's Motion is premature, because: 1) at least one of the companies owing the Debtor [*16] money has not received the necessary final waiver; and 2) the Bank has not presented sufficient evidence demonstrating that it is entitled to a sum equal to or in excess of the balance of the Debtor's accounts receivables.

With regard to the first prong of the Pension Fund's ripeness argument, the Court agrees with the Bank that the Debtor's failure to supply one of the many cited general contractors with sworn statements and waivers does not render the Bank's claim premature. Neither the general contractor nor the Pension Fund deny that the work in question was performed or that the amounts are due, and there is no indication that the Debtor cannot or will not produce these documents. Rather, the contractor merely objects to releasing the sums until it receives the customary waivers. The delay in forwarding these documents to Alter Designs does not render the Bank's claim of entitlement to the Debtor's accounts receivable premature. *See generally, D&A Partners, 1997 U.S. Dist. LEXIS 3927, 1997 WL 328010, at *4* (a security interest in accounts receivable is perfected when a subcontractor performs work on the project.)

After the Pension Fund complained about the Bank's lack of supporting documentation, [*17] the Court advised the Bank to bolster its claim with evidence of the default and the amount due and owing. The Bank attached supporting affidavits to its Reply Brief, which detailed the facts leading up to the default, and identified the elements of the entire amount due, totaling $ 444,102.02 n4. The Court then offered the Pension Fund the opportunity to respond to that evidence. The Pension Fund did not directly respond to the evidence, but instead asked that, if the district court grants the Bank's Motion, the court should limit the amount of recovery to a specific dollar amount.

n4 This amount consists of $ 417,991.14 of the principal outstanding balance; $ 11,649.54 of Interest Accrued; $ 1,315.57 in late charges and $ 13,145.76 in attorneys' fees and costs.

The Court agrees that the Bank should not be permitted to collect the accounts receivable in excess of the amount due and owing to it from the Debtor. Therefore, the Court recommends that the district court grant the Bank's Motion, but limit its recovery [*18] to $ 444,102.02 of the outstanding accounts receivable.

## F. Common Fund Doctrine

Finally, the Pension Fund argues that the Illinois Common Fund Doctrine prevents the Bank from asserting its claim against the Debtor's accounts receivable. The Court disagrees. The Illinois Common Fund doctrine provides that attorneys who generate a fund are entitled to be paid from that fund prior to the disbursement of those funds to beneficiaries. *See Blackburn v. Sundstrand Corp., 115 F.3d 493, 494 (7th Cir. 1997).* "The common fund doctrine rests upon the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched." *Bishop v. Burgard, 198 Ill.2d 495, 509, 764 N.E.2d 24, 33, 261 Ill. Dec. 733 (2002)* (emphasis added) (citing *Boeing Co v. Van Gemert, 444 U.S. 472, 478, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980)).*

In this case, the Bank is not obtaining a "benefit" from the Pension Fund's lawsuit against the debtor. The Bank is not a member of the class - ie, the beneficiaries of the Pension Fund - who will benefit from the Pension Fund's successful suit against the Debtor, nor is it a [*19] subrogee of a beneficiary of the Pension Fund.

To the contrary, the basis of the Bank's recovery is entirely independent of the agreed judgment obtained by the Pension Fund; the Bank's recovery is based upon the Debtor's default, the loan agreement with the Debtor, and the Bank's perfected security agreement. Illinois courts have not extended the Common Fund Doctrine in the manner suggested by the Pension Fund, and this Court declines to recommend such an extension of Illinois law in this case.

## Conclusion

For the foregoing reasons, this Court finds that the Bank's perfected security interest is superior to the Pension Fund's Agreed Judgment, and that the Pension Fund's arguments for ignoring the superiority of the Bank's security interest are without merit. Therefore, the Court recommends that the district court grant the Bank's Motion.

DATED: June 3, 2003

RESPECTFULLY SUBMITTED:

2003 U.S. Dist. LEXIS 9288, *; 51 U.C.C. Rep. Serv. 2d (Callaghan) 268;
30 Employee Benefits Cas. (BNA) 2815

ARLANDER KEYS

United States Magistrate Judge

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable James F. Holderman. *See FED. R. CIV. P. 72(b)*; *28 U.S.C. § 636(b)(1).* Failure to object constitutes [*20] a waiver of the right to appeal. *Egert v. Connecticut Gen. Life Ins. Co., 900 F.2d 1032, 1039 (7th Cir. 1990).*

2007 Bankr. LEXIS 766, *

LEXSEE 2007 BANKR. LEXIS 766

**In re: PUBLISHERS CONSORTIUM, INC., Debtor. AMERICAN NATIONAL BANK & TRUST COMPANY OF CHICAGO n/k/a JP Morgan Chase Bank, Plaintiff, v. COMMON COURAGE PRESS, INC., et al., Defendants.**

**Case No; 02-31588 (ASD) Chapter 11, Adv. Pro. No. 02-3048**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF CONNECTICUT**

*2007 Bankr. LEXIS 766*

**March 12, 2007, Decided**

**COUNSEL:** [*1] For Publishers Consortium, Inc., Milford, CT, aka, LPC Group, aka, Paper Mache Press, aka, Firebrand Books, aka, Albion Press, aka, Olmstead Press, Debtor: James Berman, Zeisler and Zeisler, Bridgeport, CT; James Berman, Zeisler and Zeisler, Bridgeport, CT; Louis J. Testa, Zeisler & Zeisler, P.C., Bridgeport, CT.

For Official Committee of Unsecured Creditor, Official Committee of nsecured Creditors, Creditor Committee: Eric A. Henzy, Reid and Riege, P.C., Hartford, CT; Robert U. Sattin, Reid & Riege, P.C., Hartford, CT.

For American National Bank & Trust Co., Plaintiff: Douglas S. Skalka, LEAD ATTORNEY, Neubert, Pepe, and Monteith, New Haven, CT; James A. Lenes, LEAD ATTORNEY, Neubert, Pepe, and Monteith, New Haven, CT; Lucas Bennett Rocklin, Neubert, Pepe, Monteith, P.C., New Haven, CT.

For Bank One, Plaintiff: Douglas S. Skalka, LEAD ATTORNEY, Neubert, Pepe, and Monteith, New Haven, CT.

For Publishers Consortium, Inc., Defendant: James Berman, LEAD ATTORNEY, Zeisler and Zeisler, Bridgeport, CT; Louis J. Testa, LEAD ATTORNEY, Zeisler & Zeisler, P.C., Bridgeport, CT.

For MIXX Entertainment, Inc., Dark Horse Comics, Inc., Cardoza Publishing Image Comic, Inc. [*2] , Open Road Publishing ECW Press Warwich Publishing National Journal, Inc., Child Management, Inc., Common Courage Press, Techpress, Inc., Franklin Square Press Comics One Corp., Defendants: Heidi H. Zapp, Saxe Doernbereer & Vita, P.C., Ham den, CT; Tracy Alan Saxe, LEAD ATTORNEY, Saxe Doernberger & Vita,

Hamden, CT.

For Marvel Entertainment Group, Inc., Park Avenue/Oklahoma, Park Avenue/Oklahoma, Defendant: Myles H. Alderman, Jr., LEAD ATTORNEY, Alderman & Alderman, Hartford, CT.

For McBooks Press, Inc., Defendant: Edward Y. Crossmore, LEAD ATTORNEY, The Crossmore Law Office, Ithaca, NY.

For Client Distribution Services, Defendant: Dean W. Baker, LEAD ATTORNEY, Law Offices of Dean W. Baker, New Haven, CT.

Park Avenue/California, Santa Monica, CA, Defendant, Pro se.

For Kogan Page Ltd., Defendant: Christopher J. Major, LEAD ATTORNEY, Robinson & Cole, LLP, Stamford, CT.

For Triumph Books, Inc., Defendant: Tracy Alan Saxe, LEAD ATTORNEY, Saxe Doernberger & Vita, Hamden, CT.

