

## PHARMACY SERVICES AGREEMENT

This Pharmacy Services Agreement ("Agreement") is made between PharMerica, Inc. ("Provider"), for and on behalf of its operating subsidiaries, and the party identified below as "License Owner". The parties agree as follows:

1. PharMerica, Inc. warrants and represents that it has the legal power and authority to, and by executing this Agreement intends to, enter into a legal, valid, and binding obligation on behalf of, and enforceable against, its operating subsidiaries that provide Services and Products (as further defined in this Agreement) pursuant to this Agreement.

2. License Owner represents and warrants that, if License Owner is not the actual licensee for the health care facility ("Facility") identified below, License Owner has the legal power and authority to, and by executing this Agreement intends to, enter into a legal, valid, and binding obligation on behalf of, and enforceable against, both License Owner and the actual licensee of the Facility, and the person signing as License Owner's representative shall be directly liable to Provider for License Owner's responsibilities under this Agreement if such is not the case.

3. Provider will provide pharmacy related Services and Products to the Facility in accordance with the terms and conditions of this Agreement.

4. The following documents are made part of this Agreement:

   - Terms and Conditions.
     - Schedule A-1 - Standard Services and Pricing.
     - Schedule A-2 - Medical Records Services and Pricing.
     - Schedule A-3 - Consulting Services and Pricing.

5. The Initial Term of the Agreement is from August 1, 2004 to July 31, 2005.

IN WITNESS WHEREOF, the parties have executed this Agreement and intend to be legally bound by it.

"Provider"

PharMerica, Inc.,
a Delaware corporation

Jim Allen
Regional Director of Sales
Dated: 6 30 04

PharMerica's Address for Notice:

PharMerica
3410 East Twelve Mile Road
Suite A
Warren, Michigan 48092

With Required Copies to:

Director, Risk Contracting
PharMerica, Inc.
175 Kelsey Lane
Tampa, Florida 33619

General Counsel
PharMerica, Inc.
175 Kelsey Lane
Tampa, Florida 33619

"License Owner"

Grand Blanc, LLC
a Florida corporation

Avi Klein
Owner
Dated: 6/30/04

Name & Address of Facility:

TriState of Grand Blanc
d/b/a Riverbend Post Acute Continuing Care
11941 Belsay Road
Grand Blanc, Michigan 48439

License No. _____

License Owner's Address for Notice:

TriState Health Investors, LLC
1680 Michigan Avenue
Suite 736
South Beach Miami, Florida 33154

## Pharmacy Services Agreement
## Terms and Conditions

**1. Services.**

(a) During the term of this Agreement, Provider will provide to the Facility the pharmacy-related services ("Services") and prescription drugs and other health care related products and medical devices ("Products") described in Schedules A-1 through A-3 (attached) in accordance with the terms and conditions of this Agreement.

(b) During the term of this Agreement, License Owner shall use Provider for all of its requirements of the pharmacy-related Services and Products covered by this Agreement. Provider shall be the exclusive provider of Services and Products to the Facility; subject, however, to the rights of patients and their insurers, payors or physicians to select other providers, and as otherwise is consistent with applicable law.

**2. Equipment.** Where permitted by law, Provider will provide to the Facility mobile medication carts, one fax machine and other equipment (such as infusion administration devices) as Provider deems necessary for the provision of the Services and Products at the Facility, on the following terms:

(a) The License Owner shall use the equipment only in connection to its use of Provider's Services at the Facility. For instance, License Owner will use the fax machine to submit orders to Provider for the Facility and for no other purpose.

(b) Equipment provided by Provider will remain Provider's property, and License Owner shall return the equipment to Provider upon termination of this Agreement. License Owner shall not do anything to infringe on Provider's ownership rights. License Owner shall sign legal documents (such as UCC statements) as reasonably requested by Provider to protect its ownership interest in the equipment.

(c) License Owner will secure the equipment (including, without limitation, the keys to the medication carts). License Owner will maintain the equipment in good and serviceable condition and will pay for any loss of or damage to the equipment (normal wear and tear excepted) that occurs while the equipment is in its possession. Provider will replace the equipment as needed due to normal wear and tear.

**3. License Owner's Responsibilities.** During the term of this Agreement, License Owner shall do the following:

(a) Designate one or more employees at the Facility who have the authority and responsibility to implement the Services in coordination with Provider.

