# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTEGRATED HEALTH SERVICES OF )
CLIFF MANOR, INC., INTEGRATED )
HEALTH SERVICES AT RIVERBEND, )
INTEGRATED HEALTH SERVICES AT )
SOMERSET VALLEY, INC., ALPINE )
MANOR, INC., BRIARCLIFF NURSING )
HOME, INC., INTEGRATED HEALTH )
GROUP, INC., SPRING CREEK OF IHS, INC., )
FIRELANDS OF IHS, INC., ELM CREEK OF )
IHS, INC., and IHS LONG TERM CARE )
SERVICES, INC., )
)
        Plaintiffs, )
)
    v. )
)
THCI COMPANY LLC, )
)
        Defendant, )
)
    v. )
)
ABE BRIARWOOD CORPORATION and )
JOHN DOES 1-10, )
)
        Additional Counterclaim )
        Defendants. )
)

Civil Action No. 04-910 (GMS)

## STIPULATION AND ORDER
## OF SETTLEMENT AND DISMISSAL

      Plaintiffs Integrated Health Services of Cliff Manor, Inc., Integrated Health Services

at Riverbend, Inc., Integrated Health Services at Somerset Valley, Inc., Alpine Manor, Inc.,

Briarcliff Nursing Home, Inc., Integrated Health Group, Inc., Spring Creek of IHS, Inc., Firelands

of IHS, Inc., and Elm Creek of IHS, Inc., (collectively, the "LTC Plaintiffs"), and IHS Long Term

Care Services, Inc. ("LTC"), additional counterclaim defendant Abe Briarwood Corporation

("Briarwood"), and defendant THCI Company LLC ("THCI") hereby stipulate and agree that this action is settled and dismissed on the following basis:

1.    In accordance with the provisions of this Stipulation and Order, on September 30, 2006 or such other date as may be agreed to in a writing signed by the parties hereto (for each facility, the "Transition Date") subject to obtaining any applicable licensing, the LTC Plaintiffs shall vacate, surrender, and transfer, and the "New Operators" (as defined below) shall simultaneously take possession of all and no fewer than all of the following nine nursing home facilities (the "Facilities") and all tangible items contained therein (to the extent permitted by law or contract), including but not limited to all outstanding accounts receivable records, accounts payable records, employee records, and patient records ("Business Records"), computers, software access codes, keys, billing systems, telephones and telephone numbers, equipment, personal property, supplies, patient deposits, furniture, fixtures and policy and procedure manuals:

(1)    Alpine Manor, Inc.
4114 Schaper Avenue
Erie, Pennsylvania;

(2)    Integrated Health Group, Inc.
890 Weatherwood Lane
Greensburg, Pennsylvania;

(3)    Elm Creek of IHS, Inc.
115 Elmwood Circle
West Carrollton, Ohio;

(4)    Integrated Health Services of Riverbend, Inc.
11941 Belsay Road
Grand Blanc, Michigan;

(5)    Firelands of IHS, Inc.
204 West Main Street
New London, Ohio;

(6)    Briarcliff Nursing Homes, Inc. ("Briarcliff")
       850 N.W. 9th Street
       Alabaster, Alabama;

(7)    Integrated Health Services of Somerset Valley, Inc.
       1621 Route 22 West
       Bound Brook, New Jersey

(8)    Spring Creek of IHS, Inc.
       5440 Charlesgate Road
       Huber Heights, Ohio; and

(9)    Integrated Health Services of Cliff Manor, Inc. ("Cliff Manor")
       4700 Cliffview Drive
       Kansas City, Missouri.

As used herein, the "New Operators" shall consist of the following entities, respectively to the nine

named facilities: 850 NW 9th Street Operating Company, LLC; 11941 Belsay Road Operating

Company, LLC; 4700 NW Cliff View Drive Operating Company, LLC; 1621 Route 22 West

Operating Company, LLC; 5440 Charlesgate Road Operating Company, LLC; 204 W. Main Street

Operating Company, LLC; 115 Elmwood Circle Operating Company, LLC; 4114 Schaper Avenue

Operating Company, LLC; and 890 Weatherwood Lane Operating Company, LLC.