For Comics One Corp., Common Courage Press, Child Management, Inc., National Journal, Inc., Image Comic, Inc., Dark Horse Comics, Inc., Counter-Claimants: Heidi H. Zapp, Saxe Doernbereer [*3] & Vita, P.C., Ham den, CT; Tracy Alan Saxe, LEAD ATTORNEY, Saxe Doernberger & Vita, Hamden, CT.

For Triumph Books, Inc., National Journal, Inc., Counter-Claimants: Tracy Alan Saxe, LEAD ATTORNEY, Saxe Doernberger & Vita, Hamden, CT.

For McBooks Press, Inc., Counter-Claimant: Edward Y.

2007 Bankr. LEXIS 766, *

Crossmore, LEAD ATTORNEY, The Crossmore Law Office, Ithaca, NY.

For Park Avenue/Oklahoma, Park Avenue/California, Counter-Claimants: Myles H. Alderman, Jr., LEAD ATTORNEY, Alderman & Alderman, Hartford, CT.

For American National Bank & Trust Co., American National Bank & Trust Co., American National Bank & Trust Co., American National Bank & Trust Co., American National Bank & Trust Co., Counter-Defendants: Douglas S. Skalka, LEAD ATTORNEY, Neubert, Pepe, and Monteith, New Haven, CT; James A. Lenes, LEAD ATTORNEY, Neubert, Pepe, and Monteith, New Haven, CT.

For Official Committee of Unsecured Creditor, Intervenor-Defendant: Robert U. Sattin, LEAD ATTORNEY, Reid & Riege, P.C., Hartford, CT.

For Angel River Press, Belier Press, Inc., Down There Press, Greenery Press, Inc., Guernica Edition, Survival Books Limited, Intervenor-Defendants: Tracy Alan Saxe, LEAD ATTORNEY, Saxe [*4] Doernberger & Vita, Hamden, CT.

For Arsenal Pulp Press, Odonian Press, Terrace Publishing, Intervenor-Defendant: Heidi H. Zapp, Saxe Doernbereer & Vita, P.C., Ham den, CT; Tracy Alan Saxe, LEAD ATTORNEY, Saxe Doernberger & Vita, Hamden, CT.

**JUDGES:** Albert S. Dabrowski, Chief United States Bankruptcy Judge.

**OPINION BY:** Albert S. Dabrowski

**OPINION:**

## MEMORANDUM OF DECISION ON REMAND FROM DISTRICT COURT

### I. INTRODUCTION

On December 9, 2004, the United States District Court for the District of Connecticut (Covello, J.) issued a Memorandum and Order in an appeal from rulings of this Court in the above-captioned case and adversary proceeding. That Memorandum and Order, *inter alia,* remanded the proceedings back to this Court for a determination of the parties' priorities in the subject property. This Memorandum of Decision responds to the District Court's remand.

### II. FACTUAL BACKGROUND

For the purposes of remand this Court finds the following facts, not inconsistent with those previously found by the District Court.

Publishers Consortium, Inc. (hereafter, the "Consortium" or "Debtor") was for many years a publisher and distributor of books. As part of its business, the Consortium [*5] entered into distribution agreements with various publishing houses (hereafter, the "Publisher(s)"). Although each of those distribution agreements differed in minor respects, all contained essentially the same material terms and conditions, to wit: each individual Publisher would consign books to the Consortium, and the Consortium would perform services customarily performed by a book distributor, including marketing, invoicing, shipping, customer service, collection of the receipts of sale, warehousing, and processing of returns. The distribution agreements further provided that the books would remain the property of the individual Publishers until sold to customers.

The Consortium's customers were typically large book retailers and wholesalers. The Consortium would market and ship books to those customers, then collect the accounts receivable generated by those sales. Under the distribution agreements the Consortium was independently obligated to remit the book sale price, less a commission and service costs, to individual Publishers regardless of whether, and when, it was paid by its customers. Under a typical distribution agreement, payment from the Consortium to the Publisher [*6] was due 90 days after the "report date" -- a scheduled day each month as of which the Consortium reported the total sales and the net amount due to each Publisher from the preceding month.

None of the distribution agreements obligated the Consortium to segregate funds received in connection with sales of a particular Publisher's books, and the Consortium was not otherwise restricted in its use of those funds. The individual Publishers had no direct contact with the Consortium's customers, and always logged their own accounts receivable as due from the Consortium, rather than from any of the customers of the Consortium.

In 1999, American National Bank & Trust Company of Chicago n/k/a JP Morgan Chase Bank (hereafter, the "Bank") provided the Consortium with a revolving line of credit. In connection with that credit transaction the Consortium executed, and the Bank accepted, a *Loan and Security Agreement* dated January 13, 1999 (hereafter, the "Security Agreement"), n1 which granted the Bank a security interest in certain of the Consortium's property, including present and after-acquired accounts, contract

2007 Bankr. LEXIS 766, *

rights, general intangibles, monies, reserves, deposits and deposit accounts. [*7] n2

> n1 Section 8.13 of the Security Agreement provides that it "shall be governed and controlled by the internal laws of the State of Illinois; and not the law of conflicts."

> n2 Specifically, the Security Agreement provided, *inter alia*, that:

>> 3.1     Borrower     [the Consortium] grants to Bank a security interest in and to, the following Borrower's property, wherever located, whether now or hereafter existing, owned . . . , consigned (to the extent of Borrower's ownership therein), arising and/or acquired, including without limitation all of Borrower's . . . Accounts . . . contract rights . . . general intangibles . . . monies, reserves, deposits [and] deposit accounts . . .

>> 3.2 All of the aforesaid property and products and proceeds of the foregoing . . . are herein individually and collectively called the "Collateral". The terms used herein to identify the Collateral shall have the same meaning as are assigned to such terms as of the date hereof in the Illinois Uniform Commercial Code.

On January 20, 1999, the Bank filed a UCC-1 Financing Statement with the Illinois Secretary of State covering, *inter alia*, accounts, contract rights, general intangibles, monies, reserves, deposits and deposit accounts.

By a *Second Amendment to Loan and Security Agreement* dated February 7, 2001, the Consortium granted to the Bank a security interest in classes of property which largely overlapped the classes enumerated in the Security Agreement.

[*8]

On August 29, 2001, through an *Agency Fulfillment Agreement* (hereater, the "Agency Agreement"), the Consortium subcontracted with Client Distribution Services, Inc. (hereafter, "CDS") to perform its book distribution operations beginning November 1, 2001. In that regard the Consortium delegated to CDS certain of its duties under the various distribution agreements, including its warehousing, n3 order receipt, order processing, shipping, invoicing, collection and book return processing obligations. Under the Agency Agreement, the Consortium retained its obligation to market books, report sales, and remit funds to the individual Publishers.

> n3 The Consortium transferred all books located at its warehouse in Illinois to CDS's warehouse in Tennessee.

The Consortium's President, David Wilk, testified that the Consortium entered into the Agency Agreement because CDS could perform various "back office" functions more efficiently than the Consortium. The Publishers played no role in the Consortium's negotiations [*9] with CDS, and in fact most, if not all, of the Publishers knew nothing of that development until its execution was announced by the Consortium. Gilbert Perlman, the president of CDS, testified that CDS was not equipped to administer relationships with small publishers such as were represented by the Consortium. From and after November 1, 2001, the Publishers delivered their books directly to the CDS warehouse in Tennessee. n4 CDS then invoiced those customers in its own name, collected payments, and placed those funds in its general operating account without segregation from other monies received. The Agency Agreement required CDS to remit payment to the Consortium within 88 days of a monthly report date, thus allowing the Consortium two days to pay timely those Publishers whose distribution agreements called for payment within 90 days of that same report date. Further, as was the case before the advent of the Agency Agreement, the Consortium was obligated to pay the Publishers regardless of whether it had received payment from CDS.

> n4 CDS acknowledged that it, like the Consortium, received the books on consignment and that they remained the property of the Publishers until shipped to customers.