(b) Clinically monitor its patients' drug therapies at the Facility. License Owner will coordinate and communicate with each patient and his physicians, pharmacists and other health care providers regarding the patient's needs and care. License Owner will provide Provider with access to its medical records database for the patients.

(c) Obtain any necessary consents or authorizations for the Services from the patient or his legally responsible representative.

(d) Provide sufficient access to and adequate space within the Facility to enable Provider to carry out its obligations pursuant to this Agreement.

(e) Store and handle all medications provided by Provider in accordance with applicable rules and regulations and the manufacturer and Provider's instructions.

(f) Provide Provider with complete patient billing information upon admission of a patient and within 24 hours of any change in status after that. Complete billing information will include admission data, source of payment, and information required for filing of claims to the resident or a third party payor, such as a managed care company, pharmacy benefits manager or government program.

(g) If License Owner fails to provide the required information for a patient to Provider, Provider shall have no obligation to provide Services for that patient unless License Owner or the appropriate Facility representative (as License Owner's agent) authorizes and agrees to pay for the Services.

(h) If License Owner provides Provider with the wrong billing information for a patient, or if information it provides is too late to submit under the applicable payor's procedures, Provider may bill the License Owner (and License Owner shall pay Provider) for the Services.

**4. Pricing and Payment Terms.**

(a) Charges to Facility. Provider will submit monthly statements to License Owner for Services and Products that Provider provides to the Facility. License Owner shall pay each statement in full within 365 days of the statement date.

All amounts owed to Provider shall be collateralized by License Owner with a blanket lien on all accounts receivable of the License Owner and Facility. The collateral will be perfected under the requirements set forth in the Uniform Commercial Code and the rules and regulations of the applicable jurisdiction.

License Owner shall be financially responsible for Services and Products Provider provides for a resident if Provider is not eligible after 120 days for reimbursement for its Services and Products from the resident or a third party payor, such as a managed care company, pharmacy benefits manager or government program. If Provider does receive reimbursement after 120 days, the Provider will reimburse License Owner for the previously paid claim.

License Owner shall be responsible for Bulk House Stock medication charges only if Provider receives prior authorization from an authorized individual at the Facility.

License Owner shall be responsible for paying all applicable taxes due for the Services and Products, including (without limitation) any sales taxes or other assessments applied to prescriptions dispensed by Provider.

(b) Third Party Payors. For Services and Products that Provider provides to a resident who has authorized Provider to be his pharmacy Provider and who has valid coverage for pharmacy benefits through a third party payor that is accepted by Provider, Provider will directly bill the third party payor. Nothing in this Agreement requires Provider to participate in any particular third party payor's program.

(c) Private Pay Residents. For Services and Products that Provider provides to a resident who has authorized Provider to be his pharmacy Provider and who is not eligible for coverage under a third party program accepted by Provider ("Private Pay Residents"), Provider will directly bill the Private Pay Resident or his legally responsible representative at the rates set forth on Schedule A-1. If the Private Pay Resident fails to pay any amount due to Provider within 120 days for Private Pay Residents, Provider may suspend providing Services and Products to the resident unless License Owner agrees to be responsible for Services and Products for the Private Pay Resident. In such a case, Provider will directly bill License Owner (and License Owner shall pay for) all Services and Products provided to the Private Pay Resident in accordance with subsection (a) above.

(d) Provider will bill Medicaid for all Medicaid residents.

(e) If License Owner fails to pay any undisputed amount due to Provider within the time limit required by this Agreement, Provider may upon 10 days written notice to Facility suspend Services to the Facility or, in Provider's discretion, to just those patients covered by the unpaid accounts.

(f) If License Owner fails to pay any amount due to Provider within the time limit required by this Agreement, License Owner shall pay Provider interest on the outstanding amount due. Interest will be calculated at the rate of 1.5% per month (or the highest rate permitted by law, whichever is less) from the due date until the outstanding amount and interest is paid.

(g) Unless License Owner is current under the agreed upon payment terms set forth in this Agreement, License Owner shall have no right to terminate this Agreement.

(h) If License Owner disputes any amount on a statement, License Owner must before the payment due date for the applicable statement (i) provide written notice to Provider of the dispute, and include documentation that shows the disputed amount is not due, and (ii) pay all undisputed amounts on the statement.

(i) Provider will have 30 days to respond in writing to License Owner's notice of the disputed amount; if Provider does not respond within the 30-day limit, the disputed amount will be considered to be not due. If the disputed amount is determined to be not due, Provider will issue a credit to License Owner for the applicable amount. If the disputed amount is determined to be due, License Owner will pay the amount plus interest calculated in accordance with this Agreement.