If the New Operators are unable to obtain the necessary licenses and permits from

any of the appropriate licensing authorities by the Transition Date for all of the Facilities, then the

transfer of the Facilities shall occur as follows:

a)    if, by the Transition Date, the applicable New Operators have received the

      necessary licenses and permits for the Briarcliff and Cliff Manor Facilities, then,

      on the Transition Date, the LTC Plaintiffs shall vacate, surrender, and transfer

      and the appropriate New Operators shall simultaneously take possession of the

      Cliff Manor and Briarcliff Facilities and all other Facilities for which the

- 3 -

necessary licenses and permits have been procured, and the LTC Plaintiffs shall vacate, surrender, and transfer and the appropriate New Operators shall simultaneously take possession of such other Facilities upon receipt of the necessary licenses and permits for each such Facility; or

b) if, by the Transition Date, the applicable New Operators have not received the necessary licenses and permits for the Briarcliff and Cliff Manor Facilities, then the New Operators agree that they will instruct the licensing authorities to hold the transfer documents for all Facilities until the necessary permits and licenses for Cliff Manor and Briarcliff have been received, at which time the LTC Plaintiffs shall vacate, surrender, and transfer, and the appropriate New Operators shall simultaneously take possession of the Cliff Manor and Briarcliff Facilities and all other Facilities for which the necessary licenses and permits have been procured, and the LTC Plaintiffs shall vacate, surrender, and transfer and the appropriate New Operators shall simultaneously take possession of any such other Facilities upon receipt of the necessary licenses and permits for each such Facility.

2.  a)  Immediately upon the execution of this Stipulation, the LTC Plaintiffs shall provide the New Operators, upon at least 24 hours, and up to 48 hours, notice to the LTC Plaintiffs, with reasonable access to Business Records for each Facility and such cooperation as is appropriate to effectuate the transition by the Transition Date and to provide for the continuation of patient care. The execution of this Stipulation shall constitute initial notice to the LTC Plaintiffs and the LTC Plaintiffs shall provide the New Operators with access on

- 4 -

Tuesday, September 26, 2006.  Thereafter, notice shall be provided to the LTC Plaintiffs by facsimile, electronic mail, hand delivery or overnight mail addressed as follows:

> Allison Stone, Esq.
> Allison Stone, Esq. LLC
> 1680 Michigan Avenue
> Suite 736
> Miami Beach, Florida  33139
> Telephone: (305) 538-2171
> Facsimile: (305) 538-2699
> Email: attorneystone@hotmail.com

with a copy to Aurora Cassirer, Esq. as provided in paragraph 9.

b)  This Stipulation and Order, and the transactions described herein, shall not be used to or be deemed to transfer any governmental or regulatory license or permit.  The New Operators shall, at their own expense, file all applications and take all necessary steps for the transfer and/or issuance of all necessary licenses and permits to the New Operators, and the LTC Plaintiffs shall promptly cooperate and provide such information and assistance as may be reasonably requested for such purpose.

Without limiting the foregoing, the LTC Plaintiffs and the New Operators, through their regulatory counsel, shall cooperate fully and keep the other regularly informed as to the status of the regulatory application and approval process for the Facilities and any matters which could reasonably cause a delay or objections to be raised.  References in this Stipulation and Order to "regulatory approval" and to "obtaining or receiving the necessary licenses and permits" for the transfer of a Facility to a New Operator shall mean that it is

- 5 -

legally permissible for the New Operator to commence operating the applicable Facility; the same does not require the actual physical issuance of licenses and permits to the New Operator, which may occur later, but rather that it is legally permissible to close the transfer either by informal, preliminary, verbal or written approval contemplating final approval retroactive to the transfer date, as customary in the particular state jurisdiction in which the Facility is located.

3.     The LTC Plaintiffs and LTC shall not transfer any tangible or intangible items or assets from the Facilities or incur or assume any liabilities relating to the Facilities through the Transition Date except in the ordinary course of business, and the LTC Plaintiffs shall continue to operate the Facilities in accordance with past practice. On the Transition Date, the LTC Plaintiffs shall transfer or pay to the applicable New Operators in trust all patient needs accounts, resident security deposits, advance payments, made by or on behalf of residents, and any other account or monies funded by residents and/or third parties for the direct benefit of the residents, but the LTC Plaintiffs shall retain all other cash on hand at the Facilities or being held on behalf of the Facilities.

4.(a)     <u>Settlement Payment</u>. In full and final settlement of all claims between the parties to this action and subject to the terms and considerations of this Stipulation, and in consideration of the execution, delivery and performance of this Stipulation and Order of Settlement by THCI, the LTC Plaintiffs shall pay to THCI the amount of $14,000,000 (FOURTEEN MILLION DOLLARS), at the times and in the manner provided for in this Agreement (the "Settlement Payment"). The first $10,000,000 (TEN MILLION DOLLARS) ("Initial Payment") of the Settlement Payment shall be made on September 30, 2006 ("Settlement Date") and the balance of $4,000,000 (FOUR MILLION DOLLARS) ("Final Payment") of the Settlement Payment shall be made on the Transition Date after the New