[*10]

On or before January 22, 2002, the Consortium fell into default of its obligations to the Bank. On March 28, 2002, CDS wired the sum of $ 1,095,860.76 into the Consortium's deposit account at the Bank as payment for

2007 Bankr. LEXIS 766, *

books sold in December 2001 (hereafter, the "December Sales Payment"). On the same day, the Bank exercised a set-off against the deposit account containing the December Sales Payment (hereafter, the "Set-Off"). Due to, *inter alia,* the fiscal impact of the Set-Off, the Consortium filed a petition in this Court on April 2, 2002 (hereafter, the "Petition Date"), seeking protection under Chapter 11 of the United States Bankruptcy Code.

On the Petition Date the Consortium owned accounts receivable due from CDS in connection with books sold in the months of January, February and March of 2002, and those accounts (hereafter, the "Pre-Bankruptcy Receivables") became part of its bankruptcy estate. During the pendency of this bankruptcy case, but not later than July 1, 2002, the Consortium, as debtor-in-possession, received into a deposit account in the ordinary course of business, and pursuant to the terms of the Agency Agreement, the cash proceeds of the Pre-Bankruptcy Receivables [*11] (hereafter, the "January-March Sales Payments"). None of the January-March Sales Payments were interrupted, interdicted or impounded prior to their possession and commingling by the Consortium; n5 and some, or all, of the proceeds of those Payments were used or disbursed by the Consortium, as debtor-in-possession, pursuant to orders of this Court, including, without limitation, orders authorizing the use of cash collateral.

n5 Over three months into this Chapter 11 case, it appears that the Consortium, the Bank and certain Publishers agreed to a segregation of funds *in the hands of the Consortium. See Fourth Preliminary Order Authorizing Interim Use of Cash Collateral*(Doc. I.D. No. 193)(hereafter, the "Fourth Cash Collateral Order") signed and entered on June 26, 2002. This order -- prepared in the first instance by one or more of the parties in interest -- provided, *inter alia,* that "75% of all funds held and received by the Debtor shall be segregated and maintained in a separate bank account at the [Bank] until further Order of this Court. The segregation of funds as set forth herein is based upon the request of certain Publishers and is not and shall not be deemed [sic] a determination of the rights of any party in the Debtor's accounts on [sic] the Proceeds thereof."

[*12]

On April 26, 2002, the Bank commenced an adversary proceeding (Adv. Pro. No. 02-3048) against the Consortium and individual Publishers, seeking a declaratory/judgment that the Consortium owned, and the Bank had a first priority lien in, the book inventory and/or accounts receivable that gave rise to payments from CDS to the Consortium (hereafter, the "Adversary Proceeding"). Certain of the Publishers answered and asserted counterclaims, arguing, *inter alia,* that as the owners of the books consigned to CDS and the Consortium, they had a right to the proceeds of sale. These Publishers also argued before this Court that they were entitled to the proceeds of the January-March Sales Payments as third-party beneficiaries of the Agency Agreement. These Publishers likewise objected to confirmation of the Debtor's proposed Chapter 11 plan on these bases, *inter alia.*

On August 7, 2002, this Court issued an order providing for a trial of the common issues presented by the Adversary Proceeding and the Debtor's proposed Chapter 11 plan -- which depended for its confirmation upon the Consortium's ownership of, and the Bank's priority in, the proceeds of the January-March Sales Payments. [*13] A multi-day trial ensued and, on November 20, 2002, this Court issued an oral ruling concluding that the Consortium was the owner of the January-March Sales Payments. This Court further concluded that the Publishers were not third-party beneficiaries of the Agency Agreement, finding instead that "CDS did not intend to benefit the publishers by providing them with rights in the book proceeds through the . . . [Agency Agreement] or in any other manner" and that "there existed no facts capable of granting [the Publishers] third-party beneficiary status." Accordingly, on November 26, 2002, this Court issued an order confirming the Debtor's Chapter 11 plan (Doc. I.D. No. 501), and on November 27, 2002, entered judgment in the Adversary Proceeding generally in favor of the Bank (Doc. I.D. No. 67)(hereafter, the "Bankruptcy Court Ruling").

A timely appeal (hereafter, the "Appeal") by certain of the Publishers (hereafter, the "Contesting Publishers") followed the Bankruptcy Court Ruling. The subject of the Appeal was whether or not this Court erred in concluding (i) that the Consortium owned the accounts receivable, and proceeds thereof, arising from the sale of the Contesting Publishers' [*14] books; and (ii) that the Contesting Publishers were not third-party beneficiaries of the Agency Agreement. In its appellate ruling (hereafter, the "District Court Ruling"), the District Court (Covello, J.) upheld this Court's finding that the Consortium owned the accounts receivable and proceeds arising from the sale of the Contesting Publishers' books, and that the Bank had properly exercised the Set-Off. However, the District Court concluded, contrary to this Court, that the Contesting Publishers were indeed third-

party beneficiaries of the Agency Agreement with *possible* priority over the interest of the Bank in the subject property, *i.e.* the January-March Sales Payments. Accordingly, the District Court (i) reversed this Court's confirmation of the Consortium's Chapter 11 plan; (ii) vacated this Court's judgment for the Bank in the Adversary Proceeding; and (iii) remanded with instructions to "reconsider the matter and the extent of the [B]ank's financial interest and each of the [P]ublisher-appellants' interests as third party beneficiaries of the Agency . . . Agreement . . . ."

## III. DISCUSSION

The instant case and adversary proceeding present novel and analytically [*15] challenging issues. In fact it might easily be said of this case what was written by Circuit Judge Cardamone in *Septembertide Publishing B.V. v. Stein and Day, Inc., et al., 884 F.2d 675, 676 (2d Cir. 1989)* -- a case implicating similar legal principles -- that the Court is "required to resolve a difficult and close question involving third-party beneficiary and commercial law principles . . . ."

The specific issue presented on this remand is whether, with respect to funds arising from the sale of the Publishers' books and ultimately paid to the Consortium, but not then remitted to those Publishers (*e.g.*, the January-March Sales Payments), such Publishers' third-party beneficial rights, as recognized by the District Court, are subordinate to or superior to the Bank's security interest in the same property. Of course, in answering this question the Court is constrained by certain determinations already made by Judge Covello in the District Court Ruling. Accordingly, an examination of the legal contours of that Ruling is the logical starting point of the present analysis.

### A. The District Court Ruling.

The analytical section of the District Court Ruling [*16] is divided into two subsections, titled as follows: "1. Ownership -- Accounts Receivable/Proceeds" and "2. Third Party Beneficiary". The litigants here have confessed to some difficulty in reconciling these two subsections of the District Court Ruling. One might argue -- as have some of the parties - that Subsection 1 contains an analysis of *pre-Petition* Date rights and activity, and Subsection 2 addresses *post-petition* circumstances. It might also be that Subsection 1 is concerned more generally with *title* to the subject property with respect to the efficacy of the Bank's setting off of funds already paid to the Consortium, while Subsection 2 deals with competing rights to funds not yet paid to the Consortium and/or in the control of the Bank. This Court admits that it too may not fully appreciate the relationship between

the two subsections as *intended by the District Court*. Nonetheless, this Court believes that those subsections can be harmonized by reading the District Court Ruling to provide the following express and implied holdings:

1. Although the subject books were provided by the Publishers on consignment, the Consortium had an exclusive ownership [*17] interest in the *funds* it received from CDS in connection with the sale of those books. n6

> n6 District Court Ruling at 12 (". . . CDS wired $ 1,095,860.76 to the [C]onsortium as payment for books sold in December 2001. These funds *then* became the property of the [C]onsortium." (emphasis supplied)).

2. The Contesting Publishers are third-party beneficiaries of the Agency Agreement, n7 and their third-party rights in the subject funds are in conflict with the security interest of the Bank in those same funds.

> n7 District Court Ruling at 16 (reversing and vacating this Court's Ruling rejecting a claim of third-party beneficiary status). Notwithstanding the binding nature of the District Court Ruling, this Court continues to respectfully disagree with the District Court's conclusion regarding the third-party beneficial status of the Publishers.

[*18]

3. The rights of the Contesting Publishers to the subject funds, including their third-party beneficial rights, are defeated by the commingling of those funds in the hands of the Consortium. n8

> n8 *See, e.g.*, District Court Ruling at 11-12.