(j) If License Owner does not provide Provider with written notice that it disputes an amount due on a statement in accordance with the procedure set out in this section, the statement will be deemed to be correct and License Owner shall pay Provider the entire amount due on the statement (plus interest if applicable).

**5. Returns.** Provider shall manage returns in accordance with its then current return policy, which Provider may amend from time to time. Provider shall provide a copy of its return policy to License Owner on License Owner's written request.

**6. Term and Termination.**

(a) Term. The initial term ("Initial Term") of this Agreement is as shown on the signature page. When the Initial Term ends, the term shall renew automatically for successive periods of one year each.

(b) Termination. This Agreement may only be terminated as follows:

(1) Either party may terminate this agreement with or without cause, with 30 days written notice.

(2) At any time during the term, if a party (the "non-complying party") fails to perform any of its obligations in this Agreement in any material respect, then the other party (the "complaining party") may issue a written notice of such failure specifying in detail the nature of the failure. The non-complying party shall have 60 days (or in the case of a failure to pay money when due, 10 days) from the written notice to cure the failure. If the non-complying party does not cure the failure within the applicable time limit, the complaining party may immediately terminate this Agreement upon written notice.

(3) In accordance with the provisions of Section 13 (Change in Law).

(c) Termination Void If Amounts Past Due. Notwithstanding anything in Section 6(b) above, License Owner may not issue a written notice to terminate this Agreement if there are any payment amounts past due to Provider. Any termination notice issued by License Owner when there are payment amounts past due to Provider shall be void.

(d) Effect of Termination. Termination of this Agreement shall not release or otherwise affect any liability of either party for failure to perform this Agreement prior to the effective date of such termination. Each party's rights and remedies under this Agreement are cumulative and in addition to all other rights that the party has under applicable law.

**7. Third Parties.** Except as specifically set forth in this Agreement, this Agreement does not create any rights enforceable by any third party, including (without limitation) any resident or third party payor.

8. **Representations and Warranties.** Each party warrants and represents the following to the other party, and that each warranty and representation shall continue throughout the term of the Agreement:

(a) The party is a corporation or other recognized legal business or entity duly organized, validly existing, and in good standing under the laws of the state in which it is incorporated, organized, and/or operating.

(b) The party (i) has the corporate power and legal authority to enter into this Agreement and to perform its obligations hereunder, and (ii) has taken all necessary corporate or other action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder.

(c) This Agreement has been duly executed and delivered by the party, and constitutes a legal, valid, and binding obligation that is enforceable against such party in accordance with its terms.

(d) The party has all of the necessary qualifications, including but not limited to, certificates, permits, registrations, and/or licenses, pursuant to federal, state and local laws and regulations to perform its obligations under this Agreement, and all required consents, approvals and authorizations of all governmental authorities and other persons that must be obtained by such party in connection with this Agreement have been obtained.

(e) The execution and delivery of this Agreement and the performance of such party's obligations hereunder do not (i) conflict with or violate any requirement of applicable laws or regulations, or (ii) conflict with, or constitute a default under, any contractual obligation of that party, including contractual obligations with any other pharmacy provider.

(f) The party and any individual it employs or has contracted with to perform any part of this Agreement has not been excluded from participation in any federal health care program, as defined under 42 U.S.C. section 1320a-7b(f).

9. **Compliance with Law.**

(a) Each party shall comply with all applicable federal, state and local laws, rules and regulations (collectively, "Laws") now in effect or enacted during the term of this Agreement, including (without limitation) Laws about the dispensing of prescription drug products, pharmaceutical billing or sales practices, and governmental reporting and disclosure requirements.

(b) **Confidentiality of Patient Records.** Each party shall keep and maintain patient information and records in accordance with applicable law, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996, as amended, and its implementing regulations ("HIPAA"), and shall not release such information except as permitted or required by applicable law.

(c) Without limiting any other obligations under this Section, during the term of this Agreement and for 4 years after its termination, upon written request from the Secretary of the United States Department of Health and Human Services, the Comptroller General of the United States General Accounting Office, or any of their duly authorized representatives, each party shall make available a copy of this Agreement and such books, documents and records as are necessary to certify the nature and extent of the costs of the Services provided under this Agreement.

10. **Insurance.** As required by law each party shall maintain at all times during the term of this Agreement, at its sole cost and expense, appropriate workers' compensation and professional liability insurance coverage for its employed personnel.