- 6 -

Operators shall have taken possession of all and no fewer than all of the Facilities.  On the Settlement Date, the Final Payment shall be paid into escrow with the escrow agent under an Escrow Agreement to be entered into simultaneously with this Stipulation (the "Escrow Agreement"), to be held in escrow until the occurrence of the Transition Date after the New Operators shall have obtained regulatory approval and taken possession of all and no fewer than all of the Facilities.  Interest on the Final Payment shall accrue to the benefit of THCI. Notwithstanding the foregoing, in the event that pursuant to the terms and conditions of subparagraphs a) or b) of Section 1 of this Agreement, the New Operators receive the necessary licenses and permits for the Briarcliff and Cliff Manor Facilities and simultaneously take possession of the Cliff Manor and Briarcliff Facilities and all other Facilities for which the necessary licenses and permits have been procured at such time ("First Transfer Facilities") then a pro-rata portion of the Final Payment shall be released from escrow to THCI within two (2) business days after such transition of the First Transfer Facilities, calculated as $4,000,000 multiplied by a fraction, the numerator of which is the number of Facilities included in the First Transfer Facilities, and the denominator of which is nine (9).  If, after the transition of the First Transfer Facilities, the New Operators from time to time receive the necessary licenses and permits for, and simultaneously take possession of, additional Facilities, but less then all of the remaining Facilities, then an additional pro-rata portion of the Final Payment shall be released from escrow to THCI within two (2) business days after each such transition of additional Facilities, calculated as $4,000,000 multiplied by a fraction, the numerator of which is the number of Facilities included in the additional transition, and the denominator of which is nine (9). The aggregate amounts of the Final Payment released following the transition of the First Transfer Facilities and any additional Facilities, which are fewer than all of the Facilities, shall

NEWYORK01 1140534v7 038796-000003

not exceed Three Million Dollars ($3,000,000) and such that at least One Million Dollars ($1,000,000) of the Final Payment shall remain in escrow until the transition of all nine (9) Facilities.  There shall <u>not</u> be any pro-rated release of the Final Payment, and the entire $4,000,000 shall remain in escrow, until the transition of the Briarcliff and Cliff Manor Facilities.  The balance of Final Payment shall be released from escrow to the LTC Plaintiffs if, two (2) years from the Settlement Date, not all of the Facilities have transitioned to the New Operators.  Each installment of the Settlement Payment, when it is due, shall be made to THCI by wire transfer of immediately available funds, to the following account:

> Commerce Bank
> ABA#021200957
> THCI Savings
> acct: 510259553

(b)  <u>Accounts Receivable/Accounts Payable</u>.

(i) The LTC Plaintiffs shall retain the accounts receivable and accounts payable of each Facility generated or accrued through the Transition Date applicable to such Facility (such receivables, the "LTC Receivables" and such payables, the "LTC Retained Payables" as defined below).  The LTC Plaintiffs shall retain ownership of LTC Receivables and full responsibility for the LTC Retained Payables, notwithstanding that the New Operators may be collecting such receivables on behalf of the LTC Plaintiffs, and the New Operators shall not pledge, assign, grant or permit any lien or encumbrance on, the LTC Receivables. All LTC Receivables collected by the New Operators shall be deemed held in trust for the benefit of the LTC Plaintiffs to be paid solely to the LTC Plaintiffs as provided in this Stipulation and Order of Settlement.  The LTC Retained Payables shall include all obligations incurred at the Facilities prior to the Transition Date applicable to each Facility, pro-rated and accrued through such Transition Date, including

- 8 -

real estate taxes, provider taxes, personal property taxes, utilities, bed taxes, payroll and related payroll obligations, and employee benefits required by law pro-rated through the Transition Dates applicable to each Facility, but shall exclude any payables, rent, accruals, or obligations to THCI or its affiliates which are released by this Stipulation and Order of Settlement. Prior to the applicable Transition Date for each Facility, the LTC Plaintiffs shall deliver a closing statement setting forth the amounts of the LTC Retained Payables in such categories, pro rated and accrued through the Transition Date, and the LTC Plaintiffs (1) shall pay all real estate taxes, provider taxes, personal property taxes, utilities, and bed taxes in full as of the Transition Dates, (2) shall pay, on or prior to the applicable Transition Date, all reasonably estimated payroll and related payroll obligations through the Transition Date into escrow (the "Payroll Escrow"), (3) shall pay, on or prior to the Settlement Date, $400,000 into escrow (the "PTO Escrow") as an estimate of the amount necessary to satisfy any accrued employee benefits required by law through the Transition Date, which amount shall be finally determined for each Facility within forty-five (45) days after the applicable Transition Date, and the amount, as so determined, shall be released from the PTO Escrow to the New Operators, and (4) shall pay and/or transfer, as required by paragraph 3 of this Stipulation, all patient needs accounts, resident security deposits, advance payments, made by or on behalf of residents, and any other account or monies funded by residents and/or third parties for the direct benefit of the residents. The Payroll Escrow and the PTO Escrow shall be in a form substantially similar to the Escrow Agreement required in paragraph 4(a) of this Stipulation and shall be executed immediately following the execution of this Stipulation. The LTC Plaintiffs shall be responsible for payment of the LTC Retained Payables from their own resources, including the LTC Receivables, except that the LTC Plaintiffs may direct state authorities to offset certain receivables and direct applicable amounts