4. Thus, in order to realize upon their alleged superior interest in the subject funds, the Contesting Publishers must (a) interdict the flow of those funds before they reach the Consortium and are commingled, and (b) establish that their third-party rights in those funds are superior to the security interest of the Bank.

Accordingly, the issues raised by the twin requirements of holding "4", above, are the principal questions on remand. This Court now turns to a more in-depth analysis of those critical questions. n9

> n9 The local law governing these questions is

debatable, but thankfully, not an issue which this Court must definitively determine. Certainly, in the absence of the Contesting Publishers' third-party rights, the efficacy of the Bank's security interest would be determined by the local law (UCC Article 9) of the State of Illinois (the Bank was an Illinois entity; the Consortium was an Illinois entity; and the Security Agreement (entered into in Illinois) provides that it is governed by the law of Illinois) It is also apparent to the Court that Illinois conflicts law would respect the Agency Agreement's governing law stipulation to New York law, and thus, since the Contesting Publishers' third-party rights spring from the Agency Agreement, their legal characteristics arguably are measured by the local law of New York Unfortunately, the law governing the intersection and competition of these rights and interests is not nearly as self-evident. Fortunately though, it is not necessary for this Court to determine finally that question because the issue at bar is largely determined on the basis of the law of this case, as announced in the District Court Ruling, and the wisdom and authority of *Septembertide* That decision -- an interpretation of New York commercial and contract law -- is equally persuasive with this Court even if Illinois law ultimately governs because (i) this Court has great respect for opinions of the Second Circuit Court of Appeals, even if they are not technically controlling of a given situation; and (ii) there appears to be no authority in the Illinois statutes, or from courts of Illinois jurisdiction, which is contrary to, or inconsistent with, the relevant areas of New York law as announced by the Second Circuit in *Septembertide*

[*19]

### B. The Law of the Case -- Commingling.

The District Court Ruling is presently the law of the instant case and adversary proceeding. It is clear from that Ruling that once funds subject to the rights or interests of a third party become irretrievably commingled by a debtor, the third party is relegated to the status of a "simple creditor".

It is equally clear that the District Court considered the December Sales Payment to fit this profile -- *i.e.* with respect to that payment from CDS, the District Court stated that the Publishers "did not require the [C]onsortium to segregate the proceeds of sale from other funds held within the operating account. . . . With respect

to these proceeds, then, the [P]ublishers became simple creditors of the [C]onsortium " District Court Ruling at 12.

Because the rights of "simple" creditors, *i.e.* general unsecured creditors, are subordinate to the interest of a secured creditor in its collateral, it is apparent that the District Court would have concluded that with respect to the December Sales Payment, the Publishers would lose out to the Bank *even in the absence of Bank's Set-Off rights.* n10 So the critical question is suggested: [*20] if the Publishers are "simple creditors", through commingling, with respect to the December Sales Payment, why then are they not likewise simple creditors -- and thus subordinate to the Bank's interest -- with respect to the January-March Sales Payments, which were similarly received by, and commingled in the hands of, the Consortium? n11

> n10 The efficacy of a bank creditor's right to set-off against a debtor's deposit account is not dependent upon the existence or perfection of a security interest in the funds in that account. Rather, this self-help remedy depends solely upon the bank's *control* of the subject deposit account and the *mutuality* of debts -- *e.g.,* the debt owed by the Consortium to the Bank as lender, as against the obligation owed by the Bank to the Consortium as depositor. *See, e.g., In re The Bennett Funding Group, Inc., 146 F.3d 136, 139 (2d Cir. 1998).*

> n11 The segregation of funds established by the Fourth Cash Collateral Order acted only upon commingled funds after they were received by the Consortium. Further, given the timing of the initiation of that segregation, it appears that it would have affected, at most, the final (*i.e.* March) payment of the January-March Sales Payments.

[*21]

The answer to this question does not appear to be found within the four corners of the District Court Ruling. Perhaps, as suggested by more than one party here, the District Court failed to appreciate the fact that the only funds that remained in dispute -- the January-March Sales Payments -- had already been received by the Consortium in the identical manner as the December Sales Payment. This explanation suggests that had the District Court appreciated the true status of the January-March Sales Payments, it would have concluded that as to those funds the Publishers are "simple creditors", and

thus the Bank's security interest therein is superior to their rights. This Court concurs with that inference and conclusion. Accordingly, the law of the case compels judgment for the Bank in the Adversary Proceeding, and confirmation of the Debtor's pending Chapter 11 plan.

### C. The Wisdom of *Septembertide* -- First in Time, First in Right.

Assuming, contrary to the conclusion of the preceding subsection of this Memorandum of Decision, that the law of the case does *not* mandate a determination that the Bank has a superior interest in the January-March Sales Payments, this Court [*22] turns to an examination of the principles necessary to resolve the competition between a third-party beneficiary and the holder of a security interest in funds generated pursuant to a contract. In this respect, the decision of the Second Circuit Court of Appeals in *Septembertide* -- involving a similar competition -- is persuasive and determinative of the case at bar.

In Septembertide, the firm of Stein & Day, a New York publishing house (hereafter, the "Hardcover Publisher"), and Septembertide Publishing, B.V. (hereafter, the "Author"), a corporation representing the interests of the author of a certain work of fiction (hereafter, the "Work"), were parties to a licensing agreement that provided the Hardcover Publisher with, *inter alia,* exclusive licensing rights to publish a hardcover edition of the Work in exchange for the payment of royalties. In addition, the Hardcover Publisher was permitted to sub-license its rights in the Work to a paperback publisher. In consideration for the sub-licensing rights, the Hardcover Publisher was obliged, *inter alia,* to pay the Author a two-thirds share of its sub-licensing income.

Contemporaneous with the Hardcover Agreement, the [*23] Hardcover Publisher entered into a sub-license contract (hereafter, the "Paperback Agreement") with New American Library, giving it (hereafter, the "Paperback Publisher") the right to publish a paperback edition of the Work. In consideration therefor, the Paperback Publisher agreed to advance to the Hardcover Publisher $ 750,000 in several installments, of which $ 364,500 remained unpaid at the time of the subject dispute. The Paperback Publisher, aware of conflicting claims to these unpaid funds, deposited the same with the court rather than pay them (hereafter, the "Impounded Funds") to the Hardcover Publisher. n12

n12 Because the Impounded Funds were not placed in the hands of the promisee (the Hardcover Publisher), where they might have been commingled, the decision in *Septembertide* is not inconsistent with the law of this case as detailed in Section III.B. of this Memorandum of Decision.

Approximately one year after the Hardcover and Paperback Agreements were executed, the Hardcover Publisher arranged [*24] a credit facility with Bookcrafters U.S.A., Inc. (hereafter, the "Lender"). To secure the obligation due under that facility, the parties entered into a security agreement in which the Hardcover Publisher collaterally assigned all its contract rights and accounts to the Lender, including the rights it had to receive sub-license payments from the Paperback Publisher pursuant to the Paperback Agreement.

The Hardcover Publisher subsequently became insolvent and bankrupt, leaving both the Author and the Lender unpaid. The resulting dispute concerned the competing rights and/or interests of those two parties in the Impounded Funds. The Author claimed two-thirds of those Funds as a third-party beneficiary of the Paperback Agreement; whereas the Lender contended that it had a prior and superior right to those same Funds as proceeds of its security interest in the Hardcover Publisher's contract rights and accounts receivable, specifically including the rights and accounts flowing from the Paperback Agreement.

The parallel structure of *Septembertide* and the case at bar should be readily apparent. The Consortium, like the Hardcover Publisher, is a debtor; CDS, like the Paperback Publisher, [*25] is the source, pursuant to contract, of the funds subject to dispute; and the Contesting Publishers and the Bank, like the Author and Lender, are the competing third-party beneficiaries and security interest holders, respectively.