11. **Indemnity.** Each party shall indemnify and hold harmless the other party and their respective officers, directors, shareholders, and agents from and against any and all claims, damages, demands, actions, liabilities, penalties, costs and expenses (including, without limitation, attorneys' fees, expenses and costs) (collectively "Loss") arising out of the actual or alleged acts or omissions of such indemnifying party, its employees and agents, in connection with this Agreement or any breach of any representation, warranty or covenant under this Agreement by the indemnifying party.

12. **No Special Damages.** Neither party shall have any liability for special, incidental, or consequential damages of the other party, even if the party has been advised of the possibility of such damages.

13. **Change in Law.** If there is a change in an existing (or adoption of a new) law, rule, regulation or administrative policy ("Change in Law") during the term of this Agreement that alters a party's rights or responsibilities hereunder in a material way, then upon request of the affected party, the parties will (in good faith) negotiate the terms of this Agreement, as applicable, so that for the remainder of the term of this Agreement the parties will be in the same position performing this Agreement that they would have been in without the Change in Law. If the parties are unable to agree upon such an amendment despite good faith negotiations over a period of 30 days, either party may thereafter terminate the Agreement by giving the other party 60 days written notice of termination.

14. **Proprietary Information.**

(a) In carrying out this Agreement, each party (the "Protected Party") may disclose to the other party (the "Restricted Party") certain proprietary, confidential or other non-public information (collectively, the "Confidential Information") relating to its business.

(b) Without limiting the definition of Confidential Information in the foregoing paragraph, Provider's business processes, pricing, customer materials (such as its training manuals and policy and procedures manuals), and the terms of this Agreement shall be considered Confidential Information of Provider.

(c) The Restricted Party agrees that it (i) shall hold the Protected Party's Confidential Information in confidence and protect it with the same degree of care that it uses to protect its own most confidential information, but in no event shall it use less than reasonable care, and (ii) shall not use such information for its own business other than as necessary to carry out this Agreement. Notwithstanding the foregoing, the Restricted Party shall have no obligation hereunder in respect of the Protected Party's Confidential Information if (a) it becomes generally available to the public through no act, omission or fault of the Restricted Party, or (b) at the time of disclosure was already in the possession of the Restricted Party and not subject to any existing restriction on disclosure or use. Either party may disclose Confidential Information of the other as required by law, legal process or regulatory authority.

(d) The Protected Party's Confidential Information shall remain the sole property of the Protected Party. The Restricted Party shall return all such Confidential Information upon the termination of this Agreement.

(e) The Restricted Party recognizes and agrees that there is no adequate remedy at law for a breach of this section, that such a breach would irreparably harm the Protected Party and that the Protected Party shall be entitled, without posting bond, to equitable relief (including, without limitation, injunctions) with respect to any such breach or potential breach in addition to any other remedies.

(f) This section shall survive termination of this Agreement.

15. **Change in Facility Management.** This Agreement runs with the Facility. If during the term of this Agreement (i) there is a transfer of ownership of the Facility by operation of law, (ii) License Owner through sale, assignment or otherwise transfers all or substantially all of the assets of the Facility, or (iii) License Owner otherwise transfers control of management of the Facility, to any third party (the "Transferee"), then for the remainder of the term of this Agreement the Transferee shall assume all of License Owner's responsibilities and obligations under this Agreement and be bound by all the terms and conditions of this Agreement as if the Transferee was "License Owner" under this Agreement. License Owner warrants and represents that it shall inform any potential Transferee of this provision.