- 9 -

to the payment of provider taxes, and proof of such direction to the state authority, to the extent the receivable due from the state authority exceeds the outstanding provider taxes, shall be sufficient to evidence such payment.

(ii) During the period prior to Thirty (30) days after the Transition Date applicable to each Facility, no change will be made by the New Operators in the electronic funds or other method of payment to account designations or addressee designations of the Facilities utilized by Medicare, Medicaid and other payors of receivables for the Facilities. This will enable the LTC Plaintiffs to collect directly a significant component of the LTC Receivables existing on the Transition Date and to implement billing for receivables generated during the periods ending on the Transition Date. By the Settlement Date, the LTC Plaintiffs will execute and provide to counsel for the LTC Plaintiffs any necessary authorizations to enable the New Operators to change such electronic funds and other method of payment to account designations or addressee designations for the Facilities, and the New Operators may change such designations effective thirty (30) days after the Transition Date applicable to each Facility. Counsel for the LTC Plaintiffs shall provide the New Operators with such authorizations within twenty-five (25) days after the applicable Transition Date. After such account change is implemented, LTC Receivables will be paid, in the first instance, to such New Operators' accounts, and shall be deemed collected by the New Operators on behalf of the LTC Plaintiffs. Payment accounts and addresses for payors that pay in advance, such as social security, can be changed on the applicable Transition Date for a Facility.

(iii) Following the Transition Date, the New Operators shall use commercially reasonable efforts to collect the LTC Receivables on behalf of the LTC Plaintiffs, but neither THCI nor the New Operators shall have any obligation to commence legal proceedings, or to

- 10 -

incur expenses out of the ordinary course of business. The LTC Plaintiffs, and the New Operators, shall cooperate as to the collection of the LTC Receivables, and shall designate contact persons (Aurora Cassirer, Esq. on behalf of the LTC Plaintiffs and Michael Alpert c/o HealthBridge Management, LLC) and communicate regularly as to progress and status of collections. The LTC Plaintiffs may direct (with the participation of the New Operators) all communications, negotiations, and resolution of disputes as to the LTC Receivables, and the LTC Plaintiffs may, at their own expense, take over collection of any particular LTC Receivable and commence legal proceedings against the payor. The New Operators shall not waive, settle, or compromise any LTC Receivables in a manner which would result in an aggregate reduction of more than $25,000 in any calendar month without the consent of the LTC Plaintiffs.

(iv) The New Operators shall deliver to the LTC Plaintiffs all remittance advices received with respect to the LTC Receivables on a weekly basis on the following Wednesday of each week. The amount of all LTC Receivables collected by the New Operators shall be paid to the LTC Plaintiffs or their designee, by wire transfer or ACH to an account designated by the LTC Plaintiffs on a weekly basis on the following Wednesday of each week. There shall be no offsets against payment of the LTC Receivables collected by the New Operators except if and to the extent that the LTC Plaintiffs have failed to satisfy or defaulted under their financial obligations under paragraphs 4(a), 4(b)(i)(1), (2), (3), & (4), and 9(a) of this Stipulation. The New Operators shall provide such other reports and information, as to the collection of LTC Receivables by the New Operators, in sufficient detail in a format to be reasonably approved by the LTC Plaintiffs. The LTC Plaintiffs shall have the right, by appointment and during reasonable business hours, at their own expense, to review and audit the collection by the New Operators of the LTC Receivables and all Business Records relating thereto. The LTC Plaintiffs

may retain copies of, all Business Records relating to the LTC Receivables and LTC Retained Payables of the Facilities to facilitate the collection and payment thereof and the New Operators shall provide the LTC Plaintiffs with copies of all relevant Business Records which may be generated after the Transition Date.