Septembertide affirmed a district court's determination that the Author was an intended third-party beneficiary of the Paperback Agreement. The Circuit Court also appears to have concluded that the Paperback Agreement's creation of third-party rights in the Author was tantamount to an actual assignment of a portion of the Hardcover Publisher's contract rights in the Paperback Agreement. In view of that deemed "assignment", the Circuit Court then concluded, in essence, that the debtor Hardcover Publisher could only have granted the Lender a security interest in one-third of its income under the Paperback Agreement because rights to the other two-thirds of those proceeds had been previously assigned to a third-party beneficiary -- the Author -- at the time of the making of the Paperback Agreement. *Id. at 681-82.* This novel chain of holdings (hereafter, the "Fundamental Holdings") n13 is what

ultimately fuels the contentions of the Contesting Publishers [*26] here. Nonetheless, despite any initial or superficial appearance of support, the decision in Septembertide is actually hostile to the Contesting Publishers' point of view. That is because what the Circuit Court found to be most salient, and ultimately dispositive, was the *timing* of the acquisition of the competing parties' rights and interests.

n13 *Septembertide's* Fundamental Holdings are novel in that they appear to announce a significant leap in the nature of remedies afforded an intended third-party beneficiary under New York law. Traditionally, third-party beneficiary status was thought to bestow upon the third party a simple, "procedural" remedy -- *i.e.* *standing* to bring a direct action against the promisor under the contract whose terms were intended to benefit it. In other words the beneficial status gave the third-party claimant *general contract creditor rights* against the promisor despite a technical lack of privity. *Septembertide* appears to expand that limited remedy somewhat dramatically by holding that a third-party beneficiary not only enjoys an enforceable contract *claim* against the promisor, but is also deemed to have an *interest* in specific property rights of the debtor-promisee, *e.g.*, a deemed ownership interest in a promisee's contract rights.

This Court notes that *Septembertide's* Fundamental Holdings were stated without reference or citation to pre-existing decisional authority, except for the ruling of the district court below. This Court has searched for precedent from other jurisdictions supporting the substantive remedy announced in *Septembertide,* but has located nothing akin to that principle. This Court is not the first observer to note the novelty and reach of *Septembertide's* Fundamental Holdings. *See* Orna S. Paglin, *How Secure is a Secured Creditor?* The *Septembertide Case,* 113 Banking L.J. 784, 789-95 (1996):

Nonetheless, even under the novel remedial approach of *Septembertide* -- a case where the subject funds were *impounded* -- it is far from clear that such doctrine would be extended to a case in which the subject funds were not impounded, but rather, received by the promisee, commingled, and ultimately disbursed to various payees.

[*27]

In Septembertide the Circuit Court concluded that "[i]n resolving the question of priority between a secured creditor and an intended third-party beneficiary whose interest in the collateral preceded it, *a first in time, first in right rule applies." Id., at 682* (emphasis supplied). While this holding is technically limited to *Septembertide's* unique fact, *i.e.* where the third-party rights "preceded" the interest of the secured creditor, this Court can think of no principled reason why the "first in time, first in right" rule would not also apply under the reverse scenario, *i.e.* where the acquisition of the third-party rights *followed* the granting of the security interest. Otherwise, Septembertide's first in time, first in right "rule" would not be a rule at all; it would be merely a *description* of the particular outcome when third-party rights precede a security interest.

The Contesting Publishers may well admit that their third-party rights were acquired after the execution of the Security Agreeme -- *i.e.* at the time of the making of the Agency Agreement -- yet not concede that the Bank was "first in time" because, they might argue, the [*28] Bank's security interest in the Consortium's contract rights in the Agency Agreement was not enforceable until the existence of the Agency Agreement because its interest did not *attach* until the *making* of that Agreement. See generally, *UCC § 9-203* (2000). At best though, such an argument would establish *simultaneous* attachment of the Bank and Contesting Publishers' respective interests in the subject property; it would not elevate the Contesting Publishers to "first in time" status.

Assuming *arguendo* that there was simultaneous attachment of the interests of the Bank and the Contesting Publishers, how should a court ultimately determine priority? Given the absence of direct authority on the simultaneous attachment of the interests of a secured creditor and the rights of a third-party beneficiary, this Court logically turns for guidance to the closely analogous competition between two secured creditors in the same item of collateral, *e.g.*, contract rights in a specific agreement. Under that instructive paradigm it is interesting to note that if the subject contract was made at or after the granting and perfection of the latter of the two security interests, [*29] then both creditors' security interests would *attach* at the same time, *i.e.* at the time of the making of the subject contract. Yet despite such simultaneous attachment, it is black letter law that if Secured Creditor "A" possessed a valid and perfected security interest prior to Secured Creditor "B", then Secured Creditor "A" would be granted priority and allowed to satisfy fully its secured claim from the proceeds of the subject contract rights before Secured Creditor "B" would be entitled to any satisfaction from

the same collateral. n14 See generally, *UCC § 9-322* (2000). The key temporal principle is not *attachment,* but the *granting and perfection* of the respective interests. In other words, in the case of the instant competition, an appropriate rule would accord priority to the *claimant which first dealt with the debtor with respect to the collateral.* Accordingly, the Bank must be the prevailing party under *Septembertide's* first in time, first in right rule, even if its interest did not attach to the Consortium's contract rights in the Agency Agreement until the advent of that Agreement.

> n14 This statement excludes *marshalling* and any other equitable doctrine not implicated by the facts of the present case and proceeding.

[*30]

Other statements in the Septembertide opinion are directly supportive of the Bank's primacy. For instance, the Circuit panel observed that "[i]t has always been the law in New York that an assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor *that were in existence prior to the assignment.*" Id. (emphasis supplied). Applying this statement of law to the instant factual circumstances, it should be self-evident that the "assignee" here (the Bank) does *not* "take subject to" the "liabilities" of its "assignor" (the Consortium) because those liabilities (the Contesting Publishers' third-party rights) were not "in existence *prior to* the assignment [of the Security Agreement]." (emphasis supplied).

A final observation by the Septembertide panel is instructive here, to wit: "It seems fair to require, as between a trade creditor and an author, that the creditor-assignee prudently ascertain the actual existence of its collateral before agreeing to take a security interest in it." *884 F 2d at 682.* In Septembertide, "[a]n examination of the Hardcover Agreement, flagged by the Paperback Agreement, would quickly [*31] have revealed [the Author's third-party] interest. . . ." Applying this principle to the instant case again confirms the wisdom of a rule that elevates the creditor which first dealt with the debtor with respect to the collateral. If the assignee here (the Bank) had "prudently" sought to ascertain the existence and extent of its prospective collateral -- *e g,* contract rights and accounts -- it would not have discovered the Contesting Publishers' third-party rights in the Agency Agreement since that Agreement was not extant at that time.

In sum, an extension of the principles announced in *Septembertide* to the facts of the instant case and adversary proceeding compel this Court to accord

priority to the interest of the Bank over that of the Contesting Publishers in the January-March Sales Payments.

**D. Equitable Considerations.**

The outcome impelled by Septembertide and the law of the case is strengthened and confirmed by an examination of principles of equity. A ruling recognizing a superior property right in the Contesting Publishers would be a windfall for them, and effect an undue forfeiture upon the Bank, because the Contesting Publishers' acquisition of [*32] their superior interest would have occurred simply through the intervention of the Agency Agreement, the making of which was unknown to them and for which they gave no value.

With respect to the proceeds from the sale of their books, the Publishers never bargained to be anything more than general unsecured creditors. At the time they entered into their distribution agreements with the Consortium, the Publishers' expectation and reliance was upon a state of affairs in which the Consortium's sales transactions with its customers were on an open account basis, which did not serve as a source of third-party beneficial rights. The only rights the Publishers had beyond those of general unsecured creditors of the Consortium were consignment rights entitling them to repossession of their unsold book inventory. However, once the book inventory was sold, the Publishers had no rights or interests in the resulting accounts receivable, cash proceeds, deposit accounts, etc., in which the Bank held a security interest.