16. **Miscellaneous.** (a) In all matters relating to this Agreement and its performance, the parties shall act in good faith and consistent with fair dealing. (b) A party shall be excused for any delay or failure in performing this Agreement (except for any delay or failure related to the payment of money) to the extent that the delay or failure is caused by acts of God, terrorism, fires, explosions, labor disputes, accidents, civil disturbances, material shortages or other similar causes beyond its reasonable control, even if such delay or failure is foreseeable. (c) Provider may assign this Agreement to any subsidiary or affiliate of PharMerica, Inc. without the prior written consent of License Owner. (d) Provider and License Owner are independent contractors. This Agreement shall not be deemed to create a partnership or joint venture, or employment or agency relationship between the parties. Provider shall retain sole and absolute discretion and judgment in the manner and means of providing Services to License Owner. (e) Neither party has the right or authority to assume or create any obligation or responsibility on behalf of the other. (f) A party shall send any written notice required or permitted by this Agreement by certified mail, postage prepaid, return receipt requested, or by use of a national overnight delivery service, to the other party at the notice address listed on the signature page of this Agreement, or to such other address that the other party designates upon written notice given in accordance with this provision. Written notices shall be effective upon receipt or refusal to accept delivery. (g) No failure or delay in exercising any right hereunder will operate as a waiver of such right. Any waiver of this Agreement must be in writing and duly executed by the party to be charged therewith. A waiver by a party of a full or partial breach or failure to perform this Agreement by a party shall not constitute a waiver of any subsequent breach or failure. (h) If any provision of this Agreement is found to be unlawful or unenforceable, the remaining portions of this Agreement shall continue in full force and effect and the parties shall endeavor in good faith to replace the unlawful or unenforceable provision with one that is lawful and enforceable and which gives the fullest effect to the intent of the parties as expressed in this Agreement. (i) If either party brings a lawsuit to enforce any of the terms or conditions of this Agreement, the prevailing party in the lawsuit shall be entitled to recover costs and attorneys' fees in addition to any other relief to which it may be entitled. (j) All amounts due to Provider pursuant to this Agreement shall be deemed to be due and payable at Provider's corporate headquarters in Tampa, Florida, and License Owner consents to the jurisdiction of the appropriate State or Federal Court sitting in the City of Tampa, Florida respecting any legal action by Provider for the collection of such amounts. This provision does not preclude either party from bringing a legal action in any other Court having jurisdiction over the parties. (k) This Agreement includes the complete agreement between the parties and supersedes all previous agreements and understandings (whether verbal or in writing) related to the subject matter of this Agreement. (l) This Agreement cannot be changed or modified except by a written amendment signed by both parties. (m) This Agreement shall be binding on and shall inure to the benefit of the parties hereto, and each of their respective successors and assigns.

**END OF TERMS AND CONDITIONS**



Schedule A-1

Standard Services and Per Diem Pricing

1. Definitions. The following terms used in this Schedule have the definitions set forth below:

   (a) "AWP" means the average wholesale price of a Product (including, in the case of IV Products, the drug and the bag) as reported by First Databank. AWP will be determined by PharMerica when not available by First Databank.

   (b) "Acquisition" means PharMerica's price.

   (c) "PharMerica Formulary" means the applicable version of PharMerica's drug formulary. (PharMerica may change the PharMerica Formulary from time to time. PharMerica will provide a copy of the PharMerica Formulary to Owner upon Owner's written request. PharMerica may use different formulary options for different clients.)

   (d) "Resident Day" means one day of residence at the Facility for a Med A and Managed Care Resident, whether or not PharMerica provides Services or Products in respect of that patient.

2. Standard Services. As the standard services ("Standard Services") PharMerica provides to the Facilities, PharMerica will:

   (a) Process orders from the Facility for Products and deliver the Products to the Facility. PharMerica will provide order processing and delivery Services on a routine basis Monday through Sunday. PharMerica will provide order processing and delivery Services on an emergency basis, as needed, at any time.

   (b) Supply emergency drug kits to the Facility and replenish the kits as necessary.

3. Pricing. For the Products and Services included in the Standard Services PharMerica provides to the Facility, Owner will pay PharMerica the following rate.

   (a) The initial per diem rate is **$25 per Resident Day.**
   (b) *Private Pay Resident Specific Medication Products: Brand = AWP – 13% + $3.77.
   (c) *Private Pay Resident Specific Medication Products: Generic = AWP – 25% + $3.77.
   (d) Miscellaneous Supplies: Acquisition + 20%.

   * Private pay billing is the sole responsibility of Provider

4. Included Items. All medications including but not limited to PO, Injectables and IV therapy medications including OTC medications; except those listed in Item 5 (Excluded Items).

5. Excluded Items.

   • HIV medications which will be priced at the State Medicaid Rate.

Reporting and Audit.

   (a) On the last day of each week, Owner will provide PharMerica with a written report of all Resident Days for the Facility for the applicable week.
   (b) On the last day of each month, Owner will provide PharMerica with a written report of all Resident Days for the Facility for the applicable month.
   (c) PharMerica may review and audit Owner's records in respect of the number of Resident Days at the Facility at any time, with reasonable notice during the term of this Agreement and for 4 years following its termination for any reason.