(v)  At the request of the LTC Plaintiffs, an audit of the collection of LTC Receivables by the New Operators shall be conducted after the completion of each the first four calendar quarters after the final Transition Date (each, a "Quarterly Audit Date") for all Facilities, by an independent accounting firm mutually approved by the LTC Plaintiffs and the New Operators (each, "Quarterly Audit"). The cost of each Quarterly Audit shall be borne by the LTC Plaintiffs, and each Quarterly Audit shall be distributed simultaneously to the LTC Plaintiffs and the New Operators.  The amount of LTC Receivables so collected by the New Operators as determined by each Quarterly Audit, after comments to such Quarterly Audit (if any) are submitted by the LTC Plaintiffs and the New Operators within five (5) business days of receipt of each Quarterly Audit and considered by the accounting firm, shall be utilized as the definitive amount of LTC Receivables collected, through the applicable Quarterly Audit Date, to be paid to the LTC Plaintiffs.  If the Quarterly Audit has determined that there were additional collections of LTC Receivables by the New Operators through the applicable Quarterly Audit Date, such excess collections shall be paid by New Operators to the LTC Plaintiffs within ten (10) business days of delivery of the Quarterly Audit.  Following each Quarterly Audit Date, the New Operators will continue to collect LTC Receivables (if any) on behalf of the LTC Plaintiffs and deliver payment thereof to the LTC Plaintiffs pursuant to the procedures set forth in this paragraph 4.  Notwithstanding the foregoing, the New Operators shall have no obligation to

NEWYORK01 1140534v7 038796-000003

make any effort to collect LTC Receivables after the expiration of two (2) years from the applicable Transition Date for a Facility.

(c)     The New Operators shall retain ownership of all accounts receivable generated by services rendered at each Facility after the applicable Transition Date ("New Operator Receivables") and the New Operators shall retain responsibility for payment of all accounts payable incurred or accrued at each Facility after the applicable Transition Date ("New Operator Payables").   In the event that any of the LTC Plaintiffs receive payments of New Operator Receivables, the LTC Plaintiffs shall remit such payments to the applicable New Operators without offset, and in connection with such obligation, all of the provisions of paragraph 4(b) of this Stipulation and Settlement, to the extent relevant to the LTC Plaintiffs' obligation, shall apply reciprocally to the collection and payment of the New Operator Receivables.

5.     The provisions of paragraph 2 and 4, above, are for the sole purpose of facilitating the orderly transition of the Facilities' operations, and neither THCI nor the New Operators shall assume, and nothing in this Stipulation and Order shall be construed as an assumption of, any liabilities whatsoever, accrued or contingent, relating to the Facilities up to and including the Transition Date, and the LTC Plaintiffs shall not be responsible for any liabilities incurred by THCI or the New Operators at the Facilities after the Transition Date.   Neither THCI nor the New Operators assume or agree to be bound by any contract, instrument, or agreement relating to the Facilities, except as the New Operators may, at their sole option and in their sole discretion, elect by writing signed duly by the New Operators and identifying the contract, instrument, or agreement which the New Operators elect to assume.

- 13 -

6.    The New Operators may, to the extent permitted by applicable law, use the same provider number(s) and provider agreement(s) at the Facilities as used by the LTC Plaintiffs, and prior to each Transition Date, the LTC Plaintiffs shall cooperate with and promptly execute any documents necessary to the assignment of such provider number(s) and provider agreement(s). Subsequent to the Transition Date, the LTC Plaintiffs shall be responsible for filing terminating Medicaid and Medicare cost reports (the "Terminating Cost Reports") for the Facilities within the time required and in accordance with all applicable laws and regulations relating to the preparation of such Terminating Cost Reports.  The LTC Plaintiffs shall provide all Terminating Cost Reports to the applicable New Operator for review and reasonable approval prior to submitting such Terminating Cost Reports.  The LTC Plaintiffs and the New Operators shall cooperate in obtaining and sharing information that may be required for the preparation of Terminating Cost Reports.

7.    The New Operators shall have the right, but not the obligation, to offer to hire or employ any and all employees employed at the Facilities upon such terms and conditions as the New Operators may deem appropriate in their sole discretion.  The LTC Plaintiffs shall not enforce any non-competes or restrictive covenants that may apply to any employees or independent contractors employed at the Facilities in the event the New Operators seek to hire such employees or independent contractors effective on or subsequent to the Transition Date, and the LTC Plaintiffs further agree not to solicit the employment of or hire any such employees or independent contractors at the Facilities pending the Transition and for a period of eighteen (18) months after the Transition Date unless such employment has been terminated for a period of not less than sixty (60) days or unless such employees or independent contractors are not offered employment by the New Operators.