Following the advent of the Agency Agreement, the Publishers still possessed consignment rights in their books; yet in addition, the Contesting Publishers claim, they also then enjoyed [*33] third-party beneficial rights in the "proceeds" resulting from the sale of their book inventory. These additional, putative rights were not bargained for by the Publishers, nor does the record suggest that they gave any value for them. In point of fact, most, if not all, of the Publishers were completely ignorant of the prospect and/or terms of the Agency Agreement until it was announced to them by the Consortium. Hence, any rights or interests acquired by them via the Agency Agreement can be fairly characterized as a windfall.

The flip-side of the Contesting Publishers' windfall is a forfeiture from the Bank. Prior to the creation of the Agency Agreement, the Bank acquired a property interest in, *inter alia,* all of the Consortium's existing and future contract rights and accounts. Thus, the Bank bargained for and received its interest in future contracts, such as the Agency Agreement, well before the time when the

2007 Bankr. LEXIS 766, *

Contesting Publishers argue that they too acquired an interest in the Agency Agreement. Under those circumstances, a recognition by this Court of superior rights in the Contesting Publishers would amount to a forfeiture of the Bank's property. Equity abhors a forfeiture. [*34] E.g., *Jones v New York Guaranty & Indemnity Co , 101 U.S. 622, 25 L. Ed. 1030 (1879)*. Accordingly, equity dictates that this Court recognize and protect the superior interest of the Bank in the January-March Sales Payments.

## IV. CONCLUSION

The law of this case and adversary proceeding, together with persuasive Second Circuit authority, and ultimately confirmed by a consideration of principles of equity, compel this Court to declare that the Bank has an interest in the subject property that is superior to the third-party beneficial rights and/or interests of the Contesting Publishers. A separate order and judgment shall enter effectuating this declaration in the instant case and adversary proceeding.

Dated: March 12, 2007

BY THE COURT

**Albert S. Dabrowski**

**Chief United States Bankruptcy Judge**

2006 U.S. Dist. LEXIS 90074, *

LEXSEE 2006 U.S. DIST. LEXIS 90074

**U.S. CLAIMS, INC., Plaintiff, v. FLOMENHAFT & CANNATA, LLC, et al., Defendants.**

**CIVIL ACTION NO. 2:06-CV-0978-LDD**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 90074*

**November 13, 2006, Decided**
**November 13, 2006, Filed; November 14, 2006, Entered**

**COUNSEL:** [*1] For U.S. CLAIMS, INC., Plaintiff: LEE M. HERMAN, LEAD ATTORNEY, LEE M. HERMAN, ESQ. P.C., MEDIA, PA US.

For MICHAEL FLOMENHAFT ESQUIRE, Defendant: JEFFREY A. ZUCKER, FISHER & ZUCKER LLC, PHILADELPHIA, PA.

For FLOMENHAFT & CANNATA, LLP, MICHAEL FLOMENHAFT, ESQUIRE, Defendants: JEFFREY A. ZUCKER, FISHER & ZUCKER LLC, PHILADELPHIA, PA; PAUL JOSEPH CIANCI, FISHER ZUCKER LLC, PHILADELPHIA, PA US.

For THE STILLWATER ASSET BASED FUND, LP, Defendant: JEFFREY S. SALTZ, LEAD ATTORNEY, LAW OFFICE OF JEFFREY S. SALTZ P.C., PHILADELPHIA, PA.

**JUDGES:** Legrome D. Davis, J.

**OPINION BY:** Legrome D. Davis

**OPINION:**

MEMORANDUM

Davis, J.

Presently before the Court is Defendant the Stillwater Asset-Backed Fund LP's Motion to Dismiss the Amended Complaint or to Transfer (Doc. No. 19) and Plaintiff's Response in Opposition (Doc. No. 24). Upon careful consideration of Plaintiff's pleadings, and after hearing oral argument on the matter on October 13, 2006, for the reasons set forth below, Defendant's Motion to Dismiss or Transfer is hereby GRANTED as to the dismissal of Count VI of the Amended Complaint (the declaratory judgment claim) and DISMISSED on the remaining grounds as moot.

I.    FACTUAL    [*2]    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff U.S. Claims, Inc. is a Delaware corporation engaged in the business of purchasing from attorneys fee interests in pending legal claims. Defendant Michael Flomenhaft is an attorney licensed to practice in New York, and is a partner of Defendant Flomenhaft & Cannatta LLP, a New York Limited Liability Partnership (collectively "the Flomenhaft Defendants"). From late-2001 to mid-2003, the Flomenhaft Defendants executed a series of purchase agreements with Plaintiff, in which they agreed to sell their interests in future fees they would earn in various personal injury claims in exchange for a number of monetary advances from U.S. Claims. Each agreement contains a list of a number of the law firm's clients ("claimants"), and the agreement purports to sell and assign to U.S. Claims an "interest" in the fees earned by the firm in connection with each claimant's claim. See Am. Compl., Ex. A at 1. Total fees are determined based on terms of the attorneys fee agreements the firm has with each client. Id. U.S. Claims' "interest" is calculated based on the amount originally advanced to the firm, with the "interest" owned by Plaintiff [*3] increasing every month, ultimately tapering off and resulting in a final amount after a period of one to two years, depending on the terms of the relevant purchase agreement. See, e.g., id., Ex. A at 7-8. If any of the clients hires new counsel, or if any claims result in no proceeds, either as a result of an adverse verdict or a voluntary or otherwise termination, the firm must transfer to U.S. Claims "makeup fees" from other claims "in an amount at least equal to the estimated Fees with respect to any such Claim for which no Fee was payable." Id., Ex. A at 4. U.S. Claims is entitled to one hundred percent (100%) of what the firm collects as its fee in connection

with each named claimant's case, until such time as the firm fully satisfies Plaintiff's "interest." Id., Ex. A at 1. No financing statements were ever filed by U.S. Claims with regard to any of these purchase agreements.

Subsequently, the Flomenhaft Defendants entered into a financing agreement with the Defendant the Stillwater Asset-Backed Fund LP ("Defendant Stillwater"), a New York partnership, in which the Flomenhaft Defendants pledged all their assets to Stillwater in exchange for a monetary advance. Am. [*4] Compl. P 20. Stillwater filed a financing statement for this transaction in January 2005. Id. Plaintiff alleges Stillwater had knowledge of the terms of Plaintiff's agreements with the Flomenhaft Defendants because the Stillwater transaction was arranged by Brian Spira, a former representative of U.S. Claims who previously arranged the Plaintiff's financing transactions with the Flomenhaft Defendants. Id. at P 21. After entering into the agreement with Stillwater, U.S. Claims alleges that the Flomenhaft Defendants have refused to honor their payment obligations to Plaintiff because they claim all their assets are now subject to Defendant Stillwater's lien. Id. at P 22.

Plaintiff is suing the Flomenhaft Defendants for allegedly violating the purchase agreements and is proceeding against Defendant Stillwater for a declaratory judgment that Plaintiff's rights in the Flomenhaft Defendants' assets are superior to those of Stillwater. On September 29, 2006, Defendant Stillwater moved to dismiss Plaintiff's complaint (1) for failing to properly allege diversity of citizenship, (2) for improper venue under *28 U.S.C. § 1406(a)*, or in the alternative, for [*5] a change of venue to the Southern District of New York pursuant to *28 U.S.C. § 1404*, and (3) for failure to state a claim. Plaintiff has subsequently amended its Complaint to cure the defect in its diversity of citizenship pleading. n1 Thus Defendant Stillwater's first ground for dismissal is now moot.

> n1 Indeed, counsel for Defendant Stillwater acknowledged at oral argument that Plaintiff's Amended Complaint now properly alleges citizenship for purposes of establishing diversity jurisdiction. Tr. of Or. Arg. at 4.