7. Rate Review. Every 90 days from the initial term date during the term of this Agreement, the parties will review the per diem rate. PharMerica will calculate a dollar amount for all Products it provided to the Facility in the preceding 90-day period at the rate listed below.

PharMerica will then divide that dollar amount by the number of Resident Days in the applicable 90-day period. The resulting number will be used to calculate the per diem rate for the succeeding 90-day period. The new per diem rate to be used going forward can neither increase or decrease greater than $1.00. Owner understands that the data for the preceding 90-day period may not be immediately available and PharMerica's recalculation of the per diem rate in accordance with this formula may take up to 60 days, and agrees that PharMerica may implement the recalculated rate retroactively to the first day of the applicable 90-day period.

However, at every quarterly review, if the calculated per diem rate for Facility increases 20% or greater from the previous quarter, the per diem rate will increase 20% for the subsequent quarter for Facility. If the calculated per diem rate for Facility decreases 20% or greater from the previous quarter, the per diem rate will decrease 20% for the subsequent quarter for Facility. The per diem rate at the end of the first quarter will be used as the base line rate in future calculations.

Rates will be calculated using current AWP's as reported by First Databank. Reset rate will be done using the following pricing formulas:

   • Brand: Branded State Medicaid Rate + Fee.
   • Generic: AWP – 30% + Medicaid Fee if no FUL.
   • Generic: If medication has FUL = FUL + State Medicaid Fee.

## Schedule A-2
## Medical Records Services and Pricing

1. <u>Medical Records</u>. On a monthly basis, PharMerica will provide Owner with a medical records package to include the following information for each patient for the applicable month:

    (a) physician order sheets
    (b) medication administration records
    (c) treatment sheets
    (d) psychotropic drug monitoring sheets

2. <u>Pricing</u>. For the Products and Services included in the Medical Records Services PharMerica provides to the Facility, Owner will pay PharMerica at the rate of **$1.00 per resident per month**.

    (a) Once per contract year, PharMerica may increase the pricing for Medical Records Services at a rate of 5% per year.
    (b) For additional forms requested by Owner as part of the Medical Records Services, Owner shall pay PharMerica as follows:

        (1) Telephone Order Sheets................. Per 100 sheets....................................no charge.
        (2) Other forms ................................... Per 100 forms.........................................at cost.

## Schedule A-3

## Consulting Services and Pricing- Per bed and hourly

Consulting Services. As the consulting services ("Consulting Services") PharMerica provides to the Facility, PharMerica will:

(a) Provide a consultant pharmacist (or nurse) to perform the following Services at the Facility:

(b) Once each month, consult with the Facility's staff as to each resident's drug regimen and provide a written report of concerns of inappropriate utilization patterns (if any) to the Facility's Administrator, Director of Nursing Services or the resident's physician, as appropriate.

(c) Consult with the Facility's staff as to its creation and maintenance of its Pharmacy Policy and Procedure Manual, including (without limitation) its creation and implementation of policies and procedures in respect of the distribution, control and use of prescription drugs in the Facility.

(d) Consult with the Facility's staff as to its compliance with applicable regulations in respect of the record keeping requirements for and destruction of unused controlled substances.

(e) Once each month, observe a medication pass from the Facility to a patient, and note concerns related to quality assurance (if any) to the Facility's administrator.

(f) Consult with the Facility's staff as to its formulary management process.

(g) Using its pharmacy staff, coordinate and conduct two educational programs on pharmacy issues (each one-hour long) for the Facility's staff.

(h) Once each month, attend a meeting with the Administrator and Director of Nursing at each Facility to discuss pharmacy issues.

(i) On Owner's request (but not more than once per calendar quarter), serve (in an advisory role) on the Facility's Quality Assurance and Assessment Committee.

(j) On Owner's request (but not more than once per calendar quarter) provide a consulting pharmacist or nurse to attend corporate level meetings with Owner to discuss pharmacy issues.

(k) On Owner's request, provide additional Consulting Services at the price set forth below. The additional Services will be governed by the terms of this Agreement. Owner may contact its PharMerica Account Executive to discuss additional Consulting Services.

2. Pricing. For the Products and Services included in the Consulting Services PharMerica provides to the Facility, Owner will pay PharMerica at the rate of $2.50 per bed per month.

For any additional Consulting Services PharMerica provides to the Facility, Owner will pay PharMerica at the rate of $45.00 per hour. An automatic escalation of the agreed upon charges will occur on an annual basis at the rate of 5% per year.