NEWYORK01 1140534v7 038796-000003

8.     THCI shall cooperate with the LTC Plaintiffs, and make available to the LTC Plaintiffs all relevant information and documentation in the possession of THCI or its affiliates, in connection with the property component of a Medicaid audit of the Facility located at 11941 Belsay Road, Grand Blanc, Michigan on or before the Settlement Date. Any out-of-pocket expenses incurred by THCI in connection with such cooperation (other than nominal expenses) will be reimbursed by LTC Plaintiffs.

9.(a)(i) On September 30, 2006, the LTC Plaintiffs shall place into escrow with the escrow agent under the Escrow Agreement the sum of $700,000 (the "Recoupment Escrow") to be held in escrow for a maximum period of two (2) years from the Settlement Date ("Recoupment Escrow Period") for the sole purpose of satisfying any retroactive recoupment, assessment or adjustment claims made by Medicare or Medicaid authorities or insurance or managed care providers after the Transition Date with respect to operation of a Facility by the LTC Plaintiffs up to the Transition Date applicable to such Facility ("Recoupment Claim"), in accordance with the terms and conditions of this Section 9. The Recoupment Escrow shall be in a form substantially similar to the Escrow Agreement required in paragraph 4(a) of this Stipulation and shall be executed immediately following the execution of this Stipulation. In the event a Recoupment Claim is received by any of the New Operators from any Medicaid or Medicare authority or insurance or managed care provider, the New Operators shall promptly notify the LTC Plaintiff, who shall direct (in consultation with and with the cooperation of the New Operators) all communications, negotiations, appeals, and resolution of disputes as to the Recoupment Claims, and the LTC Plaintiffs may, at their own expense, initiate appeals, litigations and arbitrations of any Recoupment Claim disputes. The New Operators shall not consent to, waive, settle, or compromise any Recoupment Claim without the consent of the LTC

- 15 -

Plaintiffs and the LTC Plaintiffs shall not take any action in respect of a Recoupment Claim which shall affect any payment to the New Operators for services rendered after the Transition Date. If there is a Recoupment Claim which is an actual assessment under which payment is demanded from the New Operators by the Medicare or Medicaid authority or insurance or managed care provider (or for which such authority or provider offsets or deduct such claim from receivables otherwise payable to the New Operators) then the New Operators and the LTC Plaintiffs shall each be entitled to require a release from the Recoupment Escrow of the amount of such required payment, under the procedures provided in the Escrow Agreement, solely for the purpose of making such payment to the Medicare or Medicaid authority or insurance or managed care provider, or, if such claim has been offset or deducted from receivables otherwise payable to the New Operators, to reimburse the New Operators. Upon expiration of the Recoupment Escrow Period, all remaining funds in the Recoupment Escrow, other than as reserved for pending claims and other than any amounts contributed by the New Operators, shall be released to the LTC Plaintiffs. The Recoupment Escrow shall be an interest bearing escrow in bank or investment accounts identified to and approved by the LTC Plaintiffs and the LTC Plaintiffs shall direct the investment of such escrow funds. All interest or investment income earned on the Recoupment Escrow shall be retained in escrow and available to satisfy the obligations covered thereby pending the release of the Recoupment Escrow to the LTC Plaintiffs. If, within two (2) years of the Settlement Date, the LTC Plaintiffs receive reimbursement as a result of their dispute or appeal of any Recoupment Claim from a Medicare or Medicaid authority or an insurance or managed care provider, the LTC Plaintiffs shall use the proceeds from such reimbursement to fund the Recoupment Escrow to the extent the Recoupment Escrow is below the sum of $700,000. If, after the expiration of two (2) years from the Settlement Date,

- 16 -

any claim or claims are pending, all reimbursement that may be received by the LTC Plaintiffs from a Medicare or Medicaid authority or an insurance or managed care provider as a result of their dispute or appeal of any prior Recoupment Claim shall first be used to fund the Recoupment Escrow to the extent of any claims then pending.

9.(a)(ii)    In the event that, after the release to the New Operators of the final amount of PTO Escrow as provided in paragraph 4(b)(ii), a balance remains in the PTO Escrow, then such amount shall be transferred to the Recoupment Escrow.