## II. LEGAL STANDARD

A motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* tests the legal sufficiency of the complaint. See *Markowitz v. Ne. Land*

*Co., 906 F.2d 100, 103 (3d Cir. 1990)*; *Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987)*. Dismissal for failure to state a claim is appropriate when it clearly appears that the plaintiff can prove no set of facts in support [*6] of the claim which would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *Robb v. Philadelphia, 733 F.2d 286, 290 (3d Cir. 1984)*. In deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, all facts alleged in the complaint must be accepted as true. *Malia v. Gen. Elec. Co., 23 F.3d 828, 830 (3d Cir. 1994)*. A court may also consider any document appended to and referenced in the complaint on which plaintiff's claim is predicated. See *Fed. R. Civ. P. 10(c)*; *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1426 (3d Cir. 1997)*; *In re Westinghouse Sec. Litig., 90 F.3d 696, 707 (3d Cir. 1996)*. While a court is to treat all facts alleged in the complaint as true when resolving a motion to dismiss, the same treatment does not extend to legal conclusions masquerading as facts. See, e.g., *Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997)*; *Plasko v. City of Pottsville, 852 F. Supp. 1258, 1261 (E.D. Pa. 1994)*. Nor must a court accept as true conclusory allegations contradicted by documents [*7] underlying the complaint. *Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1295-96 (9th Cir. 1998)*. A claim may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. See *Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 179 (3d Cir. 1988)*.

## III. DISCUSSION

In Count VI of its Complaint, Plaintiff seeks a declaratory judgment against Defendant. Am. Compl. PP 49-54. U.S. Claims alleges that because the purchase agreements at issue created sales of "payment intangibles" under Article 9 of the Uniform Commercial Code ("Article 9"), perfection was automatic pursuant to *UCC § 9-309(3)*, and thus Plaintiff is entitled to a declaratory judgment that Plaintiff's security interest in the Flomenhaft Defendants' assets is superior to that asserted by Stillwater. Id. at PP 50-51. Defendant Stillwater has moved to dismiss this claim under *Fed. R. Civ. P. 12(b)(6)*, arguing instead that the relevant purchase agreements involved sales of "accounts," and not of "payment intangibles." Therefore, Stillwater argues, [*8] since U.S. Claims did not perfect its interest by filing, Stillwater's perfected security interest in the Flomenhaft Defendants' assets has priority as a matter of law.

The creation of a valid and enforceable security interest requires (1) the secured debtor receive some value, (2) the debtor have rights in the collateral at issue,

and (3) an agreement. *UCC § 9-203(b)*. n2 When all three requirements are met, a security interest "attaches" to the collateral and is enforceable between the parties to the agreement. *UCC § 9-203(a)*. The next step, "perfection," is necessary in order to maximize the secured creditor's rights (i.e. to establish priority) against third persons laying claim to the same collateral. 4 James J. White & Robert S. Summers, Uniform Commercial Code § 30-1(b) (5th ed. 2002). Where there are conflicting security interests in the same collateral, priority is determined by looking to the order of perfection. See *UCC § 9-322(a)*. Perfected security interests take priority over conflicting unperfected interests. *UCC § 9-322(a)(2)*. The subjective knowledge of a secured creditor [*9] with regard to another's conflicting security interest is irrelevant: the first to perfect prevails. *UCC § 9-322*, cmt. 4, ex. 2.

n2 Both parties agree that Revised Article 9 of the Uniform Commercial Code governs this dispute.

A. Proper Characterization of the Transactions at Issue

The procedure required to perfect a security interest depends on the type of collateral involved. While perfection is most commonly accomplished through the filing of a financing statement, with some types of collateral, perfection is automatic. White & Summers, supra § 30-1(b). Therefore, resolution of the issue in this case turns on the proper legal characterization of the assets that are the subjects of the purchase agreements between U.S. Claims and the Flomenhaft Defendants. If, as Plaintiff claims, the purchase agreements provided for sales of "payment intangibles," perfection is automatic upon attachment, see *UCC § 9-309(3)*, and Plaintiff prevails. On the other hand, if the [*10] transactions between U.S. Claims and the Flomenhaft Defendants involved sales of "accounts" as Stillwater argues, then Stillwater's perfected interest takes priority over Plaintiff's unperfected interest. See *UCC § 9-102*, cmt. 5(a) (when accounts are sold, financing statement must be filed to perfect buyer's interest); see also *UCC § 9-322(a)(2)* (perfected interests prevails over unperfected interests).

Under *UCC § 9-102(a)(2)*, "account" is defined as "a right to payment of a monetary obligation, whether or not earned by performance ... for services rendered or to be rendered." "General intangible" is defined as "any personal property, including things in action, other than accounts," including "payment intangibles." *UCC § 9-102(a)(42)*. "Payment intangible" is further defined as "a

general intangible under which the account debtor's principal obligation is a monetary obligation." *UCC § 9-102(a)(61)*.

The proper Article 9 characterization of interests like the ones at issue in this case has not been frequently litigated, as in most instances the parties do not dispute [*11] that legal fees, both earned and unearned, are properly characterized as "accounts" or "accounts receivable." See *Cadle Co. v. Schlichtmann, 267 F.3d 14, 18 (1st Cir. 2001)* (where law firm gave bank security interest in anticipated fees for particular case, court deemed the contingency fee agreement to be part of the firm's "accounts receivable"); *In re Holstein Mack & Klein, 232 F.3d 611, 612 (7th Cir. 2000)* (court termed bank's security interest in legal fees to be earned from personal injury and class action suits by law firm interest in the firm's "receivables"). However, at least one court has squarely held that an unmatured contingency fee contract is an "account" under Article 9 of the UCC. See *PNC Bank v. Berg, 1997 Del. Super. LEXIS 19, 1997 WL 527978, *9 (Del. Super. Ct Jan 31, 1997)*. The precise question in Berg was whether a lender can take a security interest in a law firm's hourly billing and contingency fee contracts. *Id. 1997 Del. Super. LEXIS 19, [WL] at *8*. While neither party disputed that a matured contingent fee claim was an "account" under the UCC, the law firm argued that because of the contingent and uncertain nature of the fee agreements, the unmatured fee [*12] contracts could not be subject to securitization at all. *Id. 1997 Del. Super. LEXIS 19, [WL] at *8-9.* The Berg Court, however, concluded that matured or not, both the hourly billing and contingency fee contracts are "contract rights," defined as "any right to payment under a contract not yet earned by performance." *Id. 1997 Del. Super. LEXIS 19, [WL] at *9* (citing *United States v. Samel Refining Corp., 461 F.2d 941, 942 (1972)* (defining "contract rights" under Pennsylvania law)). Therefore, the fee contracts constituted "accounts" under the Uniform Commercial Code. See id. (noting that the UCC's definition of "accounts" was amended in 1972 to include contract rights).

However, Plaintiff argues that while the cases cited by Defendant Stillwater are correct, they nevertheless do not control the outcome here because those cases were "decided at a time when there was no concept of a payment intangible under the UCC." Pl.'s Resp. at 8. According to U.S. Claims, the concept of "payment intangible" was only added to the UCC in 2001. Id. Instead, Plaintiff relies on In re Cohen to distinguish between an "account" and a "payment intangible," arguing that since the *"sine qua non* of an account is the existence [*13] of a monetary obligation that is not contingent," the interests at issue here cannot be an

"account" because the Flomenhaft Defendants' fees are contingent on the outcomes of the underlying tort claims. *Id.* (citing *In re Cohen*, 305 B.R. 886, 903 (B.A.P. 9th Cir. 2004)). This Court disagrees.

First, while it is true that among the revisions to Article 9 was the addition of a separate definitional provision for "payment intangible," contrary to Plaintiff's assertion, the concept nevertheless existed in the UCC prior to 2001. See 2 Eldon H. Reiley, Security Interests in Personal Property § 33:9 (Oct. 2005) (noting that while payment intangible was not defined previously, "what revised Article 9 separately defines as a payment intangible, existed as a general intangible under the original text"); see also *US Test, Inc v NDE Environmental Corp*, 196 F.3d 1376, 1383 (Fed. Cir 1999) (citing to Article 9 of the UCC, in which "general intangibles" is defined to "include[] payment intangibles and software"). Regardless, the Delaware Superior Court reached its decision based on an interpretation of the then definition of "account," a definition [*14] that has not changed in any material way since Berg. Compare *UCC § 9-102(a)(2)* (current version) ("a right to payment of a monetary obligation, whether or not earned by performance ... for services rendered or to be rendered") with *UCC § 9-106* (previous version) ("any right to payment ... for services rendered ... whether or not it has been earned by performance"). Revised Article 9 did nothing to change the concept of "account," in fact, the revisions only expanded it; the current definition sweeps under its coverage many categories of rights to payment previously categorized as "general intangibles" under the prior version of Article 9. *UCC § 9-102*, cmt. 5(a). Indeed, commentators have remarked that "the expanded definition of accounts has virtually eaten up the category of payment intangibles." 1 Eldon H. Reiley, Security Interests in Personal Property § 4:14 (Oct. 2005). Furthermore, irrespective of whether "payment intangibles" existed when Berg was decided, neither party disputes that "payment intangibles" are a subclass of "general intangibles": every "payment intangible" is necessarily also a [*15] "general intangible." *UCC § 9-102*, cmt. 5(d). Therefore, if legal fee agreements were "accounts" and *not* "general intangibles" under the earlier Article 9, they certainly cannot become a sub-category of "general intangibles" now.