(b)    In the event that there is a Recoupment Claim such that the New Operators are compelled to make payment to Medicaid or Medicare authorities or insurance or managed care providers, or such authority or provider has offset or deducted such claim from receivables otherwise payable to the New Operators, and there are insufficient funds to make such payment from the Recoupment Escrow and/or the Recoupment Escrow period has expired, and such Recoupment Claim is not otherwise paid, satisfied or reimbursed to the New Operators separately by the LTC Plaintiffs, there shall exist a "Recoupment Deficiency". In that event, LTC will be responsible for 50% of the difference between the Recoupment Escrow ($700,000) as supplemented by any transfer from the PTO Escrow, and the sum of $1 million. LTC, pursuant to its Guaranty, shall be responsible for 100% of Recoupment Deficiencies above that sum. By way of illustrations, in the event the Recoupment Escrow had a balance of $700,000 and the New Operators assert a recoupment claim in the amount of $1,000,000, the Recoupment Deficiency would be $300,000, of which the New Operators would be entitled to recover $150,000 from LTC; and, in the event the Recoupment Escrow has a balance of $800,000 (including $100,000 from the PTO Escrow), the Recoupment Deficiency would be $200,000 of which the New Operators would be entitled to recover $100,000 from LTC.

- 17 -

LTC does hereby guaranty to THCI for a period of ten (10) years from the Settlement Date, payment in full of any Recoupment Deficiency as set forth above. Any claim by THCI under such guaranty must be submitted in writing, specifying the circumstances thereof in reasonable detail, prior to the expiration of ten (10) years from the Settlement Date ("Guaranty Claim"). The New Operators will cooperate with LTC with providing documentation relating to the Recoupment Claims or reimbursement efforts. Simultaneous with the execution and delivery of this Agreement, LTC shall execute a Consent Judgment in favor of THCI solely with respect to its failure to pay a Guaranty Claim under such guaranty. Such Consent Judgment shall be retained by counsel for THCI and shall not be released, filed or enforced in any manner unless and until at least fifteen (15) days (within the first two (2) years after the Settlement Date) or thirty (30) days (thereafter) have elapsed following the delivery of a notice of Guaranty Claim as set forth above and LTC has failed to pay such Guaranty Claim or the underlying Recoupment Deficiency. Written notice of a Guaranty Claim and identifying the basis therefore shall be provided to LTC c/o Troutman Sanders, LLC, 405 Lexington Avenue, New York, New York 10171, Attn: Aurora Cassirer, Esq. (aurora.cassirer@troutmansanders.com) by facsimile (212-704-6288), electronic mail, overnight mail (providing proof of delivery), or hand delivery. Upon the expiration of ten (10) years from the Settlement Date, the Consent Judgment automatically shall be released to LTC and shall be void and of no further force or effect.

10.     THCI shall cause the New Operators to carry out the obligations they have undertaken in favor of the LTC Plaintiffs in this Stipulation and Order and THCI shall not act inconsistently with such obligations of the New Operators. Notwithstanding the foregoing obligations of THCI to the LTC Plaintiffs, nothing in this Stipulation and Order shall be construed as creating any obligation of THCI to any third party for the obligations of the New

- 18 -

Operators or for the operation of the Facilities, it being understood that the New Operators, and not THCI, shall become the licensed operators of the Facilities.

11.     The LTC Plaintiffs, LTC, and Briarwood, jointly and severally, on the one hand, and THCI, on the other, hereby release each other from any and all claims of any nature whatsoever, excepting only claims arising out of or under this Stipulation, including the LTC Plaintiffs' ongoing obligation to operate the Facilities in the ordinary course of business and consistent with past practice until the Transition Date. Without limiting the foregoing release, the LTC Plaintiffs and LTC are expressly released from all rent relating to the Facilities, and none shall be accrued, due or owing for the period from the date hereof to the Transition Date.

12.     Except as to any security interest that the LTC Plaintiffs, LTC, and Briarwood shall terminate prior to the Settlement Date, the LTC Plaintiffs, LTC, and/or Briarwood warrant and represent that they have not provided a security interest to any vendor or other third party, including Pharmerica, relating to the Facilities except with respect to receivables that are due and owing to the LTC Plaintiffs for services provided prior to the Transition Date.

13.     Notwithstanding anything in this Stipulation to the contrary, the New Operators may, at their sole discretion, provide notice to the LTC Plaintiffs that such New Operators seek to take possession of any Facility or Facilities prior to receiving the necessary licenses and permits for such Facility or Facilities, and the LTC Plaintiffs agree to permit and cooperate with such transfer and convey management responsibilities (and execute a customary management agreement) for any such Facilities to the applicable New Operator or the New Operator's designee upon reasonable notice and effective at month's end provided that the appropriate New Operators take possession of the Cliff Manor and Briarcliff Facilities. The date

- 19 -

on which a Facility is transferred and management responsibilities are conveyed shall be deemed the Transition Date as defined in this Stipulation.