Second, *Cohen* is inapposite to the disposition of this case. In Cohen, the Cohens pledged the anticipated proceeds of their pending tort claim in exchange for a loan from a neighbor. 305 B.R. at 889. The Bankruptcy Panel held that the pledge constituted a transfer of a "general intangible." *Id. at 904.* The interest was not a "payment intangible" or an "account" because at the time the expectation was pledged, the action had not yet been reduced to settlement or judgement and thus there existed no contractual obligation to pay between the alleged tortfeasor and the Cohens. *Id. at 903.* Unlike the case in Cohen, the subjects of the security interests in Berg and in this case arise not from tort, but from contract -- that is, from the fee agreements in place between the attorneys and the clients. What was transferred by virtue of the purchase agreements at issue here was [*16] not the underlying tort claims of the claimants, but rather the right of the Flomenhaft Defendants to collect legal fees for the services they provided in prosecuting those claims. The "contingency" in Cohen was whether the tort claim would ever result in any obligation on the part of the alleged tortfeasor to pay the Cohens since there was no underlying contract creating that obligation. But where a fee contract is involved, no such contingency exists because there is nevertheless a "right to payment," even if that *right* is rendered more speculative by the fact that the *amount* of payment earned by future performance depends on a favorable outcome of the underlying legal action. Furthermore, as counsel for Stillwater pointed out at oral argument, nothing in Article 9's definition of "account" supports Plaintiff's contention that any contingency necessarily precludes the asset from being classified as an "account." See Pl.'s Resp. at 8 ("[t]he distinction between an *account* and a *payment intangible* involves the amount of risk inherent in the asset ... [a] payment intangible may be contingent or not; an account is in no way contingent").

As such, this [*17] Court is persuaded by the conclusion of the Berg Court that unmatured contingency fee agreements are a form of "contract right" and thus are "accounts." See *Berg, 1997 Del Super LEXIS 19, 1997 WL 527978 at *9.* Nothing in Cohen disturbs the sound holding of Berg. The fee contracts at issue here created rights to receive payment for services to be rendered by the Flomenhaft Defendants on behalf of their clients, and thus fall squarely under Article 9's definition of "account." See *UCC § 9-102(a)(2)* ("[a]ccount ... means a right to payment of a monetary obligation, whether or not earned by performance ... for services rendered or to be rendered").

B. Stillwater's Knowledge of the Purchase Agreements

Plaintiff further argues that because Defendant Stillwater had actual knowledge of U.S. Claims' security interest in certain assets of the Flomenhaft Defendants at the time Stillwater acquired its interest, this "places the lien priority discussion in a different light." Pl.'s Resp. at 9. Presumably, Plaintiff is suggesting that Stillwater's subjective knowledge should somehow subordinate its security interest, notwithstanding its perfection.

However, this [*18] argument is in direct contravention of the clear dictates of Article 9 that a creditor's subjective knowledge is wholly irrelevant to the question of lien priority. White & Summers, supra § 33-3 (under UCC § 9-322, "[i]f the competitor filed first or perfected first ... that is the end of it; that party wins even if aware of the other party's prior but unperfected claim at time of filing"). The Article 9 rules on priority are clear: perfected interests prevail over unperfected ones, UCC § 9-322(a)(2), and the first to perfect wins, UCC § 9-322(a)(1). As such, Plaintiff's argument to the contrary must be rejected.

C. Applicability of the Automatic Perfection Provision in UCC § 9-309(2)

Lastly, Plaintiff asserts that even if the assets transferred by the purchase agreements are "accounts," the assignments were nevertheless subject to automatic perfection under UCC § 9-309(2) because they did not collectively transfer a significant part of the Flomenhaft Defendants' outstanding accounts. Pl.'s Resp. at 9; see UCC § 9-309(2) (automatic perfection [*19] occurs in the case of "[a]n assignment of accounts ... which does not by itself or in conjunction with other assignments to the same assignee transfer a significant part of the assignor's outstanding accounts"). The first time Plaintiff raised this alternate argument was in its response to Stillwater's Motion to Dismiss. However, the Amended Complaint is completely devoid of the factual allegations necessary to establish the applicability of UCC § 9-309(2), namely that the purchase agreements at issue collectively did not result in the transfer to U.S. Claims of a significant part of the Flomenhaft Defendants' outstanding accounts. Therefore, since Plaintiff has failed to adequately plead the potential applicability of UCC § 9-309(2) in its Amended Complaint, the Court cannot consider this ground in resolving the instant Motion to Dismiss. n3

n3 In any event, the Court notes that the UCC § 9-309(2) exception is unlikely to aid Plaintiff in its position even if it had been adequately pled. While nothing in the plain text of the provision appears to bar its application to this case, the official comments make patently clear that the exception is not intended to apply to assignors like U.S. Claims: "[t]he purpose of [§ 9-309(2)] is to save from ex post facto invalidation casual or isolated assignments -- assignments which no one would think of filing. Any person who regularly takes assignments of any debtor's accounts or payment intangibles should file." UCC § 9-309, cmt. 4; see also 9 Lary Lawrence, Lawrence's

Anderson on the Uniform Commercial Code § 9-302:19 (3d ed. rev. 2006) (regular financiers should know of filing requirement and generally are not protected by this exception). Plaintiff is a financial enterprise engaged in the business of purchasing attorneys' fee interests. See Am. Compl. P 1. Furthermore, as U.S. Claims' interests at issue are alleged to have totaled in excess of three million dollars, it is hard to believe that a sophisticated corporation like Plaintiff would have regarded the transactions as "casual" such that it failed to consider that it may be necessary to file in order to protect its interests.

[*20]

IV. CONCLUSION

The Court concludes that the purchase agreements executed between the Flomenhaft Defendants and Plaintiff constituted sales of "accounts" under Article 9 and thus are not subject to automatic perfection. Therefore, because Plaintiff did not filed the requisite financing statements, Plaintiff's security interest is unperfected and thus is subordinate to Defendant Stillwater's perfected conflicting interest. UCC § 9-322(a)(2).

In conclusion, Plaintiff cannot prevail on its declaratory action against Stillwater because Stillwater's interests are superior as a matter of law. Since Defendant Stillwater will be dismissed from this action, the other arguments raised in its Motion to Dismiss or Transfer with regard to venue are thus rendered moot. An appropriate Order follows.

ORDER

AND NOW, this 13th day of November 2006, upon consideration of Defendant the Stillwater Asset-Backed Fund LP's Motion to Dismiss the Amended Complaint or to Transfer (Doc. No. 19), Plaintiff's Response in Opposition (Doc. No. 24), and hearing oral argument on the matter on October 13, 2006, it is hereby ORDERED that Defendant's Motion to Dismiss or Transfer is GRANTED [*21] with respect to Count VI of the Amended Complaint (the declaratory judgment action against the Stillwater Asset-Backed Fund LP), and DISMISSED as moot with regard to the remaining grounds. It is further ORDERED that Count VI of the Amended Complaint shall be DISMISSED, and that the Stillwater Asset-Backed Fund LP shall be DISMISSED from the case.

BY THE COURT:

2006 U.S. Dist. LEXIS 90074, *

Legrome D. Davis, J.