14.    The captioned action, together with all claims and counterclaims asserted therein, shall be dismissed, with prejudice and without costs to any party, upon the payment of the Initial Payment, payment of the Final Payment into escrow in accordance with the Escrow Agreement, and funding of the Recoupment Escrow and the PTO Escrow. The Court shall retain jurisdiction to enforce this Stipulation and Order, including for the purpose of entering the Consent Judgment provided for pursuant to paragraph 9 of this Stipulation.

15.    In the event that a material portion of the Settlement Payment is set aside as a preference pursuant to the United States Bankruptcy Code or is otherwise disgorged from THCI in legal proceedings that involve the LTC Plaintiffs or Briarwood, then the release provided herein shall be deemed null and void.

16.    The parties hereto acknowledge and agree that each party and its counsel have participated in the drafting, negotiation and review of this Stipulation and Order on an equal basis and accordingly, none of the provisions hereof shall be construed as against the draftsman thereof, notwithstanding that one or more parties' counsel has for convenience, prepared or processed the physical documents.

17.    Notice required from the LTC Plaintiffs, LTC, or Briarwood under this Stipulation shall be provided in writing by hand delivery, overnight mail (with proof of delivery) or facsimile addressed as follows: THCI, 173 Bridge Plaza North, Fort Lee, New Jersey 07024, Attention: Warren Cole with copy to David Sager, Pitney Hardin LLP, 200 Campus Drive, Florham Park, New Jersey  07932.; and the New Operators, Executive Vice President, Healthbridge Management LLC, 173 Bridge Plaza North, Fort Lee, New Jersey 07024, with

- 20 -

copy to General Counsel, Healthbridge Management LLC, 173 Bridge Plaza North, Fort Lee, New Jersey 07024.

18.     Notice required to be given to the LTC Plaintiffs, LTC, or Briarwood shall be given to Aurora Cassirer, Esq, Troutman Sanders, LLP, 405 Lexington Avenue, New York, New York  10175.

19.     The parties acknowledge that this Stipulation is not an admission of liability and shall not be treated as an admission of liability by any party.

20.     This Stipulation is not effective until signed by counsel for the parties and delivered to the attorneys for the other side.

NEWYORK01 1140534v7 038796-000003

Dated: September 25, 2006

**DUANE MORRIS LLP**

_(signature)_

Michael Lastowski (No. 3892)
Christopher M. Winter (No. 4163)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Tel.: (302) 657-4900
Fax: (302) 657-4901

-and-

~~**RICHARDS LAYTON & FINGER**~~

Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701

-and-

**TROUTMAN SANDERS LLP**

_(signature)_

Aurora Cassirer
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 704-6000
Fax: (212) 704-6288

Attorneys for Plaintiffs and
Additional Counterclaim Defendant

**CONNOLLY BOVE LODGE & HUTZ LLP**

_(signature)_

Collins J. Seitz, Jr. (No. 2237)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Tel.: (302) 888-6278
Fax: (302) 255-4278

_(signature) Kevin F. Brady_
_No. 2248_

-and-

**PITNEY HARDIN LLP**

_(signature)_

David S. Sager
P.O. Box 1945
Morristown, New Jersey 07962
Tel: (973) 966-8121
Fax: (973) 966-1550

Attorneys for Defendant

SO ORDERED this ____ day of _____, 2006.

_____
Hon. Gregory M. Sleet, U.S.D.J.

- 22 -

Dated:  September 25, 2006

**DUANE MORRIS LLP**

_____
Michael Lastowski (No. 3892)
Christopher M. Winter (No. 4163)
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801-1246
Tel.: (302) 657-4900
Fax: (302) 657-4901


-and-

**RICHARDS, LAYTON & FINGER**

_____
Daniel J. DeFranceschi (No. 2732)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Tel: (302) 651-7700
Fax: (302) 651-7701


-and-

**TROUTMAN SANDERS LLP**

_____
Aurora Cassirer
The Chrysler Building
405 Lexington Avenue
New York, NY  10174
Tel: (212) 704-6000
Fax: (212) 704-6288


Attorneys for Plaintiffs and
Additional Counterclaim Defendant

**CONNOLLY BOVE LODGE & HUTZ LLP**

_____
Collins J. Seitz, Jr. (No. 2237)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, Delaware 19899
Tel.: (302) 888-6278
Fax: (302) 255-4278


-and-

**PITNEY HARDIN LLP**

_____
David S. Sager
P.O. Box 1945
Morristown, New Jersey  07962
Tel: (973) 966-8121
Fax: (973) 966-1550


Attorneys for Defendant


SO ORDERED this ____ day of _____, 2006.


_____
Hon. Gregory M. Sleet, U.S.D.J.

- 22 -